# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY P. WEINER SUPPLEMENTAL TRUST, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| RIO TINTO PLC, SAM WALSH, TOM ALBANESE, CHRISTOPHER JAMES LYNCH, and GUY ELLIOTT, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff the Jeffrey P. Weiner Supplemental Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rio Tinto plc ("Rio Tinto" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Rio Tinto securities between March 16, 2012 and November 14, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Rio Tinto, a mining and metals company, finds, mines, and processes mineral resources.  The Company mines and produces aluminum products, including bauxite, alumina, and aluminum; copper, gold, silver, and molybdenum, as well as nickel; diamonds, titanium dioxide feedstocks, borates, and salt, as well as high purity iron, metal powders, zircon, and rutile; uranium; iron ore; and thermal coal, and coking or metallurgical coal.  Rio Tinto has operations in Australia, North America, Asia, Europe, Africa, and South America.

3.      At all relevant times, Rio Tinto has held a significant stake in the Simandou iron mine, located in southern Guinea.

4.      Rio Tinto plc operates as a subsidiary of Rio Tinto Group.  The Company was founded in 1873 and is headquartered in London, the United Kingdom.  Rio Tinto's American Depositary Receipts ("ADRs") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "RIO."

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Rio Tinto violated anti-corruption laws in connection with its operations with respect to the Simandou project; (ii) the foregoing violations would expose the Company to significant scrutiny and large

2

fines; and (iii) as a result of the foregoing, Rio Tinto's public statements were materially false and misleading at all relevant times.

6.     On November 9, 2016, Rio Tinto issued a media release entitled "Rio Tinto contacts regulatory authorities."  The release stated, in relevant part:

> On 29 August 2016, Rio Tinto became aware of email correspondence from 2011 relating to contractual payments totalling US$10.5 million made to a consultant providing advisory services on the Simandou project in Guinea.
>
> The company launched an investigation into the matter led by external counsel. Based on the investigation to date, Rio Tinto has today notified the relevant authorities in the United Kingdom and United States and is in the process of contacting the Australian authorities.
>
> Energy & Minerals chief executive Alan Davies, who had accountability for the Simandou project in 2011, has been suspended with immediate effect.
>
> Legal & Regulatory Affairs group executive Debra Valentine, having previously notified the company of her intention to retire on 1 May 2017, has stepped down from her role

7.     On November 14, 2016, post-market, *Bloomberg News* published an article entitled "Rio CEO Says Staff 'Shocked' by Probe That May Take Years."  The article reported, in relevant part:

> Rio Tinto Group Chief Executive Officer Jean Sebastien Jacques said an investigation into the lawfulness of a payment made to an external consultant relating to a giant iron ore project in Guinea has "shell-shocked" the company and ***may take several years to resolve***.
>
> . . .
>
> "Many people across Rio Tinto are still shell-shocked," Jacques said in an internal memo seen by Bloomberg News. "The day I was made aware of a potential issue we launched an investigation. It wasn't a decision we took lightly. We will fully cooperate with the authorities. ***Their investigations may take several years***."
>
> . . .
>
> A team of external lawyers undertook a "significant data collection and review exercise," which led to the decision to alert authorities, Jacques said in the memo.

Rio is restricted on what information it can release because the investigation is ongoing, said Jacques, who became CEO in July.

(Emphases added.)

8.     On this news, as the market processed the significance and scope of the investigation that the Company faced, Rio Tinto's ADR price fell $1.52, or 3.83%, to close at $38.13 on November 15, 2016, the following trading day.

9.     On November 15, 2016, post-market, Rio Tinto announced the termination of Mr. Davies and Ms. Valentine.

10.    On this news, Rio Tinto's ADR price fell $0.77, or 2.02%, to close at $37.36 on November 16, 2016.

11.    On November 18, 2016, pre-market, *Bloomberg News* reported that Guinea's Mines and Geology Minister, Abdoulaye Magassouba, wrote to Rio Tinto's Chief Executive Officer ("CEO"), Jean-Sébastian Jacques, asking him to provide details of the internal inquiry, stating, in part: "As the country caught in the middle of this boardroom drama at Rio Tinto, we need answers . . . The government of Guinea is demanding a full account from Rio Tinto of any wrongdoing identified in the company's dealings."

12.    On November 18, 2016, pre-market, *Bloomberg News* also published an article entitled "Rio Tinto Offered Bribe for Mine, Ex-Guinea Minister Says."  The article reported, in part:

A Rio Tinto Group executive asked how big a bribe it would take to beat out a competitor for a hotly contested iron ore deposit in Guinea, the country's former mining minister said, adding a new accusation of graft just days after the world's second-biggest miner fired two of its top executives over a payment made in connection with the West African project.

Mahmoud Thiam, the former mining minister, said that the head of Rio Tinto's Guinea operation, Steven Din, offered him a bribe in early 2010 in order to win back control of half of the undeveloped Simandou project, considered the world's biggest untapped iron ore deposit. Din was attempting to regain control of the

blocks from billionaire investor Beny Steinmetz's BSG Resources Ltd., Thiam said in a Nov. 9 phone interview.

Thiam claims Din said he had the backing of senior Rio Tinto executives to make the offer. Din denies ever paying or offering a bribe. Rio Tinto declined to comment.

13.     On these disclosures, Rio Tinto's ADR price fell $1.01, or 2.69%, to close at $36.55 on November 18, 2016.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

17.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Defendant Rio Tinto's ADRs trade on the NYSE, located within this Judicial District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff, as set forth in the attached Certification, acquired Rio Tinto ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant Rio Tinto is incorporated in England and Wales, and the Company's principal executive offices are located at 6 St. James's Square, London, SW1Y 4AD, United Kingdom.  Rio Tinto's ADRs trade on the NYSE under the ticker symbol "RIO."

21.     Defendant Sam Walsh ("Walsh") served as CEO of Rio Tinto from January 2013 until July 2016.

22.     Defendant Tom Albanese ("Albanese") served as CEO of Rio Tinto from May 2007 until January 2013.

23.     Defendant Christopher James Lynch ("Lynch") has served as Chief Financial Officer ("CFO") of Rio Tinto since April 2013.

24.     Defendant Guy Robert Elliott ("Elliott") served as CFO of Rio Tinto from 2002 until April 2013.

25.     The Defendants referenced above in ¶¶ 22-24 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Rio Tinto, a mining and metals company, finds, mines, and processes mineral resources.  The Company mines and produces aluminum products, including bauxite, alumina, and aluminum; copper, gold, silver, and molybdenum, as well as nickel; diamonds, titanium dioxide feedstocks, borates, and salt, as well as high purity iron, metal powders, zircon, and rutile; uranium;

iron ore; and thermal coal, and coking or metallurgical coal.  Rio Tinto has operations in Australia, North America, Asia, Europe, Africa, and South America.

27.      At all relevant times, Rio Tinto has held a significant stake in the Simandou iron mine, located in southern Guinea.

### Materially False and Misleading Statements Issued During the Class Period

28.      The Class Period begins on March 16, 2012, when Rio Tinto filed its Annual Report on Form 20-F with the SEC, announcing its financial and operating results for the year ended December 31, 2011 (the "2011 20-F").  For 2011, Rio Tinto announced net income of $5.83 billion, or $3.01 per diluted share, on revenue of $60.54 billion, compared to net income of $14.24 billion, or $7.22 per diluted share, on revenue of $55.17 billion for 2010.

29.      In the 2011 20-F, with respect to the Simandou project, Rio Tinto stated, in part:

In April the proposed development of the Simandou iron ore mining project was endorsed with a new Settlement Agreement with the Government of Guinea, confirming Rio Tinto's tenure. Rio Tinto paid US$700 million to resolve all outstanding issues with the Government, which will be able to take up to 35 per cent equity in the project.

Rio Tinto is working with the Government of Guinea to have relevant provisions of the Settlement Agreement ratified as law, as contemplated and required by the Settlement Agreement.

30.      With respect to its assessment of risks relating to bribery and corruption, Rio Tinto merely stated:

**Political, legal and commercial changes in the places where the Group operates.**

[Rio Tinto] has operations in jurisdictions where governments and communities are seeking a greater share in mineral wealth. ***In some jurisdictions commercial instability can arise from a culture of bribery and corruption.*** Some operations are conducted under specific agreements with respective governments and associated acts of parliament. In several countries land title and rights to land and resources (including Indigenous title) may be unclear. Political and administrative change, policy reform, and changes in law or government regulation can result in expropriation, or nationalisation.

(Emphasis added.)

31.     The 2011 20-F contained signed certifications by Defendants Albanese and Elliott, stating, in part, that they had reviewed the 2011 20-F and that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

32.     On March 15, 2013, Rio Tinto filed its Annual Report on Form 20-F with the SEC, announcing its financial and operating results for the year ended December 31, 2012 (the "2012 20-F").  For 2012, Rio Tinto announced a net loss of $3.03 billion, or $1.64 per diluted share, on revenue of $50.94 billion, compared to net income of $5.83 billion, or $3.01 per diluted share, on revenue of $60.54 billion for 2011.

33.     In the 2012 20-F, with respect to the Simandou project, Rio Tinto stated, in relevant part:

> During 2012, the Simandou iron ore project in Guinea also moved within [Rio Tinto's] Diamonds & Minerals [business unit], as it remains the responsibility of the group's new chief executive, Alan Davies, appointed in September. Simandou is a key pillar in Rio Tinto's long-term growth strategy, involving one of the largest known undeveloped iron ore resources in the world. The concession will enable the development of the largest mine and infrastructure project ever undertaken in Africa. This will include the progressive development of a 95 million tonne per annum mine, a 650-kilometre trans-Guinean railway and a new deep-water port.

34.     With respect to its assessment of risks relating to bribery and corruption, Rio Tinto merely stated:

> **Political, legal and commercial changes in the places where the Group operates.**
>
> [Rio Tinto] has operations in jurisdictions where governments and communities are seeking a greater share of mineral wealth. ***In some jurisdictions commercial instability can arise from a culture of bribery and corruption***. Some operations are conducted under specific agreements with respective governments and associated acts of relevant legislative bodies. In several countries, land title and

rights to land and resources (including Indigenous title) may be unclear. Political and administrative change, policy reform, and changes in law or government regulation can result in expropriation, or nationalisation of the Group's rights or assets.

(Emphasis added.)

35.     The 2012 20-F contained signed certifications by Defendants Walsh and Elliott, stating, in part, that they had reviewed the 2012 20-F and that the 2012 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

36.     On March 14, 2014, Rio Tinto filed its Annual Report on Form 20-F with the SEC, announcing its financial and operating results for the year ended December 31, 2013 (the "2013 20-F").  For 2013, Rio Tinto announced net income of $3.67 billion, or $1.97 per diluted share, on revenue of $51.17 billion, compared to a net loss of $3.03 billion, or $1.64 per diluted share, on revenue of $50.94 billion for 2012.

37.     In the 2013 20-F, with respect to the Simandou project, Rio Tinto stated, in relevant part:

The Simandou iron ore project in Guinea is one of the largest-known undeveloped high-grade iron ore resources in the world. The concession will enable the development of the largest mine and infrastructure project ever undertaken in Africa. This will include the progressive development of a 100 million tonne per annum mine, a 650-kilometre trans-Guinean railway and a new deep-water port.

38.     With respect to its assessment of risks relating to bribery and corruption, Rio Tinto merely stated:

**Political, legal and commercial changes in the places where the Group operates**

The Group has operations in jurisdictions where governments and communities are seeking a greater share of mineral wealth. Some operations are conducted under specific agreements with respective governments and associated acts of relevant legislative bodies. In several countries, land title and rights to land and resources

(including Indigenous title) may be unclear. Political and administrative change, policy reform, and changes in law or government regulation can result in expropriation or nationalisation of the Group's rights or assets. ***In some jurisdictions, commercial instability can arise from a culture of bribery and corruption.***

(Emphasis added.)

39. The 2013 20-F contained signed certifications by Defendants Walsh and Lynch, stating, in part, that they had reviewed the 2013 20-F and that the 2013 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

40. On March 6, 2015, Rio Tinto filed its Annual Report on Form 20-F with the SEC, announcing its financial and operating results for the year ended December 31, 2014 (the "2014 20-F"). For 2014, Rio Tinto announced net income of $6.53 billion, or $3.51 per diluted share, on revenue of $47.66 billion, compared to net income of $3.67 billion, or $1.97 per diluted share, on revenue of $51.17 billion for 2013.

41. With respect to the Simandou project, Rio Tinto stated, in relevant part:

The Simandou iron ore project in Guinea is one of the largest-known undeveloped high-grade iron ore resources in the world. The concession will enable the development of the largest mine and infrastructure project ever undertaken in Africa. This will include the progressive development of a 100 million tonne per annum mine, a 650-kilometre trans-Guinean railway and a new deep-water port.

In May 2014, Rio Tinto and its partners, Chinalco and the International Finance Corporation, signed the Investment Framework with the Government of Guinea for the development of the Simandou iron ore project. This provides the legal and commercial foundation for the project and formally separates the infrastructure from the mine development. The Investment Framework was approved for ratification by the Guinean National Assembly in June 2014, followed by Presidential promulgation and Supreme Court review and took effect in August 2014.

42. With respect to bribery and corruption, Rio Tinto stated:

The Group operates across a large number of jurisdictions, resulting in exposure to a broad spectrum of economies, political and legal frameworks and societal norms. Each jurisdiction poses unique complexities and challenges that in turn impose risks on the value chain, from new business development through to closure and rehabilitation, and on asset carrying values. . . . Jurisdiction-specific behaviour or circumstance may also present uncertainties to our operating environment: unclear land title and rights to land and resources (including Indigenous title); political and administrative change, policy reform, and changes in law or government regulation; ***an inherent culture of bribery and corruption***; violent criminal or sectarian tensions. Any such jurisdictional instability or legislative uncertainty that impacts the Group's operations may result in increased costs, curtail or negatively impact existing operations and/or prevent the Group from making future investments.

. . .

**Integrity and Compliance**

The way we work sets out our overall commitment to integrity and compliance. It puts our values – respect, integrity, teamwork and accountability – into practice, and holds us to the highest ethical standards to behave in ways that earn the trust of others. ***We operate within all applicable laws and regulations and are dedicated to open and transparent dealings with our stakeholders.***

Our compliance standards are core to our Integrity and Compliance programme. In 2014, we introduced a new Business Integrity standard, which applies to all Rio Tinto businesses and functions. Developed in consultation with compliance managers from across the businesses, it consolidates and streamlines four previous business integrity-related standards: ***anti-bribery due diligence***; fraud; business integrity (anti-corruption); and business integrity (conflicts of interest). This ensures that employees and contractors have a single point of reference for integrity and compliance matters. The standard applies a risk-based approach, with simplified language and improved readability.

(Emphases added.)

43.     The 2014 20-F contained signed certifications by Defendants Walsh and Lynch, stating, in part, that they had reviewed the 2014 20-F and that the 2014 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

44.     On March 3, 2016, Rio Tinto filed its Annual Report on Form 20-F with the SEC,

announcing its financial and operating results for the year ended December 31, 2015 (the "2015

20-F").  For 2015, Rio Tinto announced a net loss of $866 million, or $0.48 per diluted share, on

revenue of $34.83 billion, compared to net income of $6.53 billion, or $3.51 per diluted share, on

revenue of $47.66 billion for 2014.

45.     In the 2015 20-F, with respect to the Simandou project, Rio Tinto stated, in part:

> The Simandou iron ore project in Guinea is one of the largest-known undeveloped
> high-grade iron ore orebodies in the world. On 26 May 2014, Rio Tinto and its
> Simandou project partners signed an Investment Framework with the Government
> of Guinea which provided the legal and commercial foundation for the project and
> formally separated the infrastructure and mine development plan. The Simandou
> project partners are currently finalising an integrated Bankable Feasibility Study
> (BFS) for the mine, port and infrastructure elements of the project, which is
> scheduled to be submitted to the Government of Guinea in May 2016.

46.     With respect to the Company's compliance and "business integrity," Rio Tinto

stated, in part:

> We operate within all relevant laws and regulations and are dedicated to open and
> transparent dealings with our stakeholders. Acting with integrity and being
> accountable for our actions are the foundations on which we do business. The
> choices we make every day reflect who we are and what we stand for.
>
> . . .
> To ensure our integrity and compliance programme remains aligned with the risk-
> based approach included in our Business integrity standard, we improved our
> guidelines for assessing business integrity risks, making it easier for the business to
> consider these risks as part of their overall risk analysis framework. We regularly
> review and refresh our training material and methods of delivery to ensure they
> remain relevant to the risks that employees encounter in their jobs.

47.     The 2015 20-F contained signed certifications by Defendants Walsh and Lynch,

stating, in part, that they had reviewed the 2015 20-F and that the 2015 20-F did "not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

48.     The statements referenced in ¶¶ 28-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Rio Tinto violated anti-corruption laws in connection with its operations with respect to the Simandou project; (ii) the foregoing violations would expose the Company to significant scrutiny and large fines; and (iii) as a result of the foregoing, Rio Tinto's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

49.     On November 9, 2016, Rio Tinto issued a media release entitled "Rio Tinto contacts regulatory authorities."  The release stated, in relevant part:

> On 29 August 2016, Rio Tinto became aware of email correspondence from 2011 relating to contractual payments totalling US$10.5 million made to a consultant providing advisory services on the Simandou project in Guinea.
>
> The company launched an investigation into the matter led by external counsel. Based on the investigation to date, Rio Tinto has today notified the relevant authorities in the United Kingdom and United States and is in the process of contacting the Australian authorities.
>
> Energy & Minerals chief executive Alan Davies, who had accountability for the Simandou project in 2011, has been suspended with immediate effect.
>
> Legal & Regulatory Affairs group executive Debra Valentine, having previously notified the company of her intention to retire on 1 May 2017, has stepped down from her role.

50.     On November 14, 2016, post-market, *Bloomberg News* published an article entitled "Rio CEO Says Staff 'Shocked' by Probe That May Take Years."  The article reported, in relevant part:

> Rio Tinto Group Chief Executive Officer Jean Sebastien Jacques said an investigation into the lawfulness of a payment made to an external consultant relating to a giant iron ore project in Guinea has "shell-shocked" the company and ***may take several years to resolve***.
>
> . . .
>
> "Many people across Rio Tinto are still shell-shocked," Jacques said in an internal memo seen by Bloomberg News. "The day I was made aware of a potential issue we launched an investigation. It wasn't a decision we took lightly. We will fully cooperate with the authorities. ***Their investigations may take several years***."
>
> . . .
>
> A team of external lawyers undertook a "significant data collection and review exercise," which led to the decision to alert authorities, Jacques said in the memo. Rio is restricted on what information it can release because the investigation is ongoing, said Jacques, who became CEO in July.

(Emphases added.)

51.     On this news, as the market processed the significance and scope of the investigation that the Company faced, Rio Tinto's ADR price fell $1.52, or 3.83%, to close at $38.13 on November 15, 2016, the following trading day.

52.     On November 15, 2016, post-market, Rio Tinto announced the termination of Mr. Davies and Ms. Valentine.

53.     On this news, Rio Tinto's ADR price fell $0.77, or 2.02%, to close at $37.36 on November 16, 2016.

54.     On November 18, 2016, pre-market, *Bloomberg News* reported that Guinea's Mines and Geology Minister, Abdoulaye Magassouba, wrote to Rio Tinto's CEO, Jean-Sébastian Jacques, asking him to provide details of the internal inquiry, stating, in part: "As the country

caught in the middle of this boardroom drama at Rio Tinto, we need answers . . . The government of Guinea is demanding a full account from Rio Tinto of any wrongdoing identified in the company's dealings."

55.     On November 18, 2016, pre-market, *Bloomberg News* also published an article entitled "Rio Tinto Offered Bribe for Mine, Ex-Guinea Minister Says."  The article reported, in part:

> A Rio Tinto Group executive asked how big a bribe it would take to beat out a competitor for a hotly contested iron ore deposit in Guinea, the country's former mining minister said, adding a new accusation of graft just days after the world's second-biggest miner fired two of its top executives over a payment made in connection with the West African project.
>
> Mahmoud Thiam, the former mining minister, said that the head of Rio Tinto's Guinea operation, Steven Din, offered him a bribe in early 2010 in order to win back control of half of the undeveloped Simandou project, considered the world's biggest untapped iron ore deposit. Din was attempting to regain control of the blocks from billionaire investor Beny Steinmetz's BSG Resources Ltd., Thiam said in a Nov. 9 phone interview.
>
> Thiam claims Din said he had the backing of senior Rio Tinto executives to make the offer. Din denies ever paying or offering a bribe. Rio Tinto declined to comment.

56.     On these disclosures, Rio Tinto's ADR price fell $1.01, or 2.69%, to close at $36.55 on November 18, 2016.

57.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Rio Tinto ADRs during the Class Period (the "Class") and were damaged upon the

revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rio Tinto ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rio Tinto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Rio Tinto;

- whether the Individual Defendants caused Rio Tinto to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Rio Tinto securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

64.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Rio Tinto ADRs are traded in an efficient market;

- the Company's ADRs were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

- Plaintiff and members of the Class purchased, acquired and/or sold Rio Tinto ADRs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Against All Defendants For Violations of <u>Section 10(b) And Rule 10b-5 Promulgated Thereunder)</u>

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members,

as alleged herein; (ii) artificially inflate and maintain the market price of Rio Tinto ADRs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Rio Tinto ADRs and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rio Tinto securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Rio Tinto's business practices with respect to the Simandou project.

71.     By virtue of their positions at Rio Tinto, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers

and/or directors of Rio Tinto, the Individual Defendants had knowledge of the details of Rio Tinto's internal affairs.

73.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Rio Tinto.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rio Tinto's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Rio Tinto ADRs was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Rio Tinto's sales practices which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Rio Tinto ADRs at artificially inflated prices and relied upon the price of the ADRs, the integrity of the market for the ADRs and/or upon statements disseminated by Defendants, and were damaged thereby.

74.    During the Class Period, Rio Tinto ADRs were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired ADRs of Rio Tinto at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADRs, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Rio Tinto

20

ADRs was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Rio Tinto ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADRs during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     During the Class Period, the Individual Defendants participated in the operation and management of Rio Tinto, and conducted and participated, directly and indirectly, in the conduct of Rio Tinto's business affairs.  Because of their senior positions, they knew the adverse non-public information about Rio Tinto's business practices with respect to the Simandou project.

79.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Rio Tinto's financial condition and results of operations, and to correct promptly any public statements issued by Rio Tinto which had become materially false or misleading.

80.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Rio Tinto disseminated in the marketplace during the Class Period concerning Rio Tinto's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Rio Tinto to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Rio Tinto within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rio Tinto securities.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Rio Tinto.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*
