**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PURANJAY DAS, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | No. 1:16-cv-09572 (ALC) |
| -against- | **JURY TRIAL DEMANDED** |
| RIO TINTO PLC, TOM ALBANESE, ALAN DAVIES, and SAM WALSH, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE ................................................................. 6

III.  PARTIES .................................................................................................... 6

      1.   Lead Plaintiff ................................................................................ 6

      2.   Defendants ................................................................................... 7

      3.   Key Nonparties ............................................................................ 7

IV.  SUBSTANTIVE ALLEGATIONS .......................................................... 9

    A.  Background ........................................................................................... 9

      1.   Rio Tinto ...................................................................................... 9

      2.   Rio Tinto's Leadership ................................................................ 9

      3.   Rio Tinto's Prior History of Bribery.......................................... 10

    B.  The Fraudulent Scheme ..................................................................... 12

      1.   Simandou Iron Ore Mine in Guinea........................................... 12

      2.   The Simandou Saga ..................................................................... 13

      3.   Rio Tinto Resorts to Unlawful Payments to GoG Officials to Secure its Stake .......................................................................... 15

      4.   Other Rio Tinto Executives Became Aware of the Bribery Scheme........ 19

      5.   Rio Tinto's *The way we work* and Business Integrity Standard ............... 19

    C.  False and Misleading Statements and Omissions During the Class Period.......... 25

      1.   2012 Statements ........................................................................... 26

      2.   2013 Statements ........................................................................... 33

      3.   2014 Statements ........................................................................... 37

      4.   2015 Statements ........................................................................... 41

      5.   2016 Statements ........................................................................... 44

    D.  The Truth Slowly Emerges ................................................................ 47

    E.  Actions Taken Against the Individual Defendants ............................. 52

V.    RELIANCE PRESUMPTION .................................................................. 53

VI.  CLASS ACTION ALLEGATIONS ......................................................... 54

VII. CLAIMS FOR RELIEF ............................................................................ 56

        COUNT I ................................................................................................ 56

COUNT II ..................................................................................................................... 60

VIII.   PRAYER FOR RELIEF ................................................................................................ 61

IX.     DEMAND FOR TRIAL BY JURY ................................................................................ 62

Lead Plaintiff Puranjay Das ("Das," "Lead Plaintiff," or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") against Defendants, alleges the following based upon (i) personal knowledge as to Plaintiff's own acts and (ii) information and belief as to all other matters from the investigation conducted by and through Plaintiff's attorneys.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a securities fraud class action ("Action") on behalf of a class of all persons and entities who purchased or otherwise acquired American Depositary Receipts ("ADR" or "ADRs") of Rio Tinto plc ("Rio Tinto" or the "Company") during the period from March 16, 2012 through and including November 17, 2016 (the "Class Period") and were damaged thereby ("Class").  This Action is brought under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.    Rio Tinto is incorporated in the United Kingdom ("U.K."), and the Company's ADRs are listed on the New York Stock Exchange ("NYSE").  The Company finds, mines, and processes mineral resources, including, without limitation, iron ore, the main ingredient in steel.

3.    Simandou is a mountain in the remote interior of Guinea, an impoverished West African country that is rich in mineral resources and, according to several organizations, is one of the most corrupt countries on earth.  The Simandou iron-ore development contains one of the largest iron-ore deposits in the world.  It has been expected to be capable of yielding as much as

200 million tons annually, lasting in excess of 40 years, and has been evaluated at points to yield $50 billion.[1]

4.      Between 1997 and the first half of 2008, the government of Guinea ("GoG") granted Rio Tinto, through a joint venture, exploration rights and a concession to Simandou blocks 1 through 4—Simandou's northern half consisted of blocks 1 and 2, and its southern half consisted of blocks 3 and 4.

5.      Starting in the latter half of 2008, the GoG revoked Rio Tinto's concession and downgraded the Company's rights to a prospecting permit holder in Simandou, claiming that the Company was breaching the Guinean Mining Code by failing to vigorously develop the mine but instead focusing on prospects elsewhere.  By the end of 2008, the GoG had entirely rescinded Rio Tinto's prospecting rights to Simandou blocks 1 and 2 and awarded exploration rights to Rio Tinto's competitor, Beny Steinmetz ("Steinmetz") and BSG Resources Limited and affiliated entities ("BSGR Entities"), which ultimately secured a mining concession to Simandou blocks 1 and 2 in 2010.  Rio Tinto officials suspected that the lack of the development of the mine was only a pretext and that its rivals had in fact bribed GoG officials to secure their share of Simandou.

6.      Fearful that Rio Tinto's extraordinarily valuable concession rights to Simandou blocks 3 and 4 were slipping from the Company's grasp, the Company pumped significant resources into the mine.  Defendants and several of the Company's highest-level executives, including its chief executive officers ("CEO") and executive committee ("Executive Committee") members, regularly visited the mine, and the Company regularly updated investors about its progress.

---

[1] Unless stated otherwise, all figures herein are approximations and in U.S. dollars.

7.     In order to ensure that Rio Tinto's mining concession would not be lost as well, Defendants Tom Albanese ("Albanese") (then Rio Tinto's CEO) and Sam Walsh ("Walsh") (then chief executive of Rio Tinto's Iron Ore products group and an Executive Committee member, and later the Company's CEO), along with Defendant Alan Davies ("Davies") (then president of International Operations for the Iron Ore group, and later an Executive Committee member), arranged an unlawful $10.5 million bribe to Francois Polge de Combret ("Combret"), who was a close friend and nefarious advisor to Guinean President Alpha Conde ("Guinean President Conde"), to grease the wheels of the GoG.  At least four emails have been revealed evidencing Defendants Albanese, Walsh, and Davies' approval of the $10.5 million bribe ("May 2011 Emails").  These bribes came on the heels of revelations that Rio Tinto executives had bribed Chinese officials in connection with iron-ore operations in that country, and despite the public pronouncements of Defendant Walsh, "[r]eceiving bribes is a clear violation of Chinese law and Rio Tinto's code of conduct, *The Way We Work*. … [we] will spare no effort in doing everything we can to prevent any similar activity[,]"[2] as well as the public pronouncements of Defendant Albanese, "[e]thical behaviour is at the heart of everything we do.  We have earned a strong reputation for our ethics through our long track record of responsible business practice."

8.     Defendants went on a campaign throughout the Class Period to tout that the Company's compliance with several of its mandatory codes, including, without limitation, *The way we work* and its Business Integrity Standard, was central to its success and a competitive advantage.  Specifically in connection with Rio Tinto's activity at Simandou, Defendants extolled Rio Tinto's relationship with the GoG, and the Company disclosed that it abided by *The way we work* and other policies.  These statements included, without limitation, the following anti-bribery

---

[2] Unless stated otherwise, all emphasis herein is in the original.

statements:  "We do not commit, or become involved in, bribery or corruption of any form.  …
We do not buy business or favour, no matter where we operate, no matter what the situation is, no
matter who is involved.  …  We never offer, give, demand or accept any financial or other favour
to, or from, any person in order to secure business or any other advantage.  …  We do not use or
make payments to speed up routine administrative actions.  …  In every country where we work,
we comply with applicable laws.  When deciding whether to apply the laws of a country or the
principles of *The way we work*, use whichever is stricter."

9.     Also throughout the Class Period, Defendants disclosed (i) that there were no
material losses expected from legal claims, (ii) that the Company's disclosure controls and
procedures were sound, and (iii) Defendants Albanese and Walsh's signed certifications under the
Sarbanes-Oxley Act of 2002 ("SOX").

10.     Throughout the Class Period, these statements were materially false and misleading
because they misrepresented and/or failed to disclose the following, without limitation: Defendants
made an unlawful payment of $10.5 million to Combret to influence GoG officials, including,
without limitation, Guinean President Conde, to secure Rio Tinto's concession for Simandou
blocks 3 and 4 and to strengthen its relationship with the GoG; Rio Tinto was subject to significant
regulatory fines as a result of the unlawful payment; Rio Tinto, in conducting and hiding the
unlawful-payment scheme, was violating anti-bribery, accurate-accounting, and internal-control
laws, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA"); Rio
Tinto was violating its codes of ethics and conduct, including, without limitation, *The way we work*
and Business Integrity Standard, because its senior-most executives, including the individual
Defendants, were aware of and even participated in the unlawful-payment scheme; and statements
by Defendants regarding the adequacy of internal controls failed to disclose that the Company's

4

internal controls were insufficient to insure that the Company did not violate anti-bribery, accurate-accounting, and internal-control laws, including, without limitation, the FCPA.

11.     In 2015, the May 2011 Emails came to light to Rio Tinto officers other than Defendants Albanese, Davies, and Walsh, during discovery conducted by counsel in connection with Rio Tinto's lawsuit against Steinmetz, BSGR Entities, and others.

12.     However, it still took Rio Tinto till November 2016 to begin admitting the unlawful activity.  Armed with an internal report and findings from external counsel, Kirkland & Ellis LLP ("Kirkland & Ellis"), and Rio Tinto's internal compliance team, including former U.S. Department of Justice ("DOJ") and U.K. Serious Fraud Office ("SFO") employees, from an investigation that included having ploughed through a reported 60 terabytes of data, Rio Tinto self-reported documents reflecting the unlawful $10.5 million bribe to the DOJ, SEC, SFO, the Australian Securities and Investments Commission, and the Australian Federal Police.  These regulators are investigating the matter.

13.     Heads rolled.  In November 2016, Rio Tinto fired three Executive Committee members, Defendant Davies (then chief executive of Rio Tinto's Energy & Minerals group), Hugo Bague (then group executive of Organisational Resources), and Debra Valentine (then group executive of Legal & Regulatory Affairs).  Indicating the seriousness of the misconduct, the Company revoked over $4 million of benefits due to the executives.

14.     Between November 14, 2016 (post-market) and November 18, 2016, inclusive, a flurry of revelations about the unlawful $10.5 million payment hit the market, including, without limitation, revelations about Defendants Albanese and Walsh's involvement in approving the payment, Defendant Rio Tinto's admission that several of its senior-most executives violated the Company's conduct codes and committed wrongdoing, and the backlash from the GoG.

15.     Rio Tinto's ADR price closed at $39.65 on November 14, 2016.   Through November 18, 2016, Rio Tinto's ADR price fell to $36.55, as investors learned about the scope of the fraud and risks of further sanctions against the Company, causing the Class damages as artificial inflation from Defendant Rio Tinto's ADR price was deflated.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).   A substantial part of the conduct complained of herein, and the subsequent damages, occurred in this Judicial District, and the Company's ADRs are traded on the NYSE, which is located in this Judicial District.

19.   In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### 1.     Lead Plaintiff

20.     Lead Plaintiff Puranjay Das, as set forth in the previously filed certification on February 10, 2017, purchased Rio Tinto ADRs during the Class Period on the NYSE and was damaged upon the revelation of the alleged curative disclosures.

### 2.    Defendants

21.    Defendant Rio Tinto plc is incorporated in England and Wales, and the Company's principal executive offices are located at 6 St. James's Square, London, SW1Y 4AD, United Kingdom.  Rio Tinto plc has a sponsored ADR facility, and the underlying shares are registered with the SEC and listed on the NYSE under the ticker symbol RIO.

22.    Defendant Tom Albanese ("Albanese") served as Rio Tinto's CEO from May 2007 until January 2013.  He served on the BoD from 2006 until January 2013, and he was an Executive Committee member during the Class Period.

23.    Defendant Alan Davies ("Davies") was Rio Tinto's chief executive of the Energy & Minerals group from July 2016 through November 2016, when he was terminated, and he was an Executive Committee member during the Class Period.

24.    Defendant Sam Walsh ("Walsh") served as Rio Tinto's CEO from January 2013 until his retirement in July 2016.  He was a BoD member from June 2009 through July 2016, and he was an Executive Committee member during the Class Period.

25.    The defendants referenced above in ¶¶22-24 are sometimes referred to herein as the "Individual Defendants."

26.    The Individual Defendants and Rio Tinto are sometimes referred to herein as "Defendants."

### 3.    Key Nonparties

27.    Hugo Bague ("Bague") was a Rio Tinto Executive Committee member during the Class Period.  He was appointed chief executive of Organisational Resources in 2013, after joining Rio Tinto as Global Head of Human Resources in 2007.  Bague left Rio Tinto in March 2017.

28.    Moise Dadis Camara was Guinea's President between December 2008 and December 2009 ("Former Guinean President Camara").

29.     Francois Polge de Combret ("Combret") was a close friend and advisor to Guinean President Conde.  They became acquainted when studying political science together in Paris, before Combret went on to serve as Deputy Secretary-General of the presidency under former French President Valéry Giscard d'Estaing, and Combret then worked for decades in banking at UBS AG and Paris-based investment bank Lazard Ltd ("Lazard").   Combret established an independent advisory firm called FC Finance in 2010.

30.     Guinean President Alpha Conde ("Guinean President Conde") has been Guinea's President since December 2010.

31.     Lansana Conte was Guinea's President between April 3, 1984 and December 2008 ("Former Guinean President Conte").

32.     Ismael Diakite was Rio Tinto's former managing director of Rio Tinto Guinea and was terminated in November 2016, in connection with the unlawful $10.5 million payment.

33.     Jean Sebastien Jacques ("Jacques") is Rio Tinto's current CEO.  He was appointed to the BoD on March 2016 and then CEO on July 2016.  Before then, he was chief executive of the Copper group in 2013 and chief executive of the Copper & Coal group in February 2015.

34.     Jan du Plessis ("Plessis") served on the BoD from September 2008, and he served as BoD chairman since April 2009.  Plessis in March 2017 informed the BoD that he intends to retire as chairman after the completion of a succession process.

35.     Beny Steinmetz ("Steinmetz") controls BSG Resources Limited, which is a mining company, and its affiliated entities ("BSGR Entities").

36.     Debra Valentine ("Valentine") served as an Executive Committee member and Rio Tinto's group executive of Legal & Regulatory Affairs from 2009 until November 2016, and she was a board member of the Extractive Industries Transparency Initiative.  She joined Rio Tinto as

Global Head of Legal in 2008 and was in this position during the time that four Rio Tinto iron-ore executives were arrested and sentenced to jail in China for bribery, amongst other claims.  She headed Rio Tinto's anti-corruption agenda laid out in *The way we work* and oversaw the drafting of *The way we work*.  Upon her termination in November 2016 in connection with the unlawful $10.5 million payment, Valentine was not eligible for any short-term incentive plan awards for 2016, and all of her unvested incentive plan awards from previous years were canceled.  Her forfeited bonuses are estimated to have been worth $4 million.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

#### 1.   Rio Tinto

37.   The Rio Tinto Group is an international mining group headquartered in the U.K. that includes Defendant Rio Tinto plc, which is incorporated in the U.K. and lists ADRs on the NYSE.

38.   Rio Tinto's business is locating, mining, and processing mineral resources.  Its major products are aluminum, copper, diamonds, thermal and metallurgical coal, uranium, gold, industrial minerals (borax, titanium dioxide, and salt), and iron ore.  Its activities span the world.

#### 2.   Rio Tinto's Leadership

39.   Rio Tinto's day-to-day management falls on the Executive Committee.  Each products group's chief executive reports directly to Rio Tinto's CEO and is a member of the Executive Committee.  The Company discloses financial information related to each products group.

40.   Rio Tinto's Executive Committee, which was responsible for the Company's public statements, consisted of the following positions during the Class Period: the CEO (Defendants Albanese and Walsh had this position); chief financial officer; Organisational Resources group

executive (Bague, who stepped down in connection with the $10.5 million bribe, had this position); Aluminum group chief executive; Energy & Minerals group chief executive (Defendant Davies, who was terminated in connection with the $10.5 million bribe, had this position); Health, Safety & Environment group executive; Growth & Innovation group executive; Iron Ore chief executive (Defendant Walsh had this position); Copper & Diamonds chief executive; and Legal & Regulatory Affairs group executive (Valentine, who was terminated in connection with the $10.5 million bribe, had this position).

### 3.    Rio Tinto's Prior History of Bribery

41.    Iron ore is the main ingredient in steel, which is present in most skyscrapers and automobiles and is the building block for fast-growing economies.  For decades, iron-ore mining was a monotonous business with few geopolitical implications.

42.    By 2009, however, around 65% of Rio Tinto's net profits came from iron ore sales, which were largely to China, as that country rapidly expanded its infrastructure.

43.    As of 2010, China was importing much of its iron ore at a blistering pace: in 2000, China accounted for just 16% of global iron-ore imports; around 2010, China bought up to 70% of global supplies—much of it from Australian iron-ore mines controlled by Rio Tinto and a few of its competitors.

44.    This situation created temptation.  On July 5, 2009, four Rio Tinto iron-ore executives, Liu Caikui, Ge Minqiang, Wang Yong, and Stern Hu (Rio Tinto's former General Manager in Shanghai) were arrested in China on charges of bribery and commercial-secret theft. In March and April 2010, the Shanghai Number One Intermediate People's Court convicted the four executives with both paying and taking bribes alleged to be around $13 million and stealing commercial secrets in China from steelmakers, including internal memoranda outlining China's next prices for iron-ore negotiations, which enabled Rio Tinto to overcharge the Chinese by more

than 1 billion renminbi (RMB).  Each were given sentences ranging from seven to fourteen years

in jail.

45.     On April 6, 2010, Rio Tinto tried portraying the Chinese bribery scheme as a one-

off, isolated incident.  Defendant Walsh (then chief executive of the Iron Ore products group and

an Executive Committee member) in a press release stated the following, in relevant part:

> Receiving bribes is a clear violation of Chinese law and Rio Tinto's code of
> conduct, *The Way We Work*.  We have been informed of the clear evidence
> presented in court that showed beyond doubt that the four convicted employees had
> accepted bribes.  By doing this they engaged in deplorable behaviour that is totally
> at odds with our strong ethical culture.  In accordance with our policies we will
> terminate their employment.  …  We have already implemented a number of
> improvements to our procedures, and we have now ordered a further far-reaching
> independent review of our processes and controls.  We will introduce any necessary
> additional measures and safeguards the review recommends and will spare no effort
> in doing everything we can to prevent any similar activity.

46.     The same press release also included the following quote from Defendant Albanese

(then Rio Tinto's CEO), in relevant part:

> All our employees are required to adhere to our strict policies on how we do
> business, and to abide by the laws of the countries where we operate.  Ethical
> behaviour is at the heart of everything we do.  We have earned a strong reputation
> for our ethics through our long track record of responsible business practice.  …  I
> am determined that the unacceptable conduct of these four employees will not
> prevent Rio Tinto from continuing to build its important relationship with China.
> This is a high priority for me personally.

47.     At the heels of these egregious crimes, including bribery, by Rio Tinto's iron-ore

executives in China, Rio Tinto continued to assure investors about the importance of its efforts to

combat bribery and strengthen the Company's business integrity.  For example, in Rio Tinto's

Form 20-F for the year ended 2012, filed with the SEC on March 15, 2013 ("2012 20-F"), the

Company disclosed the following in a letter from Plessis:

> In our pursuit of greater shareholder value, we must maintain the highest standards
> of corporate governance.  …  We want to ensure we have people on your board for
> whom corporate governance is not simply a set of rules: we need those who

embrace it and appreciate that we want to manage the Group in the interests of all our stakeholders.  Good governance is at the heart of everything we do.  As you will read in the sections that follow, the board committees, under the effective leadership of their respective chairs, carry out important and demanding roles on the board's behalf and facilitate the embedding of effective governance across the organisation.

**B.      The Fraudulent Scheme**

**1.      Simandou Iron Ore Mine in Guinea**

48.      Simandou is a mountain in the remote interior of Guinea.  Guinea is an impoverished West African country that is rich in mineral resources.  Mining of these minerals and the granting of such mining rights, also known as concessions, to private companies in exchange for an interest in output is a major source of revenue for Guinea.  Guinea houses almost half of the world's bauxite reserves and significant iron ore, gold, and diamond reserves, but the majority of its 11 million people live in poverty as a result of corruption by public officials in the granting of mining and other concessions.  According to Transparency International, a global civil advocacy organization against corruption, Guinea is one of the most corrupt countries on earth.

49.      The Simandou iron-ore development contains one of the largest iron ore deposits in the world, capable of yielding as much as 200 million tons annually, lasting in excess of 40 years, and at points being evaluated to yielding $50 billion.  The Simandou iron-ore deposit has the potential to make Guinea one of the world's top iron ore exporters.  The northern half of the Simandou concession relates to blocks 1 and 2; the southern half of the concession relates to blocks 3 and 4.  According to studies, blocks 3 and 4 of Simandou alone are capable of sustaining a 100 million ton annual run rate; if one adds in production from blocks 1 and 2, the production rate could double.  The deposits are considered high grade iron ore.  The effect that these deposits could have on iron ore and steel markets has led to Simandou deposits being described as world-class deposits and the biggest and best iron ore layers.

12

50.     The Simandou project never began commercial production of iron ore.

## 2.     The Simandou Saga

51.     For several years, Simandou has been at the heart of fierce battles between Rio Tinto, the GoG, Steinmetz, BSGR Entities, and Vale S.A. ("Vale"), a mining company based in Brazil.

52.     In February 1997, the Guinean Ministry of Natural Resources and Energy awarded four exploration permits to Rio Tinto for iron-ore mining at Simandou blocks 1 through 4.  Rio Tinto thereafter formed a joint venture to develop the Simandou concession, which was entitled Simfer S.A. ("Simfer").

53.     In 2002, Simfer and the GoG executed a base convention that documented the terms relating to the iron-ore mine and supporting infrastructure.

54.     In March 2006, Former Guinean President Conte formally awarded Simfer a Simandou concession that consisted of blocks 1 through 4, spanning an area of 738 square kilometers.

55.     In 2007, Rio Tinto fought off a hostile takeover bid by BHP Billiton Ltd. ("BHP Billiton"), using its Simandou right as part of the argument that Rio Tinto was undervalued.

56.     The importance of this concession to the Company's fortunes was reflected in a May 29, 2008 media press release, including Defendant Walsh's following statement, in relevant part:

> Simandou in Guinea represents a major new iron ore province.  Its strategic location gives us access to the Atlantic basin and the fast growing Middle Eastern market.  We are planning the development of our first production phase of 70 million tonnes per annum, potentially rising to 170 million tonnes per annum, subject to agreement with the government of Guinea.  We believe this area represents one of the best undeveloped major deposits of premium-grade iron ore in the world.

57.     Rio Tinto successfully thwarted BHP Billiton's takeover efforts.  However, on June 11, 2008, the Company revealed a letter from the Secretary General of Former Guinean President Conte's office questioning the validity of Rio Tinto's Simandou mining concession.

58.     On July 28, 2008, Rio Tinto's Simandou mining rights were downgraded to a prospecting permit holder.  The GoG claimed that Rio Tinto was breaching the Guinean Mining Code by failing to do any significant exploratory work in those regions, particularly with regard to blocks 1 and 2.  Rio Tinto was required to retrocede half of its mining rights to Simandou.

59.     The GoG invited applications for prospecting permits over Simandou blocks 1 through 4 from other companies, including BSGR Entities.

60.     Around August 2008, the GoG offered Rio Tinto the opportunity to remedy some of its breaches and invited the Company to submit a retrocession plan for 50% of its mining rights or to agree to provide a greater level of financing for Guinean infrastructure projects.  Rio Tinto failed to comply with these requests.

61.     On September 10, 2008, Paul Skinner, then Rio Tinto's BoD Chairman, and Defendant Walsh discussed the Simandou development with Former Guinean President Conte.

62.     On December 4, 2008, Guinea's Minister of Mines and Geology informed Rio Tinto that the GoG would enforce the retrocession and that Simfer's prospecting permits to Simandou blocks 1 and 2 were withdrawn.  On December 9, 2008, the GoG sent a letter to Rio Tinto indicating that it was rescinding Rio Tinto's rights to Simandou blocks 1 and 2 but not blocks 3 and 4.

63.     On December 11, 2008, the GoG publicly announced that it was awarding exploration licenses for blocks 1 and 2 to BSGR Entities.

14

64.     Later in December 2008, Former Guinean President Conte died and was replaced in a coup by a military junta.  The interim president was Former Guinean President Camara.

65.     BSGR Entities began exploratory drilling in Simandou blocks 1 and 2 in April 2009 and thereafter undertook significant development costs.

66.     As of March 19, 2010, Rio Tinto had already spent over $600 million on exploration and evaluation work necessary to develop Simandou.

67.     Upon his election in 2010, former Guinean President Conde re-examined existing contracts in the mining sector and rewrote the mining code.  Guinean President Conde announced that all existing mining contracts in Guinea would be re-examined and a new mining code would be enacted.

68.     In 2010, Guinean President Conde decided to strip BGSR Entities and Vale's rights to Simandou blocks 1 and 2.

### 3.     Rio Tinto Resorts to Unlawful Payments to GoG Officials to Secure its Stake

69.     Fearful that a similar fate would befall Rio Tinto's rights with regard to Simandou blocks 3 and 4, between December 19 and 22, 2010, Defendant Albanese visited Guinea to meet with the GoG in connection with the Simandou development.

70.     Thereafter, Rio Tinto agreed to make unlawful payments totaling $10.5 million to Guinean President Conde's close friend, Combret, in order to secure mining rights to Simandou blocks 3 and 4.  Combret was acting as in informal advisor to Guinean President Conde in 2011, concurrently with Rio Tinto having retained him.  Combret became acquainted with Guinean President Conde when they studied political science together in Paris.  Combret established an independent advisory firm called FC Finance in 2010.  Since Guinean President Conde's victory in 2010, Combret has played a key, nefarious role in the renegotiations of Simandou mining rights.

15

Discussion took place at least as early as the beginning of May 2010.  According to the May 2011 Emails amongst Rio Tinto's upper-most executives, Defendants Albanese (then Rio Tinto's CEO), Walsh (then Rio Tinto's chief executive of the Iron Ore group), and Davies (then President of International Operations of the Iron Ore group), Rio Tinto agreed to pay $10.5 million to Combret for his work on greasing the wheels of the GoG.

71.     Negotiations over the amount of the payment were reflected in emails starting on May 10, 2011, when Defendant Walsh emailed Defendant Albanese with the subject "Fw: Confidential: Francois de Combret" and text to the effect of the following:

Tom [Albanese],

Alan [Davies] attempted to settle with Francois at $7.5 million, but he is holding out for $10.5 million.

No question that he delivered sizeable value, but also no question that there is still sizeable risk going forward.

I wonder if the answer is to hold part of the funds in an account in his name, but subject to first shipment.  Alan [Davies] won't like this, but I can't see another solution.

Appreciate any thoughts that you have

Sam [Walsh]

72.     On May 10, 2011 at 2:15 PM, Defendant Davies emailed Defendant Walsh with the subject "Confidential: Francois de Combret" and text to the effect of the following:

Sam [Walsh]

Further to our discussions about Francois de Combret's fee and arrangements going forward, I provide the following update and request for approval.

I have held discussions with Francois following your discussions with Tom [Albanese] last week.  We have reached a final point, where Francois has requested a fee for services on securing 3 and 4 of US$10.5m.  This is clearly stated as his bottom line, and a reduction from his request of US$15m.

16

Sam [Walsh], I accept that this is a lot of money, but I also put forward that the result we achieved was significantly improved by Francois' contribution and his very unique and unreplicable services and closeness to the President.  He vouched for our integrity when it was needed and helped bring us together when things were looking extremely difficult.  These services were of the most unique nature, and we will never fully be able to judge the potential outcome if he was not assisting in us in good faith.  My belief is that we had a very low probability of resecuring 3 and 4, but through a combination of the negotiations and Francois' unique help to me and Rio Tinto, we were able to close.  There is still an enormous amount to do to secure the investment fully.

Since the signing, Francois has helped me on a number of communication issues with the President and the Minister of Mines, which has been invaluable.  I have absolutely no doubt that Francois will not act as a friend of Rio Tinto going forward and is extremely valuable insurance that things do go smoothly as we bed down the arrangements with the GoG.

I am extremely worried if we lose the direct connection to the President that I have cultivated with Francois.  Francois has behaved with the utmost integrity and as I say, I have extreme confidence that he will continue to assist us to improve our relationship with the GoG and the President.

There is also now a glimmer of possibility that we may be able to move ourselves into a useful position in relation to 1 and 2.  Irrespective of the good advances I have personally made, I am extremely pessimistic without the invaluable services that Francois has provided.

This is not a standard situation, and is indeed extremely unique.  I am very worried if we are not able to stabilise the situation and start delivering the project.  Finalising these discussions in a satisfactory way is extremely good insurance for Rio Tinto.  May I please have your approval to agree a final fee with Francois of US$10.5m.  I am devoted to transition our relationship onto very stable footing, and see this as a very necessary step to doing that.

Thanks for your understanding Sam [Walsh]

Alan

Alan Davies
President International Operations
Rio Tinto Iron Ore

73.     On May 10, 2011 at 2:32 PM, Defendant Walsh emailed Defendant Davies with the subject "Fw: Confidential: Francois de Combret" and text to the effect of the following:

Alan [Davies],

Got the figure up to $10.5 million but only holding an amount in escrow in his name subject to first shipment.  I know that you won't like this, but put your thinking cap on.

Sam [Walsh]

74.     On May 10, 2011 at 6:32 PM, Defendant Albanese emailed Defendant Walsh with the subject "Confidential: Francois de Combret" and text to the effect of the following:

Sam [Walsh],

Worth giving this a try, but also think about optics to the GoG.

Regards, Tom

Tom Albanese
Chief Executive Rio Tinto

75.     According to a recording obtained exclusively by France 24 (an international news network based in Paris) and dating from 2012, which was posted to France 24's website on a December 9, 2016 update, Combret gave a player in the Simandou negotiations the following account of a conversation that Combret had with Guinean President Conde, in connection with services performed by Rio Tinto: "Rio Tinto is a huge company ... But the president told them, 'Listen, if there's no downpayment, I'll cancel the concession.' And he would have done it."

76.     The $10.5 million bribe worked to help Rio Tinto secure its grasp on Simandou.

77.     Rio Tinto around April 22, 2011 disclosed the signing of a "Settlement Agreement" with the GoG, under which the Company paid $700 million to the Guinean Public Treasury, which "secure[d] Rio Tinto's mining title in Guinea and pave[d] the way for first shipment of iron ore by mid-2015.  Simfer will, however, make every reasonable effort to achieve first production by the end of 2014. This agreement relates to the southern concession of Simandou, known as blocks 3 and 4, which is the location of Rio Tinto's declared iron ore resources in Guinea."

78.     Feeling more secure in its hold on Simandou blocks 3 and 4, On October 18, 2011, Rio Tinto announced approval of a further $211 million for continued studies of the project and $1.1 billion of funding for commitments for early works and procurement of long-lead items.

### 4.     Other Rio Tinto Executives Became Aware of the Bribery Scheme

79.     In 2015, the May 2011 Emails came to light to Rio Tinto officers, other than Defendants Albanese, Davies, and Walsh, during discovery conducted by counsel in connection with Rio Tinto's lawsuit against Steinmetz, BSGR Entities, and others.  On April 30, 2014, Rio Tinto sued BSGR Entities, Vale, and several others in connection with the GoG's stripping of the rights to Simandou blocks 1 and 2 from Rio Tinto, claiming violations under the Racketeer Influence and Corrupt Organizations Act, amongst other claims.  Complaint, *Rio Tinto plc v. Vale, S.A., et al.*, No. 14-cv-3042 (RMB)(AJP) (S.D.N.Y. Apr. 30, 2014), ECF No. 1.  The lawsuit was ultimately dismissed.

80.     In the course of discovery in that case, Rio Tinto's lawyers, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), uncovered the internal emails about Combret's payment.  In 2015, Quinn Emanuel reported to Valentine, who served as Rio Tinto's group executive of Legal & Regulatory Affairs from 2009 until November 2016, when she was terminated in connection with the $10.5 million bribe.

81.     Thereafter, Kirkland & Ellis was retained to conduct an internal investigation, which was not disclosed to investors until the results of which was first disclosed in November 2016, as detailed below.

### 5.     Rio Tinto's *The way we work* and Business Integrity Standard

82.     Throughout the Class Period, Rio Tinto touted that the Company's compliance with several of its mandatory codes, including, without limitation, *The way we work* and its Business Integrity Standard, was central to its success and a competitive advantage.  The Simandou project

was an extremely valuable and crucial project to Rio Tinto, as reflected by the assets that the Company pumped into the mine, Defendants and several of the Company's highest level executives' regular visits to the mine, and the Company's regular disclosures to investors about its progress. Specifically in connection with Rio Tinto's activity at Simandou, the Company disclosed that it abided by *The way we work* and other policies.

83.    Rio Tinto's highest level executives touted as central to its success and a competitive advantage the Company's compliance with its conduct codes. For example:

- During Rio Tinto's February 14, 2013 earnings call for the fourth quarter of 2012, Defendant Walsh stated the following: "I personally place the highest importance on integrity, accountability, respect and teamwork. These are values that play a big role on the way I do business and what I expect from my team."

- In Rio Tinto's Form 20-F for the year ended 2013 filed with the SEC on March 14, 2014 ("2013 20-F"), the Company stated the following: "The safety of our people, and our values – accountability, respect, teamwork and integrity – are at the core of our way of working. … Good governance is essential for the long-term success of the Group."

- In a June 17, 2013 media release, Rio Tinto disclosed that the Company's leaders, including Defendant Walsh, and the GoG met in London to discuss the Simandou project. Rio Tinto disclosed that the "partners affirmed their commitment to the Simandou Project and recognized the Project's importance to Guinea and to the other partners. They emphasised the importance of transparency and good governance in the development and operation of the Project."

- In Rio Tinto's Form 20-F for the year ended 2014 filed with the SEC on March 6, 2015 ("2014 20-F"), the Company disclosed the following: "Underpinning everything we do are our values: respect, integrity, teamwork and accountability. They are fundamental to the way we operate and engage with those around us, and form the foundation of a long-term, reliable business that generates sustainable returns for shareholders. … But we also know that against a backdrop of uncertainty, Rio Tinto thrives. Our combination of world-class assets, disciplined capital allocation, balance sheet strength, operating and commercial excellence, and our culture of safety and integrity gives me confidence we are best placed to make the most of the positive long-term demand fundamentals to generate sustainable returns. … *The way we work* sets out the principles that form the foundation of our business: collaboration, fair treatment and living our values of respect, integrity, teamwork and accountability."

- At Rio Tinto's April 15, 2014 address to shareholders filed with the SEC on May 8, 2014, the Company stated the following: "Good governance is essential to the long-term success

of the Group and your board continues to provide oversight of a robust corporate governance framework. ... Our ability to operate globally is supported by this commitment. It allows us to access high-quality resources, to effectively manage risks and opportunities, to engage with communities, and to attract talented employees."

- On November 26, 2016, Jacques, at an investors' conference at the Melbourne Mining Club, stated the following, in relevant part: "What you need to know is the following. I take integrity and our code of conduct very personally. For me it is absolutely non-negotiable: we must do the right thing whenever we operate."

- In Rio Tinto's Form 20-F for the year end 2016 filed with the SEC on March 2, 2017 ("2016 20-F"), the Company stated the following: "Rio Tinto's risk management framework reflects our belief that managing risk effectively is an integral part of how the Group creates value, and fundamental to the Group's business success. The responsibility for identifying and managing risks lies with all of Rio Tinto's employees and business leaders. ... We are firmly committed to operating with integrity and being accountable for our actions. The key principles that guide our behaviour in the *The way we work* are supported by standards that cover antitrust, business integrity, conflicts of interest, data privacy, fraud and third party due diligence. All of these are supported by workforce training. ... We maintain a strict stance against bribery and corruption. We remain dedicated to open and transparent dealings with our stakeholders. Our integrity and compliance programme is aligned with the risk-based approach included in our business integrity standard."

84.     Throughout the Class Period, Rio Tinto disclosed through its website its

"Governance framework and structure[.]", stating:

"Rio Tinto's commitment to acting responsibly plays a critical role in our success as a business, and our ability to generate shareholder value. Rio Tinto takes a unified approach to corporate governance to comply with the regulatory obligations associated with its three principal stock exchange listings in the UK, Australia and the US."

*** 

"Rio Tinto's commitment to integrity is set out in our global code of business conduct: *The way we work*[.]"

*** 

This contains principles and standards of conduct which reaffirm the Group's commitment to integrity. It is inspired by our four core values: respect, integrity, teamwork and accountability. It is available on the website."

*** 

[On the "Governance integrity" webpage]

> The key principles that guide our behaviour in *The way we work* …   Our performance is important for our continuing existence. Good performance allows regulators to grant us the permission and the licences to do the mining or the processing that we want to do. It gives local communities the confidence that we will be a good long-term neighbour, providing them with opportunities and managing our assets well.

85.    Specifically in connection with the Simandou project, on October 25, 2012, Rio Tinto published a media release entitled "Simfer S.A., with the support of Soguipami, submits the Social and Environmental Impact Assessment for the proposed port to the Government of Guinea[.]" ("SEIA").

86.    Rio Tinto disclosed this SEIA, which stated the following, in relevant part:  "[Rio Tinto] operates in accordance with strict corporate policies covering social and environmental responsibility, corporate governance and sustainability established under its [] global code of business conduct 'The way we work'.  …  Rio Tinto also supports several international voluntary agreements, including the Extractive Industries Transparency Initiative … Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions."

87.    Rio Tinto disclosed Annex 1C of the SEIA, Legislation, Standards and Administrative Framework, which stated the following, in relevant part:

> Simfer S.A. ("Simfer"), as part of the Rio Tinto Group, through its application to construct and operate the Project, is committed to meeting the spirit and intent of international, national and corporate policies, guidelines, laws and regulations.
>
> ***
>
> Rio Tinto's reputation for acting responsibly is embedded in the way Rio Tinto operates and is based on Rio Tinto's core values of Accountability, Respect, Teamwork and Integrity. These values are expressed through the principles and standards of conduct set out [in] the company's global code of business conduct, *The way we work*.  A copy of this is provided in Annex 1D.
>
> ***

As the developer of the Simandou Project, Simfer will abide by the Rio Tinto values and will comply with *The way we work*.

\*\*\*

In addition, Rio Tinto also supports a number of international voluntary commitments, agreements and conventions as follows.

\*\*\*

• OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

\*\*\*

• Transparency International.
• Business Principles for Countering Bribery.

\*\*\*

• World Economic Forum- Partnering Against Corruption Initiative (PACI).
• Principles for Countering Bribery.

88.     Rio Tinto disclosed Annex 1D of the SEIA, *The way we work*, which was signed

by Plessis and Defendant Walsh  and stated the following, in relevant part:

*The way we work* symbolises what we stand for as a business.  It makes clear how we behave according to our values of respect, integrity, teamwork and accountability.

\*\*\*

We will only succeed if we are inclusive and collaborate.  We rely on the trust of each other and our partners, including host communities, governments, suppliers, customers, investors and the media.  How we behave every day builds this trust and sets us apart from others.

\*\*\*

2.3 Bribery and corruption

We do not commit, or become involved in, bribery or corruption of any form.

• We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.

• We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.

• We do not use or make payments to speed up routine administrative actions.

***

**National laws and *The way we work***
In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter.

89.     During the Class Period, Rio Tinto disclosed its "Business integrity standard" ("Business Integrity Standard").  The Business Integrity Standard has a separate section entitled "1.0 Bribery and Corruption[.]"  It defined bribery and corruption:  "Bribery is the offer, giving, demand or acceptance of a financial or other advantage to or from any person in order to improperly secure business or any other advantage.  Rio Tinto employees and core contractors must not commit, be a party to or be involved in bribery or corruption in any form."  (Red-colored text in the original.)  It listed a key matter to remember being that bribery and corruption involves anything of value, such as money.   It listed the following points:  "**Any person**: Bribery and corruption may involve dealings with government officials or with private individuals or enterprises.  **Direct or indirect**: Bribery and corruption may take place directly or indirectly, for example via a third party such as an agent.  **No actual bribe necessary**: The offer or demand of a bribe is prohibited under most external regulations; and this Standard. This means even if no bribe is ultimately paid it can still be construed as an offence."

90.     The Business Integrity Standard also has a separate section entitled "1.2 Facilitation Payments[.]"   "Facilitation payments are small payments normally made to lower-level government officials as a personal benefit to them, to secure or speed up a performance of a routine action to which the payer is entitled (eg licences, permits, visas, customs clearance).  Facilitation payments: … are a form of corruption; … are illegal in most countries; and … can open the door

to more serious issues of corruption."   "Rio Tinto prohibits all facilitation payments."   (Red-colored text in the original.)

91.     The "Owner" of this standard was the "Global Head of Compliance[;]" its "Approver" was the "Rio Tinto Executive committee[.]"   Rio Tinto disclosed that it has a "responsibility to work with integrity when acting on behalf of Rio Tinto … The Business integrity standard (the Standard) helps to ensure we meet that responsibility."   "This Standard is key in meeting the following Rio Tinto business integrity commitments to: • prohibit bribery and corruption in all its forms; • avoid, disclose and manage conflicts of interest; • prohibit fraud in all its forms."   The Business Integrity Standard applied to "all Group employees and core contractors, as well as all other contractors, consultants or outsourced service providers engaged by Rio Tinto. All must abide by the Standard's general requirements as they form a part of Rio Tinto's control framework."

92.     Rio Tinto specifically disclosed in its Business Integrity Standard why compliance with it was important:   "1. Living our values. Conducting business with integrity is one of Rio Tinto's four core values set out in *The way we work*.  2. Protecting our reputation.  How we act when doing business determines Rio Tinto's reputation.   3. Ensuring sustainable business. External stakeholders want to partner with a company that they can trust to do the right thing.  Rio Tinto needs to comply with all relevant laws, including anti-bribery laws."

C.     **False and Misleading Statements and Omissions During the Class Period**

93.     As detailed below, throughout the Class Period, Defendants issued statements that were materially false and misleading because they misrepresented and/or failed to disclose  adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Defendants or recklessly disregarded by them.   Specifically, and without limitation, Defendants made false and misleading statements about and/or failed to disclose the following:

(a)    Defendants made an unlawful payment of $10.5 million to Combret to influence GoG officials, including, without limitation, Guinean President Conde, to secure Rio Tinto's concession for Simandou blocks 3 and 4 and to strengthen its relationship with the GoG;

(b)    throughout the Class Period, Rio Tinto was subject to significant regulatory fines as a result of the unlawful payment;

(c)    Rio Tinto, in conducting and hiding the unlawful-payment scheme, was violating anti-bribery, accurate-accounting, and internal-control laws, including, without limitation, the FCPA;

(d)    Rio Tinto was violating its codes of ethics and conduct, including, without limitation, *The way we work* and Business Integrity Standard, because its senior-most executives, including, without limitation, the Individual Defendants, were aware of and even participated in the unlawful-payment scheme;

(e)    statements by Defendants regarding the adequacy of internal controls failed to disclose that the Company's internal controls were insufficient to insure that the Company did not violate anti-bribery, accurate-accounting, and internal-control laws, including, without limitation, the FCPA; and

(f)    as a result of the foregoing, Defendants' statements about Rio Tinto's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

### 1.    2012 Statements

94.    The Class Period begins on March 16, 2012, when Rio Tinto filed with the SEC a Form 20-F annual report for the year ended December 31, 2011 ("2011 20-F"). In the 2011 20-F, Rio Tinto stated the following about the Simandou project, in relevant part: "Rio Tinto is working with the Government of Guinea to have relevant provisions of the Settlement Agreement ratified as law, as contemplated and required by the Settlement Agreement."

95.    The statements in ¶94 were materially false and misleading for the reasons set forth in ¶93(a)-(b), (f).

96.    In the 2011 20-F, Rio Tinto stated the following, in relevant part:

Rio Tinto's commitment to integrity and compliance is set out in *The way we work*. This contains principles and standards of conduct which reaffirm the Group's commitment to corporate responsibility. It is inspired by our four core values: accountability, respect, teamwork and integrity.

*** 

The board recognises that risk is an integral component of the business, and that it is characterised by both threat and opportunity.  The Group fosters a risk aware corporate culture in all decision making, and is committed to managing all risk in a proactive and effective manner through competent risk management.  To support this commitment, risk is analysed in order to inform the management decisions taken at all levels within the organisation.  The principles of the risk analysis and management process are set out in the Risk policy and standard which is on the website.

97.     In the 2011 20-F, Rio Tinto stated the following, in relevant part:

In compiling this report, the directors have referred to the … New York Stock Exchange (NYSE) Corporate Governance Standards (the NYSE Standards).  … Rio Tinto plc, as a foreign issuer with American Depositary Shares listed on the NYSE, is obliged by the NYSE Standards to disclose any significant ways in which its practices of corporate governance differ from the NYSE Standards.  …  The Company has reviewed the NYSE Standards and believes that its practices are broadly consistent with them[.]

98.     The NYSE Corporate Governance Standards, which were incorporated by reference, requires that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations.

99.     Through the statements made above in ¶¶96-98, the 2011 20-F incorporated by reference the statements made in *The way we work* and Business Integrity Standard, which during the Class Period were substantially similar in all material respects to those statements identified above in ¶¶84-92.  In particular, and without limitation, the following anti-bribery statements were incorporated by reference:  "We do not commit, or become involved in, bribery or corruption of any form.  …  We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.  …  We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.  …  We do not use or make payments to speed up routine administrative actions.  …  In every country

27

where we work, we comply with applicable laws.  When deciding whether to apply the laws of a

country or the principles of *The way we work*, use whichever is stricter."

100.    The statements in ¶¶96-99 were materially false and misleading for the reasons set

forth in ¶93.

101.    In the 2011 20-F, Rio Tinto stated the following, in relevant part:

Rio Tinto is subject to extensive governmental regulations affecting all aspects of
its operations and consistently seeks to apply best practice in all of its activities.
Due to Rio Tinto's product and geographical spread, there is unlikely to be any
single governmental regulation in effect that could have a material effect on the
Group's business.

102.    In the 2011 20-F, Rio Tinto made the following statements about its contingent

liabilities, in part:  "There are a number of legal claims currently outstanding against the Group.

No material loss to the Group is expected to result from these claims."

103.    The statements in ¶¶101-02 were materially false and misleading for the reasons

set forth in ¶93(a)-(c), (f).

104.    In the 2011 20-F, Rio Tinto stated the following about its disclosure controls and

procedures, in relevant part:

Rio Tinto makes immediate disclosure to the listing authorities of any information
that a reasonable person would expect to have a material effect on its share price in
accordance with their rules.  All information released to the markets is posted on
the media section of the website.

***

The Group maintains disclosure controls and procedures as such term is defined in
US Exchange Act Rule 13a15(e).  Management, with the participation of the chief
executive and chief financial officer, has evaluated the effectiveness of the design
and operation of the Group's disclosure controls and procedures pursuant to
Exchange Act Rule 13a15(b) as of the end of the period covered by this report and
has concluded that these disclosure controls and procedures were effective at a
reasonable assurance level.

105.    The statements in ¶104 were materially false and misleading for the reasons set forth in ¶93.

106.    The 2011 20-F contained signed certifications pursuant to SOX by Defendant Albanese, stating, in part, that he had reviewed the 2011 20-F and that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

107.    The statements in ¶106 were materially false and misleading for the reasons set forth in ¶93.

108.    On August 8, 2012, Rio Tinto held an earnings call for the Company's results in the second quarter of 2012 ("12Q2 Earnings Call").  During the 12Q2 Earnings Call, Defendant Albanese attempted addressing Rob B. Clifford and Clarke Wilkins' questions as follows, in relevant part:

> **<Q - Rob B. Clifford>**: Yeah, good morning, Tom.  Just a comment on the country diversification would be great, just with reference to the fact that the Guinea has proven much more difficult to grow than you first thought?
>
> ***
>
> **<A - Tom Albanese>**:
>
> ***
>
> I think in Guinea, we've recognized that the pathway for success involves bringing in partners and having those partners de-risk the project with us, and they then bring unique qualities that actually can help that. And again, it is – it might end up giving us less than 100% interest in it, but I think on an overall risk basis, phasing it in, it is a better outcome.
>
> ***
>
> **<Q - Clarke Wilkins>**:
>
> ***

29

And secondly just in regards to Simandou, what's the sort of spend right there at the moment? And how long do you continue that spend rate without sort of clarity on the timing around the rail and the port? And when do you sort of have to make a decision to stop spending there and then wait for the government to catch up?

**<A - Tom Albanese>**:

***

I think in terms of the Simandou, I think we are continuing to do quite a bit of work on engineering. We're engaging with the government of Guinea. We're engaging with our partners on all that work. We're doing the site prep in terms of future camp areas. So we're laying all the groundwork.

109.    The statements in ¶108 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

110.    On October 25, 2012, Rio Tinto disclosed a media release entitled "Simfer S.A., with the support of Soguipami, submits the Social and Environmental Impact Assessment for the proposed port to the Government of Guinea[.]" Rio Tinto stated the following, in relevant part:

Rio Tinto's subsidiary Simfer S.A., with the support of Soguipami Coordination Unit, has submitted the Social and Environmental Impact Assessment (SEIA) for the port component of the Simandou iron ore project to the Government for approval.

***

The Simandou SEIA was prepared in full compliance with Guinean legislation, Rio Tinto's project guidelines and the standards required by the International Finance Corporation.

111.    Rio Tinto disclosed the SEIA. It stated the following, in relevant part:

A development of the magnitude of the Simandou Project requires comprehensive and effective management of environmental and social issues.

Simfer is committed to achieving this in line with Guinean regulations and international good practice. A key step in this is the preparation of a full Social and Environmental Impact Assessment (SEIA) for the Project.

***

Rio Tinto is committed to excellence in environmental and social performance. It operates in accordance with strict corporate policies covering social and

30

environmental responsibility, corporate governance and sustainability established under its a global code of business conduct 'The way we work'. …

Rio Tinto also supports several international voluntary agreements, including the Extractive Industries Transparency Initiative, … and the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

112.    Along with disclosing the SEIA, Rio Tinto disclosed Annex 1C of the SEIA, Legislation, Standards and Administrative Framework, and Annex 1D of the SEIA, *The way we work*, which was signed by Plessis and Defendant Walsh.  The statements in all of these documents are substantially similar in all material respects to those identified above in ¶¶85-88, including, without limitation, the following anti-bribery statements:  "We do not commit, or become involved in, bribery or corruption of any form.  …  We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.  …  We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.  …  We do not use or make payments to speed up routine administrative actions.  …  In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter."

113.    The statements in ¶¶110-12 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

114.    On November 1, 2012, Rio Tinto disclosed a media release entitled "Simfer S.A., with the support of SOGUIPAMI, holds national restitution conference, as part of the Social and Environmental Impact Assessment submission[.]"  Rio Tinto stated the following, in relevant part:

As part of its ongoing commitment to open consultation and transparency, Rio Tinto's subsidiary Simfer S.A., with the support of SOGUIPAMI, will hold a national restitution conference in Conakry on 7 November to share the results of

the Social and Environmental Impact Assessment (SEIA) carried out over the past
year.

<div align="center">***</div>

The Simandou SEIA was prepared in full compliance with Guinean legislation, Rio
Tinto's project guidelines and the standards required by the International Finance
Corporation.

115.    The statements in ¶114 were materially false and misleading for the reasons set

forth in ¶¶93(a)-(d), (f).

116.    On November 2, 2012, Rio Tinto filed with the SEC a Form 6-K, including a media

release regarding the Company's third quarter 2012 operations review.   Rio Tinto stated the

following, in relevant part:

In September, the Social and Environmental Impact Assessment for the Simandou
mine and rail line was submitted for approval to the Government of Guinea.  On 15
October 2012, Rio Tinto announced that the Government of Guinea had issued a
decree declaring the Simandou infrastructure a 'Project of National Interest'
('Projet d' Interet National', or 'PIN').  PIN project status protects the area of land
needed to develop the rail and port infrastructure (including the 670 kilometre route
of the proposed rail line linking Simandou to the new port south of Conakry) from
being bought or developed by third parties.

117.    The statements in ¶116 were materially false and misleading for the reasons set

forth in ¶93(a)-(d), (f).

118.    On August 2, 2012, Rio Tinto filed a Form 6-K with the SEC regarding executive

changes.   Albanese stated the following, in relevant part:   "I welcome Alan to the Executive

Committee, and acknowledge the leading role he has played in developing partnerships with the

Government of Guinea, Chalco and the International Finance Corporation, and leading the work

to develop the Simandou project."

119.    The statements in ¶118 were materially false and misleading for the reasons set

forth in ¶93(a)-(d), (f).

<div align="center">32</div>

2.     **2013 Statements**

120.    On February 14, 2013, Rio Tinto held an earnings call for its fourth quarter 2012 results ("12Q4 Earnings Call").  During the 12Q4 Earnings Call, Defendant Walsh attempted answering a question from James F. Gurry as follows, in relevant part:

> **<Q - James F. Gurry>**:
>
> ***
>
> And just further to that, can you just outline – given your in-depth knowledge of Simandou and IOC, can you just outline your long-term vision for those two projects and where they sit?
>
> ***
>
> **<A - Samuel Maurice Cossart Walsh>**:
>
> ***
>
> I think in relation to Simandou, there are two critical issues for Simandou.  And firstly, I should say that Alan and his team are doing a great job there in terms of taking the project forward.  We are, however, waiting for the framework agreement to be put in place.  We were expecting that at the end of last year.  And Alan and his team are working with the government of Guinea in terms of taking that forward.

121.    The statements in ¶120 were materially false and misleading for the reasons set forth in ¶¶93(a)-(d), (f).

122.    Rio Tinto disclosed through the Company's website its 2012 annual report, which was dated March 6, 2013 and signed by Defendant Walsh, amongst others, stating the following, in relevant part:

> We continue to participate with Transparency International (www.transparency.org), a global civil society organisation in the fight against bribery and corruption. We were one of the original corporate members of the steering committee which drafted Transparency International's Business Principles for Countering Bribery and continue to participate in that committee.  Rio Tinto is also a strong supporter of the World Economic Forum's Partnering Against Corruption Initiative (PACI).

Rio Tinto is committed, in principle and practice, to transparency consistent with good governance and commercial confidentiality. We issue information in a timely way on the Group's operational, financial and sustainable development performance through a number of channels. We have supported the Extractive Industries Transparency Initiative (www.eiti.org), to strengthen governance by improving transparency and accountability in the extractive sector, since the initiative's launch in 2002.

<center>***</center>

There are a number of legal claims currently outstanding against the Group. No material loss to the Group is expected to result from these claims.

123. The statements in ¶122 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

124. On March 15, 2013, Rio Tinto filed with the SEC its Form 20-F annual report for the year ended December 31, 2012 ("2012 20-F"). In the 2012 20-F, Rio Tinto stated the following about the Simandou project, in relevant part:

Rio Tinto, with the support of Soguipami, the State Mining Company, submitted the Social and Environmental Impact Assessment to the Government of Guinea for review and approval. The Republic of Guinea also issued a presidential decree declaring the Simandou infrastructure a "Project of National Interest" (PIN) in October 2012, protecting the area of land needed to develop the rail and port infrastructure from any acquisition or development by third parties.

125. The statements in ¶124 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

126. In the 2012 20-F, Rio Tinto made statements about its compliance with *The way we work* and other conduct codes and its risk policies, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶96.

127. In the 2012 20-F, Rio Tinto made statements about its compliance with the regulatory obligations and governance codes and standards associated with the NYSE Corporate Governance Standards, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶97. The NYSE Corporate Governance Standards, which

<center>34</center>

were incorporated by reference, requires that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations.

128.    Through the statements referenced above in ¶¶126-27, the 2012 20-F incorporated by reference the statements made in *The way we work* and Business Integrity Standard, which during the Class Period were substantially similar in all material respects to those statements identified above in ¶¶84-92.   In particular, and without limitation, the following anti-bribery statements were incorporated by reference:  "We do not commit, or become involved in, bribery or corruption of any form.  …  We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.  …  We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.  …  We do not use or make payments to speed up routine administrative actions.  …  In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter."

129.    The statements referenced in ¶¶126-28 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

130.    In the 2012 20-F, Rio Tinto made statements about its disclosure controls and procedures, which were substantially similar in all material respects to the statements that the Company made in its 2011 20-F that are referenced above in ¶104.

131.    The statements referenced in ¶104 were materially false and misleading for the reasons set forth in ¶93.

132.     The 2012 20-F contained signed SOX certifications by Defendant Walsh, which were substantially similar in all material respects to the SOX certifications signed by Defendant Albanese in connection with the 2011 20-F referenced above in ¶106.

133.     The statements referenced in ¶132 were materially false and misleading for the reasons set forth in ¶93.

134.     On July 9, 2013, Rio Tinto filed with the SEC a Form 6-K, including a media release regarding a "Joint Press Release from the Office of His Excellency President Conde, Rio Tinto, Chalco and IFC concerning the Guinea Simandou Project[.]" Rio Tinto stated the following, in relevant part:

> Leaders from the Republic of Guinea, Rio Tinto, and IFC, a member of the World Bank Group, met in London on June 16, 2013 to discuss their project to develop Guinea's Simandou Blocks 3 and 4 project.  …  Present at the meeting were President Conde, Sam Walsh, CEO of Rio Tinto and JinYong Cai, Executive VP and CEO of IFC.  Mr. Walsh and Mr. Cai also spoke for the Aluminium Corporation of China Limited (CHALCO) the project's fourth partner.
>
> ***
>
> The partners affirmed their commitment to the Simandou Project and recognized the Project's importance to Guinea and to the other partners.  They emphasised the importance of transparency and good governance in the development and operation of the Project.

135.     The statements in ¶134 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

136.     On August 8, 2013, Rio Tinto disclosed a media release entitled "Rio Tinto announces first half underlying earnings of $4.2 billion[.]"  Rio Tinto stated the following, in relevant part:   "The directors of Rio Tinto believe that the highest standards of corporate governance are essential to its pursuit of greater shareholder value and have continued to apply the standards discussed under 'Corporate governance' on pages 72 to 82 of the 2012 Annual report which is available on the Rio Tinto Group website www.riotinto.com."

137.    The statements in ¶136 were materially false and misleading for the reasons set forth in ¶93.

### 3.    2014 Statements

138.    On February 13, 2014, Rio Tinto held an earnings call for the fourth quarter of 2013.  During this call, Defendant Walsh attempted answering a question from James F. Gurry as follows, in relevant part:

> **<Q - James F. Gurry>**: Hi, Sam. James Gurry from Credit Suisse.  Just a quick question on Simandou.  It has been in the press a bit recently.  Can you give us a quick update on your confidence of the project, its development sort of profile?  And that you can sort of develop it in a controlled manner in view of the iron ore market?
>
> **<A - Samuel Maurice Cossart Walsh>**: Yeah. Look, I think we made good progress with Simandou last year.  And Alan [Davies] has been very successful in terms of aligning the government of Guinea, ourselves, Chalco, and the IFC in how the project should move forward.  …

139.    The statements in ¶138 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

140.    On March 14, 2014, Rio Tinto filed with the SEC its Form 20-F annual report for the year ended December 31, 2013 ("2013 20-F").  In the 2013 20-F, Rio Tinto stated the following about the Simandou project, in relevant part:

> In February 2013, the Government of Guinea approved the Social and Environmental Impact Assessment (SEIA) conducted on the Simandou project.  The SEIA is the result of a consultation programme involving more than 10,000 members of the local communities and ensures the project is developed in a way that maximises long-term benefits for the people of Guinea and minimises impact on the communities and the environment.

141.    The statements in ¶140 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

142.    In the 2013 20-F, Rio Tinto made statements about its compliance with *The way we work* and other conduct codes and its risk policies, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶96.

143.    In the 2013 20-F, Rio Tinto made statements about its compliance with the regulatory obligations and governance codes and standards associated with the NYSE Corporate Governance Standards, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶97.  The NYSE Corporate Governance Standards, which were incorporated by reference, requires that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations.

144.    Through the statements referenced above in ¶¶142-43, the 2013 20-F incorporated by reference the statements made in *The way we work* and Business Integrity Standard, which during the Class Period were substantially similar to those statements identified above in ¶¶84-92. In particular, and without limitation, the following anti-bribery statements were incorporated by reference:  "We do not commit, or become involved in, bribery or corruption of any form.  …  We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.  …  We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.  …  We do not use or make payments to speed up routine administrative actions.  …  In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter."

145.    The statements referenced in ¶¶142-44 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

146.    In the 2013 20-F, Rio Tinto made the following statements about its contingent liabilities, in part:  "There are a number of legal claims currently outstanding against the Group. No material loss to the Group is expected to result from these claims."

147.    The statements in ¶146 were materially false and misleading for the reasons set forth in ¶93(a)-(c), (f).

148.    In the 2013 20-F, Rio Tinto made statements about its disclosure controls and procedures, which were substantially similar in all material respects to the statements that the Company made in its 2011 20-F that are referenced above in ¶104.

149.    The statements referenced in ¶148 were materially false and misleading for the reasons set forth in ¶93.

150.    The 2013 20-F contained signed SOX certifications by Defendant Walsh, which were substantially similar in all material respects to the SOX certifications signed by Defendant Albanese in connection with the 2011 20-F referenced above in ¶106.

151.    The statements referenced in ¶150 were materially false and misleading for the reasons set forth in ¶93.

152.    On May 2, 2014, Rio Tinto filed with the SEC a Form 6-K, including a media release entitled "Rio Tinto files Complaint in United States District Court in relation to mining concessions in Guinea[.]"  Rio Tinto disclosed the following, in relevant part:  "It should be noted that this Complaint is not against the Government of Guinea.  Rio Tinto and the Government signed a Settlement Agreement in 2011 that relates to the southern concession of Simandou, known as blocks three and four, and is the location of Rio Tinto's declared iron ore resources in Guinea. Rio Tinto and the Government continue to work cooperatively on the project."

153.    The statements in ¶152 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

154.    On June 2, 2014, Rio Tinto filed with the SEC a Form 6-K, including a media release entitled "Simandou South: Signature of the Investment Framework Marks a Significant Move Forward[.]"  Rio Tinto disclosed the following, in relevant part:

> Sam Walsh, Rio Tinto Chief Executive said:  "Today is an important milestone in the development of this world-class iron ore resource for the benefit of all shareholders and the people of Guinea.  I would like to welcome the Government of Guinea as a shareholder and thank the President for his continued commitment to the Project."

> Alan Davies, Chief Executive of Diamonds & Minerals Rio Tinto said: "The signing of the IF is testimony to the commitment of all the partners to progress the Project and is the culmination of years of collaborative and tremendous work."

> ***

> The IF builds on the 2002 Convention de Base ("CdB"), between Simfer S.A., owner of the mine, and the Republic of Guinea which documented the terms relating to the iron ore mine and the supporting infrastructure. … The original investment terms were later modified in the 2011 Settlement Agreement ("SA") to produce an Amended Convention de Base ("ACdB"), which separated the mine and infrastructure projects and committed the project partners to create the IF.

155.    The statements in ¶154 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

156.    On August 7, 2014, Rio Tinto disclosed a media release entitled "Rio Tinto announces a 21 per cent increase in first half underlying earnings to $5.1 billion[.]"  Rio Tinto stated the following, in relevant part:  "The directors of Rio Tinto believe that highest standards of corporate governance are essential to its pursuit of greater shareholder value and have continued to apply the standards discussed under 'Corporate governance' on pages 57 to 67 of the 2013 Annual report which is available on the Rio Tinto Group website www.riotinto.com."

157.    The statements in ¶156 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

### 4.      2015 Statements

158.    On March 6, 2015, Rio Tinto filed with the SEC its Form 20-F annual report for the year ended December 31, 2014 ("2014 20-F").   In the 2014 20-F, Rio Tinto stated the following, in relevant part:

> The foundation is *The way we work*, our global code of business conduct.   It contains the principles and standards of conduct which reaffirm our commitment to sustainable development, and operational excellence at our sites.   All of our sites must meet a minimum set of performance standards for health, safety, environment, closure and community and social performance.   These ensure we meet or go beyond our statutory and regulatory requirements.   The standards are backed up by strong processes to assure management that we are performing to the right levels and establishing longer-term identification and management of risks.

> We also measure ourselves against the performance of other companies in our sector as well as leaders in other industries.   Over many years we have played a leading role in developing sustainable development standards in the mining and metals sector through organisations such as the International Council on Mining and Metals (ICMM), and national bodies, particularly in Australia.

159.    In the 2014 20-F, Rio Tinto made statements about its compliance with *The way we work* and other conduct codes and its risk policies, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶96.  Also, the Company stated that "We operate within all applicable laws and regulations and are dedicated to open and transparent dealings with our stakeholders."   Also, Rio Tinto stated the following:   "The geographic and product diversity of our operations reduces the likelihood of any single government regulation having a material effect on the Group's business.   Our many internal controls – codes of conduct, standards and procedures coupled with our high standards of practice also mitigate against the impact of regulation."

160.   In the 2014 20-F, Rio Tinto made statements about its compliance with the regulatory obligations and governance codes and standards associated with the NYSE Corporate Governance Standards, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶97.  The NYSE Corporate Governance Standards, which were incorporated by reference, requires that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations.

161.   Through the statements referenced above in ¶¶158-60, the 2014 20-F incorporated by reference the statements made in *The way we work* and Business Integrity Standard, which during the Class Period were substantially similar to those statements identified above in ¶¶84-92. In particular, and without limitation, the following anti-bribery statements were incorporated by reference:  "We do not commit, or become involved in, bribery or corruption of any form.  …  We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.  …  We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage.  …  We do not use or make payments to speed up routine administrative actions.  …  In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter."

162.   The statements referenced in ¶¶158-61 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

163.   In the 2014 20-F, Rio Tinto made the following statements about its contingent liabilities, in part:  "There are a number of legal claims currently outstanding against the Group. No material loss to the Group is expected to result from these claims."

164.    The statements in ¶163 were materially false and misleading for the reasons set forth in ¶¶93(a)-(d), (f).

165.    In the 2014 20-F, Rio Tinto made statements about its disclosure controls and procedures, which were substantially similar in all material respects to the statements that the Company made in its 2011 20-F that are referenced above in ¶104.

166.    The statements referenced in ¶165 were materially false and misleading for the reasons set forth in ¶93.

167.    The 2014 20-F contained signed SOX certifications by Defendant Walsh, which were substantially similar in all material respects to the SOX certifications signed by Defendant Albanese in connection with the 2011 20-F referenced above in ¶106.

168.    The statements referenced ¶167 were materially false and misleading for the reasons set forth in ¶93.

169.    On August 6, 2015, Rio Tinto disclosed a media release entitled "Rio Tinto delivers first half underlying earnings of $2.9 billion."  Rio Tinto stated the following, in relevant part: "The directors of Rio Tinto believe that highest standards of corporate governance are essential to its pursuit of greater shareholder value and have continued to apply the standards discussed under 'Corporate governance' on pages 53 to 63 of the 2014 Annual report which is available on the Rio Tinto Group website www.riotinto.com."

170.    The statements in ¶169 were materially false and misleading for the reasons set forth in ¶¶93(a)-(d), (f).

171.    On August 6, 2015, Rio Tinto held a conference call for its second quarter 2015 results.  During the call, Defendant Walsh attempted answering a question from Ben P. McEwen as follows, in relevant part:

**<Q - Ben P. McEwen>**: Hello.  It's Ben McEwen from CIBC.  Just two questions, please.  …  And then, the second question is Simandou capital expenditure increased year-on-year only marginally, but how should we think about Simandou in the context of the current iron ore market? Thanks.

**<A - Samuel Maurice Cossart Walsh>**:  Yeah.  Look, those are two good questions and Alan Davies, who runs both of those operations, is sitting here in the front row.

\*\*\*

The work is currently under way on the bankable feasibility study.  Discussions are under way with the government, the investment framework that Alan negotiated.

172.   The statements in ¶171 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

### 5.   2016 Statements

173.   On March 3, 2016, Rio Tinto filed with the SEC its Form 20-F annual report for the year ended December 31, 2015 ("2015 20-F").  In the 2015 20-F, Rio Tinto made statements about its compliance with *The way we work* and other conduct codes and its risk policies, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶96.  Also, the Company stated the following, in relevant part:

> We operate within all relevant laws and regulations and are dedicated to open and transparent dealings with our stakeholders.  Acting with integrity and being accountable for our actions are the foundations on which we do business.  The choices we make every day reflect who we are and what we stand for.  …  The key principles that guide our behaviour are embodied in *The way we work*, which helps us live our company values of respect, integrity, teamwork and accountability.  It helps us maintain the highest ethical standard of behaviour that earns the trust of others.

174.   In the 2015 20-F, Rio Tinto made statements about its compliance with the regulatory obligations and governance codes and standards associated with the NYSE Corporate Governance Standards, which were substantially similar in all material respects to those statements identified in the 2011 20-F above in ¶97.  The NYSE Corporate Governance Standards, which

were incorporated by reference, requires that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations.

175.    Through the statements referenced above in ¶¶173-74, the 2015 20-F incorporated by reference the statements made in *The way we work* and Business Integrity Standard, which during the Class Period were substantially similar to those statements identified above in ¶¶84-92. In particular, and without limitation, the following anti-bribery statements were incorporated by reference:  "We do not commit, or become involved in, bribery or corruption of any form. … We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved. … We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage. … We do not use or make payments to speed up routine administrative actions. … In every country where we work, we comply with applicable laws.  When deciding whether to apply the laws of a country or the principles of *The way we work*, use whichever is stricter."

176.    The statements referenced in ¶¶173-75 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

177.    In the 2015 20-F, Rio Tinto made the following statements about its contingent liabilities, in part:  "The Group is subject to certain legal proceedings, claims, complaints and investigations arising out of the ordinary course of business.  Legal proceedings include, but are not limited to, breach of contract, breach of environmental, competition, securities and health and safety laws. … The Group believes that no material loss to the Group is expected to result from these legal proceedings, claims, complaints and investigations."

178.    The statements in ¶177 were materially false and misleading for the reasons set forth in ¶93(a)-(c), (f).

179.    In the 2015 20-F, Rio Tinto made statements about its disclosure controls and procedures, which were substantially similar in all material respects to the statements that the Company made in its 2011 20-F that are referenced above in ¶104.

180.    The statements referenced in ¶179 were materially false and misleading for the reasons set forth in ¶93.

181.    The 2015 20-F contained signed SOX certifications by Defendant Walsh, which were substantially similar in all material respects to the SOX certifications signed by Defendant Albanese in connection with the 2011 20-F referenced above in ¶106.

182.    The statements referenced in ¶181 were materially false and misleading for the reasons set forth in ¶93.

183.    On August 3, 2016, Rio Tinto filed with the SEC a Form 6-K regarding its unaudited interim financial report for the period ended June 30, 2016 ("16Q2 Financial Report"). In the 16Q2 Financial Report, Rio Tinto disclosed that "No events were identified after the balance sheet date which could be expected to have a material impact on the consolidated preliminary financial information included in this report."

184.    The statements in ¶183 were materially false and misleading for the reasons set forth in ¶93(a)-(c), (f).

185.    On August 3, 2016, Rio Tinto disclosed a media release entitled "Rio Tinto delivers strong cash flow generation of $3.2 billion and declares interim dividend of 45 US cents per share, equivalent to $0.8 billion."  Rio Tinto stated the following, in relevant part:  "The directors of Rio Tinto believe that highest standards of corporate governance are essential to its pursuit of greater

46

shareholder value and have continued to apply the standards discussed under 'Corporate governance' on pages 55 to 66 of the 2015 Annual report which is available on the Rio Tinto Group website www.riotinto.com."

186.    The statements in ¶185 were materially false and misleading for the reasons set forth in ¶93(a)-(d), (f).

### D.    **The Truth Slowly Emerges**

187.    On November 9, 2016, pre-market, Rio Tinto issued a media release entitled "Rio Tinto contacts regulatory authorities."  Rio Tinto stated the following, in relevant part:

> On 29 August 2016, Rio Tinto became aware of email correspondence from 2011 relating to contractual payments [totaling] US$10.5 million made to a consultant providing advisory services on the Simandou project in Guinea.
>
> The company launched an investigation into the matter led by external counsel. Based on the investigation to date, Rio Tinto has today notified the relevant authorities in the United Kingdom and United States and is in the process of contacting the Australian authorities.
>
> Energy & Minerals chief executive Alan Davies, who had accountability for the Simandou project in 2011, has been suspended with immediate effect.
>
> Legal & Regulatory Affairs group executive Debra Valentine, having previously notified the company of her intention to retire on 1 May 2017, has stepped down from her role.

188.    An adverse impact on Rio Tinto's ADR price from these particular statements was entirely offset by the outcome of the U.S. presidential election from the day before, which propelled a sustained, multi-week rally in stocks traded on U.S. exchanges.

189.    More probative details emerged on November 14, 2016, post-market, when *Bloomberg News* published an article entitled "Rio CEO Says Staff 'Shocked' by Probe That May Take Years."  The article reported the following, in relevant part:

> Rio Tinto Group Chief Executive Officer Jean Sebastien Jacques said an investigation into the lawfulness of a payment made to an external consultant

relating to a giant iron ore project in Guinea has "shell-shocked" the company and may take several years to resolve.

\*\*\*

An e-mail exchange discussing the payment shows former CEOs Tom Albanese and Sam Walsh, who was then head of Rio's iron ore unit, were aware of the payment.

\*\*\*

"Many people across Rio Tinto are still shell-shocked," Jacques said in an internal memo seen by Bloomberg News.  "The day I was made aware of a potential issue we launched an investigation.  It wasn't a decision we took lightly.  We will fully cooperate with the authorities.  Their investigations may take several years."

\*\*\*

"Some of us may be feeling that we are better informed by the press than by ourselves," he said. "Speculation is running in some quarters and some of what is being said strikes at the heart of the culture and values of our company, which for me are fundamentally strong and vitally important."

190.    On November 16, 2016, Rio Tinto disclosed the following, in relevant part:

Rio Tinto today terminated the contracts of Energy & Minerals chief executive Alan Davies and Legal & Regulatory Affairs Group executive Debra Valentine.

The Rio Tinto board reviewed the findings to date of an internal investigation into 2011 contractual arrangements with a consultant who provided advisory services on the Simandou project in Guinea.

\*\*\*

[T]he board concluded that the executives failed to maintain the standards expected of them under our global code of conduct, *The way we work*. In the circumstances, the board terminated the contracts of both executives.

In accordance with contract termination, neither executive will be eligible for any short-term incentive plan awards for 2016.  Rio Tinto will also cancel all unvested incentive plan awards from previous years.

191.    On November 16, 2016, the *Financial Times* published an article entitled "Rio Tinto faces fresh controversy over $10.5m mining payment."  The article reported the following, in relevant part:

Rio Tinto's lawyers uncovered more than a year ago internal emails about a questionable $10.5m payment to a consultant, but the mining company did not alert law enforcement authorities and investors about the matter until last week.

\*\*\*

In the emails, seen by the Financial Times, Alan Davies, the executive in charge of Simandou, discusses with Tom Albanese, then chief executive, and Sam Walsh, then head of iron ore, paying a $10.5m fee … to Francois Polge de Combret, a former top French banker and classmate of Guinea's president.

\*\*\*

Rio had suspended Mr Davies, the only one of the three executives in the email chain still at the company.

\*\*\*

Rio said last week that it had discovered the emails in August, after they were anonymously posted online.

But two people with knowledge of the matter told the FT that the emails had been uncovered last year by lawyers working for the company on a legal dispute about the Simandou project.

\*\*\*

In 2011, Rio secured its claim to the remaining half of Simandou with a $700m payment to the then new government of President Alpha Conde – a deal which, the emails indicate, Mr de Combret helped to facilitate.  The ex-Lazard banker declined to comment.

192.    On November 18, 2016, *Bloomberg News* published an article entitled "Guinea Sends Rio CEO Letter Seeking Details of Simandou Probe."  The article reported the following, in relevant part:

Guinea has written to Rio Tinto Group's top executive asking for information on the company's investigation into a $10.5 million payment to an external consultant over the country's Simandou project, one of the world's richest iron ore deposits.

Mines and Geology Minister Abdoulaye Magassouba wrote to Rio's Chief Executive Officer Jean-Sebastien Jacques asking him to provide details of an internal inquiry into the 2011 payment, according to a copy of the letter dated Nov. 11 and obtained by Bloomberg News.  …  Guinea holds concerns on possible repercussions for the project amid investigations by authorities in the U.K., United States and Australia, Magassouba wrote in the letter.

49

An external spokesman for the minister confirmed Magassouba had sent the letter and that Guinea has yet to receive any response. A Melbourne-based spokesman for Rio declined to comment Friday on the letter.

"As the country caught in the middle of this boardroom drama at Rio Tinto, we need answers," Magassouba said in a separate e-mailed statement. "The government of Guinea is demanding a full account from Rio Tinto of any wrongdoing identified in the company's dealings" in the country, he said.

193.     On November 18, 2016, *Bloomberg News* published an article entitled "Rio Tinto Offered Bribe for Mine, Ex-Guinea Minister Says." The article reported the following, in relevant part:

A Rio Tinto Group executive asked how big a bribe it would take to beat out a competitor for a hotly contested iron ore deposit in Guinea, the country's former mining minister said, adding a new accusation of graft just days after the world's second-biggest miner fired two of its top executives over a payment made in connection with the West African project.

Mahmoud Thiam, the former mining minister, said that the head of Rio Tinto's Guinea operation, Steven Din, offered him a bribe in early 2010 in order to win back control of half of the undeveloped Simandou project, considered the world's biggest untapped iron ore deposit. Din was attempting to regain control of the blocks from billionaire investor Beny Steinmetz's BSG Resources Ltd., Thiam said in a Nov. 9 phone interview.

Thiam claims Din said he had the backing of senior Rio Tinto executives to make the offer. Din denies ever paying or offering a bribe. Rio Tinto declined to comment.

\*\*\*

"Rio offered to pay me off," Thiam said after Bloomberg News inquired about Rio Tinto's disclosure of the banking consultant's payment. "There is no possibility of doubt. They assumed that BSGR had paid me. He said, 'Whatever BSGR offered to pay you, you know we are bigger, we can do better.'" BSGR has denied that it paid any bribes.

\*\*\*

After a new government was elected, Rio Tinto ended up paying the government $700 million to confirm its rights to blocks 3 and 4, and to get the new administration to skip a review of all mining contracts to remove uncertainty.

194.    On November 18, 2016, the *Australian Financial Review* published an article entitled "Guinea demands answers from Rio."  The article reported the following, in relevant part:

> The African nation at the centre of Rio Tinto's payment scandal, the Republic of Guinea, has demanded answers from the mining company over its decision to sack two executives this week, as a former minister claimed he was offered a bribe by a Rio employee.
>
> ***
>
> Guinea's minister of mines and geology, Abdoulaye Magassoub, issued a statement on Friday urging Rio to clarify any wrongdoing.
>
> ***
>
> But Mr Magassoub's statement was overshadowed late on Friday when his predecessor Mahmoud Thiam claimed he was offered a bribe in 2010 by Rio's top executive in Guinea at the time, Steven Din.
>
> "Rio offered to pay me off," Mr Thiam told Bloomberg.
>
> ***
>
> Mr Magassoub said Rio's decision to sack its two executives raised legal and ethical concerns.
>
> "Statements to the media from Rio Tinto have suggested that Francois Polge de Combret was in the pay of Rio Tinto during high-level negotiations between the company and the Guinean government," said Mr Magassoub in the statement.
>
> "Mr de Combret was at the time acting in a capacity that would have given him access to highly confidential information. It raises both legal and ethical concerns if, as media reports suggest, Mr de Combret was passing on privileged information in return for large amounts of money."

On November 18, 2016, the *Australian Financial Review* also published an article entitled "Guinea Pushes for Answers on Rio Sackings[,]" which reported similar information

195.    Rio Tinto's ADR price closed at $39.65 on November 14, 2016.   Through November 18, 2016, Rio Tinto's ADR price had fallen to $36.55, as investors learned about the scope of the fraud and risks of further sanctions against the Company.

196.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Rio Tinto's securities, Plaintiff and other Class members have suffered significant losses and damages.

### E.    Actions Taken Against the Individual Defendants

197.    Rio Tinto deferred the payment of bonuses due to Defendant Walsh, which were valued at $20 million, in connection with the unlawful $10 million payment.   Institutional Shareholder Services Inc., a global leader in corporate governance and responsible investment, blessed Walsh's bonus deferral in a note to Rio Tinto's shareholders in April 2017.

198.    Defendant Davies had accountability over the Simandou project in 2011 when the unlawful payment was made, and he later became Rio Tinto's chief executive of the Energy and Mineral group and an Executive Committee member.   Also, Defendant Davies was a member of Rio Tinto's ethics committee, so he oversaw the drafting of *The way we work*.   He resigned from his non-executive board of directors position at Rolls-Royce, given the damage to his professional reputation, which he did not want to have impact Rolls-Royce.

199.    Upon his termination, Defendant Davies was not eligible for any short-term incentive plan awards for 2016, and all of his unvested incentive plan awards from previous years were canceled.   His forfeited bonuses are estimated to have been worth $4 million.   Rio Tinto even clawed back monies paid to him in 2015 for his relocation to London, while he still worked for the Company, which was the first time that the Company exercised this option since the rule came into effect in 2013.

200.    On March 2, 2017, Rio Tinto filed with the SEC its Form 20-F for the year ending 2016 ("2016 20-F").   Rio Tinto recognized as a contingent liability the outfall from the $10.5 million payment, disclosing the following, in relevant part:

Contingent Liabilities

The Committee assessed certain matters in respect of which contingent liabilities exist.  In particular the Committee reviewed and recommended that contingent liabilities be disclosed in the financial statements in respect of the following matters:

– contractual payments totalling US$10.5 million made to a consultant who had provided advisory services on the Simandou project, in respect of which the authorities in the US, the UK and Australia have been notified[.]

201.   Rio Tinto admitted that at the least, its senior-most executives violated the Company's internal code of conduct.  Plessis said the following to shareholders on April 12, 2017, in part:  "And therefore to come across a situation where it appears perhaps we did not do the right thing was a very upsetting experience for all of us to go through.  It's a very sensitive topic.  …  Our conclusion was when we looked at the matter is that we have seen enough to convince ourselves that we have an obligation to voluntarily report to all the authorities that you've identified – I think there are 5 or 6 of them – to report to them that we think something might have gone wrong.  …   What we believe, our conclusion has been is what we have seen is that the payment of $10.5 million that was made in 2011 wasn't – done in a manner which is not consistent with our internal code of conduct, our rules of engagement, we call it the way we work.  That is why we made the decision in relation to our 2 colleagues, and that is why we made the decision to self-report to the authorities[.]"

## V.   RELIANCE PRESUMPTION

202.   At all relevant times, Rio Tinto shares traded in an efficient market, as evidenced by the following, without limitation:

> (a) the Company met the requirements for listing, was listed, and actively traded on the NYSE under ticker symbol RIO, a highly efficient and automated market;

> (b) during the Class Period, an average of  3.29 million shares of Rio Tinto ADRs traded on a daily basis; there were at least 14  market makers for the stock;

(c) the Company filed periodic public reports with the SEC, issued press releases, and conducted telephonic conference calls with analysts;

(d) at least 7 analysts issued reports on Rio Tinto during the Class Period;

(e) The markets' rapid incorporation of news related to Rio Tinto is evidenced by its stock-price reactions to the curative disclosures, as set forth above.

203.    As a result of the foregoing, the market for Rio Tinto shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all purchasers of Rio Tinto shares during the Class Period suffered similar injury through their purchases of Rio Tinto shares at artificially inflated prices, and a presumption of reliance applies.

## VI.    CLASS ACTION ALLEGATIONS

204.    Lead Plaintiff brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities who purchased or otherwise acquired Rio Tinto ADRs during the Class Period and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

205.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Rio Tinto ADRs were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Rio Tinto, its transfer agent, and by brokerage firms, who can be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

206.    Lead Plaintiff's claims are typical of the claims of the other Class members as they are all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

207.    Lead Plaintiff will fairly and adequately protect the other Class members' interests and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

208.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, financial condition, operations, internal controls, prospects, and management of Rio Tinto;

- whether the Individual Defendants caused Rio Tinto to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether Rio Tinto ADRs traded on an efficient market;

- whether the prices of Rio Tinto ADRs during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether Class members have sustained damages and, if so, what is the proper measure of damages.

209.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

210.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Rio Tinto ADRs are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

- Lead Plaintiff and the other Class members purchased Rio Tinto ADRs between the time that Defendants failed to disclose or misrepresented material facts and the time that the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

211.     Based upon the foregoing, Lead Plaintiff and the other Class members are entitled to a presumption of reliance upon the integrity of the market.

212.     Also, Lead Plaintiff and the other Class members are entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VII.     CLAIMS FOR RELIEF

## COUNT I

## (Against all Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

213.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

214.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

215.    During the Class Period, Defendants did the following: engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

216.    The scheme was intended to and, throughout the Class Period, did the following: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rio Tinto ADRs; and (iii) cause Lead Plaintiff and the other Class members to purchase Rio Tinto ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants—and each of them—took the actions set forth herein.

217.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including, without limitation, statements made to securities analysts and the media that were designed to influence the market for Rio Tinto ADRs.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Rio Tinto's results.

218.    By virtue of their positions at Rio Tinto, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other Class members or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants.  Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth.  Defendants issued statements without a reasonable basis in fact.

219.    Information showing that the Individual Defendants acted knowingly or with reckless disregard for the truth is particularly within the Individual Defendants' knowledge and control.  As the senior managers, executives, and/or directors of Rio Tinto, the Individual Defendants had knowledge of the details of Rio Tinto's internal affairs.

220.    The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Rio Tinto securities from their personal portfolios.

221.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Rio Tinto.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rio Tinto's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Rio Tinto's ADRs was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning Rio Tinto's business and financial condition that were concealed by the Individual Defendants, Plaintiffs and the other Class members purchased or otherwise acquired the Company's ADRs at artificially inflated prices and relied upon the price of the ADRs, the integrity of the market for the ADRs, and/or upon statements disseminated by the Individual Defendants, and they were damaged upon the revelation of the truth.

222.     During the Class Period, Rio Tinto ADRs were traded on an active, well-developed, and efficient market.  Lead Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Rio Tinto ADRs at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by the Lead Plaintiff and the other Class members, the true value of Rio Tinto ADRs was substantially lower than the prices paid by Lead Plaintiff and the other Class members.  The market price of Rio Tinto ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the other Class members.

223.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.     As a direct and proximate result of Defendants' misconduct, Lead Plaintiff and the other Class members suffered damages.

225.     Defendants thereby violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

226.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

227.    This Count is asserted against the Individual Defendants and is based upon Section

20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

228.    During the Class Period, the Individual Defendants participated in the operation

and management of Rio Tinto and conducted and participated directly and indirectly in the conduct

of the Company's business affairs.  Because of their senior positions, they knew the adverse non-

public information about Rio Tinto's fraudulent misstatements and omissions.

229.    As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to Rio Tinto's

financial condition and results of operations and to promptly correct any public statements issued

by the Company that had become materially false or misleading.

230.    Because of their positions of control and authority as senior officers, the Individual

Defendants were able to, and did, control the contents of the various reports, press releases, and

public filings that Rio Tinto disseminated in the marketplace during the Class Period concerning

the Company's results of operations.  Throughout the Class Period, the Individual Defendants

exercised their power and authority to cause Rio Tinto to engage in the wrongful acts complained

of herein.  The Individual Defendants therefore were "controlling persons" of Rio Tinto within the

meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful

conduct alleged herein that artificially inflated the market price of Rio Tinto ADRs.

231.     Each of the Individual Defendants acted as a controlling person of Rio Tinto.  By reason of their senior management positions and/or being directors of Rio Tinto, each of the Individual Defendants had the power to direct the actions of and exercised the same to cause Rio Tinto to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Rio Tinto and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiff and the other Class members complain.

232.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, as they culpably participated in the fraud alleged herein.

### VIII.     PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands Judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, certifying Lead Plaintiff as the Class representative and its choice of counsel, lead counsel, as Class counsel;

B.     Requiring defendants to pay damages sustained by Lead Plaintiff and the other Class members by reason of the acts and transactions alleged herein;

C.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including, without limitation, pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other reasonable costs and expenses;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such other and further relief as this Court may deem Just and proper.

## IX.    <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  May 30, 2017

**POMERANTZ LLP**

By<u>: /s/ Marc I. Gross</u>
Marc I. Gross
Jeremy A. Lieberman
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181

***Lead Counsel for the Class***