**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PURANJAY DAS, Individually and on Behalf of
All others Similarly Situated,

                    *Plaintiff*,

v.

RIO TINTO PLC, et al.,

                    *Defendants.*

Case No. 16-cv-09572 (ALC)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**Table Of Contents**

Preliminary Statement ................................................................................................ 1

Background ................................................................................................................ 3

    A.    The Alleged Unlawful Payment To Rio Tinto's Consultant ................................. 3

    B.    Rio Tinto's Disclosure Of The Payment To The Consultant ............................... 5

Argument ................................................................................................................... 6

I.    Plaintiff Does Not Plead With Particularity A False Or Misleading Statement. ................ 6

    A.    Plaintiff Does Not Plead With Particularity That Rio Tinto's Payment To
de Combret Was Unlawful ....................................................................... 6

    B.    Plaintiff Does Not Plead An Actionable Misstatement For Additional,
Independent Reasons. ............................................................................ 9

        1.    Many Of The Alleged Misstatements Are Non-Actionable Puffery. ......... 9

        2.    Many Of The Alleged Misstatements Are Not False Or Misleading
As A Matter Of Law. ....................................................................... 13

            a.    Statements Regarding The Potential For Material Loss
From Current Legal Claims ........................................................ 13

            b.    Statements Regarding NYSE Standards And Practices ................ 14

            c.    Other Miscellaneous Statements ................................................ 15

        3.    Plaintiff Does Not Plead That Statements Regarding Internal
Controls Were False Or Misleading Because Plaintiff Does Not
Plead Anything About Rio Tinto's Internal Controls. ............................. 16

II.    Plaintiff Does Not Plead With Particularity Facts Giving Rise To The Requisite
"Strong Inference" That Any Defendant Acted With Scienter ........................................ 18

    A.    Plaintiff Does Not Plead Scienter As To Any Individual Defendant. .................. 19

    B.    Plaintiff Does Not Plead Scienter As To Rio Tinto. ...................................... 21

III.    Plaintiff Does Not Plead Loss Causation. ...................................................................... 22

Conclusion ................................................................................................................ 25

## **Table Of Authorities**

### **Cases**

*In re Advanced Battery Techs.*,
 781 F.3d 638 (2d Cir. 2015).............................................................................18

*ATSI Commns v. Shaar Fund*,
 493 F.3d 87 (2d Cir. 2007)................................................................................6

*In re Axis Capital*,
 456 F. Supp. 2d 576 (S.D.N.Y. 2006)...........................................................7, 19

*In re Braskem Sec. Litig.*,
 __ F. Supp. 3d __, 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017).............10, 11, 17

*Carpenters Pension Trust v. Barclays*,
 750 F.3d 227 (2d Cir. 2014).............................................................................22

*Central States v. Fed'l Home Loan Mortg. Corp.*,
 543 Fed. Appx. 72 (2d Cir. 2013).....................................................................25

*City of Brockton Ret. Sys. v. Avon Prods.*,
 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).....................................................12

*City of Monroe Emp's Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011).....................................................17

*City of Pontiac Policemen v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014).............................................................................10

*Dura Pharm. v. Broudo*,
 544 U.S. 336 (2005).......................................................................................22

*In re Eletrobras Sec. Litig.*,
 __ F. Supp. 3d __, 2017 WL 11517138 (S.D.N.Y. Mar. 27, 2017).......................13

*Funke v. Life Financial Corp.*,
 237 F. Supp. 2d 458 (S.D.N.Y. 2002)................................................................20

*Ganino v. Citizens Utilities Co.*,
 228 F.3d 154 (2d Cir. 2000).............................................................................23

*GE Investors v. General Elec. Co.*,
 447 Fed. Appx. 229 (2d Cir. 2011)....................................................................23

*In re Gentiva Sec. Litig.*,
 932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................17

*In re Investment Tech. Grp. Sec. Litig.*,
  __ F. Supp. 3d __, 2017 WL 1498055 (S.D.N.Y. Apr. 26, 2017) ...........................................14

*Janbay v. Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .........................................................................17

*In re JP Morgan Chase Sec. Litig.*,
  2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) ...........................................................................10

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005).......................................................................................7

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001).......................................................................................18, 19, 20

*Lapin v. Goldman Sachs*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006).....................................................................................13

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).....................................................................................................23

*In re Lions Gate Entm't Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)...........................................................................................9

*Lopez v. CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016).......................................................................................11

*Loreley Financing v. Wells Fargo*,
  797 F.3d 160 (2d Cir. 2015).....................................................................................................21

*Menaldi v. Och-Ziff Capital Management*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................................................8, 9

*In re Mirant Corp.*,
  2009 WL 48188 (N.D. Ga. Jan. 7, 2009) ..................................................................................7

*In re Omnicom Grp. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)................................................................................22, 24

*In re Omnicom Grp., Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)....................................................................................................22

*In re Par Pharm. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990)..........................................................................................13

*In re PetroChina Sec. Litig*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015)......................................................................12, 15, 17

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) ........................................................................ 19

*Richman v. Goldman Sachs*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........................................................................... 16, 17

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................................................. 19

*S. Cherry St. LLC v. Hennessee Grp.*,
   573 F.3d 98 (2d Cir. 2009) ................................................................................................ 18

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................................ 18

*Shoemaker v. Cardiovascular Systems*,
   2017 WL 1180444 (D. Minn. Mar. 29, 2017) ..................................................................... 7

*Special Situations Fund III v. Deloitte Touche Tohmatsu*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014) .................................................................................. 25

*Stevelman v. Alias Research*,
   174 F.3d 79 (2d Cir. 1999) ................................................................................................ 19

*Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ............................................................................................................ 6

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) ................................................................................................ 22

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................................... 23

*Teachers' Ret. Sys. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ............................................................................................. 24

*Teamsters Local 455 v. Dynex Capital*,
   531 F.3d 190 (2d Cir. 2008) .............................................................................................. 21

*Tellabs v. Makor Issues & Rights*,
   551 U.S. 308 (2007) .......................................................................................................... 18

*In re Tyson Foods Sec. Litig.*,
   2017 WL 3185856 (W.D. Ark. July 26, 2017) ..................................................................... 7

*United States v. Kay*,
   359 F.3d 738 (5th Cir. 2004) .............................................................................................. 8

*Wang v. Bear Stearns*,
  14 F. Supp. 3d 537 (S.D.N.Y. 2014)................................................................24

*Waters v. General Elec. Co.*,
  2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010).................................................23

*In re Yukos Oil Co.*,
  2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...............................................7, 20

## **Statutes**

15 U.S.C. § 78t(a) ...................................................................................................25

15 U.S.C. § 78u-4(b)(2)(A)......................................................................................18

15 U.S.C. § 78dd-2(a) ...............................................................................................7

15 U.S.C. § 78dd-2(h)(2)(A).......................................................................................7

18 U.S.C. § 215 ..........................................................................................................7

## **Rules**

Rule 9 .........................................................................................................................7

Rule 9(b) ..................................................................................................................6, 9

**Preliminary Statement**

On November 9, 2016, Rio Tinto plc announced that, in 2011, it had paid $10.5 million to a consultant, Francois de Combret, for advisory services in connection with the Company's efforts to secure rights to a mining development in the Simandou region of Guinea.  Rio Tinto disclosed that it had launched an internal investigation into the matter, had notified regulatory authorities in the United Kingdom, the United States, and Australia, and that two of the Company's executives were no longer in their positions.  Shortly thereafter, Rio Tinto announced that its board of directors had concluded that the two executives, only one of whom is named as a defendant in this case, had not maintained the standards expected under Rio Tinto's internal code of conduct.  Rio Tinto did not announce it had concluded any law was violated.

Still, rather than await the conclusion of the Company's investigation or any government inquiries, Plaintiff filed suit immediately—asserting, without *any* supporting factual allegations, that Rio Tinto's payment to de Combret was unlawful.  Plaintiff brings securities fraud claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 against Rio Tinto and three of its former officers.  Plaintiff repeatedly characterizes the payment to de Combret as an "unlawful bribe," and claims that Defendants committed securities fraud by failing to disclose it in public statements made from March 16, 2012 through November 17, 2016.  The non-disclosure of the alleged unlawful payment is the sole basis for Plaintiff's securities fraud claims.

The only law Plaintiff claims the payment to de Combret violated is the U.S. Foreign Corrupt Practices Act.  However, the FCPA does not prohibit payments to consultants; it prohibits certain payments to "foreign officials."  Plaintiff does not allege that de Combret was a foreign official.  To the contrary, he affirmatively alleges facts indicating that de Combret was *not* a foreign official, characterizing him as the owner of an "independent advisory firm," and an "informal advisor" and close friend of the Guinean President.

1

Plaintiff's failure to plead any unlawful conduct by Rio Tinto is dispositive of this case. When a securities fraud claim is premised on a failure to disclose allegedly illegal conduct, the heightened pleading requirements applicable to securities fraud claims require the plaintiff to plead *with particularity* that the alleged unlawful conduct occurred.  Because Plaintiff does not do so, he cannot state a securities fraud claim for failing to disclose such putative conduct.

Further, Plaintiff has not stated a claim for other independent reasons.  *First*, none of the alleged misstatements identified in the complaint is actionable.  Many of the statements are non-actionable puffery, and others are not false or misleading as a matter of law.

*Second*, and independently, Plaintiff fails to plead with particularity facts giving rise to a strong inference that Defendants acted with scienter—that is, with knowledge that any statement was false or misleading or with reckless disregard for the truth.  Rather, the strongest inference from Plaintiff's allegations is that the Individual Defendants did *not* believe the payments were unlawful because the complaint quotes from internal Rio Tinto emails that show they believed de Combret had behaved with integrity in his work for Rio Tinto.

*Third*, and independently, Plaintiff fails to plead that the allegedly fraudulent statements proximately caused him economic loss, another indispensable component of a securities fraud claim.  Plaintiff alleges that Rio Tinto's November 9, 2016 disclosure—in which it announced its internal investigation, that it was self-reporting to regulators, and that it had removed certain executives from their positions—was a "corrective" disclosure, but Plaintiff does not allege that any losses flowed from that disclosure.  Rather, the complaint notes, the price of Rio Tinto securities *went up*.  Plaintiff then purports to peg his loss to disclosures that occurred almost a week later—but those were not "corrective" of anything Plaintiff alleges should have been disclosed earlier.  Thus, because Plaintiff does not (and cannot) claim a negative market reaction

following the November 9 disclosure, Plaintiff's loss causation allegations are insufficient.

## Background[1]

Rio Tinto is a mining company headquartered in the United Kingdom.  (Docket #40, Compl. ¶¶ 21, 37)  Plaintiff is a putative investor in Rio Tinto American Depositary Receipts ("ADRs"), and seeks to bring this lawsuit on behalf of investors who purchased Rio Tinto ADRs from March 16, 2012 through November 17, 2016.  (*Id.* ¶ 1)

### A.     The Alleged Unlawful Payment To Rio Tinto's Consultant

Plaintiff alleges that, in 2010, Rio Tinto was anxious that it might lose mining rights to certain parts of the Simandou region of Guinea, which the government of Guinea had granted to the Company years before.  (Compl. ¶ 69)  As a result of that anxiety, as Plaintiff tells it, Rio Tinto paid $10.5 million to Francois de Combret, the principal of an independent advisory firm.  (*Id.* ¶ 70)  Plaintiff alleges that de Combret provided services including "vouch[ing] for [the Company's] integrity," "help[ing] to bring [the Company and Guinea] together," and "help[ing] with a number of communications issues with the President and the Minister of Mines."  (*Id.* ¶ 72)  And, according to the complaint, de Combret was effective: Plaintiff alleges that de Combret's services "help[ed] Rio Tinto secure its grasp" on the Simandou mining rights.  (*Id.* ¶ 76)  Rio Tinto signed an agreement on April 22, 2011 to secure the Simandou rights in exchange for a payment to Guinea of $700 million.  (*Id.* ¶ 77)

What Plaintiff does not allege is also significant.  Plaintiff does not allege that de Combret had an official role with the Guinean government, nor that de Combret paid the money he received from Rio Tinto to anyone in the Guinean government.  To the contrary, Plaintiff alleges de Combret was "[a]n *informal* advisor to Guinean President Conde" and was his "close friend."

---

[1] This motion takes as true, as it must, the facts alleged in the complaint.  However, Plaintiff's legal conclusions and characterizations of his factual allegations are owed no deference.

(Compl. ¶ 70, emphasis added)  Thus, the entirety of Plaintiff's factual allegations regarding de Combret is that he ran an independent advisory firm, was a friend and informal advisor to Guinea's president, and was retained by Rio Tinto to assist in securing mining rights in Simandou.[2]

In addition to the allegations about de Combret himself, Plaintiff also alleges the contents of four internal Rio Tinto emails discussing the Company's efforts to reach a final agreement with de Combret on his payment after his work had concluded.  In the first email, Defendant Davies wrote to Walsh that,

> the result we achieved was significantly improved by Francois' contribution and his very unique and unreplicable services and closeness to the President. He vouched for our integrity when it was needed and helped bring us together when things were looking extremely difficult.  These services were of the most unique nature, and we will never fully be able to judge the potential outcome if he was not assisting in [sic] us in good faith.

(Compl. ¶ 72)[3]  Davies also wrote that de Combret "helped me on a number of communication issues with the President and the Minister of Mines, which has been invaluable" and that de Combret had "behaved with the utmost integrity."  (*Id.*)  Walsh then wrote to Defendant Albanese: "No question that [de Combret] delivered sizeable value."  (*Id.* ¶ 71)  Thus, the internal emails alleged in the complaint do not indicate, or even suggest, any belief by the Individual Defendants that the payment to de Combret was unlawful.  Rather, they state the

---

[2] Plaintiff alleges that, in 2012 (that is, after de Combret's work is alleged to have concluded), de Combret was recorded to have said that Guinea's President told Rio Tinto, "if there's no downpayment, I'll cancel the concession."  (Compl. ¶ 75)  Plaintiff does not allege the supposed statement had anything to do with Rio Tinto's payment to de Combret, rather than the Company's $700 million payment to Guinea itself.  There is nothing suspicious about a contractual party saying that unless it receives payment on a satisfactory schedule, the contract will be canceled.

[3] Although it is not meaningful for purposes of this motion, the complaint quotes the four emails out of order, likely because the various time stamps on the emails were from different time zones.  The correct order of the emails is paragraph 72, 71, 74, and then 73.

officers believed de Combret acted with integrity.  The complaint alleges no facts suggesting otherwise.

### B.      Rio Tinto's Disclosure Of The Payment To The Consultant

Plaintiff alleges that, in 2015, other unnamed Rio Tinto officers discovered the 2011 internal emails and decided to hire outside counsel to investigate.  (Compl. ¶¶ 79, 81)  Plaintiff does not allege who made the decision to investigate, why the decision was made, how the investigation was conducted, or what the investigation found.  Instead, Plaintiff fast-forwards to November 9, 2016, when Rio Tinto issued a press release titled "Rio Tinto contacts regulatory authorities" that stated:

> On 29 August 2016, Rio Tinto became aware of email correspondence from 2011 relating to contractual payments [totaling] US$10.5 million to a consultant providing advisory services on the Simandou project in Guinea.

> The Company launched an internal investigation into the matter led by external counsel.  Based on the investigation to date, Rio Tinto has today notified the relevant authorities in the United Kingdom and United States and is in the process of contacting the Australian authorities.

> Energy & Minerals chief executive Alan Davies, who had accountability for the Simandou project in 2011, has been suspended with immediate effect.

> Legal & Regulatory Affairs group executive Debra Valentine, having previously notified the Company of her intention to retire on 1 May 2017, has stepped down from her role.

(*Id*. ¶ 187)  One week later, on November 16, 2016, Rio Tinto announced that its board had determined that Davies and Valentine had "failed to maintain the standards expected of them under [Rio Tinto's] global code of conduct" and that it had terminated both executives.  (*Id.* ¶ 190)  Plaintiff does not identify any Rio Tinto disclosure indicating that any individual—or the Company itself—had violated any law.

## Argument

The elements of a § 10(b) claim are that the defendant (1) made a material misrepresentation or omission of fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff justifiably relied, and (5) that caused the plaintiff's damages. *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act create a heightened pleading standard for such claims, requiring the plaintiff to plead the first two elements—a misrepresentation and scienter—with particularity.  *See ATSI Commns v. Shaar Fund*, 493 F.3d 87, 99 (2d Cir. 2007).  Here, Plaintiff's allegations do not satisfy his pleading burdens for three independent reasons.  First, Plaintiff has not pled that Defendants issued a false or misleading statement because: (A) he has not pled with particularity that Rio Tinto's payment to de Combret was unlawful, and (B) each allegedly fraudulent statement is either non-actionable corporate puffery or is otherwise non-actionable as a matter of law.  Second, Plaintiff has not pled facts that create the requisite strong inference that Defendants acted with scienter in issuing any alleged misstatement.  Third, Plaintiff has not pled that he was damaged by any misstatement.

## I.    Plaintiff Does Not Plead With Particularity A False Or Misleading Statement.

### A.    Plaintiff Does Not Plead With Particularity That Rio Tinto's Payment To de Combret Was Unlawful.

The central premise of Plaintiff's securities fraud claim is that Rio Tinto's payment to de Combret was unlawful.  Plaintiff *characterizes* the payment as a "bribe" intended "to grease the wheels" in Guinea.  (*E.g.*, Compl. ¶ 7)  But when a securities fraud claim is premised on the non-disclosure of an allegedly unlawful act, Rule 9(b) and the PSLRA require the plaintiff to

plead *with particularity* that the unlawful conduct occurred and why it was unlawful.[4]  Plaintiff

fails to plead with particularity any facts establishing the payment to de Combret was unlawful.

Plaintiff pleads that Rio Tinto paid de Combret $10.5 million, and that de Combret was

"a close friend" and "informal advisor to Guinean President Conde."  (Compl. ¶ 70)  Plaintiff

*characterizes* the payment as an unlawful bribe, but alleges no *facts* that support the characteri-

zation.  The FCPA does not prohibit all payments to foreigners.  Rather, it prohibits only certain

payments made directly or indirectly to "foreign officials."  15 U.S.C. § 78dd-2(a).  The FCPA

defines "foreign official" to mean an "officer or employee of a foreign government" or a person

"acting in an official capacity" for a foreign government.  15 U.S.C. § 78dd-2(h)(2)(A).

Plaintiff does not allege that de Combret was a foreign official.  He does not allege that

de Combret was an "officer or employee" of the Republic of Guinea, or that de Combret could or

did act in an "official capacity" for the Republic.  Quite the opposite, he alleges de Combret was

an "*informal* advisor" and "close friend" of Guinea's President, and that de Combret had his own

independent advisory firm.  (Compl. ¶¶ 70, 29 (emphasis added))  Nor does Plaintiff allege—

even in a conclusory manner—that de Combret passed along the payment to any foreign official.

Paying a consultant or lobbyist familiar with the practices of a local country is not unlaw-

ful.  This is true even if the consultant or lobbyist has close ties to the local government.  (*See*

---

[4] *See In re Axis Capital*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (dismissing a § 10(b) claim alleging undisclosed illegal conduct because the plaintiffs' allegations were "far too conclusory to satisfy the requirements of Rule 9 and the PSLRA"); *In re Yukos Oil Co.*, 2006 WL 3026024, *14 (S.D.N.Y. Oct. 25, 2006) ("[T]he Complaint fails to plead with particularity sufficient facts demonstrating that [Defendant's] tax strategy violated Article 40 of the Russian Federation Code."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) ("Plain-tiffs contend that [Defendant] made material omissions in failing to disclose its violations of 18 U.S.C. §§ 215 and 1005.  Plaintiffs have failed to allege with particularity that [Defendant] or its agents violated these statutes."); *In re Tyson Foods Sec. Litig.*, 2017 WL 3185856, *10 (W.D. Ark. July 26, 2017) (same); *Shoemaker v. Cardiovascular Systems*, 2017 WL 1180444, *8 (D. Minn. Mar. 29, 2017) (same); *In re Mirant Corp.*, 2009 WL 48188, *17 (N.D. Ga. Jan. 7, 2009).

Kritzer Ex. 1: DOJ Opinion Procedure Release 12-01 (Sept. 18, 2012) (concluding that a company may even employ a member of a local Royal Family as a lobbyist))[5]  "Many companies doing business in a foreign country retain a local individual or company to help them conduct business."  (Kritzer Ex. 2: DOJ & SEC, A Resource Guide to the U.S. Foreign Corrupt Practices Act, at 21 (Nov. 14, 2012))  Such individuals may provide essential advice regarding local customs and procedures and may help facilitate business transactions.  *Id*.  A Conference Committee report issued in 1988 regarding amendments to the FCPA expressly indicated Congress's understanding that the statute should not "be construed so broadly as to include lobbying or other normal representations to government officials."  U.S. H.R. Conf. Rep. 100-576, 1988 WL 170253, *1918-19; *United States v. Kay*, 359 F.3d 738, 751 (5th Cir. 2004) (same).  Thus, Plaintiff's allegation that Rio Tinto paid de Combret to assist in communicating or improving relations with Guinea or to lobby Guinea's government does not constitute unlawful conduct.

    Plaintiff's allegations here closely parallel those recently dismissed by Judge Oetken in *Menaldi v. Och-Ziff Capital Management*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016).  There, the plaintiffs alleged that the defendants had used a "fixer" to broker deals in Libya that "resulted in unlawful payments to Libya's Intelligence Chief."  *Id*. at 579.  But the plaintiffs "d[id] not allege such a payment; they simply state[d] that the fixer in question 'maintains a close relationship with the Libyan Intelligence Chief.'"  *Id*.  As a result, the court held that the plaintiffs had not pled that unlawful conduct occurred.[6]  The same is true here.  As in *Menaldi*, Plaintiff alleges

---

[5] Citations herein to "Kritzer Ex." are to the exhibits attached to the Declaration of Nathaniel J. Kritzer, filed with this brief.

[6] In that case, Judge Oekten held that he need not even resolve whether a heightened pleading requirement applies to allegations of unlawful conduct that underpin a securities fraud claim because the plaintiffs' allegations—which are substantially the same as Plaintiff's here—did not even state a claim under the regular notice-pleading standard.  *See* 164 F. Supp. 3d at 578 n.5.

that Rio Tinto paid a friend of a senior government official to provide assistance.  But, as in *Menaldi*, Plaintiff fails to allege that the friend had any official government position or that the payment ultimately passed to a government official.  Thus, Plaintiff has not pled unlawful conduct, and that is fatal to his claim that Defendants are liable for securities fraud for failing to disclose unlawful conduct.[7]

### B.   Plaintiff Does Not Plead An Actionable Misstatement For Additional, Independent Reasons.

Plaintiff also fails to plead a false or misleading statement because each of the alleged misrepresentations are not actionable for additional reasons.

### 1.   Many Of The Alleged Misstatements Are Non-Actionable Puffery.

Plaintiff identifies as fraudulent certain statements in which Rio Tinto discussed the Company's commitment to integrity, or its compliance with the law or with the Company's internal codes of conduct (called *The way we work* and the Business Integrity Standard):

> 2011 SEC Form 20-F: "Rio Tinto's commitment to integrity and compliance is set out in *The way we work*."  (Compl. ¶ 96)

> October 25, 2012 Media Release: "Rio Tinto is committed to excellence in environmental and social performance.  It operates in accordance with strict corporate policies covering social and environmental responsibility, corporate governance

---

[7] Plaintiff's pre-motion letter argued that "Rio Tinto tacitly conceded the illegality of [the de Combret] payment by recognizing a contingent liability" in 2017.  (Docket #58 at 3)  But the disclosure of a contingent liability is not a concession of a definite liability—that is, that the Company's conduct was unlawful.  Rather, it is, under Generally Accepted Accounting Principles, a statement that the contingency disclosed is more than a remote possibility, but less than a likely one.  *See, e.g.*, *In re Lions Gate Entm't Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (explaining ASC 450, the accounting rule for contingent liabilities).  Disclosing a contingent liability is substantively no different from what Rio Tinto said on November 9, 2016, when it announced it was investigating and self-reporting to regulators—that there *might* be an issue.  (*E.g.*, Compl. ¶ 201 ("we think something *might* have gone wrong") (emphasis added))  But Rio Tinto has not announced the results of its investigation, and neither has any regulator.  Plaintiff asks the Court to assume, based on the existence of investigations evaluating *whether* there was unlawful conduct, that unlawful conduct did in fact occur.  Rule 9(b) and the PSLRA require more. *See supra* at 6-7 & n.4.

and sustainability established under its a [sic] global code of business conduct 'The way we work'…. Rio Tinto also supports several international voluntary agreements, including the Extractive Industries Transparency Initiative … and the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions." (*Id.* ¶ 111, ellipses in complaint)

November 1, 2012 Media Release: "[Rio Tinto has an] ongoing commitment to open consultation and transparency." (*Id.* ¶ 114)

2012 Annual Report: "We continue to participate with Transparency International (www.transparency.org), a global civil society organization in the fight against bribery and corruption. We were one of the original corporate members of the steering committee which drafted Transparency International's Business Principles for Countering Bribery and continue to participate in that committee. Rio Tinto is also a strong supporter of the World Economic Forum's Partnering Against Corruption Initiative (PACI). Rio Tinto is committed, in principle and practice, to transparency consistent with good governance and commercial confidentiality." (*Id.* ¶ 122)

July 9, 2013 SEC Form 6-K: "[Rio Tinto and Guinea] affirmed their commitment to the Simandou Project and recognized the Project's importance to Guinea and to the other partners. They emphasized the importance of transparency and good governance in the development and operation of the project." (*Id.* ¶ 134)

August 8, 2013 Media Release: "The directors of Rio Tinto believe that the highest standards of corporate governance are essential to its pursuit of greater shareholder value and have continued to apply the standards discussed under 'Corporate governance' [in the Annual Report]." (*Id.* ¶ 136; *see also* ¶¶ 156, 169 (same))

These statements are non-actionable puffery for purposes of a securities fraud claim. As an initial matter, it is "well-established" that "general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely on them." *City of Pontiac Policemen v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Thus, a "generalized boast that [a company] set the standard for best practices in risk management could not have been relied upon by reasonable investors." *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, *12 (S.D.N.Y. Mar. 29, 2007); *see also In re Braskem Sec. Litig.*, __ F. Supp. 3d __, 2017 WL 1216592, *14 (S.D.N.Y. Mar. 30, 2017) (similar).

Consequently, statements discussing generally Rio Tinto's commitment to transparency or status as an industry leader in risk management are not actionable.

The same holds true for statements about Rio Tinto's internal codes of conduct. Plaintiff asserts that Rio Tinto's annual SEC filings "incorporated by reference the statements made in *The way we work* and Business Integrity Standard." (Compl. ¶ 99; *see also* ¶¶ 112, 128, 144, 161, 175) This is inaccurate. Rather, the SEC filings described *The way we work*, stating:

> Rio Tinto's commitment to integrity and compliance is set out in *The way we work*. This contains principles and standards of conduct which reaffirm the Group's commitment to corporate responsibility. It is inspired by our four core values: accountability, respect, teamwork, and integrity.

(*Id*. ¶ 96)[8] The SEC filings make no representations regarding compliance with *The way we work* or the Business Integrity Standard. Consequently, the descriptions in the SEC filings are immaterial puffery for the same reasons as described above.

Nor are the statements in *The way we work* or Business Integrity Standard themselves actionable, for "a code of ethics is inherently aspirational." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016); *see also Braskem*, 2017 WL 1216592, at *14 ("[I]t simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all."). This is further established by the context of the documents themselves, which are not statements to investors but to Rio Tinto's *employees*, and are both instructional and aspirational, rather than representations about the Company's actual status. (Kritzer Exs. 3-6) There is an "important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct." *Braskem*, 2017 WL 1216592, at *14. Rio Tinto's internal codes are an ex-

---

[8] Plaintiff does not allege the SEC filings described the Business Integrity Standard. (*E.g.*, Compl. ¶ 99) Further, although Plaintiff alleges "Rio Tinto disclosed its 'Business integrity standard,'" he does not allege how it was disclosed, when, or who disclosed it. (*Id*. ¶ 89)

ample of the former.  Thus, "[a]lthough the Company's codes of ethics prohibit bribery, they do

not claim [the Company's] officers are abiding by them."  *In re PetroChina Sec. Litig*, 120 F.

Supp. 3d 340, 360 (S.D.N.Y. 2015).

Judge Gardephe's decision in *Avon Products* demonstrates concretely the application of

these principles.  In that case, Avon had stated publicly that "its associates will observe the very

highest standards of ethics in the conduct of Avon's business, so that even the mere appearance

of impropriety is avoided."  *City of Brockton Ret. Sys. v. Avon Prods.*, 2014 WL 4832321, *13

(S.D.N.Y. Sept. 29, 2014).  The company's internal code of conduct stated that "[b]ribes, kick-

backs and payoffs to government officials, suppliers and other[s] are strictly prohibited."  *Id.* at

*14 (brackets in original).  It published a "corporate responsibility report" that stated "Avon con-

tinues to adhere to the highest standards of integrity, ethical conduct and good corporate citizen-

ship."  *Id.*  Even so, in response to allegations that Avon employees had bribed Chinese officials,

that Avon executives had been aware of it, and that government investigations were ongoing, the

court held that Avon's statements regarding compliance with anti-bribery laws and its internal

code were not actionable.  The court first explained that "[c]ourts in this Circuit have found

statements similar to those in Avon's Ethics Code and Corporate Responsibility Reports—

general statements proclaiming compliance with ethical and legal standards—to be non-

material."  *Id*. at *15.  The court then held:

> Here, a reasonable investor would not rely on the statements discussed above as a
> guarantee that Avon would, in fact, maintain a heightened standard of legal and
> ethical compliance.  The aforementioned statements from the Ethics Codes and
> the Corporate Responsibility Reports offer no assurance that Avon's compliance
> efforts will be successful, and do not suggest that Avon's compliance systems
> give the Company a competitive advantage over other companies.  Instead, these
> statements merely set forth standards in generalized terms that Avon hoped its
> employees would adhere to.  Such statements are not material.

*Id*. at *16 (internal citation omitted).  So too here.

12

Plaintiff's pre-motion letter cited two decisions where courts have found narrow exceptions to the above, holding that statements about compliance with the law or internal codes of conduct were actionable.  (Docket #58 at 4 n.5)  But in the first case compliance was central to the defendant's effort to win *customers*, so the court held the statement was material to shareholders for that reason.  *See Lapin v. Goldman Sachs*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006).  And in the second decision, the statements were made in response to press reports of an investigation into unlawful conduct, and so the court held that investors would have understood that statement, in context, as a specific representation.  *See In re Eletrobras Sec. Litig.*, __ F. Supp. 3d __, 2017 WL 11517138, *6 (S.D.N.Y. Mar. 27, 2017).  Neither of these situations is alleged to be true here, and so the narrow exceptions to the general rule do not apply.

## 2.  Many Of The Alleged Misstatements Are Not False Or Misleading As A Matter Of Law.

Next, many of the alleged misstatements are also inadequately pled for the *additional* and independent reason that "reasonable minds could not differ on the question of whether the statements alleged in the complaint were [false or] misleading under the circumstances in which they were made."  *In re Par Pharm. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990).

### a.  Statements Regarding The Potential For Material Loss From Current Legal Claims

First, Plaintiff alleges that Defendants misled investors regarding the potential material losses Rio Tinto expected from *currently* outstanding legal claims.  For example:

> 2011 SEC Form 20-F: "There are a number of legal claims currently outstanding against the Group.  No material loss to the Group is expected to result from these claims."

(Compl. ¶ 102; *see also* ¶¶ 122, 146, 163 (same quote, different years))  Reasonable minds could not differ on the question of whether the statements alleged in the complaint were false or misleading, for the statements concerned only legal claims or regulatory investigations pending *at*

*that time. See In re Investment Tech. Grp. Sec. Litig.*, __ F. Supp. 3d __, 2017 WL 1498055, *11 (S.D.N.Y. Apr. 26, 2017) (holding that statements made in the present tense, "on their face, purport to describe [a company's] then-present state").  Plaintiff does not allege there were any legal claims or investigations pending against Rio Tinto regarding the payment to de Combret at the time these statements were made.  Thus, Plaintiff has not alleged the statements were false.

And neither has he alleged they were misleading, for investors are aware that large companies take, through their employees, hundreds or thousands of actions each day, any of which might lead to legal claims or regulatory investigations.  No investor could reasonably interpret a statement about then-pending claims as a statement that Rio Tinto's managers had evaluated each act of each employee that had already occurred to determine whether any might lead to legal claims or investigations in the future.  Defendants' statements did not say any such thing, and no reasonable investor would have been misled by them.

### b.    Statements Regarding NYSE Standards And Practices

Additionally, Plaintiff alleges as fraudulent statements regarding Rio Tinto's compliance with the New York Stock Exchange's Corporate Governance Standards.  For example:

> 2011 SEC Form 20-F: "Rio Tinto plc, as a foreign issuer with American Depositary Shares listed on the NYSE, is obliged by the NYSE Standards to disclose any significant ways in which its practices of corporate governance differ from the NYSE Standards…. The Company has reviewed the NYSE Standards and believes that its practices are broadly consistent with them."

(Compl. ¶ 97; *see also* ¶¶ 127, 143, 160, 174 (alleging that, in other SEC Form 20-Fs, "Rio Tinto made statements … which were substantially similar in all material respects to those statements in the 2011 20-F above in ¶ 97"))  According to Plaintiff, the NYSE Corporate Governance Standards "requir[e] that companies adopt and disclose a code of business conduct and ethics for directors, officers, and employees, which must at the least address compliance with laws, rules, and regulations."  (*Id.* ¶ 98)  But Rio Tinto *did* adopt and disclose a code of business conduct and

14

ethics—as Plaintiff himself alleges.  (*E.g.*, *id.* ¶ 82 ("Throughout the Class Period, Rio Tinto touted … the Company's compliance with several of its mandatory codes, including, without limitation, *The way we work*."))  As Judge Ramos held in rejecting precisely the same argument only two years ago, "[s]ince the [complaint] does not challenge the actual existence of these rules, nor PetroChina's description of them, Plaintiffs have not demonstrated that the Company's statements were false or misleading."  *PetroChina*, 120 F. Supp. 3d at 360.

### c.      Other Miscellaneous Statements

Plaintiff also asserts a number of other putative misstatements, but they are statements that plainly are not false or misleading.  For example, Plaintiff alleges that, in 2012, more than a year after Rio Tinto and Guinea signed the mining rights agreement, Defendant Albanese stated on a conference call with analysts that "I think in terms of Simandou, I think we are continuing to do quite a bit of work on engineering.  We're engaging with the government of Guinea. We're engaging with our partners on all that work.  We're doing the site prep in terms of future camp areas.  So we're laying the groundwork." (Compl. ¶ 108)  Similarly, in 2013, in response to a question about his "long-term vision" for the Guinea project, Defendant Walsh stated:

> I think in relation to Simandou, there are two critical issues for Simandou.  And firstly, I should say that Alan and his team are doing a great job there in terms of taking the project forward.  We are, however, waiting for the framework agreement to be put in place.  We were expecting that at the end of last year.  And Alan and his team are working with the government of Guinea in terms of taking that forward.

(*Id.* ¶ 120; *see also* ¶¶ 124, 134, 138, 140, 152, 171 (similarly unexplained assertions of misstatements))  As to both the 2012 and 2013 statements, Plaintiff's only explanation for how they were false or misleading is a citation to the same paragraph of the complaint that "explains" how every other alleged misstatement was fraudulent.  (*Id.* ¶¶ 109, 121)  There is simply nothing even arguably false or misleading about these statements.  They neither make a false assertion of fact,

nor leave the reader with a misimpression about whether Rio Tinto paid a consultant to aid in securing the mining rights agreement with Guinea.  Nor do they speak, implicitly or explicitly, to compliance with Rio Tinto's internal code of conduct.  Similarly, Plaintiff highlights a series of statements regarding the SEIA, the national restitution conference, and the Simandou project's designation as a Project of National Interest.  (*Id.* ¶¶ 110-116)  However, he pleads no connection between these events and the alleged bribery, and merely revealing one fact about Simandou does not give rise to a duty to disclose everything about that subject as long as what is revealed is not misleading.  *Richman v. Goldman Sachs*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).[9]

### 3.   Plaintiff Does Not Plead That Statements Regarding Internal Controls Were False Or Misleading Because Plaintiff Does Not Plead Anything About Rio Tinto's Internal Controls.

Finally, Plaintiff alleges that statements about Rio Tinto's internal controls were fraudulent.  For example, Rio Tinto's 2011 SEC Form 20-F stated:

> The Group maintains disclosure controls and procedures as such term is defined in US Exchange Act Rule 13a15(e).  Management, with the participation of the chief executive and chief financial officer, has evaluated the effectiveness of the design and operation of the Group's disclosure controls and procedures pursuant to Exchange Act Rule 13a15(b) as of the end of the period covered by this report and has concluded that these disclosure controls and procedures were effective at a reasonable assurance level.

(Compl. ¶ 104; *see also* ¶¶ 130, 148, 165, 179 (alleging the same statement in other SEC filings))

Plaintiff asserts that such statements were false because they failed to disclose that "the Company's internal controls were insufficient to insure that the Company did not violate anti-bribery, accurate accounting, and internal-control laws."  (*Id.* ¶ 93(e))

---

[9] Similarly, Plaintiff alleges that Rio Tinto's August 3, 2016 SEC Form 6-K misrepresented that "[n]o events were identified after the balance sheet date [June 30, 2016] which could be expected to have a material impact on the consolidated preliminary financial information included in this report."  (Compl. ¶ 183)  However, Plaintiff alleges no events occurring between June 30, 2016, and August 3, 2016, or any other explanation why the statement was false or misleading.

First, Plaintiff fails to allege with particularity "any facts explaining why or how [the] internal controls were materially deficient." *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, *9 (S.D.N.Y. Mar. 30, 2012). "Since plaintiffs' allegations of lack of controls are conclusory assertions without any factual support, they cannot survive this motion to dismiss." *City of Monroe Emp's Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, *22 (S.D.N.Y. Sept. 19, 2011); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (the plaintiff did not allege "any facts pertaining to the Company's internal structure for financial reporting"); *Braskem*, 2017 WL 1216592, at *15 ("[T]he SAC is devoid of *any* allegations indicative of undisclosed control deficiencies affecting Braskem's financial reporting.") (emphasis in original); *PetroChina*, 120 F. Supp. 3d at 359 ("Even if PetroChina officials were engaging in bribery, the SAC does not make any allegations that would imply that the Company had flawed internal controls over financial reporting.").

Second, Plaintiff alleges that Defendants' statements regarding internal controls were false because they "failed to disclose that the Company's internal controls were insufficient to insure that the Company did not violate anti-bribery, accurate-accounting, and internal-control laws." (Compl. ¶ 93(e)) But the statements referred to disclosure controls, and disclosure controls (as their name suggests) are not intended to prevent violations of the law, but to promote accurate disclosures. Thus, even if Plaintiff had alleged unlawful conduct (which he has not), that would not suggest anything about Rio Tinto's disclosure controls, for "[t]he federal securities laws do not require a company to accuse itself of wrongdoing." *Richman*, 868 F. Supp. 2d at 273.[10]

---

[10] Plaintiff also alleges that the required Sarbanes-Oxley Act certifications for Rio Tinto's SEC Form 20-F filings were false. (Compl. ¶¶ 106, 132, 150, 167, 181) But those certifications (Continued…)

## II.   Plaintiff Does Not Plead With Particularity Facts Giving Rise To The Requisite "Strong Inference" That Any Defendant Acted With Scienter.

Independent of his failure to plead a false or misleading statement, Plaintiff also fails to plead that any Defendant acted with scienter—with a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 319 (2007).  While recklessness can satisfy the scienter requirement, it "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." *In re Advanced Battery Techs.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal citations and quotation marks omitted).  It is "a state of mind approximating actual intent." *S. Cherry St. LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009).  A plaintiff bringing a § 10(b) claim must plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). This "strong inference" of state of mind must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The Second Circuit has identified two ways a plaintiff can plead the required "strong inference" of fraudulent intent: (1) by alleging that the defendants "had both motive and opportunity to commit fraud," or (2) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). For motive allegations, a plaintiff must plead with particularity a "concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* at 139.  However, "[m]otives that are

---

merely stated that each filing contained no false statements or material omissions and they therefore add nothing to Plaintiff's claims.  Additionally, the certifications were prefaced by the qualification that it was "based on my knowledge," and Plaintiff does not allege facts showing that the persons who signed the certifications (Defendants Albanese and Walsh) knew or believed any statement in the SEC filing was false.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (holding identical statement was not demonstrably false because plaintiffs did not show that CEO did not believe the statement).

generally possessed by most corporate officers and directors," such as "the desire for the corporation to appear profitable" or "the desire to keep stock prices high to increase officer compensation," are insufficient. *Id.* Further, if the complaint "has failed to demonstrate that the defendant had a motive to defraud the shareholders"—meaning the plaintiff must therefore satisfy the second method of pleading scienter—the "strength of the circumstantial allegations must be correspondingly greater." *Id.* at 142. Here, Plaintiff's allegations do not satisfy either method of pleading scienter for the Individual Defendants or for Rio Tinto.

### A.   Plaintiff Does Not Plead Scienter As To Any Individual Defendant.

First, Plaintiff fails to plead scienter for any Individual Defendant. As an initial matter, Plaintiff does not allege with particularity that any Individual Defendant had motive to commit fraud. The complaint's only reference to motive states that the Individual Defendants "were personally motivated to make false statements … in order to personally benefit from the sale of Rio Tinto securities from their personal portfolios." (Compl. ¶ 220) But the complaint fails to identify *any* stock sales. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period"); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2017 WL 3278928, *2 (S.D.N.Y. Aug. 1, 2017) (same). And, even if Plaintiff had pled specific sales of stock, it would be insufficient, for "the mere allegation of insider sales during the Class Period does not, without more, properly allege motive." *Axis Capital*, 456 F. Supp. 2d at 595. "Instead, Plaintiffs must further allege adequately that the insider sales were 'unusual.'" *Id.*; *see also Stevelman v. Alias Research*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that a strong inference of scienter had not been pled because the plaintiff failed to allege the percentage of their holdings in the company that officers sold during the relevant period and wheth-

er the officers realized an inflated price).  Plaintiff's failure to allege *any* stock sales necessarily means he has not pled that any such sales were unusual.

Nor does Plaintiff allege with particularity circumstantial evidence of scienter for the Individual Defendants.  Plaintiff alleges that the Individual Defendants were aware of Rio Tinto's relationship with de Combret, but, even assuming the payment to de Combret was unlawful, the complaint contains *no* allegations that would establish any Individual Defendant knew it was unlawful, or was reckless in not knowing.  As noted above, the FCPA does not prohibit employing a foreign consultant or lobbyist, even if the individual has close ties to government officials.  *See supra* at 7-8.  And Plaintiff does not allege that any regulatory authority has charged any Individual Defendant of violating the FCPA or any other law.  Nor can scienter be inferred from the "failure" to disclose the payment itself, because there is no duty to disclose unlawful conduct. *See supra* at 17; *Kalnit*, 264 F.3d at 143 (rejecting an inference of scienter for failure to disclose because the duty to disclose "was not so clear"); *Funke v. Life Financial Corp.*, 237 F. Supp. 2d 458, 468 (S.D.N.Y. 2002) (because the accounting rules "did not unambiguously dictate a rule" with respect to the accounting method in question, the "circumstances [were] entirely antithetical to the notion that defendants engaged in conscious misconduct or reckless behavior" in their use of an allegedly inappropriate accounting method); *Yukos*, 2006 WL 3026024, at *20 (dismissing scienter allegation regarding compliance with Russian tax law because Russian law did not clearly prohibit the defendants' actions).  In short, Plaintiff fails to allege facts creating *any* inference—strong or otherwise—that the Individual Defendants acted with fraudulent intent.

Moreover, Plaintiff's allegations affirmatively undermine any inference of scienter. Plaintiff's factual allegations regarding the Individual Defendants' knowledge consist entirely of four internal emails from 2011.  (Compl. ¶¶ 71-74)  However, the emails suggest the individuals

did not believe Rio Tinto's relationship with de Combret was improper, let alone unlawful.  In the emails, the individuals discussed de Combret's work for Rio Tinto—for instance, that he had helped with "communications issues with the President and the Minister of Mines."  (*Id.* ¶ 72)  The emails discussed that de Combret "behaved with the utmost integrity."  (*Id.*)  There is no suggestion that the individuals believed what the Company was doing was unlawful.  The Court need not accept Plaintiff's (or Defendants') characterization of the emails; it can read them for itself.  (*Id.* ¶¶ 71-74, reprinting the email correspondence)

As a result, Plaintiff's allegations do not constitute particularized allegations of fact that give rise to a strong inference that the Individual Defendants acted with knowledge that Rio Tinto's relationship with de Combret was unlawful or with reckless disregard—an extreme departure from the ordinary standard of care—for whether it was unlawful.  Plaintiff alleges next-to-nothing about what acts the Individual Defendants took regarding de Combret, and what thin allegations they do include create a stronger inference of non-culpable intent than of scienter.

### B.    Plaintiff Does Not Plead Scienter As To Rio Tinto.

Plaintiff similarly fails to allege with particularity facts creating a strong inference of corporate scienter for Rio Tinto.  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Teamsters Local 455 v. Dynex Capital*, 531 F.3d 190, 195 (2d Cir. 2008).  However, it is "possible to plead corporate scienter by pleading facts sufficient to create a strong inference either that (1) someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading."  *Loreley Financing v. Wells Fargo*, 797 F.3d 160, 177 (2d Cir. 2015).  Here, Plaintiff has not pled allegations that would create the requisite strong inference of scienter for Rio Tinto apart from the allegations regarding the

Individual Defendants.  Plaintiff does not allege that any Rio Tinto officer or employee other than the Individual Defendants knew about or participated in any allegedly unlawful conduct. As a result, Plaintiff does not plead scienter for Rio Tinto separate from his attempt to plead scienter for the Individual Defendants (which, as discussed above, is insufficient).

## III.    Plaintiff Does Not Plead Loss Causation.

The complaint should also be dismissed for the independent reason that Plaintiff does not adequately plead loss causation, another required component of a § 10(b) claim.  *Dura Pharm. v. Broudo*, 544 U.S. 336, 346 (2005).  Loss causation is the requirement that "the subject of [a] fraudulent statement or omission was the cause of [an] actual [economic] loss suffered."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

To establish loss causation, a plaintiff "must show a sufficient connection between [the fraudulent conduct] and the losses suffered."  *In re Omnicom Grp., Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (brackets in original).  A plaintiff may do this in one of two ways: He may establish that "(1) the market reacted negatively to a corrective disclosure," or "(2) the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused [his] loss."  *In re Omnicom Grp. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008).

Plaintiff in this case alleges a corrective disclosure.  (Compl. ¶¶ 187-195)  However, to plead the required loss causation connected to that corrective disclosure, Plaintiff must *also* allege "that the market reacted negatively to the corrective disclosure."  *Carpenters Pension Trust v. Barclays*, 750 F.3d 227, 233 (2d Cir. 2014) (bracket in original).  Plaintiff fails to do so.

According to Plaintiff's theory of the case—that Rio Tinto should have disclosed the payment to de Combret earlier—the Company's November 9, 2016 disclosure would be entirely sufficient to correct the putative misstatements identified in the complaint.  On that day, Rio Tinto informed investors and regulators that it (1) was aware of, and was conducting an in-

ternal investigation into, the de Combret payment, (2) was informing regulatory authorities of the payment, and (3) had removed two executives from their positions. (Compl. ¶ 187) That is more than what Plaintiff alleges should have been disclosed earlier. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 286-287 (S.D.N.Y. 2008) (holding that an announcement that the SEC was conducting an investigation into a company's options-granting practices was a corrective disclosure for purpose of a securities fraud claim premised on the non-disclosure of allegedly unlawful options-granting).

However, Plaintiff does not allege that the market reacted negatively to the November 9 disclosure, as is required to state an actionable claim. Rather, Rio Tinto's ADR price *rose* 7.05% from November 8 to the close of trading on November 9.[11] Thus, Plaintiff does not allege—and judicially noticeable facts affirmatively disprove—the existence of the required negative market reaction. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (dismissing a securities fraud claim on loss causation grounds because "there is no allegation that the market reacted negatively to a corrective disclosure"); *GE Investors v. General Elec. Co.*, 447 Fed. Appx. 229, 231-32 (2d Cir. 2011) (holding that the plaintiff "failed adequately to plead loss causation" because "no loss occurred upon the revelation of [the] information, as GE's stock price increased" after the supposed corrective disclosure).

---

[11] *See* https://finance.yahoo.com/quote/RIO/history?period1=1478494800&period2=1478754000&interval=1d&filter=history&frequency=1d. *See also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("The district court may take judicial notice of well-publicized stock prices without converting [a] motion to dismiss into a motion for summary judgment."). Plaintiff's allegation that the presidential election "offset" what otherwise would have been a price drop is "inconsequential" here, not to mention entirely speculative. *Compare* Compl. ¶ 188 ("An adverse impact on Rio Tinto's ADR price from these particular statements was entirely offset by the outcome of the U.S. presidential election."), *with Waters v. General Elec. Co.*, 2010 WL 3910303, *10 (S.D.N.Y. Sept. 29, 2010) ("The loss-causation inquiry does not concern itself with why an actual, economic loss did not occur.").

23

Once the "truth" about the payments was disclosed on November 9, 2016, it could not be "disclosed" again.  *See Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory on the C&C transactions is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline."); *Wang v. Bear Stearns*, 14 F. Supp. 3d 537, 545 (S.D.N.Y. 2014) ("Wang has acknowledged that the substance of Zhou's alleged omission on March 14 had already been disclosed to the market at the time of the purchases that day.").  Thus, unless new information that was fraudulently concealed was disclosed on some later date and damaged Plaintiff, he has not adequately pled loss causation.

Plaintiff alleges no such disclosures.  However, he attempts to do so, alleging subsequent events on November 14, 16, and 18.  (Compl. ¶¶ 189-94)  But he does not allege that anything was disclosed on those dates that revealed information he alleges was fraudulent concealed.  First, on November 14, Plaintiff alleges *Bloomberg News* published an article with quotes from Rio Tinto's CEO saying he was "shocked," and that the regulatory investigations may take years to resolve.  (*Id*. ¶ 189)  However, the CEO's reaction to the November 9 disclosure is not something alleged to have been fraudulently concealed, but rather a characterization of the November 9 disclosure.  "[I]f markets react negatively to a characterization, the loss is caused by the subsequent characterization of the transaction, not by the transaction itself."  *Omnicom*, 541 F. Supp. 2d at 552.  So, too, with the length of the regulatory investigations.

On November 16, Plaintiff alleges, Rio Tinto announced it had terminated the contracts of Defendant Davies and another executive, and that the board had concluded the two had failed to maintain the standards expected of them under Rio Tinto's internal code of conduct.  (Compl. ¶ 190)  And, also on that day, Plaintiff alleges, the *Financial Times* published an article stating

that Rio Tinto's lawyers had discovered the emails that led to the investigation more than a year before.  (*Id.* ¶ 191)  But Rio Tinto had already announced on November 9 that the two executives were no longer in their positions.  (*Id.* ¶ 187)  And Plaintiff does not allege any misstatements regarding when the Company discovered the 2011 emails or began the investigation that ultimately led to its November 9 disclosure.  Therefore, the November 16 announcement disclosed nothing new in terms of facts that Plaintiff alleges should have been disclosed earlier.  *See Central States v. Fed'l Home Loan Mortg. Corp.*, 543 Fed. Appx. 72, 76-77 (2d Cir. 2013).

Finally, on November 18, Plaintiff alleges, *Bloomberg News* published an article stating that Guinea had asked Rio Tinto for information regarding the payment to de Combret (Compl. ¶ 192), and another article in which a former mining minister of Guinea was quoted as saying a Rio Tinto executive had tried to bribe him in 2010 (*id.* ¶ 193).  Plaintiff alleges that these statements were also published in an article in the *Australian Financial Review*.  (*Id.* ¶ 194)  However, none of the information published on that date concerns what Plaintiff alleges had been fraudulently concealed earlier.  Consequently, it does not constitute a well-pled loss causation allegation.[12]

## **Conclusion**

For the foregoing reasons, the Court should dismiss this action with prejudice.

---

[12] Count II of the complaint asserts a claim for "control person" liability against the Individual Defendants under § 20 of the Exchange Act, 15 U.S.C. § 78t(a).  But to succeed on this claim, Plaintiff must sufficiently plead a primary violation of § 10(b).  Because Plaintiff has failed to allege a primary violation of § 10(b) (as discussed above), his § 20(a) claim fails as well.  *See Special Situations Fund III v. Deloitte Touche Tohmatsu*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014).

Respectfully submitted,

Dated: September 11, 2017

 /s/ Nathaniel J. Kritzer 
Nathaniel J. Kritzer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
(212) 446-4900 (fax)
Nathaniel.Kritzer@kirkland.com

Mark Filip
Joshua Z. Rabinovitz
Martin L. Roth
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000

Counsel for Rio Tinto plc


 /s/ Michael G. Bongiorno 
Michael G. Bongiorno
Fraser L. Hunter
Musetta C. Durkee
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
(212) 230-8888 (fax)
Michael.Bongiorno@wilmerhale.com
Fraser.Hunter@wilmerhale.com
Musetta.Durkee@wilmerhale.com

Attorneys for Alan Davies

 /s/ Peter J. Romatowski 
Robert C. Micheletto
Nidhi Nina Yadava
JONES DAY
250 Vesey Street
New York, New York 10281
T: 212.326.3939; F: 212.755.7306
rmicheletto@jonesday.com
nyadava@jonesday.com

Peter J. Romatowski
David R. Woodcock
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
T: 202.879.3939; F: 202.626.1700
promatowski@jonesday.com
dwoodcock@jonesday.com

Attorneys for Tom Albanese


 /s/ Matthew L. Schwartz 
Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300
(212) 446-2350 (fax)
mlschwartz@bsfllp.com

Counsel for Sam Walsh

26