**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PURANJAY DAS, Individually and on Behalf of All Others Similarly Situated, <br><br>         Plaintiffs, <br><br>     -against- <br><br> RIO TINTO PLC, TOM ALBANESE, ALAN DAVIES, and SAM WALSH, <br><br>         Defendants. | No. 1:16-cv-09572 (ALC) <br><br> **ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS RIO TINTO PLC, TOM ALBANESE, ALAN DAVIES, AND SAM WALSH'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    STATEMENT OF FACTS ...................................................................................... 4

    1.     Rio Tinto's Bribery Scandal in China and Its Campaign to Reassure the Public ... 4

    2.     The Simandou Saga ................................................................................... 6

    3.     Defendants Make an Unlawful Payment to the GoG for Simandou ...................... 7

    4.     Defendants' Material Misstatements and Omissions During the Class Period .... 11

    5.     Curative Disclosures Caused Rio Tinto ADR Price Drops ................................. 14

III.   ARGUMENT ...................................................................................................... 14

    1.     PLAINTIFF ALLEGES AND SECTION 10(b) AND RULE 10b-5 CLAIM ..... 16

        A.     Falsity and Materiality is Alleged Through Statements About Law-Abidance, Anti-Corruption, GoG Dealings, Contingent Liabilities, and Internal Controls. .................................................................. 16

            i.     Statements About Law Abidance and Anti-Corruption ............... 17

            ii.    Dealings with Gog on Simandou .................................. 33

            iii.   Contingent Liabilities................................................... 37

            iv.    Contingent Liability Under Item 303 of SEC Regulation S-K ..... 40

            v.     Disclosure Controls and Procedures, Internal Controls, and SOX certifications................................................................... 42

            vi.    Individual Defendants' Statements and Omissions ..................... 45

        B.     Scienter is alleged through Defendants doling out the bribe and its repercussions................................................................................... 49

        C.     Loss Causation is Alleged Through Several Curative Disclosures and Price Drops.................................................................................... 59

    2.     CONTROL-PERSON LIABILITY UNDER SECTION 20(a) IS ALLEGED .... 64

    3.     PERSONAL JURISDICTION SHOULD BE EXERCISED .............................. 65

IV.    CONCLUSION.................................................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014) ......................................................................... 51

*Arthur Lipper Corp. v. SEC*,
547 F.2d 171 (2d Cir. 1976) .................................................................................... 53

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... 15, 22, 49

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 15, 22, 49

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007) .................................................................................... 66

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...................................................................... 64

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ................................................................................................ 66

*Burges v. Bancorp South, Inc.*,
No. 3-14-1564 (TJC), 2015 WL 4198795, 2015 U.S. Dist. LEXIS 89822 (D.
Tenn. Jul. 10, 2015) ................................................................................................ 44

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) .................................................................................... 59

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001) .................................................................................... 63

*Cent. States v. Fed. Home Loan Mortg. Corp.*,
543 Fed. App'x 72 (2d Cir. 2013) ............................................................................ 62

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) ................................................................... 35

*Charas v. Sand Tech. Sys. Int'l, Inc.*,
No. 90-cv-5638 (JFK), 1992 WL 296406, 1992 U.S. Dist. LEXIS 15227
(S.D.N.Y. Oct. 7, 1992) ........................................................................................... 69

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) ...................................................................... 20

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
  No. 11-cv-4665 (PGG), 2014 WL 4832321, 2014 U.S. Dist. LEXIS 137387
  (S.D.N.Y. Sept. 29, 2014) ..................................................................................................32, 54

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
  540 F.Supp.2d 464 (S.D.N.Y.2008) ....................................................................................49

*City of Pontiac Gen. Emp. Ret. Sys. v. Wal-Mart Stores, Inc.*,
  No. 12-cv-5162 (SOH), 2014 WL 4823876 (W.D. Ark. Sep. 26, 2014) ...............................54

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................................48, 49

*Derensis v. Coopers & Lybrand Chartered Accountants*,
  930 F. Supp. 1003 (D.N.J. 1996) .........................................................................................69

*DiStefano v. Carozzi N. Am., Inc.*,
  286 F.3d 81 (2d Cir. 2001) ...................................................................................................65

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) ..................................................................................63

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................................59, 60

*ECA & Local 143 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .................................................................................................16

*Fogarazzo v. Lehman Bros., Inc.*,
  341 F. Supp. 2d 274 (S.D.N.Y. 2004) ..................................................................................61

*Fogel v. Wal-Mart De Mexico SAB de CV*,
  No. 13-cv-2282 (KPF), 2017 WL 751155, 2017 U.S. Dist. LEXIS 26976
  (S.D.N.Y. Feb. 27, 2017) ......................................................................................................54

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................................59

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000) .................................................................................................50

*GE Investors, Ret. Plan v. Gen. Elec. Co.*,
  447 F. App'x 229 (2d Cir. 2011) ..........................................................................................62

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012) .................................................................................................59

*Halford* v. *AtriCure, Inc.*,
  No. 1:08-cv-867 (MRB), 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ..............................24

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (SDNY 2008) ..................................................................................52, 55

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ..............................................................................................................64

*Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ......................................................................................57

*In re Advanced Battery Tech., Inc. Sec. Litig.*,
  No. 11-cv-2279 (CM), 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ..................................25

*In re Alstom S.A. Sec. Litig.*,
  406 F. Supp. 2d 346 (S.D.N.Y. 2005) ......................................................................................68

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV 10-06352 MMM, 2013 WL 174119, 2013 U.S. Dist. LEXIS 6977
  (C.D. Cal. Jan. 16, 2013) ....................................................................................................55, 57

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................................................24

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008), *aff'd sub nom. State Univs. Ret. Sys. of
  Ill. v. Astrazeneca LPC*, 334 F. App'x 404 (2d Cir. 2009) .....................................................69

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................................................58

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................................27

*In re Barrick Gold Sec. Litig.*,
  No. 13-cv-3851 (SAS), 2015 WL 1514597, 2015 U.S. Dist. LEXIS 43053
  (S.D.N.Y. Apr. 1, 2015) ................................................................................................ *passim*

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .............................................................35, 52, 56, 65

*In re BofI Holding Sec. Litig.*,
  No. 3:15-cv-02324-GPC-KSC, 2016 WL 5390533, 2016 U.S. Dist. LEXIS
  132574 (S.D. Cal. Sept. 27, 2016) ...........................................................................................44

*In re Braskem S.A. Sec. Litig.*,
  No. 15-cv-5132 (PAE), 2017 WL 1216592, 2017 U.S. Dist. LEXIS 49266
  (S.D.N.Y. Mar. 30, 2017) ............................................................................... *passim*

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................34, 51, 57

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).........................................................................................57

*In re Cadence Design Sys. Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010) ..................................................................52

*In re Check Point Software Tech. Ltd. Sec. Litig.*,
  No. 03 Civ. 6594(KMB), 2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006) ..............58

*In re CINAR Corp. Sec. Litig.*,
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ......................................................................69

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ...................................................................................52

*In re Eletrobras Sec. Litig.*,
  No. 15-cv-5754 (JGK), 2017 WL 1157138, 2017 U.S. Dist. LEXIS 44350
  (S.D.N.Y. Mar. 25, 2017) .................................................................................2, 30, 52

*In re EZCorp., Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016)............................................................. *passim*

*In re Fairway Group Holding Corp. Sec. Litig.*,
  No. 14-cv-0950 (LAK), 2015 WL 249508, 2015 U.S. Dist. LEXIS 5999
  (S.D.N.Y. Jan. 20, 2015).............................................................................................55

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)........................................................................27

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .............................................................25, 34, 57

*In re Geopharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005).......................................................................64

*In re Goldman Sachs Group, Inc. Sec. Litig.*,
  No. 10–cv–3461, 2014 WL 2815571, 2014 U.S. Dist. LEXIS 85683
  (S.D.N.Y. June 23, 2014), *cert. of appeal. denied,* 2014 WL 5002090
  (S.D.N.Y. Oct. 7, 2014) ..............................................................................................43

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12 Civ. 8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)............................57, 58

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................27

*In re JP Morgan Chase Sec. Litig.*,
No. 02-cv-1282 (SHS), 2007 WL 950132, 2007 U.S. Dist. LEXIS 22948
(S.D.N.Y. Mar. 29, 2007) ......................................................................................32

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016).........................................................................42

*In re Magnetic Audiotape Antitrust Litig.*,
99 Civ. 1580(LMM), 2002 WL 975678 (S.D.N.Y. May 9, 2002) .........................................65

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................................54

*In re Mirant Corp. Sec. Litig.*,
2009 WL 48188, 2009 U.S. Dist. LEXIS 789 (N.D. Ga. Jan. 7, 2009)....................................28

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007)..................................................................44, 54

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)..................................................................14, 15

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007)...................................................................4, 61

*In re Oxford Health Plans, Inc. Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999)........................................................................57

*In re Par Pharm., Inc. Sec. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990)...........................................................................35

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 449 (S.D.N.Y. 2005)..................................................................67, 68

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2016)........................................................... *passim*

*In re Petrobras Sec. Litig.*,
150 F. Supp. 3d 337 (S.D.N.Y. 2015)................................................................4, 61, 63

*In re PetroChina Co.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015).................................................................32, 45

*In re Philip Services Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)......................................................................49

*In re Providian Fin. Corp. Secs. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ....................................................................36

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)....................................................................57

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)....................................................................43

*In re Salix Pharms., Ltd.*,
    No. 14-cv-8925 (KMW), 2016 WL 1629341, 2016 U.S. Dist. LEXIS 54202
    (S.D.N.Y. Apr. 22, 2016)..............................................................................49, 58

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................45, 53

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001), *cert. denied*, 534 U.S. 1071 (2001)......................14, 42

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................40, 43, 52, 55

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    No. 00-cv-1041 (DLC), 2000 WL 1234601, 2000 U.S. Dist. LEXIS 12504
    (S.D.N.Y. Aug. 30, 2000) ............................................................................31, 52

*In re Syncor Int'l Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004), *aff'd in part, rev'd in part and
    remanded*, 239 F. App'x 318 (9th Cir. 2007) ........................................................24

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................64

*In re Tyson Foods, Inc. Sec. Litig.*,
    No. 5:16-cv-05340 (TLB), 2017 WL 3185856, 2017 U.S. Dist. LEXIS 116824
    (W.D. Ark. July 26, 2017) ..................................................................................28

*In re UBS AG Securities Litigation*,
    No. 07-cv-11225 (RSJ), 2012 WL 4471265, 2012 U.S. Dist. LEXIS 141449
    (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014) ................31, 48, 49, 55

*In re Van der Moolen Holdings N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)....................................................................34

*In re VEON Ltd. Sec. Litig.*,
　　No. 15-cv-08672 (ALC), 2017 WL 4162342, 2017 U.S. Dist. LEXIS 152240
　　(S.D.N.Y. Sept. 19, 2017) ............................................................................................... *passim*

*In re Vivendi Universal S.A. Sec. Litig.*,
　　634 F. Supp. 2d 352 (S.D.N.Y. 2009) ........................................................................... 60, 64

*In re Winstar Commc'ns*,
　　No. 01-cv-3014 (GBD), 2006 WL 473885, 2006 U.S. Dist. LEXIS 7618
　　(S.D.N.Y. Feb. 24, 2006) .............................................................................................. 57, 61

*In re World Access, Inc. Sec. Litig.*,
　　119 F. Supp. 2d 1348 (N.D. Ga. 2000) ............................................................................... 23

*In re Yukos Oil Co. Sec. Litig.*,
　　No. 04-cv-5243 (WHP), 2006 WL 3026024, 2006 U.S. Dist. LEXIS 78067
　　(S.D.N.Y. Oct. 25, 2006) ................................................................................................... 27

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
　　818 F.3d 85 (2d Cir. 2016) ................................................................................... 39, 41, 55

*Isakov v. Ernst & Young, Ltd. (Bermuda)*,
　　No. 3:10-cv-1517 (MRK), 2012 WL 951897, 2012 U.S. Dist. LEXIS 37534
　　(D. Conn. Mar. 19, 2012) ................................................................................................... 49

*Itoba, Ltd. v. LEP Group PLC*,
　　930 F. Supp. 36 (D. Conn. 1996) ....................................................................................... 69

*Janus Capital Grp., Inc. v. First Derivative Traders*,
　　564 U.S. 135 (2011) ............................................................................................................ 45

*Kiken v. Lumber Liquidators Holdings, Inc.*,
　　155 F. Supp. 3d 593 (E.D. Va. 2015) ................................................................................. 34

*Landry v. Price Waterhouse Chartered Accountants*,
　　715 F. Supp. 98 (S.D.N.Y. 1989) ....................................................................................... 68

*Lapin v. Goldman Sachs Grp.*,
　　506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................................... 2, 30

*Lentell v. Merrill Lynch & Co.*,
　　396 F.3d 161 (2d Cir. 2005) ............................................................................................... 62

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
　　732 F.3d 161 (2d Cir. 2013) ............................................................................................... 66

*Litwin v. Blackstone Grp. L.P.*,
　　634 F. 3d 706 (2d Cir. 2011) ............................................................................................. 33

*Lopez v. CTPartners Exec. Search, Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)......................................................................31

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)...............................................................................70

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986)..................................................................................70

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013).................................................................................65

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................14

*Mauss v. NuVasive, Inc.*,
  No. 13-cv-2005 JM (JLB), slip ............................................................25, 34, 52

*Medis Investor Grp. v. Medis Techs., Ltd.*,
  586 F. Supp. 2d 136 (S.D.N.Y. 2008)..................................................................58

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  No. 14-cv-3251 (JPO), 2016 U.S. Dist. LEXIS 60314 (May 6, 2016).......................25, 26, 27

*Menkes v. Stolt-Nielsen S.A.*,
  No. 3:03-cv-409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) .................................35

*Metro, Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)..................................................................................66

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..............................................................................2, 30

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................14, 50, 51

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)........................................................................................44

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
  595 F.3d 86 (2d Cir. 2010)..................................................................................35

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) (Alito, J.) ..............................................................41

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012).................................................................................40

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
No. 15-CV-7199 (JMF), 2016 WL 5818590, 2016 U.S. Dist. LEXIS 138439
(S.D.N.Y. Oct. 5, 2016) ........................................................................................31

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................51

*Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)....................................................................39

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
No. 10-cv-2835 (NRB), 2011 WL 4357368, 2011 U.S. Dist. LEXIS 106046
(S.D.N.Y. Sept. 19, 2011) ......................................................................................45

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................... *passim*

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (1st Cir. 1987)....................................................................................33

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................................................................53

*S.E.C. v. Jackson*,
908 F. Supp. 2d 834 (S.D. Tex. 2012) ........................................................... *passim*

*S.E.C. v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)...............................................................66, 68

*S.E.C. v. Syron*,
934 F. Supp. 2d 609 (S.D.N.Y. 2013)....................................................................33

*Sapssov v. Health Mgmt. Assoc., Inc.*,
22 F. Supp. 3d 1210 (M.D. Fla. 2014) ..................................................................52

*SEC v. Penn*,
225 F. Supp. 3d 225 (S.D.N.Y. 2016)....................................................................56

*SEC v. Sharef*,
924 F. Supp. 2d 539 (S.D.N.Y. 2013)...............................................................65, 66, 67, 69

*Shell Oil Co. v. Writt*,
464 S.W.3d 650 (Tex. 2015)............................................................................23, 56

*Shoemaker v. Cardiovascular Sys., Inc.*,
No. 16-cv-568, 2017 WL 1180444, 2017 U.S. Dist. LEXIS 47972 (D. Minn.
Mar. 29, 2017)........................................................................................................28

*Siemers v. Wells Fargo & Co.*,
  No. C 05-04518 WHA, 2007 WL 1140660 (N.D. Cal. Apr. 17, 2007)...................................33

*Steckman* v. *Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ........................................................................................41

*Steiner v. MedQuist Inc.*,
  No. 04-5487 (JBS) 2006 WL 2827740 (D.N.J. Sept. 29, 2006)..........................................34

*Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het*
  *Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
  327 F.3d 173 (2d Cir. 2003)..........................................................................................53

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015).......................................................................................41, 42

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001).............................................................................................63

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
  No. 06-cv-13447 (CM) 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008)......................................68

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..........................................................................................62

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)............................................................................................59

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................16, 23, 49

*U.S. v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011)...................................................................................20, 21, 51

*U.S. v. Liebo*,
  923 F.2d 1308 (8th Cir. 1991) ........................................................................................18

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...........................................................................25, 63

*Varghese v. China Shenghuo Pharm. Holdings*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009)..........................................................................43, 55, 57

*Waters v. Gen Elec. Co.*,
  No. 08 Civ. 8484 (RJS), 2010 WL 3910303, 2010 U.S. Dist. LEXIS 107720
  (S.D.N.Y. Sept. 29, 2010)................................................................................................62

*Wilder v. News Corp.*,
No. 11-cv-4947 (PGG), 2015 WL 5853763, 2015 U.S. Dist. LEXIS 137158
(Oct. 7, 2015) ........................................................................................................69

**Statutes**

15 U.S.C. 78m ........................................................................................................41

15 U.S.C. §78aa ......................................................................................................65

15 U.S.C. §78dd-1 ............................................................................................ *passim*

15 U.S.C. §78ff .............................................................................13, 17, 19, 21, 43

15 U.S.C. §78j(b) ......................................................................................................1

15 U.S.C. §78t(a) ......................................................................................................1

15 U.S.C. §78u-4 ........................................................................................14, 16, 49

18 U.S.C §215 ........................................................................................................27

15 U.S.C. §78m ........................................................................................13, 17, 43

18 U.S.C. § 3571(d) ................................................................................................38

**Rules**

Rule 8 ......................................................................................................................22

Rule 9(b) ........................................................................................................ *passim*

Rule 10b-5 ..................................................................................................... *passim*

Rule 12(b)(6) ..................................................................................................14, 15

Rule 15(a) ..............................................................................................................70

**Other Authorities**

17 C.F.R. 229.10(a)(2) ...........................................................................................40

17 C.F.R. §229.303 ........................................................................................ *passim*

17 C.F.R. §240.10b-5 .........................................................................................1, 16

45 Fed. Reg. 63,694 (Sept. 25, 1980) ....................................................................40

47 Fed. Reg. 11,474 (Mar. 16, 1982) .....................................................................40

Case 1:16-cv-09572-ALC   Document 70   Filed 10/11/17   Page 15 of 86

54 Fed. Reg. at 22,428 .................................................................................................41

64 Fed. Reg. 45150 (1999) No. 99...........................................................................33

68 Fed. Reg. 75,061 (Dec. 29, 2003) .......................................................................41

81 Fed. Reg. 23,944 (Apr. 22, 2016) .......................................................................41

xiv

Lead Plaintiff Puranjay Das ("Plaintiff") in the above-referenced action respectfully submits this omnibus opposition to motions by Defendants Rio Tinto plc ("Rio Tinto" or the "Company"), Tom Albanese ("Albanese"), Alan Davies ("Davies"), and Sam Walsh ("Walsh," and together, "Defendants") filed on September 11, 2017 ("Motions") [ECF Nos. 61-69] to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") filed on May 30, 2017 [ECF No. 40].   This action is on behalf of all purchasers of American Depository Receipts ("ADR") of Rio Tinto during the period from March 16, 2012 through and including November 17, 2016 ("Class Period") and were damaged thereby ("Class").   ¶1.[1] Defendants are sued under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## I.      PRELIMINARY STATEMENT

Rio Tinto finds, mines, and processes mineral resources, including iron ore.  Simandou is a mountain that houses one of earth's most valuable iron-ore reserves and is located in Guinea, an African country that is one of the most corrupt countries on earth.  Between 1997 and the first half of 2008, the government of Guinea ("GoG") granted Rio Tinto concessions to Simandou blocks 1 through 4.  In the latter half of 2008, the GoG revoked Rio Tinto's rights to blocks 1 and 2 for breaching the Guinean Mining Code, awarding them to competitors.  Upon his election in 2010, Guinean President Alpha Conde ("Guinean President Conde") announced a re-examination of mining contracts, stripping Simandou concessions from Rio Tinto's competitors.

To ensure that Rio Tinto would not suffer the same fate, in 2011, Rio Tinto made at least one unlawful payment to the GoG to secure its extremely valuable Simandou mining concessions, using Francois Polge de Combret ("Combret"), who was a very close friend, instrumentality, and acted on behalf of Guinean President Conde and other GoG officials.  Upon the revelations related to the payment, Rio Tinto swiftly fired those responsible for the payment, admitted that they

---

[1] "¶__" refers to citations herein to paragraphs in the Complaint.

violated its mandatory code, *The way we work*, and self-reported the payment to several regulators, including, without limitation, the U.S. Department of Justice ("DOJ"), in order to mitigate penalties arising from potential violations of laws, including, without limitation, the anti-bribery provisions, the books-and-records provisions, conspiracy to violate the anti-bribery provisions or books-and-records provisions, and internal-control provisions of the U.S. Foreign Corrupt Practices Act of 1977, 15 U.S.C. §78dd-1, *et seq.* ("FCPA").

Despite this bribe, Rio Tinto misled investors by disclosing in SEC filings, including its annual reports, that "*[w]e operate within all applicable laws and regulations*[,]" for example, and the Company touted compliance with its mandatory code, including, without limitation, *The way we work*, which was disclosed during the Class Period and specifically stated the following, for example, "*We do not commit, or become involved in, bribery or corruption of any form.*"  This was not simply "aspirational."  Rather, Rio Tinto embarked on a campaign to trumpet its adherence to laws and the *The way we work* on the heels of revelations that four Rio Tinto executives a year earlier in 2010 had bribed Chinese officials in connection with iron-ore operations in that country and were sentenced to jail, and despite the public pronouncements of Walsh, "[r]eceiving bribes is a clear violation of Chinese law and Rio Tinto's code of conduct, *The Way We Work.* … [we] will spare no effort in doing everything we can to prevent any similar activity[,]" as well as Albanese, "[e]thical behaviour is at the heart of everything we do.  We have earned a strong reputation for our ethics through our long track record of responsible business practice."  Courts have recognized the actionality of abidance-by-law statements, corporate-integrity statements, and related measures—for example, Sarbanes-Oxley Act of 2002 ("SOX") certifications—under similar circumstances.  *See, e.g.*, *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014); *In re EZCorp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 203-04, 206-08 (S.D.N.Y. 2016); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 377-81 (S.D.N.Y. 2016); *In re Eletrobras Sec. Litig.*, No. 15-cv-5754 (JGK), 2017 WL 1157138, 2017 U.S. Dist. LEXIS 44350, *19-24 (S.D.N.Y. Mar. 25, 2017); *Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006).

Plaintiff also alleges material misstatements and omissions in connection with the following bodies of Defendants' disclosures: Defendants' dealings with the GoG on Simandou, including a $700-million "Settlement Agreement" with the GoG, while hiding that this "Settlement," Rio Tinto's concession in Simandou, and its relationship with the GoG was effectuated, in part, by the unlawful payment; no disclosure of a contingent liability in connection with the unlawful payment starting from the beginning of the Class Period, in violation of International Financial Reporting Standards ("IFRS") and Item 303 of SEC Regulation S-K, 17 C.F.R. §§229.303, 339.303(a); and Rio Tinto's disclosure controls and procedures, internal controls (including those mandated under the FCPA), and Albanese and Walsh's SOX certifications.

Scienter is also clear.  Rio Tinto's senior-most executives, including, without limitation, Albanese (then Rio Tinto's chief executive officer ("CEO")), Davies (then president of International Operations for the Iron Ore group), and Walsh (then Iron Ore group chief executive) authorized the bribe—their fingerprints are on incriminating emails.  Defendants' assertion that this payment was legal and thus did not violate the FCPA, other anti-bribery laws, or internal codes of ethics, is belied by steps taken once the bribes were uncovered.  Rio Tinto swiftly fired senior personnel, including Davies and other members of the Company's executive committee ("Executive Committee"), admitted to violations of *The way we work*, and self-reported to regulators, including, without limitation, the DOJ, reflecting that Defendants knew, or recklessly ignored, that this conduct was illegal.  Defendants' attempt to provide nonculpable explanations for the payment, including whether Combret served as a legitimate consultant for Rio Tinto, as opposed to a conduit for the unlawful payment, should be considered later upon a full record, as opposed to disposition now based on Defendants' self-serving statements.

Loss causation is also amply demonstrated through a flurry of curative disclosures between November 14, 2016 (post-market) and November 18, 2016 in the form of materializations of the risks of the concealed payment, as investors learned about the scope of the fraud and risks of further sanctions against the Company, causing significant damage as artificial inflation in Rio

Tinto's ADRs deflated.  *See, e.g.*, *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 242-43, 245-46, 252-53 (S.D.N.Y. 2007); *In re Barrick Gold Sec. Litig.*, No. 13-cv-3851 (SAS), 2015 WL 1514597, 2015 U.S. Dist. LEXIS 43053, *39-42 (S.D.N.Y. Apr. 1, 2015).

By sufficiently pleading a primary violation and Albanese, Davies, and Walsh's control and culpable participation, Plaintiff pleads a Section 20(a) claim.  Personal jurisdiction should be exercised on all Defendants because they were directly involved in and approved the unlawful payment and made and had ultimate authority over material misstatements and omissions.

## II.      STATEMENT OF FACTS

Plaintiff Das lives in the U.S., purchased Rio Tinto ADRs during the Class Period on the New York Stock Exchange ("NYSE"), and was damaged upon the revelations of the fraud.  ¶20.

Defendant Rio Tinto plc is incorporated in England and Wales.  ¶21.  The Company sponsors an ADR facility with the underlying shares registered with the SEC and listed on the NYSE.  *Id.*  Rio Tinto finds, mines, and processes minerals, including iron ore, the main ingredient in steel.  ¶41.  During the Class Period, (i) Albanese was Rio Tinto's CEO and a member of its board of directors ("BoD") and Executive Committee, (ii) Davies was chief executive of the Energy & Minerals and Diamonds & Minerals business groups and an Executive Committee member, and (iii) Walsh was CEO and a BoD and Executive Committee member.  ¶¶22-24.

## 1.      Rio Tinto's Bribery Scandal in China and Its Campaign to Reassure the Public

In 2010, four Rio Tinto iron-ore executives were convicted in China for bribes approximating $13 million[2] and commercial-secret theft from steelmakers, including internal memoranda outlining China's prices for iron-ore negotiations.  ¶44.  This bribery scandal enabled Rio Tinto to overcharge the Chinese by more than 1 billion renminbi (RMB).  *Id.*  Each Rio Tinto iron-ore executive was sentenced to ranges from seven to fourteen years in jail.  *Id.*

---

[2] Unless stated otherwise, all figures herein are approximations and in U.S. dollars.

Recognizing the shockwaves resonating from this bribery scandal and the convictions, Rio Tinto portrayed those bribes as isolated, including Walsh's public pronouncements:

> "[r]eceiving bribes is a clear violation of Chinese law and … *The Way We Work*. … By doing this they engaged in deplorable behaviour that is totally at odds with our strong ethical culture. In accordance with our policies we will terminate their employment. … We have already implemented a number of improvements to our procedures, and we have now ordered a further far-reaching independent review of our processes and controls. We will introduce any necessary additional measures and safeguards the review recommends and *will spare no effort in doing everything we can to prevent any similar activity.*" ¶¶7, 44-46.[3]

Albanese said *"[e]thical behaviour is at the heart of everything we do.* We have earned a strong reputation for our ethics through our long track record of responsible business practice." ¶46.

Quelling the public's heightened concern, throughout the Class Period, Defendants campaigned to trumpet that Rio Tinto's compliance with laws and its mandatory codes, including, without limitation, *The way we work*, was central to its success and a competitive advantage. ¶82.

- During a February 14, 2013 earnings calls, Walsh stated the following: "*I personally place the highest importance on integrity, accountability, respect and teamwork.* These are values that play a big role on the way I do business and what I expect from my team."

- Form 20-F for 2013 filed with the SEC on March 14, 2014 ("2013 20-F"): "The safety of our people, and *our values – accountability, respect, teamwork and integrity – are at the core of our way of working. … Good governance is essential for the long-term success of the Group.*"

- Form 20-F for 2014 filed with the SEC on March 6, 2015 ("2014 20-F"): "Underpinning everything we do are our values: respect, integrity, teamwork and accountability. *They are fundamental to the way we operate and engage with those around us, and form the foundation of a long-term, reliable business that generates sustainable returns for shareholders.* … But we also know that against a backdrop of uncertainty, Rio Tinto thrives. Our combination of world-class assets, disciplined capital allocation, balance sheet strength, operating and commercial excellence, *and our culture of safety and integrity gives me confidence we are best placed to make the most of the positive long-term demand fundamentals to generate sustainable returns.*"

- April 15, 2014 address to shareholders: "*Good governance is essential to the long-term success of the Group* and your board continues to provide oversight of a robust corporate governance framework. … *Our ability to operate globally is supported by this*

---

[3] Unless stated otherwise, all emphasis herein is added.

*commitment.  It allows us to access high-quality resources, to effectively manage risks and opportunities, to engage with communities, and to attract talented employees.*"

- During the Class Period, Rio Tinto disclosed through its website its "Governance framework and structure" and "Governance integrity," stating the following:  "***Rio Tinto's commitment to acting responsibly plays a critical role in our success as a business, and our ability to generate shareholder value.***  …  The key principles that guide our behaviour in *The way we work* …  ***Our performance is important for our continuing existence.  Good performance allows regulators to grant us the permission and the licences to do the mining or the processing that we want to do.  It gives local communities the confidence that we will be a good long-term neighbour, providing them with opportunities and managing our assets well.***"

¶¶83-84.

## 2.    The Simandou Saga

Simandou is a mountain in Guinea, an impoverished West African country that is rich in mineral resources and, according to Transparency International (a global advocacy organization against corruption), is one of the most corrupt countries on earth.  ¶48.  Granting mining rights, also known as concessions, to private companies in exchange for an interest in output is a major source of revenue for Guinea.  *Id.*  The Simandou iron-ore development contains one of the largest iron-ore deposits in the world.  ¶49.  It has been expected to yield as much as 200 million tons annually, lasting in excess of 40 years, and evaluated at points to yield $50 billion.  ¶¶3, 49.

Between 1997 and 2008, Rio Tinto had concessions to Simandou blocks 1 through 4.  ¶¶52-54.  These concessions were so integral to Rio Tinto that it used them to thwart a hostile-takeover bid by BHP Billiton Ltd., arguing that Rio Tinto was undervalued.  ¶55.  Simandou's importance to Rio Tinto's fortunes was reflected in Walsh's quotes in a May 29, 2008 press release:  "Simandou in Guinea represents a major new iron ore province.  Its strategic location gives us access to the Atlantic basin and the fast growing Middle Eastern market.  …  We believe this area represents one of the best undeveloped major deposits of premium-grade iron ore in the world."  ¶56.

In 2008, the GoG rescinded Rio Tinto's rights to blocks 1 and 2 and awarded them to a competitor, since Rio Tinto was breaching the Guinean Mining Code by failing to develop the mine and instead focusing on prospecting elsewhere.  ¶¶58-63.  Fearful that Rio Tinto's

extraordinarily valuable concessions to Simandou blocks 3 and 4 were slipping from the Company's grasp, the Company committed to pump significant resources—well over a billion dollars-worth—into the mine.  ¶¶66, 78, 82.  The individual Defendants and several other high-level executives routinely visited the mine and met with GoG officials, and Rio Tinto regularly updated investors about its progress.  ¶¶61, 69, 82.  Specifically in connection with Rio Tinto's activity at Simandou, Defendants extolled Rio Tinto's relationship with the GoG, and the Company disclosed that it abided by laws, *The way we work*, and other policies.  ¶¶8, 82.

Upon his election in 2010, Guinean President Conde announced that he would re-examine existing contracts in the mining sector and re-write the mining code.  ¶¶67-68.  Indeed, he stripped Simandou concessions from Rio Tinto's competitors.  *Id.*

### 3.    Defendants Make an Unlawful Payment to the GoG for Simandou

In 2011, To ensure that Rio Tinto would not suffer the same fate, Albanese (then Rio Tinto's CEO), Davies (then president of International Operations for the Iron Ore group), and Walsh (then chief executive of the Iron Ore group) were directly involved in and approved a $10.5-million payment to Combret, a "person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, ***directly or indirectly***, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office [GoG official(s)], for purposes of" (*see* FCPA, 15 U.S.C. §78dd-1(a)(3)) effectuating a $700-million "Settlement Agreement" with the GoG, under which the Company secured its grasp on the then-jeopardized, crucial Simandou concessions and cemented its relationship with the GoG (*see e.g.* ¶¶69-78).   Alternatively, Defendants paid $10.5 million to Combret, who was a "foreign official[,]" meaning "any officer or employee of a foreign government or ***any … instrumentality thereof***, or of a public international organization, ***or any person acting … on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization***" (*see* 15 U.S.C. §§78dd-1(a), 78dd-1(f)(1)), for purposes of effectuating the $700-million "Settlement Agreement" with the GoG, under which the Company

secured its grasp on the then-jeopardized, crucial Simandou concessions and cemented its relationship with the GoG (*see e.g.* ¶¶69-78).  This payment reaped dividends: on April 22, 2011, the Company disclosed the signing of a "Settlement Agreement" with the GoG, under which the Company paid $700 million to the Guinean Public Treasury, which "secure[d] Rio Tinto's mining title in Guinea[.]" ¶¶7, 10, 70, 76-77, 93.  The payment was unlawful under U.S. and international anti-bribery, books-and-records, conspiracy, and internal-control laws, including, without limitation, FCPA provisions.  ¶¶7, 70.

It is inescapable that Albanese, Davies, and Walsh' were involved in and approved the unlawful payment.  ¶7.  At least four May 2011 emails ("May 2011 Emails") have been revealed evidencing the unlawful payment (Combret was demanding $15 million, and Davies attempted to settle the amount at $7.5 million), and the May 2011 Emails add icing on the cake by including nefarious details.  ¶¶72-75.  For example, Davies said the following to Walsh:

> "I accept that this is a lot of money, but I also put forward that the result we achieved was significantly improved by ***Francois' contribution and his very unique and unreplicable services and closeness to the President***.  …  My belief is that we had a very low probability of resecuring 3 and 4, but through a combination of the negotiations and ***Francois' unique help to me and Rio Tinto***, we were able to close.  …  ***I have absolutely no doubt that Francois will not act as a friend of Rio Tinto going forward and is extremely valuable insurance that things do go smoothly as we bed down the arrangements with the GoG.  I am extremely worried if we lose the direct connection to the President that I have cultivated with Francois.***  …  There is also now a glimmer of possibility that we may be able to move ourselves into a useful position in relation to 1 and 2.  Irrespective of the good advances I have personally made, ***I am extremely pessimistic without the invaluable services that Francois has provided.  This is not a standard situation, and is indeed extremely unique.***  I am very worried if we are not able to stabilise the situation and start delivering the project.  ***Finalising these discussions in a satisfactory way is extremely good insurance for Rio Tinto.***" ¶72.

Walsh said the following to Albanese:  "No question that he delivered sizeable value, but also ***no question that there is still sizeable risk going forward.  I wonder if the answer is to hold part of the funds in an account in his name, but subject to first shipment.  Alan [Davies] won't like this, but I can't see another solution.***" ¶71.  Also, Walsh said the following to Davies:  "***Got the figure up to $10.5 million but only holding an amount in escrow in his name subject to first shipment.***

*I know that you won't like this, but put your thinking cap on.*"  ¶73.  Albanese said the following to Walsh:  "*Worth giving this a try, but also think about optics to the GoG.*"  ¶74.

The individual Defendants cannot feign ignorance, as Combret has played a key, notorious role as an instrumentality (whether himself or through an entity) or on behalf of Guinean President Conde in the renegotiations of Simandou mining rights, contemporaneously with Rio Tinto having retained him.  ¶¶29, 70.[4]  According to a recording obtained by a news network, Combret gave a player in the Simandou negotiations an account of a conversation between Combret and Guinean President Conde: "Rio Tinto is a huge company ... But the president told them, 'Listen, if there's no downpayment, I'll cancel the concession.' And he would have done it."  ¶75.  On November 18, 2016, Guinea's Minister of Mines and Geology, Abdoulaye Magassoub, stressed concern over Rio Tinto's use of Combret to get to Guinean President Conde:  "Statements to the media from Rio Tinto have suggested that [Combret] was in the pay of Rio Tinto during high-level negotiations between the company and the Guinean government[.] … [Combret] was *at the time acting in a capacity that would have given him access to highly confidential information.  It raises both legal and ethical concerns if, as media reports suggest, [Combret] was passing on privileged information in return for large amounts of money*."  ¶194.

Rio Tinto was not forthcoming with self-reporting incriminating documents to regulators, having delayed the day of reckoning for at least a year after the May 2011 Emails were known by the Company's legal department.  *See* ¶¶11-12, 79, 81.  In 2015, the May 2011 Emails came to light to Rio Tinto officers (in addition to the individual Defendants), including those in its legal department, during discovery conducted by Rio Tinto's counsel, in connection with the Company's lawsuit against competitors and others—this lawsuit was ultimately dismissed.  ¶¶11, 79, 80.  However, it still took Rio Tinto till November 2016 to begin admitting the unlawful activity.  ¶12.  Armed with an internal report and findings from external counsel and Rio Tinto's internal compliance team, including former DOJ and U.K. Serious Fraud Office ("SFO")

---

[4] Combret's relationship with Guinean President Conde was deep: they were close friends, having become acquainted when studying political science together in Paris.  ¶29.

employees, from an investigation that included having ploughed through a reported 60 terabytes of data, Rio Tinto self-reported documents reflecting the unlawful payment to the DOJ, SEC, SFO, the Australian Securities and Investments Commission ("ASIC"), and the Australian Federal Police ("AFP"). ¶12. These regulators are investigating the matter. ¶12. Rio Tinto disclosed that the AFP and SFO have already announced formal investigations.[5]

Heads rolled. In reaction to the unlawful payment, Rio Tinto swiftly fired three Executive Committee members, Davies (then chief executive of Rio Tinto's Energy & Minerals group), Hugo Bague ("Bague") (then group executive of Organisational Resources), and Debra Valentine ("Valentine") (then group executive of Legal & Regulatory Affairs). ¶¶13, 36, 40. Valentine oversaw drafting *The way we work*, was Rio Tinto's Global Head of Legal during the Company's Chinese bribery scandal, and was one of Rio Tinto's lead lawyers when terminated. *Id.* Rio Tinto revoked extraordinarily lucrative compensation—several millions of dollars-worth—from each of Davies and Valentine and deferred about $20 million of bonuses to Walsh. ¶¶13, 36, 197, 199. Institutional Shareholder Services Inc. (a global leader in corporate governance and responsible investment) blessed Walsh's bonus deferral. ¶197. Rio Tinto even clawed back money paid to Davies in 2015 for his relocation to London—the first time that the Company exercised this option since effectuation in 2013. ¶199. Davies resigned from his non-executive BoD position at Rolls-Royce, given the damage to his professional reputation. ¶198.

Jean Sebastien Jacques ("Jacques"), Rio Tinto's current CEO, and Jan du Plessis ("Plessis"), chair of Rio Tinto's BoD, both admitted that wrongdoing was involved with the payment and expressed the gravity of the situation; Rio Tinto's decision to self-report to several regulators was not taken lightly. ¶¶33-34, 94, 186, 189, 201. Jacques stated that "Many people across Rio Tinto are still shell-shocked … The day I was made aware of a potential issue we

---

[5] *See* Declaration of Justin Nematzadeh, dated October 11, 2017 ("Dec."), in support of Plaintiff's Omnibus Memorandum of Law ("MOL") in Opposition to Defendants' Motions, Exhibit ("Ex.") 1, Rio Tinto's Form 6-K, Ex. 99.2, filed with the SEC on August 2, 2017, at F-22 ("8/2/17 6-K").

launched an investigation.  It wasn't a decision we took lightly.  We will fully cooperate with the authorities.  Their investigations may take several years."  ¶190.  Plessis said the following:

> "And therefore to come across a situation where it appears perhaps we did not do the right thing was a very upsetting experience for all of us to go through.  It's a very sensitive topic.  …  Our conclusion was when we looked at the matter is that we have seen enough to convince ourselves that we have an obligation to voluntarily report to all the authorities that you've identified – I think there are 5 or 6 of them – to report to them that we think something might have gone wrong.  …  What we believe, our conclusion has been is what we have seen is that the payment of $10.5 million that was made in 2011 wasn't – done in a manner which is not consistent with our internal code of conduct, our rules of engagement, we call it the way we work.  That is why we made the decision in relation to our 2 colleagues, and that is why we made the decision to self-report to the authorities[.]"  ¶201.

**4.      Defendants' Material Misstatements and Omissions During the Class Period**

Throughout the Class Period, within its annual reports filed with the SEC, Defendants made non-aspirational statements that "*[w]e operate within all applicable laws and regulations* and are dedicated to open and transparent dealings with our stakeholders."  *E.g.* ¶¶159, 162; *see also* ¶¶173, 176 ("***We operate within all relevant laws and regulations*** and are dedicated to open and transparent dealings with our stakeholders.").

Independently, Rio Tinto expressly admitted that at the least, the payment contradicted its disclosures in *The way we work*, which was disclosed directly to investors during the Class Period on Rio Tinto's website and incorporated by reference in Rio Tinto's SEC filings, including, without limitation, in its annual reports.  ¶¶190, 201.  Rio Tinto through its SEC filings and *The way we work*, including, without limitation, Annex 1C of the Simandou Social and Environmental Impact Assessment ("SEIA"), Legislation, Standards and Administrative Framework, and Annex 1D of the Simandou SEIA, *The way we work*, which Walsh signed and the Company disclosed through its website, provided a deluge of actionable statements: for example, "As the developer of the Simandou Project, Simfer will abide by the Rio Tinto values and will comply with *The way we work*.  … ***We do not commit, or become involved in, bribery or corruption of any form.*** … ***We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved.*** … ***We never offer, give, demand or accept any financial or other favour***

*to, or from, any person in order to secure business or any other advantage.  … In every country where we work, we comply with applicable laws.*"  ¶¶8, 87-88, 99-100, 110-13, 122-23, 128-29, 144-45, 161-62, 173-76.   Additionally, Rio Tinto in several media releases made material misstatements and omissions about its continued application of "highest" corporate-governance standards.  ¶¶136-37, 156-57, 169-70, 185-86.

Rio Tinto disclosed its Business Integrity Standard during the Class Period through its website, amongst other means, including a section devoted to anti-bribery.  ¶89.  Rio Tinto disclosed that it forbade bribery and corruption: "Bribery is the offer, giving, demand or acceptance of a financial or other advantage to or from any person in order to improperly secure business or any other advantage.  Rio Tinto employees and core contractors must not commit, be a party to or be involved in bribery or corruption in any form."  *Id.* (red-colored text in original).  "**Any person**: Bribery and corruption may involve dealings with government officials or with private individuals or enterprises.  **Direct or indirect**: Bribery and corruption may take place directly or indirectly, for example via a third party such as an agent.  **No actual bribe necessary**: The offer or demand of a bribe is prohibited under most external regulations; and this Standard. This means even if no bribe is ultimately paid it can still be construed as an offence."  ¶89 (emphasis in original).  "This Standard is key in meeting the following Rio Tinto business integrity commitments to: • prohibit bribery and corruption in all its forms; • avoid, disclose and manage conflicts of interest; • prohibit fraud in all its forms."  ¶91.  "All must abide by the Standard's general requirements as they form a part of Rio Tinto's control framework."  *Id.*  "Ensuring sustainable business.  External stakeholders want to partner with a company that they can trust to do the right thing.  Rio Tinto needs to comply with all relevant laws, including anti-bribery laws."  ¶92.

Plaintiff alleges material misstatements and omissions about dealings with the GoG, including, without limitation, the $700 million "Settlement," while hiding that this agreement, Rio Tinto's concession in Simandou, and its relationship with the GoG was effectuated, in part, by the unlawful payment.  *See* ¶¶94-95, 108-09, 118-21, 138-39, 152-55, 163-64, 171-72.

Plaintiff alleges material misstatements and omissions regarding the Company not having disclosed a contingent liability in connection with the unlawful payment starting from the beginning of the Class Period, which it ultimately admitted to recognizing in its Form 20-F for 2016 filed with the SEC on March 2, 2017 ("2016 20-F").  ¶¶101-03, 122-23, 146-47, 159, 162, 177-78, 183-84, 200.  Examples of the fraudulent statements follow: in the Company's Form 20-F for 2011 filed with the SEC on March 16, 2012 ("2011 20-F"), "Rio Tinto is subject to extensive governmental regulations affecting all aspects of its operations and consistently seeks to apply best practice in all of its activities.  Due to Rio Tinto's product and geographical spread, there is unlikely to be any single governmental regulation in effect that could have a material effect on the Group's business."  ¶¶101, 103; in the Company's Form 20-F for 2015 filed with the SEC on March 3, 2016 ("2015 20-F"), "The Group is subject to certain legal proceedings, claims, complaints and investigations arising out of the ordinary course of business.  Legal proceedings include, but are not limited to, breach of contract, breach of environmental, competition, securities and health and safety laws. … The Group believes that no material loss to the Group is expected to result from these legal proceedings, claims, complaints and investigations."  ¶¶177-78; and in Rio Tinto's Form 6-K filed with the SEC on August 3, 2016 ("8/3/16 6-K"), "No events were identified after the balance sheet date which could be expected to have a material impact on the consolidated preliminary financial information included in this report."  ¶¶183-84.

Plaintiff alleges material misstatements and omissions regarding Rio Tinto's disclosure controls and procedures, internal controls, including those mandated under the FCPA (15 U.S.C. §§78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), and 78ff(a)), and Albanese and Walsh's signed SOX certifications, which were incorporated by reference in the Complaint, such as "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[,]" and "[t]he Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit

committee of the Company's board of directors (or persons performing the equivalent functions): … (b) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting[,]"[6], while hiding that the Defendants were directly involved in and approved the unlawful payment, including, without limitation, Albanese and Walsh, who signed these statements.  ¶¶10, 93, 104-07, 130-33, 148-51, 165-68, 179-82.

### 5.      Curative Disclosures Caused Rio Tinto ADR Price Drops

Between November 14, 2016 (post-market) and November 18, 2016, a flurry of curative disclosures hit the market in the form of materializations of the risks of the concealed payment. ¶14.  Rio Tinto ADRs closed at $39.65 on November 14, 2016.  ¶¶15, 195.  Through November 18, 2016, Rio Tinto ADRs fell to $36.55, as investors learned about the scope of the fraud and risks of further sanctions against the Company, causing damages as artificial inflation deflated from Rio Tinto ADRs.  ¶¶15, 195.

## III.      ARGUMENT

To plead securities fraud under Section 10(b) and Rule 10b-5, plaintiffs must allege that defendants (1) made material misstatements or omissions, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) reliance, (5) economic loss, and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[7]  Although securities-fraud claims are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*, and Federal Rule of Civil Procedure ("Rule") 9(b), plaintiffs need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), *cert. denied*, 534 U.S. 1071 (2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading, *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  Any Rule 12(b)(6) movant faces a difficult hurdle. *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003).  "[C]ommon

---

[6] Dec. Ex. 2, Rio Tinto's Form 20-F for 2011, filed on March 16, 2012, at Ex. 12.1.

[7] Internal citations and quotations are omitted herein, unless stated otherwise.

sense requires that courts remember the purpose of a pleading—to state a claim and provide adequate notice of that claim.  A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *Id.*  "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *Id.*  "[T]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Id.*

The pleading standards established by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), also apply.  For a Rule 12(b)(6) motion to dismiss, courts must accept as true all well-pleaded factual allegations and draw all reasonable inferences in plaintiffs' favor.  *See Twombly*, 550 U.S. at 572.  To survive a Rule 12(b)(6) motion, a Complaint need only contain sufficient facts "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Plausible does not mean "probable"; plausibility requires only that there be more than a "sheer possibility" that a defendant is liable for the alleged misconduct.  *Id.*  As the Supreme Court noted in *Twombly*, "asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556.

Plaintiff exceeds the Section 10(b) and Rule 10b-5 pleading standards, including Rule 9(b) and the PSLRA, by pleading that Defendants, in connection with the purchase or sale of securities:

- **made material misstatements and omissions**: specific law abidance and anti-corruption; dealings with the GoG on Simandou; no contingent liability in connection with the unlawful payment; and Rio Tinto's internal controls and Defendants' signed SOX certifications;

- **with scienter**: the individual Defendants—Rio Tinto's senior-most executives— were directly involved in and approved the unlawful payment; and

- **and that reliance on Defendants' actions caused injury to the Plaintiff and the Class**: several curative disclosures revealed materializations of the risks concealed by the fraud, causing significant drops in Rio Tinto's ADRs.

By sufficiently pleading a primary violation and Albanese, Davies, and Walsh's control and culpable participation, Plaintiff pleads a Section 20(a) claim. Personal jurisdiction should be exercised on Davies and Walsh because they were involved in and approved the unlawful payment and made and had ultimate authority over several material misstatements and omissions.

## 1.   PLAINTIFF ALLEGES AND SECTION 10(b) AND RULE 10b-5 CLAIM

### A.   Falsity and Materiality is Alleged Through Statements About Law-Abidance, Anti-Corruption, GoG Dealings, Contingent Liabilities, and Internal Controls.

Rule 10b-5 makes it unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5. The Second Circuit has repeatedly stated that "materiality is a mixed question of law and fact," which should not be decided on a motion to dismiss, unless the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 143 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Plaintiff satisfies the PSLRA by identifying each misleading statement, who made the statement, and explains in detail why it was misleading. ¶¶93-186; 15 U.S.C. §78u–4(b)(1); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). There are five bodies of Defendants' material misstatements and omissions: (i) specific statements about law abidance and anti-corruption; (ii) dealings with the GoG on Simandou; (iii) contingent liability in connection with the unlawful payment; (iv) contingent liability under Item 303; and (v) Rio Tinto's disclosure controls and procedures, internal controls, and Albanese and Walsh's SOX certifications.

16

> ### i.    Statements About Law Abidance and Anti-Corruption

Plaintiff sufficiently alleges the unlawfulness of the $10-5 million payment, which violated laws under U.S. and international anti-bribery, books-and-records, conspiracy, and internal-control laws, including, without limitation, FCPA provisions. *E.g.* ¶¶10, 93; *see In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, 2017 U.S. Dist. LEXIS 152240, at *2-3 (S.D.N.Y. Sept. 19, 2017) (discussing several components of FCPA provisions).  Defendants unpersuasively argue that Plaintiff fails to plead a securities-fraud claim because, in essence, under specific clauses of the FCPA, Plaintiff does not prove that the $10.5-million payment was an unlawful bribe to Combret, who they argue was neither an "officer or employee of a foreign government" nor "a person 'acting in an official capacity' for a foreign government." *See* Defendants' MOL, dated September 11, 2017 [ECF No. 62] ("Defs.' MOL") at 7.  This argument is myopic because the FCPA prohibits paying, offering to pay, promising to pay, or authorizing the payment of money or anything of value to any person, while knowing that all or a portion of such remuneration will be offered, given, or promised, ***directly or indirectly***, to any foreign official—***or instrumentality or person acting on behalf thereof***—in order to influence any act or decision of the foreign official in his or her official capacity or to secure any other improper advantage in order to obtain or retain business.  15 U.S.C. §78dd-1.[8]

Rio Tinto paid $10.5 million to Combret, a "person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, ***directly or indirectly***, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office [GoG official(s)], for purposes of" (*see* 15 U.S.C. §78dd-1(a)(3)) effectuating the

---

[8] Under the FCPA, "[i]t shall also be unlawful for [Defendants] to corruptly do any act outside the United States in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any of the persons or entities set forth in [15 U.S.C. §§78dd-1(a)] for the purposes set forth therein, irrespective of whether such issuer or such officer, director, employee, agent, or stockholder makes use of the mails or any means or instrumentality of interstate commerce in furtherance of such offer, gift, payment, promise, or authorization."  15 U.S.C. §§78dd-1(g).  Moreover, Defendants violated the internal-control provisions of the FCPA, 15 U.S.C. §§78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), and 78ff(a).  *See S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 864-65 (S.D. Tex. 2012).

$700-million "Settlement Agreement" with the GoG, under which the Company secured its grasp on the then-jeopardized, crucial Simandou concessions and strengthened its relationship with the GoG (*see e.g.* ¶¶69-78); *see also In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, 2017 U.S. Dist. LEXIS 152240, at *3 (S.D.N.Y. Sept. 19, 2017) (defendants made or attempted to make improper payments to the daughter of Uzbekistan's President, "in an effort to achieve favorable treatment in Uzbekistan"). [9]

Alternatively, Rio Tinto paid $10.5 million to Combret, who was a "foreign official[,]" meaning "any officer or employee of a foreign government or any … ***instrumentality thereof***, or of a public international organization, ***or any person acting … on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization***" (*see* 15 U.S.C. §§78dd-1(a), 78dd-1(f)(1)), for purposes of effectuating the $700-million "Settlement Agreement" with the GoG, under which the Company secured its grasp on the then-jeopardized, crucial Simandou concessions and strengthened its relationship with the GoG (*see e.g.* ¶¶69-78).  Combret (whether himself or as an "officer or employee" of his entity) was acting as an "instrumentality" of or "on behalf of" the GoG: for example, according to a Guinean minister of mines and geology, during high-level negotiations between Rio Tinto and the GoG, when Combret was in Rio Tinto's pay, he was "at the time acting in a capacity that would have given him access to highly confidential information [of the GoG].  It raises both legal and ethical concerns if, as media reports suggest, Mr. de Combret was passing on privileged information in

---

[9] *See also U.S. v. Liebo*, 923 F.2d 1308, 1311-13 (8th Cir. 1991) ("Evidence established that Tiemogo [Niger Air Force chief of maintenance] and Barke were cousins and best friends.  The relationship between Barke and Tiemogo could have allowed a reasonable jury to infer that Liebo [individual executive defendant] made the gift to Barke intending to buy Tiemogo's help in getting the contracts approved.  Indeed, Tiemogo recommended approval of the third contract and the President of Niger approved that contract just a few weeks after Liebo gave the tickets to Barke. …  For example, Liebo gave the airline tickets to Barke shortly before the third contract was approved. In addition, there was undisputed evidence concerning the close relationship between Tiemogo and Barke and Tiemogo's important role in the contract approval process.  …  This evidence could allow a reasonable jury to infer that Liebo gave the tickets to Barke intending to influence the Niger government's contract approval process.").

return for large amounts of money." *See* ¶194.  Moreover, Combret had direct involvement with Guinean President Conde in the concession negotiations.  For example, Combret gave a player in the Simandou negotiations an account of a conversation between Combret and Guinean President Conde: "Rio Tinto is a huge company ... But the president told them, 'Listen, if there's no downpayment, I'll cancel the concession.' And he would have done it." ¶75.

As the FCPA statutory language "makes clear, the FCPA broadly applies to corrupt payments to 'any' officer or employee of a foreign government and ***to those acting on the foreign government's behalf***.  …  Whether a particular entity constitutes an 'instrumentality' under the FCPA requires a fact-specific analysis of an entity's ownership, control, status, and function." DOJ and SEC, A Resource Guide to the U.S. Foreign Corrupt Practices Act (Nov. 14, 2012), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf ("FCPA Guide"), at 20.[10]  As of 2012, the DOJ and SEC noted that, as is consistent with their approaches, all district courts that have considered whether an entity constitutes an instrumentality of a foreign official have concluded that it is a an issue of fact for the jury.  *Id.* at 20 n. 119.  "Companies and individuals should also remember that, whether an entity is an instrumentality of a foreign government or a private entity, commercial (i.e., private-to-private) bribery may still violate the FCPA's accounting provisions, the Travel Act, anti-money laundering laws, and other federal or foreign laws.  Any type of corrupt payment thus carries a risk of prosecution." *Id.* at 21.[11]

Neither the language of the statute nor Congressional intent supports Defendants' overly narrow view of the FCPA.  The FCPA contains both criminal and civil provisions.  15 U.S.C.

---

[10] Defendants cite to the FCPA Guide and submitted it as Ex. 2 to the Declaration of Nathaniel J. Kritzer in support of Defendants' Motion [ECF No. 63-2].

[11] Indeed, Rio Tinto itself adopted this broad definition of unlawful avenues and disclosed this to investors throughout the Class Period through its Business Integrity Standard:  "Bribery is the offer, giving, demand or acceptance of a financial or other advantage to or from any person in order to improperly secure business or any other advantage.  Rio Tinto employees and core contractors must not commit, be a party to or be involved in bribery or corruption in any form. … **Any person**: Bribery and corruption may involve dealings with government officials or with private individuals or enterprises.  **Direct or indirect**: Bribery and corruption may take place directly or indirectly, for example via a third party such as an agent." ¶89 (emphasis in original).

§§78ff(c), 78dd-2(g), 78dd-3(e).   Recognizing that "[c]orporate bribery is bad business,"[12] Congress enacted the FCPA in 1977 "to halt corrupt practices, create a level playing field for honest business, and restore public confidence in the integrity of the marketplace."  *See* FCPA Guide at 2, n. 2.  Thus, the FCPA is deliberately broad in scope and is not limited to direct payments from a covered party to a foreign official.  *See* 15 U.S.C. § 78dd-1(a)(3).  "Congress meant to prohibit a range of payments wider than only those that directly influence the acquisition or retention of government contracts or similar commercial or industrial arrangements." FCPA Guide at 13.  "[A]nything of value," as used in the FCPA, encompasses a broad range of unfair benefits, including, for example, employment offers, travel expenses, and charitable contributions.  *E.g. Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 597 (S.D.N.Y. 2014).  The "FCPA expressly prohibits corrupt payments made through third parties or intermediaries."  FCPA Guide at 21 (citing 15 U.S.C. §78dd-1(a), 15 U.S.C. §§78dd-2(a), and 78dd-3(a)).

"[T]he FCPA does not require that a corrupt act succeed in its purpose.  Nor must the foreign official actually solicit, accept, or receive the corrupt payment for the bribe payor to be liable." FCPA Guide at 14.  Indeed, the Second Circuit has affirmed a criminal judgement of a conspiracy to commit an FCPA violation without requiring jurors to reach a unanimous agreement on the particular overt act committed to further the conspiracy.  *U.S. v. Kozeny*, 667 F.3d 122, 132 (2d Cir. 2011) ("We conclude, therefore, that although proof of at least one overt act is necessary to prove an element of the crime, which overt act among multiple such acts supports proof of a conspiracy conviction is a brute fact and not itself element of the crime.  The jury need not reach unanimous agreement on which particular overt act was committed in furtherance of the conspiracy.").

"[A]s long as the offer, promise, authorization, or payment is made corruptly, the actor need not know the identity of the recipient; the attempt is sufficient."  FCPA Guide at 14.  Defendants

---

[12] *See* S. Rep. No. 95-114, at 4 (1977), *available at* http://www.justice.gov/criminal/fraud/fcpa/history/1977/senaterpt-95-114.pdf.

misconstrue the level of awareness necessary to constitute an FCPA violation, which is distinctly different than pleading scienter under Section 10(b).

The FCPA contains both criminal and civil provisions.  15 U.S.C. §78ff(c); 15 U.S.C. §78dd-2(g), 3(e).  "Notably, as both the Second Circuit and … Courts of Appeals have found, the FCPA does not require the government to prove that a defendant was specifically aware of the FCPA or knew that his conduct violated the FCPA."  FCPA Guide at 14; *see also Kozeny*, 667 F.3d at 132-36.  "Because Congress anticipated the use of third-party agents in bribery schemes— for example, to avoid actual knowledge of a bribe—it defined the term 'knowing' in a way that prevents individuals and businesses from avoiding liability by putting 'any person' between themselves and the foreign officials."  FCPA Guide at 22.  While criminal liability requires a "knowing" violation, the FCPA does not define that standard as "actual knowledge" of wrongdoing; rather, "knowing" with respect to "conduct, a circumstance, or a result" is satisfied when "such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or … such person has a firm belief that such circumstance exists or that such result is substantially certain to occur."  15 U.S.C. §§78dd-1(f)(2).  Congress intended to impose liability on anyone who "is aware of a high probability of the existence of such circumstance[s]" and "consciously and intentionally avoided confirming that fact," or "who purposefully avoid[s] actual knowledge" that a violation may occur.  FCPA Guide at 22; *Kozeny*, 667 F.3d at 132.  For example, an executive who authorizes others to pay "whoever you need to" in a foreign government to obtain a business advantage has violated the FCPA, even if he or she is unaware of actual payments, and even if no payments ultimately are offered or paid.  FCPA Guide at 14.  Anticipating that bribery schemes often involve complicated transactional structures and use of intermediaries to cower from liability, Congress explicitly intended to impose liability not only on those with actual knowledge of wrongdoing, but also on those who purposefully avoid actual knowledge:

> [T]he so-called "head-in-the-sand" problem – variously described in the pertinent authorities as "conscious disregard," "willful blindness" or "deliberate ignorance" – should be covered so that management officials could not take refuge from the Act's prohibitions by their unwarranted obliviousness to any action (or inaction), language or other "signaling device" that should reasonably alert them of the "high probability" of an FCPA violation.  *See* FCPA Guide at 22; *see also* H.R. Rep. No. 100-576, at 920 (1988).

"The 'knowing' standard was intended to cover 'both prohibited actions that are taken with 'actual knowledge' of intended results as well as other actions that, while falling short of what the law terms 'positive knowledge,' nevertheless evidence a conscious disregard or deliberate ignorance of known circumstances that should reasonably alert one to the high probability of violations of the Act." *See* FCPA Guide at 22 n. 139; *see also* H.R. Rep. No. 100-576, at 920 (1988).

Consequently, individuals and businesses cannot use subsidiaries, off-shore entities, and/or other persons as shields to avoid "actual knowledge" of misconduct and therefore evade prosecution.  Indeed, companies "also may violate the FCPA if they give payments or gifts to third parties, like an official's family members, as an indirect way of corruptly influencing a foreign official."  FCPA Guide at 16.

Unlike the PSLRA, the FCPA does not impose heightened pleading requirements to state a claim and survive dismissal.  *E.g.*, *Jackson*, 908 F. Supp. 2d at 847 (applying Rule 8 pleading requirements enunciated in *Iqbal* and *Twombly* to FCPA claims).  Consequently, it is not necessary to provide the granular level of detail regarding which government official was targeted, what benefit was conferred, or what action was taken in exchange for the bribe, as Defendants suggest. *Id.* at 850.  "Congress intended, with the FCPA, to 'cast an otherwise wide net over foreign bribery.'" … In light of [] legislative history, it would be perverse to read into the [FCPA] a requirement that a defendant know precisely which government official, or which level of government official, would be targeted by his agent; a defendant could simply avoid liability by ensuring that his agent never told him which official was being targeted and what precise action the official took in exchange for the bribe." *Id.*  It is enough at this stage that the "factual

allegations … when assumed to be true 'raise a right to relief above the speculative level[.]' *Id.* at 846-47 (citing *Twombly*, 550 U.S. at 555, 556 n. 3).[13]

The individual Defendants were directly involved in and approved the unlawful payment to secure Rio Tinto's Simandou concessions and put the Company in bed with the GoG.  ¶¶7, 70.  At least the May 2011 Emails have been revealed evidencing Albanese, Davies, and Walsh's approval of the unlawful payment, and the nefarious details therein add icing on the cake as to their awareness.  ¶7.  Rio Tinto's unlawful payment reaped dividends: on April 22, 2011, the Company disclosed the signing of a "Settlement Agreement" with the GoG, under which the Company paid $700 million to the Guinean Public Treasury, which "secure[d] Rio Tinto's mining title in Guinea[.]" ¶¶76-77.  According to a video recording and Guinea's Minister of Mines and Geology, Rio Tinto's Combret was well known to have played a key, nefarious role in meddling in Guinean President Conde's renegotiations of Simandou concessions contemporaneously with Rio Tinto's unlawful payment to retain him, which gave the Company access to privileged information.  ¶¶29, 70, 75, 194.

Jacques, Rio Tinto's current CEO, and Plessis, then BoD chair, admitted that wrongdoing was involved with the payment (including admitting to contradictions in Rio Tinto's publicly disclosed *The way we work*) and expressed the gravity of the situation; Rio Tinto's decision to self-report to the DOJ, SEC, SFO, ASIC, and the AFP—after an investigation that included having ploughed through a reported 60 terabytes of data—was not taken lightly and reflects that Rio Tinto was worried about criminal and civil penalties.  ¶¶12, 34, 94, 186, 189, 201.  As noted by the DOJ and SEC (FCPA Guide at 54-55), a company that self-reports can seek leniency in both criminal and civil cases.  *See also Shell Oil Co. v. Writt*, 464 S.W.3d 650, 659 (Tex. 2015) ("[B]usinesses that chose not to cooperate were subjected to substantially greater punishments if a DOJ prosecution was successful. … 'Knowing all the consequences that accompany FCPA litigation,

---

[13] *See also Tellabs*, 551 U.S. at 324 ("smoking-gun" evidence does not need to be pled to satisfy the PSLRA); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) ("It is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendant transgressed, by customer, amount, and precise method.").

many companies choose to be proactive and self-report to the DOJ and SEC to take advantage of any leniency that the government might offer.' … Federal prosecutors and the U.S. Sentencing Guidelines 'place a high premium on self-reporting, along with cooperation and remedial efforts, in determining the appropriate resolution of FCPA matter.'"). These regulators are investigating the matter. ¶12. Rio Tinto disclosed that the AFP and SFO have already announced formal investigations into the matter (*see* Dec., Ex. 1 (8/2/17 6-K)). Rio Tinto recognized a contingent liability in connection with this payment. ¶200. The Company fired three Executive Committee members, Davies, Bague, and Valentine. ¶¶13, 36, 40. Also, Rio Tinto rescinded extraordinarily lucrative compensation from each of Davies and Valentine, clawed back monies from Davies under a policy that the Company never exercised before, and deferred $20 million of bonuses to Walsh. ¶¶36, 197, 199. These admissions of wrongdoing, self-reporting of grave conduct to regulators, and the swift firings more than creates a reasonable inference that the payment was unlawful.

Where, as here, securities-fraud claims involve statements and omissions about a company's compliance with rules and regulations, courts focus on the fraudulent nature of defendants' disclosures, as opposed to whether plaintiffs prove the underlying alleged unlawful conduct. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008) ("Defendants assert that Plaintiffs' claims constitute an impermissible attempt to enforce the Federal Food, Drug and Cosmetics Act ["FDCA"], an area in which the FDA has exclusive authority…[Defendants assert that] doctors may legally prescribe FDA-approved drugs for off-label purposes, and manufacturers may lawfully disseminate information concerning off-label uses of drugs to doctors in response [to] questions…[but] [t]he issue before the Court is not whether the FDA improperly approved Amgen's products as safe and effective, but rather whether Defendants violated securities laws by improperly marketing Epogen and Aranesp for off-label uses."); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1161 (C.D. Cal. 2004) ("An FCPA [] violation is not required for a section 10b or Rule 10b-5 violation."), *aff'd in part, rev'd in part and remanded*, 239 F. App'x 318 (9th Cir. 2007); *Halford* v. *AtriCure, Inc.*, No. 1:08-cv-

867 (MRB), 2010 WL 8973625, at *10 (S.D. Ohio Mar. 29, 2010) (rejecting defendants'
arguments "regarding the viability of a claim brought by a private litigant under the [FDCA]
because plaintiffs' claims [were] not based upon Defendants' compliance with the FDCA," but
were brought under the federal securities laws.).  Similarly, in this context, the kind of specificity
details requested by Defendants need not be plead to satisfy Rule 9(b) or the PSLRA.

Defendants' defense that the payment was lawful is premature for a motion to dismiss.  *See
Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470-71 (S.D.N.Y. 2013) (finding falsity, where
defendants prematurely argued the propriety of an equity-incentive-compensation plan, stating that
defendants' "efforts amount to an appeal to the referee to call a foul while the opposing team is
still announcing its lineup and taking the field"); *In re Advanced Battery Tech., Inc. Sec. Litig.*,
No. 11-cv-2279 (CM), 2012 WL 3758085, at *9-10, 26-30 (S.D.N.Y. Aug. 29, 2012) (finding
falsity, where defendants' prematurely argued that the statements were true, including that an
alleged fraudulent transaction was legitimate).  Plaintiff need not *prove* the fraud at the pleading
stage.  *E.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) ("[W]hether or
not [the D]efendants…actually violated various provisions of [Medicare]—and thus whether the
representation that the [Company's practices] complied with [Medicare] was actually an 'untrue'
statement—are not issues for resolution at this stage.").[14]

The facts in *Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC* are distinguishable.  There, the
court granted, in part, defendants' motions to dismiss the securities-fraud claims based on
plaintiffs' theory that defendants had a duty to disclosed uncharged illegal conduct that violated
the FCPA.  *See* 164 F. Supp. 3d 568, 578-72 (S.D.N.Y. 2016).  But there, unlike here, there were

---

[14] *See also Mauss v. NuVasive, Inc.*, No. 13-cv-2005 JM (JLB), slip opin. at 15, 2015 U.S. Dist.
LEXIS 178117, at *24-25 (S.D. Cal. Aug. 28, 2015) (Dec., Ex. 3) ("However, while Defendants
baldly assert that Plaintiff must allege a *per se* violation of the Anti-Kickback Statute or False
Claims Act to adequately plead a claim for securities fraud, they did not cite any authority to
support that proposition.  Moreover, their proposed rule, taken to its logical conclusion, would
mean that no company could ever be sued for misleading investors about its compliance, or lack
thereof, with respect to these statutes. That would undoubtedly be convenient for Defendants, but
they have not provided any authority showing that any court has ever imposed such a
requirement.").

no emails with fingerprints of the most-senior executives' involvement, no admissions by the company itself of wrongdoing, nor terminations of those involved in the alleged wrongdoing.[15] Furthermore, the statements that the *Menaldi* court deemed inactionable puffery, unlike those here, did "not address the sources of Och-Ziff's success, nor do they deny illegal conduct[.]" *Id.* at 582. Plaintiffs in their first amended complaint identified an investment from the Libyan Investment Authority into defendant Och-Ziff's funds and defendants' loans to and investments in private and quasi-public companies and sovereign-wealth funds, which were too loosely connected to African governments, without alleging "bribes," "unlawful payments," "other promises," or "anything of value" in violation of the FCPA. *See id.* at 573-74, 578-79.

But the court in *Menaldi* sustained plaintiffs' securities-fraud claims on the duty to disclose DOJ and SEC investigations and potential fall-out from them, which supports Plaintiff's allegations here in connection with Rio Tinto's alleged material misstatements and omissions concerning contingent liabilities from the unlawful payment. Regardless of how defendants in *Och-Ziff* attempted to anchor their contingent liabilities in their public disclosures by referencing "judicial, administrative, or arbitration proceedings," they had to disclose a pending DOJ and SEC investigation because without doing so, they misled investors about "regulatory proceedings[.]" *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, No. 14-cv-3251 (JPO), 2016 U.S. Dist. LEXIS 60314, *3-4 (May 6, 2016) (Dec., Ex. 4) (denying reconsideration motion: "The distinction between 'judicial, administrative, or arbitration proceedings,' the phrase used in one line of a longer statement made by Och-Ziff, and 'regulatory proceedings,' the term used by the Court to describe the SEC investigation, does not disturb this conclusion. … The Court based its analysis on … (1) the entirety of the statement in question, which included references to 'scrutiny by regulatory agencies' and 'regulatory agency investigations'; (2) the alleged factual context in which Och-Ziff's statements were made; and (3) the Second Circuit's clear instruction that 'materiality is a mixed question of law and fact,' which ought not be resolved on a motion to

---

[15] At least these facts were apparently unavailable to plaintiffs when preparing the first amended complaint that was subject to this decision.

dismiss unless the alleged misstatements or omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"); *Och-Ziff*, 164 F. Supp. 3d at 584 ("Plaintiffs have plausibly alleged that Och-Ziff's projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from Och-Ziff's statements themselves.").  Plaintiffs in *Och-Ziff* have already amended their pleadings to allege additional information learned after the first decision discussed here, *Menaldi*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016), which included, without limitation, Och-Ziff's entering into a deferred-prosecution agreement and having admitted to FCPA violations.  *See* Consolidated Second Amended Class Action Complaint, *Menaldi, et al., v. Och-Ziff Capital Mgmt. Grp., LLC*, *et al.*, No. 14-cv-03251 (JPO) (S.D.N.Y. Nov. 18, 2016) [ECF No. 76].

Similarly, Defendants rely on other distinguishable cases, where plaintiffs provided insufficient allegations about the underlying wrongdoing.  *In re FBR Inc. Sec. Litig.,* 544 F. Supp. 2d 346, 354-55, 357-58 (S.D.N.Y. 2008) (plaintiffs failed to allege an insider-trading scheme— itself subject to Rule 9(b)—because they alleged no facts that defendant-underwriter provided assistance to investors who engaged in insider trading in another company; indeed, defendant-underwriter had a right to provide material nonpublic information to investors participating in a private-investment-in-public-equity offering); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 581-83, 585-89 (S.D.N.Y. 2006) (plaintiffs made "no allegations specifying how any [] activities would actually violate state or federal antitrust laws"; instead, plaintiff piggy-backed off of another complaint that did not implicate the defendant-issuer, alleging only a steering of business with "no explication of how the steering occurred or in what manner this activity violated competition laws"); *In re JP Morgan Chase Sec. Litig.,* 363 F. Supp. 2d 595, 624, 632-34 (S.D.N.Y. 2005) (plaintiffs failed to allege defendants' scienter nor that they even violated 18 U.S.C. 1005 and 215, since plaintiffs failed to allege that the benefits flowing from defendants' loans to Enron were indeed provided as kickbacks); *In re Yukos Oil Co. Sec. Litig.,* No. 04-cv-5243 (WHP), 2006 WL 3026024, 2006 U.S. Dist. LEXIS 78067, at *42-49 (S.D.N.Y. Oct. 25,

2006) (plaintiffs failed to allege that defendants violated Russian Federal Tax Code Article 40 by not addressing a key element that defendant's transaction prices diverged from the prevailing market rate by at least 20%, but instead merely asserted that the defendant-issuer sold oil at "well below-market" prices, which was not illegal).[16]

Here, Plaintiff's sufficient allegations of violations of laws under U.S. and international anti-bribery, books-and-records, conspiracy, and internal-control laws, including, without limitation, FCPA provisions, renders actionable Defendants' misleading statements in its SEC filings, including, without limitation, its annual reports about law-abidance, anti-corruption, and anti-bribery: for example, "*[w]e operate within all applicable laws and regulations* and are dedicated to open and transparent dealings with our stakeholders." *E.g.* ¶¶159, 162; *see also* ¶¶173, 176. Also, regardless of whether Plaintiff has sufficiently alleged the illegality of the payment, independently, Defendants have already admitted the violation of Rio Tinto's disclosures in the *The way we work*, which was disclosed directly to investors during the Class Period on Rio Tinto's website and incorporated by reference in Rio Tinto's SEC filings and included the following statements, without limitation: "*We do not commit, or become involved in, bribery or corruption of any form. … We do not buy business or favour, no matter where we operate, no matter what the situation is, no matter who is involved. … We never offer, give, demand or accept any financial or other favour to, or from, any person in order to secure business or any other advantage. … In every country where we work, we comply with applicable laws*." ¶¶8,

---

[16] *See also In re Tyson Foods, Inc. Sec. Litig.,* No. 5:16-cv-05340 (TLB), 2017 WL 3185856, 2017 U.S. Dist. LEXIS 116824, at *11-17, 45-49, 51-61 (W.D. Ark. July 26, 2017) (plaintiffs failed to allege an antitrust conspiracy because the very business strategy that plaintiffs identified in their complaint, along with changes in the market and defendant-issuer's leadership, were all inconsistent with the existence of an antitrust conspiracy); *Shoemaker v. Cardiovascular Sys., Inc.,* No. 16-cv-568 (DWF/KMN), 2017 WL 1180444, 2017 U.S. Dist. LEXIS 47972, at *23-27 (D. Minn. Mar. 29, 2017) (plaintiffs failed to allege FDCA and Anti-Kickback Statute violations, where confidential witnesses' statements were not credited, leaving merely generalized pleadings based on a related complaint); *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, 2009 U.S. Dist. LEXIS 789, at *67-73 (N.D. Ga. Jan. 7, 2009) (plaintiffs failed to allege unlawful trading activity, where other than describing the activities with "nefarious sounding" characterizations, plaintiffs "provide[d] no explanation of its theory of illegality" or "what laws were violated").

87-88, 99-100, 110-13, 122-23, 128-29, 144-45, 161-62, 173-76, 190.  Defendants ignored all of the specific statements in this paragraph in their motion-to-dismiss briefing.

The materiality of this payment is magnified because it came on the heels of revelations that Rio Tinto iron-ore executives bribed Chinese officials, and despite the public pronouncements of Defendant Walsh, "[r]eceiving bribes is a clear violation of Chinese law and Rio Tinto's code of conduct, *The Way We Work*. … [we] will spare no effort in doing everything we can to prevent any similar activity[,]" as well as the public pronouncements of Defendant Albanese, "[e]thical behaviour is at the heart of everything we do.  We have earned a strong reputation for our ethics through our long track record of responsible business practice."  ¶7.  Moreover, knowing that Rio Tinto was under a microscope by investors weary of the Company's abidance by laws and integrity, throughout the Class Period, Defendants embarked on a campaign to trumpet that the Company's compliance with laws and its mandatory codes was central to its success and a competitive advantage.  ¶¶83-84.  The materiality of this unlawful payment is further magnified by how important Simandou was to Rio Tinto.  ¶¶6, 44-46, 56, 61, 66, 69, 78, 82-84.

These statements are actionable for creating the misimpression that Rio Tinto had not committed an unlawful payment, which was material especially because the Company only recently assured investors that the Chinese bribes in the iron-ore market were aberrations and isolated and that according to Walsh, "[we] will spare no effort in doing everything we can to prevent any similar activity[,]" (¶44-46).  These facts are analogous to those in, for example, *In re EZCorp., Inc. Sec. Litig.*, where this Court found actionable statements describing defendant's subsidiary's lending practices as compliant with regulations and industry best practices, where defendants engaged in banned practices (part of which occurred prior to the class period).  181 F. Supp. 3d 197, 203-04, 206-08 (S.D.N.Y. 2016).  The facts here are also analogous to those in *In re Petrobras Sec. Litig.*, where the court found that Petrobras' repeated statements about transparency and integrity and undertakings to refuse corruption and bribery made repeatedly and in context were actionable, since they caused reasonable investors to rely on them as reflecting reality, even though defendants engaged in a bribery and kickback scheme (part of which began

before the class period).  *See* 116 F. Supp. 3d 368, 377-81 (S.D.N.Y. 2016).  Also, the facts here are analogous to those in *In re Eletrobras Sec. Litig.*, where the court found actionable Eletrobras' repeated references to ethics and integrity:  "[P]laintiffs have thus plausibly alleged material misstatements or omissions with respect to Eletrobras's repeated references to its ethics and integrity[,]" where Eletrobras engaged in a bribery scheme (part of which occurred before the class period).  No. 15-cv-5754 (JGK), 2017 WL 1157138, 2017 U.S. Dist. LEXIS 44350, *19-24 (S.D.N.Y. Mar. 25, 2017).

Several other courts have found statements actionable, where, as here, defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs did not occur.  *See, e.g., Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014) (finding actionable environmental-compliance statements because defendants knew that their precautions failed to prevent violations of Chinese pollution regulations); *Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("Goldman stated that such integrity 'was at the heart' of its business and attempted to distinguish itself from other institutions based on its 'truly independent investment research' while it allegedly knew the contrary was true. … there is enough to suggest that Defendants were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs, namely that contrary to their truly-held beliefs, Goldman analysts changed or withheld negative reports to appease Goldman's investment bankers and clients. … In this context, Defendants' 'vague statements' were actually statements that implied certainty when, in fact, Defendants' purportedly had little reason to believe them.")[17]; *VEON*, 2017 U.S. Dist. LEXIS 152240, at *3, 21-23, 33-34 (finding misleading statements that VEON enjoyed "equal protection guaranteed by [Uzbekistan] law[,]" while VEON engaged in bribery to enter and remain in the market (part of which occurred prior

---

[17] Defendants attempt to distinguish *Lapin* with a distinction without a difference, in that "compliance was central to the defendant's effort to win *customers*, so the court held the statement was material to shareholders for that reason[.]"  *See* Defs.' MOL at 13.  But the crucial focus in *Lapin* was that optimistic statements were actionable upon a showing that defendants did not genuinely nor reasonably believe the statements that they touted, which demonstrated a contradiction of fact.  506 F. Supp. 2d at 239-40.

to the class period)); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, 2016 U.S. Dist. LEXIS 138439, *17-23 (S.D.N.Y. Oct. 5, 2016) (finding actionable statements about regulatory compliance); *In re Barrick Gold Sec. Litig.*, No. 13-cv-3851 (SAS), 2015 WL 1514597, 2015 U.S. Dist. LEXIS 43053, at *33-35 (S.D.N.Y. Apr. 1, 2015) (finding actionable environmental-compliance disclosures, where defendants knew of environmental violations); *In re Sotheby's Holdings, Inc. Sec. Litig.,* No. 00-cv-1041 (DLC), 2000 WL 1234601, 2000 U.S. Dist. LEXIS 12504, at *10-*11 (S.D.N.Y. Aug. 30, 2000) (statements that defendant faced intense competition were misleading, as it did not disclose that defendant and competitor had entered into a price-fixing agreement).

The decision in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG* is distinguishable.  First, Plaintiff here alleges non-aspirational false statements that contradicted what occurred, such as "***[w]e operate within all applicable laws and regulations ... [w]e do not commit, or become involved in, bribery or corruption of any form***" (*e.g.*, ¶¶8, 159, 162, 173, 176), which are distinguishable from the inactionable statements that were "explicitly aspirational, with qualifiers such as '***aims to***,' '***wants to***,' and '***should***[,]'" in *UBS*.  752 F.3d 173, 183 (2d Cir. 2014).  Second, the trial court's decision reflects that alleged fraudulent statements did not specifically reference UBS' abidance with tax laws, which was the subject of the fraud.  *See In re UBS AG Securities Litigation*, No. 07-cv-11225 (RSJ), 2012 WL 4471265, 2012 U.S. Dist. LEXIS 141449, *91-94, 110-12 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014).  Third, UBS specifically warned investors about the U.S. DOJ's investigation into the alleged tax scheme and that it could expose UBS to substantial monetary damages.  *UBS*, 752 F.3d at 184.  Fourth, unlike in *UBS*, *see* 2012 U.S. Dist. LEXIS 141449, at *13-16*, Plaintiffs allege that Rio Tinto's senior-most executives were at the helm of the unlawful scheme.  ¶¶71-75.

Here, the non-aspirational false statements that contradicted what occurred (bribes), are distinguishable from those in cases that Defendants rely upon, which were vague, general representations that companies ***aimed*** not to take certain actions and merely disclosed their policies ***without disclosing compliance*** as a fact.  *See Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp.

3d 12, 26-30 (S.D.N.Y. 2016) ("[T]he challenged statements … do not address any concrete policy or practice, let alone policies or practices aimed at preventing workplace hostility or discrimination[.]"); *In re PetroChina Co.*, 120 F. Supp. 3d 340, 356-57, 360-61 (S.D.N.Y. 2015) (finding that bribery allegations postdated the allegedly fraudulent statements and the class period, stating that "PetroChina [did] not claim to be in compliance with any of the corporate governance rules and regulations that it concedes to be subject to. … the Company's codes of ethics … do not claim that PetroChina's officers are abiding by them."); *In re Braskem S.A. Sec. Litig.*, No. 15-cv-5132 (PAE), 2017 WL 1216592, 2017 U.S. Dist. LEXIS 49266, at *9-18, 37-42 (S.D.N.Y. Mar. 30, 2017) ("There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct. … [T]he Braskem statements at issue about the company's culture, reputation, and compliance were all pitched at a general and an aspirational level. They do not contain historical representations. And they do not address any concrete policy or practice. … And the SAC does not allege that Braskem deployed these documents to quell a controversy or to lull a discontented investor or regulator."); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, 2014 U.S. Dist. LEXIS 137387, at *27, 38-47, 53-93 (S.D.N.Y. Sept. 29, 2014) (plaintiffs failed to demonstrate executives' scienter, and "a reasonable investor would not rely on the statements discussed above as a guarantee that Avon would, in fact, maintain a heightened standard of legal and ethical compliance … these statements merely set forth standards in generalized terms that Avon ***hoped*** its employees would adhere to"); *In re JP Morgan Chase Sec. Litig.*, No. 02-cv-1282 (SHS), 2007 WL 950132, 2007 U.S. Dist. LEXIS 22948, at *35-36 (S.D.N.Y. Mar. 29, 2007) ("generalized boast that it 'set the standard for best practices in risk management' could not have been relied upon by reasonable investors as a specific representation that the company would not take certain actions[.]").

Defendants involvement in and approval of an unlawful payment—at the least, one admittedly violating Rio Tinto's mandatory codes, warranting swift termination of senior-most executives, and grave self-reporting to regulators around the globe—is material; assessment of

materiality "should be undertaken in an integrative manner," which involves consideration of both quantitative and qualitative factors. *See Litwin v. Blackstone Grp. L.P.*, 634 F. 3d 706, 717 (2d Cir. 2011) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB No. 99")). "[A] complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 630 (S.D.N.Y. 2013). The misstatements here are directly connected to concealment of unlawful activity and compliance with regulatory requirements, which in this context, a reasonable investor would view as "significantly altering the total mix of information made available to … making the investment decision." *See* SAB No. 99 at 45152.[18]

### ii.    *Dealings with Gog on Simandou*

Plaintiff sufficiently alleges material misstatements and omissions about Defendants' dealings with the GoG on Simandou, including, without limitation, the $700 million "Settlement," while hiding that this agreement, Rio Tinto's concession in Simandou, and its relationship with the GoG was effectuated, in part, by the unlawful payment. *See* ¶¶94-95, 108-09, 118-21, 138-39, 152-55, 163-64, 171-72. For example, Rio Tinto disclosed the following during the Class Period: "Rio Tinto is working with the Government of Guinea to have relevant provisions of the Settlement Agreement ratified as law, as contemplated and required by the Settlement Agreement." (¶¶94-95); "Rio Tinto and the Government signed a Settlement Agreement in 2011 that relates to the southern concession of Simandou, known as blocks three and four, and is the location of Rio Tinto's declared iron ore resources in Guinea. Rio Tinto and the Government continue to work cooperatively on the project." (¶¶152-53); and "The original investment terms were later modified

---

[18] *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) ("Management's willingness to engage in practices that probably or obviously are illegal, and its decision to put the corporation at risk by so doing, may be critically important factors to investors. Investors may prefer to steer away from an enterprise that … opens itself to accusations of misconduct. Furthermore, regardless of financial motives, investors may not want to associate themselves with such an enterprise."); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007) ("The integrity of management is always of importance to investors.").

in the 2011 Settlement Agreement ('SA') to produce an Amended Convention de Base ('CdB'), which separated the mine and infrastructure projects and committed the project partners to create the IF."  (¶¶154-55.)

Defendants put these issues at play by making statements about dealings with the GoG, so they misled investors by failing to disclose the unlawful payment that played an integral part in these dealings.  The facts here are analogous to those in, for example, *VEON*, where this Court found misleading statements that placed the reasons for growth in Uzbekistan at issue, such as macroeconomics, product quality, and sales and marketing efforts, while VEON hid that this growth—at least in part—was due to bribes (part of which occurred prior to the Class Period).  *See* 2017 U.S. Dist. LEXIS 152240, at *3, 18-19, 33-34.  Also, the facts here are analogous to those in several other cases where courts sustained claims based on misleading statements about the source of defendants' performance.  *See. e.g., Petrobras,* 116 F. Supp. 3d at 377-81 (although Petrobras actually spent the amount of money disclosed on purchasing assets, the statements were actionable because the money was used for illegal purposes); *In re Van der Moolen Holdings N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 388, 393-94, 400-01 (S.D.N.Y. 2005) (where statements put at issue the revenue from NYSE specialists' trades, the alleged failure to disclose that the source of that revenue was improper trading was actionable).[19]

Moreover, once Defendants chose to make statements that put the Company's regulatory status and purported competitive strengths for transparency and risk management at issue, "Rule 10b-5 mandates that [their] speech must be truthful, accurate, and complete."  *See*, *e.g.*, *In re*

---

[19] *See also Gentiva*, 932 F. Supp. 2d at 368 ("The complaint alleges that the Defendants failed to disclose that a portion—any portion [without specificity]—of the company's reported revenue and profits were derived from Medicare fraud."); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015) (representations that increased margins were due to legitimate sourcing initiatives in China were actionable because the initiatives were illegal); *NuVasive,* 2015 U.S. Dist. LEXIS 178117, at *27-28 (accurately reported revenues and expenditures were actionable, where they were attributable—in an unspecified part—to illegal activity); *Steiner v. MedQuist Inc.*, No. 04-5487 (JBS) 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (defendant attributed improved earnings to legitimate business practices, while omitting unlawful billing).

*Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008) (citing *Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002) ("Upon choosing to speak, one must speak truthfully about material issues.").

Courts regularly hold that defendants, such as those here, were compelled to disclose uncharged illegal conduct because such disclosure "[was] necessary … in order to prevent statements the corporation [did] make from misleading the public." *Menkes v. Stolt-Nielsen S.A.*, No. 3:03-cv-409 (DJS), 2005 WL 3050970, *7 (D. Conn. Nov. 10, 2005) (finding that defendant was obligated to disclose uncharged, anti-competitive conduct in light of statements "convey[ing] the false impression to investors that [defendant] achieved success in a competitive pricing environment"); *see also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 89-93 (2d Cir. 2010) (finding actionable defendant investment fund's disclosures of transfer-agent fees that although accurate in amount, hid that the fees in essence were a kickback to an affiliated fund—part of the alleged fraudulent conduct occurred before the class period); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (statements suggesting that defendants "routinely responded to investigatory requests from the Government" and that there was "no assurance that [they] will not receive subpoenas … from time to time" were misleading where company was already in receipt of an investigatory demand); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675-78 (S.D.N.Y. 1990) (finding actionable statements suggesting that defendant had particular ability to obtain approval from the U.S. Food and Drug Administration ("FDA"), as success in getting approvals was due to bribery of FDA employees: "The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose. . . . The fact that a defendant's act may be a crime does not justify its concealment.").[20]

---

[20] *See also Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708-10 (E.D. Mich. 2010) ("The CCAC adequately pleads that Defendants knew, as evidenced by their Ethics Code, that market allocation agreements were of the most pernicious sort of antitrust violations and adequately alleges that, notwithstanding this knowledge, they entered into such market division agreements with their major competitors for the express prohibited anti-competitive purpose of driving up prices.  This satisfies the pleading requirement that a complaint adequately allege that

Plaintiff's argument is supported by *Braskem*, which Defendants heavily rely upon. Braskem's otherwise accurate factors for the bases of its purchase price of naphtha were actionable for having selectively omitted that a determinant of the price was corrupt arrangements, part of which were executed before the class period. *See* 2017 U.S. Dist. LEXIS 49266, at *44-55.

> [T]he context in which Braskem's statements regarding [naptha's] price were made would permit a reasonable jury to find those statements misleading. Braskem was certainly not obliged to publicly address the components and determinants of the prices it paid Petrobas for naphtha. It was entitled to stay mum on that point. But, having opened up that subject [], it was not at liberty to selectively omit what the SAC fairly alleges as a central determinant of that price: the corrupt arrangement Braskem had struck with the Petrobras officials it bribed. *Id.* at *54-55.

Defendants also rely on *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012), to their detriment (*see* Defs.' MOL at 15-17). There, defendant Goldman Sachs was not under a duty to disclose receipt of Wells Notices from the SEC—that did not indicate charges would necessarily follow—because prior to receipt, it already disclosed the investigation; additional specific disclosure of Wells Notices would only have "indicated that the government investigations were indeed ongoing." *See* 868 F. Supp. 2d at 272-74. But the court in *Richman* held that plaintiffs nevertheless sufficiently alleged a securities-fraud claim based on a fact pattern analogous to those here: when Goldman Sachs disclosed long interests in synthetic collateralized-debt obligations, to be both accurate and complete, it also had a duty to disclose its investment interest in short positions in those securities, which hid a conflict of interest with shareholders. *See id.* at 277-80. "Given Goldman's fraudulent acts, it could not have genuinely believed that its statements about complying with the letter and spirit of the law—and that its continued success depends upon it, valuing its reputation, and its ability to address 'potential' conflict of interests

---

the defendants knew that their statements were untruthful. The CCAC also adequately alleges that Defendants made express representations to the contrary in multiple public filings, specifically and repeatedly stating that their market share and earnings were the result of their ability to compete on price, service and quality in a 'highly competitive' packaged ice industry. Thus, the CCAC alleges a direct nexus between the allegedly illegal conduct and the Defendants' allegedly materially false and misleading statements."); *In re Providian Fin. Corp. Secs. Litig.*, 152 F. Supp. 2d 814, 823-25 (E.D. Pa. 2001) (defendants' statements about a "customer-focused approach" were actionable, where fraudulent business practices were the hidden cause of the success).

were accurate and complete." *Id.* at 279. "Goldman must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest as mere puffery or statements of opinion. Assuming the truth of Plaintiffs' allegations, they involve 'misrepresentations of existing facts.'" *Id.* 279-80.

### iii.   *Contingent Liabilities*

Plaintiff sufficiently alleges Rio Tinto's material misstatements and omissions regarding the Company not having disclosed a contingent liability in connection with the unlawful payment starting from the beginning of the Class Period. ¶¶101-03, 122-23, 146-47, 159, 162, 177-78, 183-84, 200. Examples of the fraudulent statements during the Class Period follow: in the 2011 20-F, "[d]ue to Rio Tinto's product and geographical spread, there is unlikely to be any single governmental regulation in effect that could have a material effect on the Group's business[,]" ¶¶101, 103; in the Company's 2015 20-F, "[t]he Group believes that no material loss to the Group is expected to result from these legal proceedings, claims, complaints and investigations[,]" ¶¶177-78; and in the 8/3/16 6-K, "[n]o events were identified after the balance sheet date which could be expected to have a material impact on the consolidated preliminary financial information included in this report[,]" ¶¶183-84. It is undeniable that armed with same facts that Rio Tinto had in April 2011, the Company waited to ultimately recognize the contingent liability in its 2016 20-F. ¶¶69-78, 101-03, 122-23, 146-47, 159, 162, 177-78, 183-84, 200.[21]

Defendants violated IFRS, with which Rio Tinto's disclosures needed to comply, by not recording a provision for material liability under International Accounting Standard ("IAS") 37,

---

[21] Contrary to Defendants' arguments, Rio Tinto's statements identified herein were not myopically focused on only legal claims and regulatory investigations pending at the time of those disclosures. *See* Defs.' MOL at 13-14. Defendants also toss up a lame excuse: "[L]arge companies take, through their employees, hundreds or thousands of actions each day, any of which might lead to legal claims or regulatory investigations. No investor could reasonably interpret a statement about then-pending claims as a statement that Rio Tinto's managers had evaluated each act of each employee that had already occurred to determine whether any might lead to legal claims or investigations in the future." The culprits implicated here, who were at the helm of Rio Tinto's disclosures during the Class Period, were indeed "employees" and "managers" **but nevertheless the former CEOs and Executive Committee members**.

Provisions, Contingent Liabilities and Contingent Assets.  Under IAS 37, Rio Tinto (a) had an obligation as a result of the bribery scheme[22]; (b) it was probably—more likely than not—that an outflow of resources embodying economic benefits would be required to settle the obligation; and (c) a reliable estimate could have been made based on foreseeable penalties.  Any benign warnings by Rio Tinto about contingent liabilities during the Class Period fell woefully short because Defendants knew about the unlawful payment (*see, e.g.*, ¶¶70-77).

According to IAS 37, only in "extremely rare" cases could reliable estimates not be made.  This is not an "extremely rare" case.  The FCPA Guide that Defendants cite actually supports the point that Rio Tinto was subject to likely penalties:  "Under the Alternative Fines Act, 18 U.S.C. § 3571(d), courts may impose significantly higher fines than those provided by the FCPA—up to twice the benefit that the defendant obtained by making the corrupt payment[,]" (FCPA Guide at 68); "The [U.S. Sentencing] Guidelines ["Guidelines"] provide a very detailed and predictable structure for calculating penalties for all federal crimes, including violations of the FCPA[,]" (*id.*).

DOJ prosecutorial factors made clear that penalties were likely for Rio Tinto: "[t]he nature and seriousness of the offense, including the risk of harm to the public"; "the pervasiveness of wrongdoing within the corporation, including the complicity in, or the condoning of, the wrongdoing by corporate management"; "the existence and effectiveness of the corporation's pre-existing compliance program"; "the corporation's remedial actions, including any efforts to implement an effective corporate compliance program or improve an existing one, replace responsible management, discipline or terminate wrongdoers, pay restitution, and cooperate with the relevant government agencies"; "collateral consequences, including whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as impact on the public arising from the prosecution"; and "the adequacy of the prosecution of individuals responsible for the corporation's malfeasance[.]"  *See*

---

[22] Indeed, in Rio Tinto's Form 20-F for 2016, the Company ultimately recognized as a contingent liability the outfall from the unlawful payment.  ¶200.

FCPA Guide at 53.[23]  Rio Tinto's offense level and culpability score would have been magnified here because of "the value of the bribe or the benefit that was conferred, and the level of the public official[,]" … "a substantial part of the scheme occurred outside the United States or if the defendant was an officer or director of a publicly traded company at the time of the offense[,]" … "the size of the organization committing the criminal acts[,]" and "the involvement in or tolerance of criminal activity by high-level personnel within the organization[.]"  *See id.* at 69.

Defendants failed to take credible remedial actions.  Rio Tinto decided to self-report in 2016, several years after Defendants made the 2011 unlawful payment and a year after Rio Tinto executives (in addition to the Defendants) learned about the payment.  ¶¶11-12, 70-77, 79, 81.  The Company failed to discipline the senior executives with knowledge of the bribery scheme until 2016.  *See id.*  The knowledge of Rio Tinto's senior-most executives, including Albanese, Davies, and Walsh, along with Rio Tinto's documentary evidence of the unlawful payment (*see* ¶¶70-77), should have made likely to Defendants that a contingent liability was needed.  *See Ind. Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 93-94 (2d Cir. 2016) (finding falsity and materiality in connection with defendants' failure to disclose loss contingencies, given defendants' knowledge about the alleged unlawful activity under regulatory investigation); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 356-57 (S.D.N.Y. 2012) ("The BoA Defendants also argue that they did not violate FAS 5 because it 'requires accrual or disclosure of a loss contingency when it is 'probable' or 'reasonably possible' that a loss has already been incurred[.]'  The BoA Defendants maintain that because Plaintiff cannot point to any existing, undisclosed repurchase claim, a violation of FAS 5 cannot form the basis of this claim.  However, the BoA Defendants' argument misses the mark … Plaintiff alleges that the BoA Defendants purposely prohibited BoA's accountants from recording accruals on the repurchase allowance until BoA received a formal demand through a trustee or litigation ... Thus, by failing to record repurchase claims until the

---

[23] Similarly, the SEC enforcement factors also weigh against Rio Tinto:  "the seriousness of the conduct and potential violations"; "the sufficiency and strength of the evidence"; "the extent of potential investor harm if an action is not commenced"; and "the age of the conduct underlying the potential violations."  *See id.* at 77.

occurrence of a later event, BoA did not disclose a loss contingency when it was probable or reasonably possible that the loss already occurred[.]"); *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 375-76, 378, 388-90 (S.D.N.Y. 2007) (finding falsity, based on defendants' failure to take a sufficient reserve against deferred tax assets, a basis for which was defendant's acquisition of another company that occurred before the class period).

### iv.   Contingent Liability Under Item 303 of SEC Regulation S-K

Rio Tinto misled investors by omitting contingent liabilities from the unlawful payment from its SEC filings, including, without limitation its annual reports,  pursuant to an affirmative duty under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303").  Item 303 "outlines the disclosure required in the 'Management's discussion and analysis of financial condition and results of operations' section [("MD&A")]" which include annual reports, amongst other documents.[24]  As relevant here, the issuer must "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," 17 C.F.R. 229.303(a)(1), and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. 229.303(a)(3)(ii).  "Instruction 3 to paragraph 303(a) provides that '[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.'"  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  The Second Circuit

---

[24] Centrally relevant here is Item 7, MD&A, where the company must "[f]urnish the information required by Item 303 of Regulation S-K."  *See* SEC, Form 10-K (https://www.sec.gov/files/form10-k.pdf); 47 Fed. Reg. 11,474 (Mar. 16, 1982) (adopting this requirement).  Regulation S-K provides instructions for disclosures in the non-financial statement portions of Forms 10-K and other reports.  *See* 17 C.F.R. 229.10(a)(2).  Regulation S-K is intended to ensure "that investors and the marketplace are provided meaningful, nonduplicative information periodically and when securities are sold to the public, while the costs of compliance for public companies are decreased."  45 Fed. Reg. 63,694 (Sept. 25, 1980).

has held that "Item 303's affirmative duty to disclose . . . can serve as the basis for a securities fraud claim under Section 10(b)[.]" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also SAIC*, 818 F.3d at 93-95 (defendants had a duty under Item 303 to disclose loss contingencies for alleged unlawful activity associated with a contract with New York City).

The SEC has provided guidance as to when, such as here, Item 303's disclosure obligation is triggered: disclosure "is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte-McClure*, 776 F.3d at 101 (quoting MD&A, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 SEC LEXIS 1011, 1989 WL 1092885, at *4 (May 18, 1989)). Section 13(a) of the Exchange Act (15 U.S.C. 78m(a)) and SEC regulations specifically make nondisclosure unlawful. The "reasonably expects" standard "helps distinguish statements of known facts relating to the future, which are mandatory, from forward-looking statements, which are not required." *Steckman* v. *Hart Brewing, Inc.*, 143 F.3d 1293, 1297 (9th Cir. 1998). Item 303 sets a "lower threshold than 'more likely than not,'" 81 Fed. Reg. 23,944 (Apr. 22, 2016), and "extend[s] considerably beyond [the materiality standard] required by Rule 10b-5," *Oran* v. *Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.). The SEC has explained that, without Item 303's required narrative, a company's numerical financial statements and accompanying footnotes "may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." 54 Fed. Reg. at 22,428. The required disclosure is "[o]ne of the most important elements necessary to an understanding of a company's performance." 68 Fed. Reg. 75,061 (Dec. 29, 2003). The Second Circuit in *SAIC* stated that "Item 303 imposes an 'affirmative duty to disclose'" that "'can serve as the basis for a securities fraud claim under Section 10(b).'" *SAIC*, 818 F.3d at 94 n.7 (quoting *Stratte-McClure*, 776 F.3d at 101). Due to the obligatory nature of these regulations, a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of additional trends or uncertainties meeting the regulatory threshold. *Stratte-McClure*, 776 F.3d at 102. If additional trends or uncertainties actually exist for which Item 303 mandates further

41

disclosure, the MD&A would be misleading, even if the issuer could be described as silent.  A statute or regulation that mandates disclosure thus creates a "duty" to disclose as that term is commonly understood.  *E.g.*, *Stratte-McClure*, 776 F.3d at 101 (2d Cir. 2015) (duty to disclose may arise "when there is … a 'statute or regulation requiring disclosure'"); *Scholastic*, at 70-74 (2d Cir.).[25]

The facts in *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016), are distinguishable (*see* Defs.' MOL at 9 n. 7).  There, the court found that defendants' statements regarding then-currently pending claims accurately reflected that an ongoing investigation actually existed and could impact the company's business, obviating the need to additionally and expressly disclose receipt of a Wells Notice from the SEC.  *Id.* at 13-16, 21-22, 25.  Plaintiffs did "not explain any qualitative factors that would plausibly show materiality," nor any factual allegations about why defendants would have believed that there would be a material adverse effect.  *Id.*  But here, Defendants gave no warning at all to investors that a material contingent liability in connection with the unlawful payment was staring Rio Tinto in the face throughout the Class Period (up until admitting the contingent liability in the 2016 20-F), even though the individual Defendants were aware of it since 2011.

     *v.*    ***Disclosure Controls and Procedures, Internal Controls, and SOX certifications***

Plaintiff sufficiently alleges material misstatements and omissions regarding Rio Tinto's disclosure controls and procedures, internal controls, and Albanese and Walsh's signed SOX certifications, which were incorporated by reference in the Complaint (*e.g.*, 2011 20-F), while

---

[25] The SEC has instituted administrative proceedings and imposed sanctions under Rule 10b-5 for MD&A omissions in violation of Item 303.  For example, in *In re Fitzpatrick*, Exchange Act Release No. 34,865, 57 SEC Docket 2178 (Oct. 20, 1994), the SEC concluded that two executives had violated Rule 10b-5 by filing an MD&A that omitted material information in breach of Item 303.  *Id*. at 2182-2183; *see also In re Cypress Bioscience Inc.*, Exchange Act Release No. 37,701, 62 SEC Docket 2286, 2292 (Sept. 19, 1996) (finding Rule 10b-5 violation based on issuer's Form 10-Q that included false financial statements and "failed to disclose" information "in the MD&A section" in violation of Item 303); *In re Valley Sys., Inc.*, Exchange Act Release No. 36,227, 60 SEC Docket 541, 544 (Sept. 14, 1995) (similar); *In re Westwood One, Inc*., Exchange Act Release No. 33,489, 55 SEC Docket 2350, 2359 (Jan. 19, 1994) (similar).

hiding that Defendants, including, without limitation, the SOX signatories Albanese and Walsh, were directly involved in and approved the unlawful payment.  ¶¶10, 93, 104-07, 130-33, 148-51, 165-68, 179-82.  Within Rio Tinto's failed internal controls were the internal-controls provisions of the FCPA, 15 U.S.C. §§78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), and 78ff(a).  *See Jackson*, 908 F. Supp. 2d at 864-65.

These statements are actionable because while professing that they were sufficiently sound, Defendants knew of the unlawful payment approved by Rio Tinto's senior-most executives, which Rio Tinto at the least admitted violated *The way we work*.  ¶¶71-75, 190, 201; *Varghese v. China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 606-07 (S.D.N.Y. 2009) (finding actionable statements regarding internal controls, where "internal control problems were much more serious than the picture conveyed by its filings and press releases"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 533 (S.D.N.Y. 2009) (SOX certification was false because defendant violated internal hedging policy, which was fraud required to be disclosed to auditor); *Scottish Re*, 524 F. Supp. 2d at 388-89, 391-93, 398 (holding that "plaintiffs' factual allegations [regarding, in part, an insufficient valuation allowance for its deferred-tax assets], accepted as true, suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls"); *VEON*, 2017 U.S. Dist. LEXIS 152240, at *26-27 ("Falsely recording a bribe as the acquisition of an asset or consulting services … would seem to violate policies or procedures that '[p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions . . . of the issuer.'"); *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10–cv–3461, 2014 WL 2815571, at *5-6, 2014 U.S. Dist. LEXIS 85683, at *16-17 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct … Goldman is alleged to have sold financial products to clients despite clear and egregious conflicts of interest."), *cert. of appeal. denied,* 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014).[26]

---

[26] *See also Nature's Sunshine*, 486 F. Supp. at 1307 (plaintiffs adequately alleged that defendant signed SOX certification but did not disclose FCPA violation to auditor); *In re BofI Holding Sec.*

Defendants can find no solace in couching Defendants' SOX certifications—or other statements—as opinions (*see* Defs. MOL at 17-18 n. 10).  Even if these statements are opinions, they are actionable for two reasons.  First, Defendants did not honestly hold them.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327-29 (2015).  Second, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 135 S. Ct. at 1328-29.  "He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.  Thus, if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then [the] omissions clause creates liability." *Id.* at 1329.  As Plaintiff alleges, while signing the SOX certifications, Albanese and Walsh were directly involved in and approved the unlawful payment. ¶¶10, 93, 104-07, 130-33, 148-51, 165-68, 179-82.  These allegations demonstrate that their SOX certifications are actionable.  *See Petrobras*, 116 F. Supp. 3d at 380-81 ("[P]laintiffs allege that at the time the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities.").

---

*Litig.*, No. 3:15-cv-02324-GPC-KSC, 2016 WL 5390533, 2016 U.S. Dist. LEXIS 132574, at *23-33 (S.D. Cal. Sept. 27, 2016) (representations that "we have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance," were false and misleading "by the allegation that Garrabrants was interfering with auditor duties in contravention of OCC guidance, that internal controls were 'nonexistent,' and that Third Party Risk Department was understaffed"); *Burges v. Bancorp South, Inc.*, No. 3-14-1564 (TJC), 2015 WL 4198795, 2015 U.S. Dist. LEXIS 89822, at *11-15 (D. Tenn. Jul. 10, 2015) (statements that defendants were in compliance with banking laws, including "a system of internal controls to ensure ongoing compliance[,]" were actionable affirmative statements about present or historical facts, and plaintiffs "sufficiently allege[d] that Defendants knew these statements were false and misleading, given the Bank's non-compliance [with federal banking laws] and the existing FDIC review").

Defendants rely upon distinguishable cases, where—as opposed to here—plaintiffs did not allege that the very defendants, while making those certifications, knew that they were materially deficient. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402, 406-07 (S.D.N.Y. 2016) (plaintiffs failed to allege any facts supporting defendant-CEO's scienter over an alleged illegal marketing scheme (that was not demonstrated to have occurred), nor thus a material misstatement or omission); *PetroChina Co.*, 120 F. Supp. 3d at 356-59 (finding inactionable internal-control-related statements, where allegations of bribery postdated the allegedly fraudulent statements and the class period—indeed, not a single fact preceded the false annual reports); *Braskem*, 2017 U.S. Dist. LEXIS 49266, at *42-45 ("The SAC … lacks any concrete factual allegations that Braskem had deficient internal controls governing its financial reporting.  Indeed, the SAC does not concretely allege that any of Braskem's financial reports were in any way inaccurate."); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-cv-2835 (NRB), 2011 WL 4357368, 2011 U.S. Dist. LEXIS 106046, at *80-81 (S.D.N.Y. Sept. 19, 2011) (plaintiffs in opposing motions abandoned argument that SOX certifications were fraudulent).

### vi.    Individual Defendants' Statements and Omissions

Albanese, Davies, and Walsh each made actionable statements and omissions during the Class Period and had "ultimate authority over [other statements], including [the] content and whether and how to communicate [them]."  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).[27]

Albanese signed the SOX certification for the 2011 20-F that was filed with the SEC in the U.S. and contained material misstatements and omissions.  ¶¶106-07.  He made material misstatements and omissions in other documents that Rio Tinto filed with the SEC in the U.S. ¶¶118-19.  Also, he made material misstatements and omissions during a call on August 8, 2012 for the Company's interim results for 2012, ¶¶108-09, a copy of which was available in the U.S.[28]

---

[27] Only Albanese and Davies raise defenses to liability under *Janus*; Walsh does not.

[28] An example of an available avenue for these results is https://seekingalpha.com/article/792071-rio-tintos-ceo-discusses-interim-2012-results-earnings-call-transcript.

Walsh signed SOX certifications for Rio Tinto's Form 20-F for 2012 filed on March 15, 2013, the 2013 20-F, the 2014 20-F, and 2015 20-F, which were all filed with the SEC in the U.S. and contained material misstatements and omissions. ¶¶132-33, 150-51, 167-68, 181-82. He signed Annex 1D of the Simandou SEIA, *The way we work*, which included material misstatements and omissions, ¶¶88, 112-13, a copy of which was available in the U.S.[29] He made material misstatements and omissions in other documents that Rio Tinto filed with the SEC in the U.S. or made available in the U.S. through its website[30]. ¶¶122-23, 154-55. He made material misstatements and omissions during the following calls: on February 14, 2013 for the Company's fourth quarter of 2012 results, ¶¶120-21; on February 13, 2014 for the Company's fourth quarter of 2013 results, ¶¶138-39; and on August 6, 2015 for the Company's interim results for 2015, ¶¶171-72, copies of which were all available in the U.S.[31]

Davies made material misstatements and omissions during the Class Period about Rio Tinto's relationship with the GoG in connection with Simandou. *E.g.* ¶¶154-55. He was also expressly referenced in connection with material misstatements and omissions made in Rio Tinto's filings with the SEC in the U.S. ¶¶118-19. He was present when material misstatements and omissions were made that expressly referenced him, given his involvement in the unlawful payment scheme, during the following calls: on February 14, 2013 for the Company's fourth quarter of 2012 results, ¶¶120-21; on February 13, 2014 for the Company's fourth quarter of 2013 results, ¶¶138-39; and on August 6, 2015 for the Company's interim results for 2015, ¶¶171-72, copies of which were all available in the U.S.[32]

---

[29] An example of an available avenue for reviewing *The way we work* is http://www.riotinto.com/documents/RT_The_way_we_work_EN.pdf.

[30] http://www.riotinto.com/investors-87.aspx.

[31] Examples of available avenues for these results, respectively, follow: https://seekingalpha.com/article/1186831-rio-tinto-plc-adr-ceo-discusses-q4-2012-results-earnings-call-transcript; http://www.alacrastore.com/thomson-streetevents-transcripts/Full-Year-2013-Rio-Tinto-PLC-Earnings-Conference-Call-T5293637; and https://seekingalpha.com/article/3419896-rio-tintos-rio-ceo-sam-walsh-on-q2-2015-results-earnings-call-transcript.

[32] Examples of available avenues for these results, respectively, follow: https://seekingalpha.com/article/1186831-rio-tinto-plc-adr-ceo-discusses-q4-2012-results-

Albanese, Walsh, and Davies all had ultimate authority over material misstatements and omissions during the Class Period as Executive Committee members.  ¶23.  Rio Tinto's day-to-day management fell on the Executive Committee.  ¶39.  Each products group's chief executive (during the Class Period, Davies and Walsh were chief executives of the products groups that controlled Rio Tinto's Simandou iron-ore operations) was an Executive Committee member and reported directly to the CEO (Albanese and Walsh's roles during the Class Period).  ¶39.  Rio Tinto disclosed information related to each products group.  ¶39.  The Executive Committee was responsible for these disclosures.  ¶40.  Moreover, the "Approver" of the materially false or misleading Business Integrity Standard was the Executive Committee; Albanese, Walsh, and Davies were thus each an "Approver" of these actionable statements.  *See* ¶¶90-91.

Davies' authoritative role over Simandou was referenced in Rio Tinto's Class Period statements.  For example, Albanese in Rio Tinto's August 2, 2012 Form 6-K filed with the SEC in the U.S. stated "I welcome Alan [Davies] to the Executive Committee, and acknowledge the leading role he has played in developing partnerships with the [GoG], Chalco and the International Finance Corporation, and leading the work to develop the Simandou project."  ¶¶118-19; *see also* ¶¶120-21, 138-39.  Davies had accountability over Simandou in 2011 when the unlawful payment was made, and he later became Rio Tinto's chief executive of the Energy and Mineral products group and an Executive Committee member.  ¶198.  Also, Davies was a member of Rio Tinto's ethics committee, so he oversaw the drafting of *The way we work*.  ¶198.

Albanese's cherry-picked citation to the 2011 20-F for the point that he was not a member of the "Disclosure Committee" (*see* Albanese's MOL [ECF 65] at 4-5; *see also* Davies' MOL [ECF 67] at 5-6) is unconvincing because the very 2011 20-F that Defendants cite states the following:

---

earnings-call-transcript; http://www.alacrastore.com/thomson-streetevents-transcripts/Full-Year-2013-Rio-Tinto-PLC-Earnings-Conference-Call-T5293637; and
https://seekingalpha.com/article/3419896-rio-tintos-rio-ceo-sam-walsh-on-q2-2015-results-earnings-call-transcript.

> The ***main channels of communication with the investment community are through*** the chairman, ***chief executive*** and chief financial officer, who have regular meetings with the Companies' major shareholders. The senior independent director, chairmen of board committees, ***and other nonexecutive directors are also available on request.*** The senior independent director has a specific responsibility to be available to shareholders who have concerns, and where contact with the chairman, chief executive or chief financial officer has failed to resolve their concerns, or for whom such contact is inappropriate. (Emphasis added.) Dec., Ex. 2 at 106.

Regardless of how Rio Tinto assembled its "Disclosure Committee," it strains credibility that Albanese, ***Rio Tinto's former CEO during the Class Period***, could hide from liability for Rio Tinto's statements during the Class Period, especially considering those statements referenced in this section, the fact that he signed SOX certifications, and that Walsh—also Rio Tinto's CEO during the Class Period—did not raise this defense.  Similarly, considering the statements that Davies made or had ultimate authority over, as demonstrated herein, he cannot hide from liability based on how Rio Tinto assembled its "Disclosure Committee."

Davies' reliance on *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) (*see* Davies' MOL at 5), actually supports Plaintiff's argument here. The court in *Lockheed* found that an individual defendant was liable for defendant-issuer's written statements, even though she did not personally make them: "Gooden was (1) the executive in charge of the division whose misconduct is at the heart of plaintiff's claims; 2) an officer of Lockheed; and (3) one of seven individuals listed as part of Lockheed's 'Leadership, … , it is appropriate to invoke the group pleading doctrine and presume that Gooden, a high-level executive at Lockheed who played a daily role in the company's operations, was a 'maker' of Lockheed's projections insofar as they related to IS&GS." *Lockheed*, 875 F. Supp. 2d at 374-75.  Moreover, Davies' reliance on *UBS* (*see* Davies' MOL at 4-6) is unavailing because there, plaintiffs failed to allege that any of the individual defendants made or had authority over the content of the statements.  *See id.*, 2012 U.S. Dist. LEXIS 141449, at *28-35.  Defendants' reliance on *Braskem* is also unconvincing.  *See* 2017 U.S. Dist. LEXIS 49266, at *55-57.  There, plaintiffs' allegations were merely "global and general" and "not particularized at all as to" the former chief executive

officer ("Gradin"): Gradin was no longer in this position when the Form 20-Fs at-issue were filed, and the "SAC lack[ed] any specific factual allegation regarding Gradin's role in the creation, formulation, or dissemination of Braskem's public filings, whether in general, as to Forms 6-K as a body, or as to the particular Forms 6-K that the Court has found actionable." *Id.* at \*56-57.

    **B.**    **Scienter is alleged through Defendants doling out the bribe and its repercussions.**

Under the PSLRA, a securities-fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u–4(b)(2). This is satisfied when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. A court must "accept all factual allegations in the complaint as true" and must evaluate "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-323 (emphasis is original). Defendants "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *In re Philip Services Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004). The requisite inference of scienter need not be the "most plausible of competing inferences," nor does it need to be "irrefutable, *i.e.*, of the 'smoking gun' genre." *Tellabs*, 551 U.S. at 324. "[T]he tie goes to the plaintiff." *In re Salix Pharms., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, 2016 U.S. Dist. LEXIS 54202, at \*38 (S.D.N.Y. Apr. 22, 2016); *see also City of Brockton Ret. Sys. v. Shaw Group Inc.,* 540 F.Supp.2d 464, 472 (S.D.N.Y.2008) (When the competing inferences rest in equipoise, the "tie ... goes to the plaintiff."). While scienter must be pled with particularity, "[n]either *Iqbal*, *Twombly*, Rule 9(b), nor the PSLRA require detailed factual allegations." *Isakov v. Ernst & Young, Ltd. (Bermuda)*, No. 3:10-cv-1517 (MRK), 2012 WL 951897, 2012 U.S. Dist. LEXIS 37534, at \*13 (D. Conn. Mar. 19, 2012) (citing *Scholastic*, 252 F.3d at 72 ("Even with … Rule 9(b) and the [PSLRA,] we do not require the pleading of detailed evidentiary matter in securities litigation")).

As the Second Circuit has long held since the passage of the PSLRA, plaintiffs need not plead scienter with "great specificity provided the plaintiff alleges enough facts to support a strong inference of fraudulent intent." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000). The requisite strong inference may be established by pleading either (a) "motive and opportunity to commit fraud," or (b) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307.  Recklessness is defined as "conduct which is highly unreasonable and which represents 'extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 308.  "An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness." *Id.*  "Strong circumstantial evidence includes a showing that defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *EZCorp.*, 181 F. Supp. 3d at 209.

Viewed holistically, Plaintiff sufficiently alleges facts giving rise to a strong inference of Defendants' conscious misbehavior or recklessness: (1) violations of anti-bribery laws, including, without limitation, the FCPA, with direct involvement by Rio Tinto's former CEOs and Executive Committee members, or at the least, admitted-to violations of *The way we work*; (ii) knowledge and concealment of the unlawful payment from the public after discovery; (iii) the abrupt terminations of Executive Committee members and rescinding of valuable compensation expressly in connection with the scheme; (iv) the Company's admission of wrongdoing, self-reporting of a serious crime to regulators, and regulators' investigations into the scheme; (v) fraudulent SOX certifications by Albanese and Walsh; and (vi) the importance of Rio Tinto's integrity, especially after the Chinese bribery scandal, and Simandou.  As demonstrated in Section III.1.a.i. above (*Statements About Law Abidance and Anti-Corruption*),  Plaintiff sufficiently alleges the illegality of the $10-5 million payment at this stage.  Defendants were directly involved in and approved the unlawful payment in 2011.

**First**, it is inescapable that Albanese, Davies, and Walsh approved the unlawful payment, and the May 2011 Emails add icing on the cake by including nefarious details.  ¶¶71-76.  At the least, Rio Tinto admitted that the payment violated *The way we work*.  ¶¶190, 201.  According to a video recording and Guinea's Minister of Mines and Geology, Combret was well known to have played a key, nefarious role in meddling in Guinean President Conde's renegotiations of Simandou concessions contemporaneously with Rio Tinto's unlawful payment to retain him, which gave the Company access to privileged information.  ¶¶29, 70, 75, 194.

The individual Defendants' direct involvement in and approval of the payment supports scienter against them and Rio Tinto.  *See, e.g., Novak,* 216 F.3d at 308 (a strong inference of scienter can be inferred where a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements."); *Kozeny*, 667 F.3d at 133-34 ("Moreover, [conscious avoidance] may be established where, a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge."); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,* 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (scienter based on defendants' alleged direct involvement in fraudulent revenue practices); *Ark. Teacher Ret. Sys. v. Bankrate, Inc*., 18 F. Supp 3d 482, 486 (S.D.N.Y. 2014) (defendants were "personally involved in directing hands-on efforts" supported a "strong plausible inference of scienter"); *Richman*, 868 F. Supp. 2d at 283 (scienter based on individual defendants' knowledge of Goldman Sachs' collateralized-debt obligations that were the subject of the fraud); *Bristol Myers*, 586 F. Supp. 2d at 166-71 (scienter against corporation and individuals based on knowledge about side agreements with generic drug company; an innocent inference was less compelling when defendants were aware of "how critical maintaining [drug] exclusivity was to the [c]ompany's profitability," but did not disclose a threat to that exclusivity); *Hall v. Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 233 (SDNY 2008) (executive's knowledge of scheme is imputed to the corporation); *Braskem*, 2017 U.S. Dist. LEXIS 49266, at *60-63 (Defendants "were directly involved in the bribery scheme and therefore had actual

knowledge that the naphtha pricing statements in Braskem's SEC filings were false or misleading. … The SAC alleges in detail that executives from Braskem and its affiliate Odebrecht coordinated payments to [Petrobras] and political officials so as to obtain favorable naphtha pricing for Braskem"); *Sotheby's*, 2000 U.S. Dist. LEXIS 12504, at *10-11 (finding scienter where executives had direct involvement in collusive scheme, even where that scheme occurred prior to the class period).[33]

At minimum, Plaintiff's allegations of individual Defendants' direct involvement in and approval of the payment evince conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to Defendants or so obvious that they must have been aware of it.  *See, e.g., Scottish Re*, 524 F. Supp. 2d at 393-94 (finding implausible an inference that sophisticated executives actively engaged in the planning of the transactions-at-issue were ignorant of the tax consequences); *BioScrip*, 95 F. Supp. 3d at 720-24, 733 (defendants' pre-class period knowledge regarding illegal kickbacks supported the court's finding of scienter); *Petrobras*, 116 F. Supp. 3d at 377-81 (taking into account pre-class period allegations of corruption and bribery scheme in finding scienter); *Eletrobras*, 2017 U.S. Dist. Lexis 44350, at *8-9, 29-34 (finding scienter in connection with bribery scheme based on facts, some of which occurred prior to the class period).[34]

Whether or not Defendants "believed" that they had an obligation to disclose the payment does not shield them from scienter at this stage.  *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181-82 (2d Cir. 1976) (recognizing that Rule 10b-5 requires "proof of intention 'to deceive,

---

[33] *See also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (finding "allegations of direct involvement…probative of scienter"); *NuVasive*, 2015 U.S. Dist. LEXIS 178117, at *32-34 (finding scienter based on executives' direct involvement in transactions that allegedly violated healthcare-compliance laws); *Sapssov v. Health Mgmt. Assoc., Inc.*, 22 F. Supp. 3d 1210, 1228 (M.D. Fla. 2014) (finding that viewed holistically, allegations created a strong inference of scienter, where defendants implemented and oversaw a scheme to defraud Medicare, were heavily involved in daily operations, and were subject to a regulatory investigation).

[34] *See also In re Cadence Design Sys. Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191-92 (N.D. Cal. 2010) (executive "was at least deliberately reckless"; "[t]he competing inference, that he worked on these [important] deals and innocently missed the most important details, is less plausible.").

manipulate or defraud' not an intention to do this in knowing violation of the law."). Any argument that the individual Defendants did not have scienter because they were not aware that they were violating the FCPA—or at the very least, that the adverse publicity and regulatory probes resulting therefrom would harm the Company and its investors—is not a valid defense here and defies common sense. *See Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003) ("A defense of reliance on advice of counsel is available only to the extent that it might show that a defendant lacked the requisite specific intent, …, and specific intent to violate the FCPA is not an element of an FCPA violation."); *S.E.C. v. China Ne. Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 388-93 (S.D.N.Y. 2014) (rejecting argument that individuals performed no role in scheme, where CEO exerted actual control over company and the CFO "did more than perform ministerial actions while in the dark about the goals of the scheme; it has pled that he was an active, aware, and essential participant subject to scheme liability"); *Jackson*, 908 F. Supp. 2d at 861-62 ("Indeed, this Court seriously doubts that the SEC even needs to prove that Defendants knew that their actions violated *any* specific law. … However, as explained, the SEC has no obligation to plead that Defendants knew that they were violating a law, or even that they were seeking an illegal result to state a civil FCPA violation."). Moreover, as demonstrated in Section III.1.a.i. above (*Statements About Law Abidance and Anti-Corruption*), especially the discussion about the FCPA's awareness requirements, Defendants unpersuasively attempt to argue at this stage that they were unaware of an FCPA violation.

Defendants' direct involvement in and approval of the payment here is distinguishable from the facts in cases that Defendants rely upon, where those scienter allegations were based merely on general allegations of executives' supervisory roles over lower-level employees who did not escalate the suspicious information. *See Sanofi*, 155 F. Supp. 3d at 398-400, 402, 406-07 (plaintiffs failed to allege any facts supporting defendant-CEO's scienter over purported illegal marketing scheme, which were based merely on defendant's position and corporate policies that—in theory— mandated internal investigations and reports, which were insufficiently demonstrated to have

existed; allegations were based predominantly on whistleblowers' accounts that did not specifically reference details of any illegal contracts); *Fogel v. Wal-Mart De Mexico SAB de CV*, No. 13-cv-2282 (KPF), 2017 WL 751155, 2017 U.S. Dist. LEXIS 26976, at *40-42 (S.D.N.Y. Feb. 27, 2017) ("Plaintiff invites the Court to speculate that because Vega was responsible for supervising a culpable individual, that individual must have reported to Vega directly, and must have conveyed information that would make Vega at least reckless not to know of the alleged bribery in which that individual was involved. … And considering the very strong competing inferences that Vega supervised Juárez but did not know of the bribery — because the relationship between the two was attenuated, or because an employee is likely to hide his wrongdoing from his supervisor[.]"); *Avon*, 2014 U.S. Dist. LEXIS 137387, at *27, 38-47, 53-93 (plaintiffs failed to demonstrate CEO and CFO's scienter, which was based substantially on their supervisory and approval roles over "not senior executive level" employees linked to purported bribery scheme, but who were not shown to have escalated revealing information to the executives).

**Second,** the context surrounding the revelation of the May 2011 Emails also scream scienter. Rio Tinto was not forthcoming with self-reporting incriminating documents to regulators, having delayed the day of reckoning for at least a year after documents were known by the Company's legal department and others (in addition to the individual Defendants). ¶¶11-12, 79, 81; *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1311 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-38 (E.D. Va. 2000) (noting that the "inference of scienter becomes more probable as the violations … become more obvious"); *City of Pontiac Gen. Emp. Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 12-cv-5162 (SOH), 2014 WL 4823876, at *9 (W.D. Ark. Sep. 26, 2014) (finding that failure to acknowledge suspected corruption until after publication of a *New York Times* article supported the inference that defendants "were concerned about exposure of their alleged mishandling of the suspected corruption" and "consciously chose to omit" that information from earlier disclosures); *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (JCGx), 2013 WL 174119, 2013 U.S. Dist.

LEXIS 6977, at *72 (C.D. Cal. Jan. 16, 2013) ("[I]t strains credulity to infer that the company's management remained completely ignorant of [the company's] immigration compliance problems during the *entire pendency* of the [Immigration and Customs Enforcement Division] investigation.") (emphasis in original).  That Rio Tinto conducted its own internal investigation and self-reported does not whitewash the compelling inference of scienter.  *SAIC*, 818 F.3d at 88, 96-97 (cooperating with regulators' investigations and conducting an internal investigation did not negate scienter).  Defendants knew well before in 2011 that the scheme had taken place; the timing of the internal investigation and revelation in 2016 certainly calls their motivations into question and cannot quell the inference of scienter.

**Third,** in reaction to the unlawful payment, Rio Tinto swiftly fired three Executive Committee members, Davies, Bague, and Valentine.  ¶¶13, 36, 40.  Rio Tinto rescinded extraordinarily lucrative compensation—several millions of dollars-worth—from each of Davies and Valentine, clawed back monies from Davies under a policy that the Company never exercised before, and deferred about $20 million of bonuses to Walsh.  ¶¶36, 197, 199.  These unusual and suspicious resignations in reaction to the unlawful payment constitute circumstantial evidence of scienter.  *See*, *e.g.*, *Varghese*, 672 F. Supp. 2d at 603, 608; *Hall*, 580 F. Supp. 2d at 233-34 (an executive's forced resignation added to holistic analysis of scienter); *Scottish Re*, 524 F. Supp. 2d at 394 n.176; *In re Fairway Group Holding Corp. Sec. Litig.*, No. 14-cv-0950 (LAK), 2015 WL 249508, 2015 U.S. Dist. LEXIS 5999, at *40 (S.D.N.Y. Jan. 20, 2015) (defendant's resignation announced concurrently with fraud revelation supported scienter).  These terminations, coupled with links to the fallout of the alleged unlawful payment, are distinguishable from the terminations that did not support scienter in *UBS*, since those were not linked to the alleged fraud.  2012 WL 4471265, 2012 U.S. Dist. LEXIS 141449, *58-59, *aff'd*, 752 F.3d 173 (2d Cir. 2014).

**Fourth**, Jacques and Plessis' admissions of wrongdoing and the gravity surrounding the payment were warranted.  ¶¶189-201.  Armed with an internal report and findings from external counsel, along with Rio Tinto's internal compliance team, from an investigation that included having ploughed through a reported 60 terabytes of data, Rio Tinto self-reported documents to the

DOJ, SEC, SFO, ASIC, and the AFP.  ¶12.  Self-reporting reflects that Rio Tinto was cognizant of criminal and civil penalties: a company that self-reports can seek leniency in both criminal and civil cases.  *See* FCPA Guide at 54-55; *see also Shell Oil Co. v. Writt*, 464 S.W.3d 650, 659 (Tex. 2015) ("[B]usinesses that chose not to cooperate were subjected to substantially greater punishments if a DOJ prosecution was successful.  …  'Knowing all the consequences that accompany FCPA litigation, many companies choose to be proactive and self-report to the DOJ and SEC to take advantage of any leniency that the government might offer.'  …  Federal prosecutors and the U.S. Sentencing Guidelines 'place a high premium on self-reporting, along with cooperation and remedial efforts, in determining the appropriate resolution of FCPA matter.'").  These regulators are investigating the matter.  ¶12.  Rio Tinto has disclosed that the AFP and SFO have already announced formal investigations into the matter (*see* Dec., Ex. 1, 8/2/17 6-K).

The Company's self-reporting, key executives' admissions of wrongdoing, and investigations from regulators add to the holistic inquiry of scienter—this fallout would not have unraveled following innocent activity.  *See, e.g.*, *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (finding that defendant's "admissions satisfy Rule 10b-5's scienter requirement"); *BioScrip*, 95 F. Supp. 3d at 732-33 (finding that defendants "knew facts or had access to information suggesting their public statements [concerning regulatory compliance] were not accurate[,]" based on company's receipt of subpoena and pendency of regulatory investigations at that time); *Richman*, 868 F. Supp. 2d at 281 (Goldman Sachs "certainly knew that Paulson played an active role in the asset selection process.  How else could Goldman admit that it was a 'mistake' not to have disclosed such information."); *Bristol Myers*, 586 F. Supp. 2d at 168 (a DOJ investigation was an element supporting scienter).[35]

---

[35] *Gentiva*, 932 F. Supp. 2d at 380 (considering pending investigations as part of the scienter analysis, even though regulators had not yet instituted any action); *Am. Apparel,* 2013 WL 174119, at *20-21 (finding scienter, where defendants touted the company's progressive labor policies, while subject to an ongoing investigation related to violations of U.S. immigration laws).

**Fifth**, Albanese and Walsh's signatures on SEC filings alleged to contain material misstatements and omissions support scienter. *See, e.g.*, *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) (defendants' signatures on Form 10-K "accept[ing] responsibility for its contents" was indicative of scienter) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000)). Corporate officers who sign SEC filings have a duty to familiarize themselves with the facts contained therein. They may not ignore available data indicating that they issued material misstatements and omissions. *See Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012); *In re Winstar Commc'ns,* No. 01-cv-3014 (GBD), 2006 WL 473885, 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 24, 2006). This is particularly so, given Albanese and Walsh's roles as CEOs and Executive Board members in attempting to heal Rio Tinto's wounded reputation after the Chinese bribery scandals. Defendants had access to information and, as senior executives and signatories and/or authors of Rio Tinto's SEC filings and press releases, had a duty to inquire and investigate, familiarize, and reassure themselves as to the truth of their statements. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007); *see also Varghese*, 672 F. Supp. 2d at 608 ("[p]laintiffs allege that (1) [the defendant company] had weak internal controls and (2) that the . . . [d]efendants were aware of the problems. Both these allegations support a strong inference of scienter."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999). Their failure amounts to recklessness.

**Sixth**, Plaintiffs are also entitled to rely on the "core operations" doctrine to support scienter. "To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[T]he fact that [defendant's] statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made"); *In re Check Point Software Tech. Ltd. Sec. Litig.*, No. 03 Civ. 6594(KMB), 2006 WL 1116699, at

*4 (S.D.N.Y. Apr. 26, 2006) (same).   "Core operations include matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'" *Hi-Crush*, 2013 WL 6233561, at *26.   "[A] plaintiff need not identify specific reports or data containing contradictory information when the defendant's misstatements pertain to subject-matter critical to key corporate functions." *Medis Investor Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 145 (S.D.N.Y. 2008).   Rather, knowledge of "contradictory facts of critical importance" can be attributed to "high-level officers … by virtue of their positions within the company."   *Atlas Air*, 324 F. Supp. 2d at 489.   It is the nature of certain types of corporate wrongdoings, often characterized by both their centrality to a company's operations and their duration, that cannot easily occur without top executives' knowledge.   *See Salix Pharm.*, 2016 WL 1629341, at *16 ("The magnitude of Defendants' alleged fraud and the fact that it involved the core operations of [the company's] business also support a strong inference of scienter.").   Though alleging this type of conspiracy cannot alone form the basis for a strong inference of scienter, it will certainly "buttress" other factors found by the Court to support such an inference.   *Salix Pharm.*, 2016 WL 1629341, at *16.

By Defendant's own admissions, the unlawful-payment scheme went to the core of Rio Tinto: Rio Tinto's reputation of integrity was integral to its success and a competitive advantage, especially after the Chinese bribery scandal; "Simandou in Guinea represents a major new iron ore province.   Its strategic location gives us access to the Atlantic basin and the fast growing Middle Eastern market.   …   We believe this area represents one of the best undeveloped major deposits of premium-grade iron ore in the world[.]"; and the Company committed to pump significant resources—well over a billion dollars-worth—into the mine, the individual Defendants and several other high-level executives routinely visited the mine and met with GoG officials, and Rio Tinto regularly updated investors about its progress.   ¶¶6, 44-46, 56, 61, 66, 69, 78, 82-84.[36]

---

[36] It is inescapable that corporate scienter is alleged against Rio Tinto through its former CEOs and Executive Committee members.   *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *VEON*, 2017 U.S. Dist. LEXIS 152240, at *31 n.

### C.    Loss Causation is Alleged Through Several Curative Disclosures and Price Drops

"The loss causation pleading standard is 'not meant to impose a great burden upon a plaintiff[,]' and is met with 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *EZCorp.*, 181 F. Supp. 3d at 211.  To plead loss causation, plaintiffs need only allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  Plaintiff can plead loss causation by alleging losses from a corrective disclosure or a materialization of the risks concealed by the misrepresentations or omissions.  *EZCorp.,* 181 F. Supp. 3d at 211.  "It is also 'clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.'"  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).  Before trial, plaintiff need only present a "reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself."  *See Gould v. Winstar Commc'ns., Inc.*, 692 F.3d 148, 161-62 (2d Cir. 2012).

"[N]either the Supreme Court in [*Dura Pharm*] nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud."  *Freudenberg*, 712 F. Supp. 2d at 202 (referencing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)).  "Because corporate wrongdoers rarely admit that they committed fraud, 'it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.'"  *Id.*  "Thus, the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'"  *Id.*  To allege a materialization of a risk, plaintiffs need not establish "a one-to-one correspondence between concealed facts and the materialization of the

---

3 ("[T]he Court briefly notes that, generally, courts in this district find that the scienter of 'management level' employees can be attributed to the corporation.").

risk." *In re Vivendi Universal S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 367 (S.D.N.Y. 2009). A materialization of the risks concealed by fraud is illustrated as follows:

> If a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). As discussed above, to prove the causal connection between misrepresenting fact A and the revelation of fact B, plaintiffs must establish only that the revelation of fact B was foreseeable, i.e., within the zone of risk X, and that fact B reveals information about risk X. When fact B is revealed, the market need not be aware of fact A or that fact A had been previously misrepresented. *Id.*

Here, between November 14, 2016 (post-market) and November 18, 2016, a flurry of revelations about the unlawful payment hit the market. ¶14. Rio Tinto ADRs closed at $39.65 on November 14, 2016. ¶¶15, 195. Through November 18, 2016, Rio Tinto ADRs fell to $36.55, as investors learned about the scope of the fraud and risks of further sanctions against the Company, causing damages as artificial inflation deflated from Rio Tinto ADRs. ¶¶15, 195.

There was an avalanche of new, important revelations in the media—at least six different articles—that exposed the following key details about the scheme, without limitation:

- November 14, 2016 (post-market): Albanese and Walsh were aware of the payment; Jacques said that the payment "shell-shocked" the company, it could take several years to investigate, and the decision to investigate "wasn't a decision we took lightly" (¶189);

- November 16, 2016: the BoD concluded that executives violated *The way we work* and terminated their employment and portions of their compensation (¶190);

- November 16, 2016: details about the discovery of the May 2011 Emails, which was earlier than what the Company admitted to before, and the purpose of the payment to help facilitate the Company's deal with the GoG for Simandou concessions (¶191);

- November 18, 2016: the GoG reacted, asserting legal concerns surrounding Rio Tinto's relationship with Combret; and a former GoG official accused Rio Tinto of another bribery scheme by a former executive, Steven Din, with the backing of Rio Tinto executives, in connection with Simandou (¶192-94).

Rio Tinto's ADR prices fell significantly after these manifestations of the concealed risks from the unlawful payment, which revealed new, important information about the fallout from the bribery scheme. ¶¶195-96. This amply demonstrates loss causation. *See In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015) (rejecting argument against loss causation

that later revelations were "merely 'negative characterization[s] of already-public information[,]'" where they included previously unknown, additional news: "At a later stage, defendants may challenge the novelty and accuracy of plaintiffs' alleged news and its impact on the market, but plaintiffs have adequately alleged loss causation"); *Richman*, 868 F. Supp. 2d at 282-83 (S.D.N.Y. 2012) (finding loss causation based on a series of curative disclosures: (i) the SEC filed fraud charges related to a Goldman Sachs transaction; (ii) the U.S. Senate released Goldman Sachs' internal emails that added details surrounding the fraud; and (iii) the SEC announced an investigation into Goldman Sachs transaction); *Barrick Gold*, 2015 U.S. Distl. LEXIS 43053, *39-42 (S.D.N.Y. Apr. 1, 2015) (loss causation adequately pled where revelations of court orders and regulatory resolutions halting a construction project materialized risks concealed by fraud regarding gold mining company's environmental compliance); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 242-43, 245-46, 252-53 (S.D.N.Y. 2007) (finding loss causation, based on U.S. Attorneys' announced investigation because the determination of whether it was a "different phenomena [than a prior SEC investigation curative disclosure] that may exert different influences on the market price of a company's stock [was] one for the jury to make"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 290 (S.D.N.Y. 2004) (finding loss causation, based on revelations of corporation's financial health, even though defendants had not concealed or withheld financial information and "the true facts were available for the world to see…"); *Winstar Commc'ns*, 2006 WL 473885, at *15 (finding loss causation, where short-seller's ability to discern conclusions regarding the Company's accounting improprieties based on public information gleaned from its securities filings "[did] not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available information.").

The facts in *In re Omnicom Grp., Inc. Sec. Litig.* are distinguishable, which was decided at summary judgment, since no curative disclosures caused stock-price drops; instead, the loss-inducing event, an article reporting that defendant's former director and audit-committee chair resigned, revealed nothing new nor was related to the fraud.  *See* 597 F.3d 501, 509-14 (2d Cir. 2010).

Defendants also rely on other distinguishable cases, where—unlike here—plaintiffs failed to allege *any* curative disclosures followed by stock drops nor revelations of information that was related to or hidden by the purported frauds.  *See Cent. States v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 74-77 (2d Cir. 2013) (loss causation was not alleged because at the outset of the class period, even before the first alleged corrective disclosure, defendant extensively disclosed the financial issues that were the subject of the alleged fraud,  and where plaintiffs failed to identify how the alleged corrective disclosures even purported to reveal undisclosed facts about the alleged);  *GE Investors, Ret. Plan v. Gen. Elec. Co.*, 447 F. App'x 229, 230-32 (2d Cir. 2011) (not a single curative disclosure caused a stock-price drop: a drop followed the pricing of a preferred-stock offering, which plaintiffs failed to allege was part of the fraud concealed, and no drop followed another curative disclosure); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174-78 (2d Cir. 2005) (although plaintiffs alleged that defendant's analysts' "buy" and "accumulate" ratings were false with respect to two companies that later lost substantial value, plaintiffs did not allege that the underlying data provided in the analysts' reports, including sufficient warnings about the two companies' volatility, were false; defendant's eventual downgrades of the two companies were not curative disclosures because they did not reveal the falsity of defendant's prior "buy" and "accumulate" recommendations); *Waters v. Gen Elec. Co.*, No. 08 Civ. 8484 (RJS), 2010 WL 3910303, 2010 U.S. Dist. LEXIS 107720, *23-32 (S.D.N.Y. Sept. 29, 2010) (the *only* alleged truth revelation of information concealed by the purported fraud was *not* followed by stock-price fall).[37]

While Defendants concede that Plaintiff can demonstrate loss causation by alleging a materialization of the concealed risks (*see* Defs.' MOL at 21-22), they apparently ignore this avenue when arguing that Plaintiff fails to allege loss causation because several alleged curative disclosures did not "concern[] what Plaintiff alleges had been fraudulently concealed earlier[,]"

---

[37] *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186-88 (4th Cir. 2007) (alleged curative disclosures failed to reveal information that was the subject of the fraud, defendants' "round-trip" transactions, and did not reveal any new information about an alleged fraudulent transactions).

(*see* Defs.' MOL at 25)—this in essence imposes a burden of identifying curative disclosures that are mirror images of the alleged fraudulent statements.

But courts routinely find loss causation where plaintiffs allege that materializations of risks concealed by fraud caused losses, even though those materializations were not one-to-one corrections of prior misstatements, similarly to Plaintiffs allegations here that materializations of risks stemming from Defendants fraudulent concealment of its unlawful payment caused losses. *See, e.g.*, *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 175-80, 186, 188-91 (2d Cir. 2001) (loss causation based on defendants assuring plaintiff that an initial public offering would not occur, but omitting negotiations that ultimately resulted in a recapitalization, causing plaintiff losses through foregoing value appreciation from the recapitalization); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96-99 (2d Cir. 2001) (loss causation based on revelations of risks of liquidity problems materialized risks of misrepresentations that led investors to assume competency of principal executive ); *Petrobras*, 150 F. Supp. 3d at 343-44 (S.D.N.Y. 2015) (loss causation based on revelations of risks due to additional developments from regulators' investigations materialized risks of fraud regarding oil company's money laundering and bribery scheme); *VEON*, 2017 U.S. Dist. LEXIS 152240, at *7-10, 38 ("[T]he concealed risk that VEON's position in Uzbekistan was tenuous (or at least not as strong as presented) given the company's reliance on bribes, for example, materialized when the company began to disclose that government agencies were investigating the entities related to those bribes and, ultimately, VEON itself").[38]

---

[38] *See also, e.g.*, *Van Dongen*, 951 F. Supp. 2d at 476-77 (S.D.N.Y. 2013) (finding loss causation, where press release linking decreased growth to pressures on and changes to the compensation model materialized risks of misrepresentations and omissions as to the manner that sales agents were compensated, even if it "does not explicitly disclose in flashing neon lights a switch from an equity model to an all-cash model," because the disclosure was in the "zone of risk" that was concealed); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 640-41, 649-50 (S.D.N.Y. 2012) (finding loss causation, where ratings downgrades materialized risks of omissions of adverse information regarding CDO investments); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 235-36, 244-46 (S.D.N.Y. 2012) (finding loss causation, where risks of regulatory actions and analysts' downgrades manifested risks of fraud regarding legally compliant oil drilling); *Vivendi*, 634 F. Supp. 2d at 366-69 (finding loss causation, where revelations of risks of liquidity crisis, ratings downgrades, and sudden treasury-shares sales materialized risks of fraud regarding issuers' earnings and, free cash flow).

The losses resulting from one curative disclosure on November 9, 2016 (pre-market) were entirely offset by the outcome of the U.S. presidential election from the prior day, which propelled a sustained, multi-week rally in stocks traded on U.S. exchanges. *See* ¶¶187-88. Loss causation is not defeated merely because the losses resulting from this one curative disclosure were entirely offset by the outcome of the U.S. presidential election. *See In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 453 (S.D.N.Y. 2005) (finding loss causation, even though the issuer's stock price increased after a curative disclosure); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 286-90 (S.D.N.Y. 2008) (finding that plaintiffs adequately alleged loss causation, even though some of the apparent revelations of the fraud were followed by stock-price increases: "the Court nonetheless finds that Lead Plaintiffs have pleaded a plausible theory of loss causation with respect to the July 10 Disclosure, at least at this early stage of the proceedings … because the rapid recovery of Take-Two's share price from declines that it suffered may have resulted from factors unrelated to the company's options backdating, it is premature to preclude a showing of loss causation on that ground.").[39]

## 2.    CONTROL-PERSON LIABILITY UNDER SECTION 20(a) IS ALLEGED

To plead a Section 20(a) control-person claim, Plaintiff must allege (i) a primary violation by the controlled person, (ii) control of the primary violator by the defendant, and (iii) culpable participation. *EZCorp.*, 181 F. Supp. 3d at 212-14. As demonstrated herein, Plaintiff alleges a primary violation of §10(b) and Rule 10b-5 against Rio Tinto, Albanese, Davies, and Walsh. Plaintiff also alleges each of Albanese, Davies, and Walsh's control over and culpable participation in the unlawful payment and the alleged material misstatements and omissions. Therefore, Plaintiff sufficiently alleges a Section 20(a) control-person claim against each of Albanese, Davies, and Walsh at this stage of the litigation. *See BioScrip*, 95 F. Supp. 3d at 741 (denying motion to dismiss a §20(a) claim, where "each of the Defendants was responsible for reviewing [the

---

[39] *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2409 (2014) ("The markets for some securities are more efficient than the markets for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood.").

company's] SEC filings[,]" stating that "[d]etermining an individual defendant's liability as a control person is a 'fact-intensive inquiry that . . . should not be resolved on a motion to dismiss.'").

**3.      PERSONAL JURISDICTION SHOULD BE EXERCISED[40]**

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). Before discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations." *Dorchester*, 722 F.3d at 84. The court in *SEC v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013), outlined the burden at this stage:

> [W]hen the issue "is decided initially on the pleadings and without discovery, the plaintiff need only show a prima facie case." … A court may consider materials outside the pleadings, … but must credit plaintiffs' averments of jurisdictional facts as true. … '[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.' … Nonetheless, where a defendant "rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that evidence—the allegation may be deemed refuted. *Id.* at 543-45.[41]

First, the Court must determine whether there is a statutory basis for exercising personal jurisdiction. *Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 129 (2d Cir. 2013). Here, Plaintiff identifies a valid statutory basis to exercise personal jurisdiction over Davies and Walsh: Section 27 of the Exchange Act, 15 U.S.C. §78aa. *See* ¶¶16-19; *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013).

Second, courts consider whether the exercise of personal jurisdiction over defendants is consistent with due process under the U.S. Constitution. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167-69 (2d Cir. 2013). The due-process inquiry has two components:

---

[40] Interestingly, Davies (Davies' MOL [ECF 67] at 12-14) and Walsh (Walsh's MOL [ECF 69] at 3-10) challenge personal jurisdiction against them, while Albanese does not, even though he spent the least amount of time out of the three during the Class Period as a Rio Tinto executive.

[41] In any event, Courts should not dismiss claims against defendants without first affording plaintiffs the opportunity to take jurisdictional discovery. *See In re Magnetic Audiotape Antitrust Litig.*, 99 Civ. 1580(LMM), 2002 WL 975678, at *1 (S.D.N.Y. May 9, 2002) (it was "premature to decide whether personal jurisdiction exists before the close of jurisdictional discovery").

first, courts inquire whether defendants have sufficient minimum contacts with the forum; if so, courts inquire whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice". *See Metro, Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996). As to sufficient minimum contacts, courts evaluate the "quality and nature" of defendants' contacts with the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)). Courts considers these contacts in totality, the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[,]" "such that [defendants] should reasonably anticipate being haled into court there." *Id.*

"If the defendant's contacts with the forum state rise to this minimum level, the defendant may defeat jurisdiction only by presenting 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Sharef*, 924 F. Supp. 2d at 546; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (a defendant must demonstrate that the assertion of personal jurisdiction in the forum will "make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent"). Courts determine reasonableness by applying the five-factor test articulated in *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cty*.: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. 480 U.S. 102, 113-14 (1987). Reasonableness is evaluated in tandem with defendants' minimum contacts: a lesser showing as to one inquiry may be tolerated if the other strongly favors an exercise of jurisdiction, and vice-versa. *Id.* at 114.

In securities-fraud actions, a "nonresident defendant sued under the Exchange Act need not have minimum contacts with the state seeking to exercise personal jurisdiction; rather the only contacts required are with the United States as a whole, as Section 78 provides for nationwide

service of process." *Sharef*, 924 F. Supp. 2d at 544.  "There is ample (and growing) support in case law for the exercise of jurisdiction over individuals who played a role in falsifying or manipulating financial statements relied upon by U.S. investors in order to cover up illegal actions directed entirely at a foreign jurisdiction." *Id.* at 547.  "As the SEC points out, the lynchpin of these decisions is that jurisdiction exists where 'an executive of a foreign securities issuer, wherever located, participates in a fraud *directed* to deceiving United States shareholders.' … It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies this test." *Id.*  "It long has been recognized that effects in the United States attributable to conduct abroad may be sufficient predicate for the exercise of personal jurisdiction[.]" *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005).

Here, a substantial part of the conduct and damages occurred in the U.S.  ¶18.  Rio Tinto has a sponsored ADR facility with the underlying ADR shares registered with the SEC and listed on the NYSE.  ¶¶2, 18, 21.  Davies and Walsh directly or indirectly used the instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets, to perpetuate the fraud.  ¶19. Walsh, Rio Tinto's former CEO and Executive Committee member who was directly involved in effectuating the unlawful payment, (i) signed SOX certifications for Rio Tinto's annual reports filed with the SEC, (ii) signed *The way we work*, (iii) made statements in Rio Tinto's other SEC filings, and (iv) made statements during Rio Tinto's calls, all of which contained material misstatements and omissions and were available in the U.S.  *See,* Section III.1.a.vi. above (*Individual Defendants' Statements and Omissions*).  Davies, Rio Tinto's former Executive Committee member and chief executive of the business group overseeing Simandou, who was also was directly involved in effectuating the unlawful payment, (i) made statements in Rio Tinto's SEC filings and (ii) made statements during Rio Tinto's calls, all of which contained material misstatements and omissions and were available in the U.S.  *See* Section III.1.a.vi. above (*Individual Defendants' Statements and Omissions*).  Also, they both had ultimate authority over

several categories of material misstatements and omissions.   *See* Section III.1.a.vi. above (*Individual Defendants' Statements and Omissions*).  U.S. Class members suffered from this fraud. ¶¶216-24.

Courts have routinely exercised personal jurisdiction over individual defendants in securities-fraud actions, where, as here, individuals had a role in preparing the material misstatements and omissions.  *See, e.g.*, *Straub*, 921 F. Supp. at 248, 252-59 (exercising personal jurisdiction over Hungarian telecommunications company's executives who engaged in bribery of public officials in Macedonia and Montenegro and made false statements in SEC filings; inasmuch as defendants had "allegedly engaged in conduct that was designed to violate United States securities regulations," their conduct was "necessarily directed toward the United States, even if not principally directed there"; "[b]ecause these companies made regular quarterly and annual consolidated filing[s]," they "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities."); *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 346, 401 (S.D.N.Y. 2005) (exercising personal jurisdiction over inside director, noting that "it would have been foreseeable to those creating and disseminating the [registration statements] that the documents would have an effect in the United States"); *Parmalat*, 376 F. Supp. 2d at 451-56 (exercising personal jurisdiction over economics professor involved in issuing audit reports related to defendant's alleged fraudulent public statements); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 100-02 (S.D.N.Y. 1989) (exercising personal jurisdiction over third-party-defendant lawyer, based, in part, on his work on preparing an agreement that enabled defendant-issuer to keep its NASDAQ listing); *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-cv-13447 (CM) 2008 WL 650385, at *12 (S.D.N.Y. Mar. 7, 2008) (exercising personal jurisdiction over directors for having prepared and approved allegedly false statements).[42]

---

[42] *See also In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305–06 (E.D.N.Y. 2002) (exercising personal jurisdiction over Canadian vice president and general counsel of defendant was "perfectly reasonable … based solely" on her signing an allegedly fraudulent registration statement[.]  … There is no clearer example of purposeful availment of the privilege of doing business in the United

Davies and Walsh making or having ultimate authority over several material misstatements and omissions to U.S. investors is distinguishable from the facts in *Braskem*, where personal jurisdiction was not exercised over Odebrecht S.A. ("Odebrecht"), which was ***not*** the defendant-issuer, Braskem S.A. ("Braskem"), both of which were incorporated in Brazil, where plaintiffs "ma[de] only the most sweeping and conclusory allegations[.]"  2017 U.S. Dist. LEXIS 49266, at *3, 73-76.  Plaintiffs relied only on Odebrecht having held 50.1% of Braskem's voting share capital and veto power over Braskem's actions and appointments.  *Id.*  But notably, plaintiffs failed to allege "that Odebrecht played ***any*** role in making, proposing, editing or approving Braskem's public filings in the United States[,]" which were held to be the only potential bases for liability. *Id* at *74-75.  Similarly, Davies and Walsh unpersuasively rely on cases in which the individuals were deemed not to have had any roles in making the allegedly fraudulent statements.[43]

## IV.      CONCLUSION

For all the foregoing reasons, the Defendants' motions to dismiss should be denied.

---

States than this."); *Itoba, Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 41 (D. Conn. 1996) (exercising personal jurisdiction over director for approving of the filing of an allegedly fraudulent form required by the SEC); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (exercising personal jurisdiction over directors because they were "controlling persons" of defendant and "allegedly approved and disseminated financial statements that they knew would influence the price of Nesmont securities on the NASDAQ market.").

[43] *See Sharef*, 924 F. Supp. 2d at 546-49 (no personal jurisdiction over individual who "neither authorized the bribe, nor directed the cover up, much less played any role in the falsified filings"); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 466-67 (S.D.N.Y. 2008) (dismissing action in its entirety based on scienter, and finding no personal jurisdiction over defendant directors, where their status as board members alone were insufficient to establish jurisdiction), *aff'd sub nom. State Univs. Ret. Sys. of Ill. v. Astrazeneca LPC*, 334 F. App'x 404 (2d Cir. 2009); *Wilder v. News Corp.*, No. 11-cv-4947 (PGG), 2015 WL 5853763, 2015 U.S. Dist. LEXIS 137158, *3, *27-39 (Oct. 7, 2015) (no personal jurisdiction over a chief executive, Rebekah Brooks ("Brooks"), of NI Group Limited ("NIG") (over which the court also did not exercise personal jurisdiction), the wholly-owned subsidiary of the defendant-issuer News Corporation ("News Corp."), where plaintiffs failed to allege that Brooks had any role in drafting, reviewing, authorizing, or disseminating two press releases posted on News Corp's website, nor were those two press releases attributed to her); *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90-cv-5638 (JFK), 1992 WL 296406, 1992 U.S. Dist. LEXIS 15227, at *3, 12-16 (S.D.N.Y. Oct. 7, 1992) (no personal jurisdiction over outside director who did not sign the registration statements at issue).

In the event that the Court finds that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to file an amended complaint pursuant to Rule 15(a), especially given that new crucial findings from regulators' investigations could emerge.[44]

---

[44] *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189-91 (2d Cir. 2015) (granting leave to amend, even though plaintiffs forfeited opportunity to re-plead after exchanging pre-conference letters and attending pre-motion conference, and even though plaintiffs made the request "in the alternative" at the end of briefing); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) (noting with regard to dismissal of plaintiffs' 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend").

Dated:  October 11, 2017

**POMERANTZ LLP**

By*: /s/ Marc I. Gross*
Marc I. Gross
Jeremy A. Lieberman
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181

***Lead Counsel for the Class***