# EXHIBIT 3

 Neutral
As of: October 12, 2017 1:06 AM Z

# Mauss v. NuVasive, Inc.

United States District Court for the Southern District of California

August 28, 2015, Decided; August 28, 2015, Filed

CASE NO. 13cv2005 JM (JLB)

**Reporter**
2015 U.S. Dist. LEXIS 178117 *

BRAD MAUSS, individually and on behalf of all other persons similarly situated, Plaintiff, vs. NUVASIVE, INC.; ALEXIS V. LUKIANOV; KEVIN C. O'BOYLE; and MICHAEL J. LAMBERT, Defendants.

**Prior History:** Mauss v. Nuvasive, Inc., 2014 U.S. Dist. LEXIS 115910 (S.D. Cal., Aug. 19, 2014)

**Counsel:** [*1] For Danny Popov, Individually and on Behalf of All Other Persons Similarly Situated, Plaintiff: Cheryl D. Hamer, LEAD ATTORNEY, Pomerantz LLP, San Diego, CA; Lionel Z Glancy, LEAD ATTORNEY, Glancy Prongay & Murray LLP, Los Angeles, CA; Michele S. Carino, LEAD ATTORNEY, PRO HAC VICE, Pomerantz LLP, New York, NY; Jeremy A. Lieberman, PRO HAC VICE, Pomerantz LLP, New York, NY.

For Brad Mauss, Individually and on Behalf of All Other Persons Similarly Situated, Plaintiff: Cheryl D. Hamer, LEAD ATTORNEY, Pomerantz LLP, San Diego, CA; Emma Gilmore, LEAD ATTORNEY, PRO HAC VICE, Pomerantz LLP, New York, NY; Lionel Z Glancy, LEAD ATTORNEY, Glancy Prongay & Murray LLP, Los Angeles, CA; Michael M Goldberg, LEAD ATTORNEY, Goldberg Law PC, Marina del Rey, CA; Michele S. Carino, LEAD ATTORNEY, Pomerantz LLP, New York, NY; Jeremy A. Lieberman, PRO HAC VICE, Pomerantz LLP, New York, NY.

For Nuvasive, Inc., Alexis V. Lukianov, Kevin C. O'Boyle, Michael J. Lambert, Defendants: Robert W Brownlie, LEAD ATTORNEY, Noah A Katsell, DLA Piper LLP (US), San Diego, CA; Kellin Maurine Chatfield, DLA Piper LLP, San Diego, CA.

**Judges:** Hon. Jeffrey T. Miller, United States District Judge.

**Opinion by:** Jeffrey T. Miller

## Opinion

ORDER DISMISSING FOURTH [*2] AMENDED COMPLAINT WITH LEAVE TO AMEND

Defendants move to dismiss Plaintiff's fourth amended complaint for failure to state a claim, (Doc. No. 49), and both parties requested judicial notice of several items, (Doc. Nos. 53, 55, 63, and 67). These matters were fully briefed and found suitable for resolution without oral argument

pursuant to Local Civil Rule 7.1.d.1. For the reasons set forth below, the requests for judicial notice and the motion to dismiss are granted, and Plaintiff may file a fifth amended complaint.

## BACKGROUND

### A. Procedural History

This case is a putative securities-fraud class action on behalf of those who purchased NuVasive securities between October 22, 2008, and July 30, 2013. Danny Popov filed the initial complaint in August 2013. (Doc. No. 1.) Brad Mauss was appointed as lead plaintiff in December 2013. (Doc. No. 15.)

Plaintiff filed a first amended complaint in February 2014. (Doc. No. 22.) The first amended complaint was dismissed for failure to state a claim because it did not link the allegedly false statements to the asserted reasons for their falsity, and it did not identify which Defendant made the statements. (Doc. No. 29.)

Plaintiff filed a second amended complaint in September **[*3]** 2014. (Doc. No. 30.) The second amended complaint was dismissed because the loss-causation allegations were insufficient under Loos v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014), which had recently held that the announcement of an investigation, without more, is insufficient to establish loss causation. (Doc. No. 38.) At that point, Plaintiff's loss-causation theory rested solely on the announcement that the company was being investigated for possible false or improper claims submitted to Medicare or Medicaid. Additionally, although the claims were premised on alleged misrepresentations about the company's compliance with federal healthcare laws, Plaintiff had not provided enough details about the violations and the relevant laws to make it possible to assess whether the challenged statements were false.

Plaintiff filed a third amended complaint in December 2014. (Doc. No. 39.) Soon thereafter, the parties sought leave for Plaintiff to file a fourth amended complaint, (Doc. No. 44), which the court granted, (Doc. No. 45).

### B. The Operative Complaint

Plaintiff filed a fourth amended complaint ("FAC") in February 2015. (Doc. No. 47.) Like the complaints before it, the FAC asserts two claims, for (1) securities fraud, in violation of Section 10(b) of the Securities and Exchange Act of 1934 **[*4]** and Rule 10b-5, against all Defendants; and (2) control-person liability under Section 20(a) of the Securities and Exchange Act, against Defendants Lukianov, O'Boyle, and Lambert. Lukanov was NuVasive's Chief Executive Officer and Chairman of the Board of Directors at all relevant times. O'Boyle was the company's Executive Vice President and Chief Financial Officer through November 2009. Lambert has been Chief Financial Officer since November 2009.

Plaintiff alleges, in sum, that Defendants engaged in illegal sales, marketing, and billing practices that exposed the company to an increased risk of regulatory liability under the federal Anti-Kickback Statute and the False Claims Act, but they did not disclose that risk to investors, who bought their shares at an inflated price and were harmed when the concealed risk materialized. He provides the following account:

NuVasive develops and markets products and services for use in the surgical treatment of spine disorders. To sustain and grow its business, NuVasive faces constant pressure to innovate, promote its products, establish relationships with surgeons and hospitals, and convince surgeons to choose its products over **[*5]** those of its competitors. At the same time, the company is subject to an extensive regulatory framework that is designed to protect patients and government-funded healthcare programs from fraud and abuse. Under that framework, sales and marketing practices and other conduct that are commonplace in other industries may be illegal when soliciting business that is ultimately paid for, in whole or in part, by government healthcare programs. Failure to adhere to the applicable laws and regulations can result in civil and criminal penalties and exclusion from participation in government healthcare programs.

Because NuVasive and its customers—mainly hospitals and surgeons—rely primarily on third-party reimbursement for surgical and monitoring fees, exclusion from participation government healthcare programs could be fatal to NuVasive's business. If hospitals and physicians cannot recover adequate payments from programs like Medicare or Medicaid because NuVasive is ineligible to participate or because there is a disagreement about reimbursement, they are unlikely to use NuVasive's products and services.

Plaintiff alleges that Defendants knew and recognized in public filings that the Anti-Kickback **[*6]** Statute prohibits the knowing and willful solicitation, offer, payment or receipt of any remuneration, direct or indirect, in cash or in kind, in return for or to induce the referral of patients for items or services covered by Medicare, Medicaid and certain other government health programs. They also knew that by compromising the independent judgment of physicians, promoting the use of equipment that was not medically necessary, manipulating and exploiting loopholes in the billing coding system, and encouraging customers to do the same, improper claims would be submitted for payment to Medicare and Medicaid in violation of the False Claims Act. Nevertheless, Plaintiff claims, Defendants determined to sustain NuVasive's revenues and expand its customer base by employing numerous aggressive sales and marketing practices that violated the Anti-Kickback Statute and False Claims Act.

Plaintiff identifies three specific practices that he claims violated these laws. First, NuVasive lured surgeons to use its products and services and to encourage other surgeons to do the same by devising purported educational and training programs and clinical studies that included, among other things, all-expense **[*7]** paid trips to New York, San Diego, Puerto Rico, and other locations, first-class flights on private jets, tickets to Broadway shows and NFL games, expensive cocktail receptions and dinners, luxury hotel stays, and gift cards. Defendants also created a network of prominent physicians, known within the company as "high end rollers," who received rewards and special treatment, such as all-expense-paid travel, concierge services, and speaking engagements based on the number of patients they referred to NuVasive and their promotion and publication of peer-reviewed papers touting the benefits of NuVasive's products and services.

Second, after losses in revenue in NuVasive's monitoring business due to changes in the rules for billing and coding intra-operative monitoring services, the company responded by having sales representatives place monitoring equipment in operating rooms when it was redundant and not medically necessary; allowing doctors to remotely monitor several patients simultaneously, then generating separate invoices for the same time billed; developing

marketing materials to instruct customers on how to code monitoring services so as to take advantage of coding loopholes; and **[*8]** improperly coding monitoring services in claims submissions to Medicare and Medicaid.

Third, when coding disputes threatened to impact revenues for NuVasive's Extreme Lateral Interbody Fusion ("XLIF") procedure, NuVasive's most lucrative and well-known line of business, the company waged a heated battle with third-party payers, including Medicare and Medicaid, insisting that they accept the coding designation assigned by NuVasive. Ultimately, NuVasive decided to continue to use the coding that resulted in the highest reimbursement for the XLIF procedure.

Plaintiff supports this account with the alleged statements of various confidential witnesses who observed and raised concerns about the company's apparent indifference to healthcare laws and regulations. For example, CW1 was Defendant Lukianov's executive assistant from December 2009 through September 2012, and had access to the company's sales and marketing-related programs and expenses, including Lukianov's expense reports. CW1 became aware of millions of dollars in gifts given to doctors who used NuVasive products extensively, including flights on private jets to meetings with Lukianov in San Diego or New York, and all-expense-paid **[*9]** vacations to destinations like Puerto Rico. According to CW1, twenty or so doctors who were Lukianov's favorites, some identified by name, participated in Medicare and Medicaid, used the entire line of NuVasive products to the exclusion of all others, were known within the company as "high end rollers," and received more gifts than others.

CW6, a NuVasive accounting manager from June 2010 to April 2012 who audited the company's expenses every quarter offers a similar account. According to CW6, surgeons were flown on private jets or first-class flights to San Diego, New York, Puerto Rico, and other destinations for luxury trips, costing between $80,000 and $200,000 per month, which Lukianov partook in and submitted as expenses. A 2011 look-back audit requested by the board of directors revealed that half of the expenses under review were inappropriate, including expense reports that did not comply with the requirements set forth in the Patient Protection and Affordable Care Act, and other expenses that violated the company's internal compliance policy, which was designed to maintain compliance with the regulations. For example, the audit identified $40,000 spent on NFL tickets and other **[*10]** entertainment, which was categorized as "employee recognition," when, in fact, the money had been used to entertain doctors.

The audit results were provided to the executive leadership team and the Board of Directors. Additionally, CW1 and CW6 informed Defendant Lambert, NuVasive's Chief Financial Officer, that inappropriate expenses were being billed to the company. In early 2010, CW1 began informing Lambert of inappropriate expenses. Lambert nevertheless "approved the expenses anyway. Always." (Id. ¶ 66.) CW6 also didn't see any change in the company. Instead, steps were taken to conceal the expenses after the audit. At the direction of the Controller and General Counsel, CW6 was instructed to categorize inappropriate travel and entertainment expenses for doctors with nondescript code names like "Wolverine," and senior executives, including Lukianov and Lambert, began approving each others' expense reports.

Nevertheless, in various public filings, press releases, and investor calls beginning on October 22, 2008 (the beginning of the proposed class period), Defendants stated that figures

representing the company's financial condition were accurate and that the company was in compliance **[*11]** with regulatory requirements, including the Anti-Kickback Statute and the False Claims Act. According to Plaintiff, those statements were false or misleading, in sum, because they failed to disclose that

> (1) the Company utilized kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same in violation of federal and state laws and regulations; (2) the Company employed improper sales and billing practices to sustain revenues related to its monitoring business and XLIF procedure, including by submitting false or otherwise improper claims to Medicare and Medicaid; (3) the Company provided guidance to its customers as to how to code NuVasive's products and procedures in order to take advantage of loopholes and maximize reimbursement by third party payers, including Medicare and Medicaid; and (4) the Companys earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws.

(Id. ¶ 17.)

Plaintiff alleges that the risk Defendants concealed began to materialize on July 30, 2013 (the end of the **[*12]** proposed class period), when NuVasive disclosed in its Form 10-Q for the second quarter of 2013 that it was being investigated in connection with possible false or improper claims submitted to Medicare and Medicaid. The statement read:

> During the three months ended June 30, 2013, the Company received a federal administrative subpoena from the Office of the Inspector General of the U.S. Department of Health and Human Services (OIG) in connection with an investigation into possible false or otherwise improper claims submitted to Medicare and Medicaid. The subpoena seeks discovery of documents for the period January 2007 through April 2013. The Company is working with the OIG to understand the scope of the subpoena and its request for documents, but do not expect to have greater clarity regarding the request for several months. The Company intends to fully cooperate with the OIG's request. At June 30 2013, the Company is unable to determine the potential financial impact, if any, that will result from this investigation.

(Id. ¶ 305.)

Later that day, during a conference call with investors, Lukianov described the subpoena, stating:

> The OIG subpoena is a very broad document request. It was **[*13]** very focused on interbody CoRoent and biologics Osteocel and Formagraft, but very very broad beyond those as well. And again, it's a request for information. It's not litigation. And this will be going on for a few months, I'm sure, as we sort it out with OIG in terms of the specific information that they would like to see.

(Id. ¶ 306.) After an analyst remarked that the subpoena had the earmarks of a false-claims or whistleblower action, Lukianov acknowledged that the subpoena was not part of a broader request of similarly situated companies, but rather was "specific to NuVasive and a very broad request." (Id.)

Almost immediately, analysts reported that the likely outcome of the subpoena was a settlement, increased legal fees, the costs of hiring a government-appointed monitor, fines in the tens of millions of dollars, and business disruptions during the monitoring period:

> [The OIG subpoena] has plenty of precedence on how it plays out: The [OIG] has requested documents for the period January 2007 through April 2013. While the government is mainly focused on Medicare billing claims on inter-body fusions (used for most of NUVA's fusion procedures) and biologics (Osteocel Plus), they are **[*14]** 'casting a very broad net.' As NUVA points out, no charges have been filed against the company, and they are complying with the investigation. However, as these investigations have become commonplace in the device industry (usually relating to sales practices in violating Federal anti-kickback legislation, or the Federal Healthcare Fraud and False Claims statute, which appears to be the case here) there is plenty of precedence on the likely outcome. Specifically, almost all of these inquiries have led to a settlement, in the form of a Corporate Integrity Agreement, which includes a Deferred Prosecution Agreement (where the company agrees to clean up questionable practices over a 1-2 year period to avoid prosecution and disqualification from Medicare participation). Assuming the investigation follows this path, the initial impact will be increased legal cost near term (which the company has assumed in 2013, leaving us to believe NUVA is not peripheral, but the focus of the investigation), and an eventual settlement, leading to a DPA that will require additional cost for hiring a government appointed monitor (WMGI $27.37, Buy was of similar size, and paid $50 million per year over initially **[*15]** a year and a half period), fines (hard to gauge, but historically in the $25-75 million range, for a company of NUVA's size), and the strong likelihood of business disruptions over the monitoring period. In addition, there is increased headline risk, and given that NUVA is less likely to be acquired until the investigation is resolved, we think valuation is capped at ~$25 or 2x 2014 EV/Sales, as a near-term acquisition becomes unlikely.

(Id. ¶ 307.) On July 31, 2013, the day after the investigation was announced, NuVasive securities declined $3.28 per share, or over 12%, to close at $22.84 per share.

### C. The Motion to Dismiss

Defendants moved to dismiss the FAC for failure to state a claim on March 2, 2015. (Doc. No. 49.) Plaintiff opposed the motion, (Doc. No. 50), and Defendant replied, (Doc. No. 51). The motion was taken under submission on April 6, 2015. (Doc. No. 52.)

### D. Subsequent Requests for Judicial Notice

Three days later, on April 9, 2015, Plaintiff filed a request for judicial notice of an April 1, 2015 press release in which NuVasive announced that Lukianov had resigned after an investigation revealed that he had not complied with certain of the company's expense-reimbursement **[*16]** and personnel policies:

> Greg Lucier, a member of the Company's Board of Directors since 2013, has been appointed to serve as Chairman of the Board and Interim Chief Executive Officer. This appointment follows Alex Lukianov's resignation as Chief Executive Officer and a member of the Company's Board.

> Jack R. Blair, Lead Independent Director of the NuVasive Board, said, "The results of an independent investigation overseen by the Board of Directors revealed that Alex had not complied with certain of the Company's expense reimbursement and personnel policies. . . ."

(Doc. No. 53 & Exh. A.) Defendants opposed the request. (Doc. No. 54.)

On April 30, 2015, Plaintiff requested judicial notice of an April 29, 2015 press release in which Nuvasive announced that it had reached a settlement in principle with the Department of Justice regarding the OIG subpoena:

> Nuvasive, Inc. . . . today announced that it has reached an agreement in principle with the U.S. Department of Justice ("DOJ") related to the previously disclosed subpoena issued to the Company in 2013 by the Office of Inspector General of the Department of Health and Human Services ("OIG"). Subject to completion of a definitive written settlement **[*17]** agreement, the Company has agreed to pay $13.8 million, including fees, to the United States to resolve this matter. The Company does not currently anticipate entering into a corporate integrity agreement with the OIG as part of the settlement. Finalizing the settlement agreement could take several months.

(Doc. No. 55, Exh. A.) Defendants also opposed this request. (Doc. No. 56.)

**E. Further Briefing on Loss Causation**

On May 12, 2015, after preliminary review of the filings, the court requested additional briefing on whether the new developments, together with the allegations in the FAC, were capable of supporting a viable theory of loss causation. (Doc. No. 59.) The parties responded on May 27, 2015, (Doc. Nos. 61-62), and replied on June 1, 2015, (Doc. Nos. 64-66). With their briefing, Defendants requested judicial notice of excerpts of various NuVasive SEC filings as evidence of the company's disclosures or risk, and of the two press releases that were the subjects of Plaintiff's requests for judicial notice. (Doc. No. 63.)

**F. Additional Request for Judicial Notice**

On August 5, 2015, Plaintiff requested judicial notice of two more items. (Doc. No. 67.) The first item is a July 30, 2015 **[*18]** press release by the Department of Justice reporting that NuVasive agreed to pay $13.5 million to settle allegations that it caused healthcare providers to submit false claims by marketing products for surgical uses not approved by the Food and Drug Administration and that it paid physicians kickbacks to induce them to use the company's products. (Id., Exh. A.) The second item is the complaint from a recently settled *qui tam* action against NuVasive, which also alleged false claims and illegal kickbacks. (Id., Exh B.) Defendants opposed the request on August 7, 2015. (Doc. No. 68.)

**DISCUSSION**

**A. Requests for Judicial Notice**

Courts can take judicial notice of matters that are either generally known within the court's jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. See *Fed. R. Evid. 201(b)*. Courts must take judicial notice of

such facts if a party requests it and the court is supplied with the necessary information. See Fed. R. Evid. 201(c)(2).

In securities cases, courts routinely take judicial notice of SEC filings, press releases, and other publicly available financial documents. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (stock-price history and publicly available financial documents); **[*19]** Dreiling v. Am. Express Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings); Mallen v. Alphatec Holdings, Inc., 861 F. Supp. 2d 1111, 1122 n.5 (S.D. Cal. 2012) (SEC filings, press releases, and transcripts of conference calls). Courts may take judicial notice that the market was aware of the information contained in such documents. See Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Court filings in related cases can also be proper subjects of judicial notice if the proceedings have a "direct relation" to matters at issue. *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2006); Vasserman v. Henry Mayo Newhall Memorial Hosp., 65 F. Supp. 3d 932, 943 (C.D. Cal. 2014) (collecting cases). However, courts cannot take notice of the truth of facts alleged in complaints filed in other cases because the truth of allegations is subject to reasonable dispute. See, e.g., Harper v. Poway Unified Sch. Dist., 345 F. Supp. 2d 1096, 1102-03 (S.D. Cal. 2004).

In this case, both parties request judicial notice of the NuVasive press releases announcing Lukianov's resignation and the company's settlement in connection with the OIG subpoena. These press releases are appropriate for judicial notice under the rules set forth above.

Defendants also request judicial notice of excerpts of twenty-two NuVasive SEC filings from April 29, 2008, through April 1, 2015. They propose that the excerpts show that they repeatedly disclosed that the company was subject to a risk of regulatory scrutiny, which, according to them, means that Plaintiff's materialization-of-the-concealed-risk theory of loss causation necessarily fails. **[*20]** Plaintiff does not oppose the request for notice, and these public filings are also appropriate for judicial notice.

Last, Plaintiff asks the court to take notice of the Department of Justice's announcement of NuVasive's settlement related to the investigation and of the amended complaint in a recently settled *qui tam* action against NuVasive, United States ex rel. Kevin Ryan v. NuVasive, Inc., No. 12-cv-2683 (D. Md.), which, like this case, alleged that NuVasive was engaging in illegal kickbacks, resulting in false claims. Defendants object, correctly, that the court cannot take notice of either item to corroborate the allegations in this case. However, the court can take notice of these items to the extent that they reflect the information available to the market.

Accordingly, the court grants the requests for judicial notice of these items to the extent that they reflect the information that was available to the market.

## B. Defendants' Motion to Dismiss

A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). When deciding such a motion, the court must construe the pleadings in the light most favorable to the non-moving party, accepting as true all material allegations **[*21]** in the complaint and any reasonable inferences to be drawn from them. See Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). While dismissal is proper only

in "extraordinary" cases, United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981), "[f]actual allegations must be enough to raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

The court's review "is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." Metzler, 540 F.3d at 1061. The court should grant relief under Rule 12(b)(6) if the complaint lacks either a cognizable legal theory or facts sufficient to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

Because Plaintiff has alleged securities-fraud claims governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, he must satisfy the heightened pleading standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, the latter of which imposed "formidable pleading requirements to properly state a claim and avoid dismissal under [Rule] 12(b)(6)." Metzler, 540 F.3d at 1055; see Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004). To satisfy this requirement, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." Vess v. Ciba-Geigy Corp., USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). Recently, the Ninth Circuit held [*22] that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc., 774 F.3d 598, 604 (9th Cir. 2014).

Similarly, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." Zucco Partners, 552 F.3d at 990 (internal quotation marks omitted). The complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). The allegations must give rise not simply to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 324.

### 1. Section 10(b) Claim

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which [*23] they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b).

There are six elements to a private securities-fraud claim under *Section 10(b)* and *Rule 10b-5*: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. See *Loos, 762 F.3d at 886-87*.

Defendants challenge Plaintiff's allegations on falsity, scienter, and loss causation. The court addresses each of these elements below.

**a. Falsity**

To adequately plead falsity, the complaint must identify "(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement was misleading; and (3) all facts on which that belief is formed." *Desaigoudar v. Meyercord, 223 F.3d 1020, 1023 (9th Cir. 2000)*. The plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made." *Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999)*. This requirement can be satisfied "by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Id.* (internal quotation marks omitted).

In the FAC, Plaintiff describes the relevant **[*24]** provisions of the Anti-Kickback Statute and False Claims Act, the conduct that he claims violated these laws, the confidential witnesses whose statements his claims are based on, the statements he claims were false, the Defendant or Defendants who made each statement, the reasons he believes each challenged statement is false or misleading, and the confidential witness statements he relies on to show the falsity of each statement. (See FAC ¶¶ 43-304.)

Defendants challenge these allegations on four grounds, none of which require dismissal. Defendants' main argument is that Plaintiff must allege *per se* violations of the Anti-Kickback Statute and False Claims Act to show that any statements were false, which he cannot do because there is no such thing as a *per se* violation of either statute. See, e.g., *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 708 (11th Cir. 2014) ("Whether a complaint alleges sufficient indications of reliability that actual [false] claims were submitted is performed on a case-by-case basis."); *McDonnell v. Cardiothoracic & Vascular Surgical Assocs., Inc., 2004 U.S. Dist. LEXIS 29436, 2004 WL 3733402, at *8 (S.D. Ohio July 28, 2004)* ("Arrangements that do not qualify for the [Anti-Kickback Statute's] safe harbor must be evaluated on a case-by-case basis.").

However, while Defendants baldly assert that Plaintiff must allege a *per se* violation of the Anti-Kickback Statute **[*25]** or False Claims Act to adequately plead a claim for securities fraud, they did not cite any authority to support that proposition. Moreover, their proposed rule, taken to its logical conclusion, would mean that no company could ever be sued for misleading investors about its compliance, or lack thereof, with respect to these statutes. That would undoubtedly be convenient for Defendants, but they have not provided any authority showing that any court has ever imposed such a requirement.

Second, Defendants contend that Plaintiff's allegations regarding the falsity of the company's reported financial results are insufficient because he did not allege the amount by which the

figures were misstated and he did not identify the customers or suppliers who were involved. Defendants rely on two cases involving claims that a company's financial results were misreported because of deviations from generally accepted accounting principles. See *In re Daou Sys., Inc., Sec. Litig., 411 F.3d 1006, 1017 (9th Cir. 2005)* ("Plaintiffs here contend that defendants systematically reported revenue, before it was earned in violation of GAAP."); *In re REMEC, Inc. Sec. Litig., 388 F. Supp. 2d 1170, 1175-76 (S.D. Cal. 2005)* ("Plaintiff alleges that Remec falsely reported revenues by improperly recognizing revenue on sales of non-functional and zero basis products **[*26]** and by pulling-in future revenues into current periods."). In such cases, information about the amount of the misstatements and the suppliers or customers involved is necessary to show that the alleged accounting irregularities "were material in light of the company's overall financial position." *In re Daou, 411 F.3d at 1018*.

In this case, however, Plaintiff does not allege that Defendants used irregular accounting methods, manipulated the numbers, or otherwise cooked the books. Rather, he alleges that the company's financial reports were false or misleading because they failed to disclose that the reported revenues were partially attributable to illegal sales, marketing, and billing practices, and that the reported sales and marketing expenses included millions of dollars in illegal kickbacks. (See, e.g., FAC ¶¶ 142-44.) Defendants did not identify any case like this one where a court required the specifics they demand, and other courts have not required them, reasoning that a reasonable investor could find it material that the company's profitability was partially attributable to illegal activities. See, e.g., *In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013)* ("[W]hile the complaint does not specify the exact percentage of the revenue and profits that was a misstatement **[*27]** because it was earned solely as a result of alleged Medicare fraud, this is not of importance.").

Third, Defendants contend that Plaintiff has not shown how the alleged nondisclosures made the reported revenues and expenditures false or that other numbers should have been reported. They point out that "*Rule 10b-5* . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002)*.

However, Brody also explained that omissions are actionable if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id*. And, in other cases, the Ninth Circuit has recognized that literally accurate statements can be misleading. See *Miller v. Thane Int'l, Inc., 519 F.3d 879, 886 (9th Cir. 2007)* ("[S]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." (internal quotation marks omitted)).

In this case, Plaintiff alleges that investors were led to believe that the reported revenues and expenditures were attributable to legal activity, when that was not the case. (See, e.g., FAC ¶¶ 201, 203-04.) These allegations are sufficient, at this stage, to show that Defendants' representations and omissions created an impression **[*28]** of a state of affairs that materially differed from reality. See *Neborsky v. Valley Forge Composite Techs., Inc., 2014 U.S. Dist. LEXIS 104681, 2014 WL 3767011, at \*6 (S.D. Cal. 2014)* ("[B]ased on Defendants' disclosures as to the source of Valley Forge's revenues, investors were misled to believe that Valley Forge was engaged in legal activity, when in fact, much—if not all—of the Company's success was attributable to the illegal exportation of semiconductors."); *In re Gentiva Sec. Litig., 932 F. Supp.*

*2d at 368-69* ("The statements by Gentiva put the source of its Medicare revenue at issue, and[, as such,] the alleged failure to disclose the true sources of this revenue could give rise to liability under *Section 10(b)*.").

Finally, Defendants contend that Plaintiff's allegations regarding the underlying illegalities are insufficiently particular because he did not identify any particular false claim that was submitted, and he did not identify a single instance in which NuVasive actually paid a surgeon or anyone else to use its products.

The court is not persuaded that these details are necessary. Liability under the False Claims Act extends to anyone who knowingly "causes to be presented" a false claim for payment. *31 U.S.C. § 3729(a)(1)*. "Thus, a person need not be the one who actually submitted the claim forms in order to be liable." *United States v. Mackby, 261 F.3d 821, 827 (9th Cir. 2001)*. Claims that result from unlawful kickbacks are false claims **[*29]** for purposes of the False Claims Act. See *42 U.S.C. § 1320a-7b(g)*. "Claims influenced by kickbacks are false because courts, without exception, agree that compliance with the Anti-Kickback Statute is a precondition of Medicare payment, such that liability under the False Claims Act can be predicated on a violation of the Anti-Kickback Statute." *United States ex rel. Solis v. Millennium Pharms., Inc., 2015 U.S. Dist. LEXIS 40860, 2015 WL 1469166, at \*6 (E.D. Cal. Mar. 30, 2015)* (internal quotation marks omitted).

The Ninth Circuit does not require representative examples of false claims. See *Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)* ("In our view, use of representative examples is simply one means of meeting the pleading obligation."). Instead, "in accord with general pleading requirements under *Rule 9(b)*, . . . it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were also submitted." *Id. at 998-99* (internal quotation marks omitted).

Plaintiff has met this requirement here. He provides particular details of a scheme, supported by the statements of numerous confidential witnesses from within the company, in which doctors who provided Medicare and Medicaid-covered products and services were pampered, entertained, and given gifts, which were tied to the volume of business and referrals they generated. ( **[*30]** See, e.g., FAC ¶¶ 62-63, 71-72, 80.) The alleged kickbacks included flights on private jets and all-expense-paid vacations and ski trips, (id. ¶¶ 61, 79); suites and tickets to Giants and Jets games, (id. ¶ 61, 88); a $614.84 dinner enjoyed by Dr. Bill Smith and Dr. Juan Uribe on July 14, 2011, (id. ¶ 91); $1,640 in tickets to an Eagles concert attended by doctors and Lukianov, (id. ¶ 88); 24/7 concierge services and costs of travel, lodging, and hospitality for physicians attending the company's Marquis Visit Program ("MVP"), (id. ¶ 68); catered events featuring large amounts of champagne and wine, one of which cost more than $1 million, including expenses for doctors and their spouses, (id. ¶¶ 69, 92); large consulting fees, commissions, and royalties paid to doctors, including high-end roller Dr. Andrew Cappuccino, in some cases amounting to $1 million or more a year per doctor, (id. ¶¶ 62, 72, 80); custom wine sets costing $1,700 to $2,000 given to high-end rollers Dr. J. Allen Goodrich and Dr. J. Volcan, who edited a textbook promoting NuVasive's NVM5 monitoring system, (id. ¶¶ 62, 76); and hundreds of thousands of dollars in consulting fees paid to doctors who authored papers **[*31]** touting the benefits of NuVasive products, (id. ¶ 77).

Thus, Plaintiff has alleged specific details of a broad scheme that used kickbacks to induce doctors to promote and use NuVasive products and services, which would ultimately be paid for by Medicare or Medicaid, supported by the observations of various confidential witnesses from within the company who personally observed and raised concerns about the company's activities. Similar allegations have been deemed sufficient to survive dismissal in the *qui tam* context. See, e.g. Solis, 2015 U.S. Dist. LEXIS 40860, 2015 WL 1469166, at *6-7; United States ex rel. Brown v. Celgene Corp., 2014 U.S. Dist. LEXIS 99815, 2014 WL 3605896, at *9-10 (C.D. Cal. July 2014). Moreover, given the details alleged, Defendants cannot reasonably suggest that the complaint does not give adequate notice of the alleged misconduct or of the basis of Plaintiff's claims that Defendants affirmatively misrepresented the company's compliance with the Anti-Kickback Statute and False Claims Act.

Accordingly, Defendants have not shown that Plaintiff's *Section 10(b)* and Rule 10b-5 claims fail because of insufficient allegations of falsity. However, the court notes a difficulty, which Defendants raised but did not develop sufficiently for the court to address: The proposed class period spans approximately five years, from October 22, 2008, through July 30, 2013, but the **[*32]** allegations regarding the company's purportedly illegal conduct form an arc, beginning in 2008, cresting in 2010 and 2011 around the time of the audit, and perhaps subsiding thereafter. Although, as discussed below, Plaintiff appears poised to allege claims that will survive the pleadings for some portion of this span, whether he can do so for the entire length of the span is unclear. Defendants may raise this issue again going forward.

**b. Scienter**

In the context of *Section 10(b)*, scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). To satisfy the scienter requirement at the pleading stage, "the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." In re Daou Sys., Inc., 411 F.3d at 1015. The allegations must give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.

Regarding scienter, Plaintiff alleges that Defendants repeatedly recognized in public filings that NuVasive's business depended upon compliance with healthcare fraud and abuse laws, and they must have known that the purported sales and marketing expenses were improper because they **[*33]** consumed more than 60% of the company's revenues, which was disproportionate compared to the amounts spent by NuVasive's competitors. (FAC ¶¶ 310-12.) Moreover, several confidential witnesses detail Lukianov and Lambert's direct participation in the kickbacks and efforts to cover them up after concerns were raised and after the 2011 internal audit identified various improprieties. (Id. ¶¶ 316-26.)

Defendants contend that Plaintiff has not adequately alleged scienter because he has not established that any false statements were made, and he lumped Defendants together at points in the allegations.

However, as discussed above, Plaintiff has adequately alleged that false statements were made. And a cursory review of the FAC reveals that Plaintiff has, in fact, identified the

statements and the facts regarding scienter for each Defendant. In particular, for each statement Plaintiff claims is false, he identifies the Defendant or Defendants who signed off on the relevant filing or who made the statement. (See, e.g., FAC ¶¶ 141, 146, 158.) He also provides confidential-witness allegations detailing Lukianov and Lambert's direct participation in the illegal practices, with Lukianov entertaining **[\*34]** the doctors and submitting the costs as personal expenses, and Lambert continuing to approve the expenses after employees met with him to raise concerns about their impropriety. (See, e.g., id. ¶¶ 66, 79, 81, 316-26.) Further, according to the confidential witnesses, the improper practices continued after the results of the 2011 audit—which identified tens of thousands of dollars spent on entertaining doctors and noted that no gifts or entertainment are allowed with healthcare providers—were provided to the executive leadership team and the board of directors. (See id. ¶¶ 82-90.) According to CW6, after the audit, senior executives, including Lambert and Lukianov, began approving each others' expense reports, and CW6 was instructed to categorize expenses related to travel and entertaining physicians under nondescript code names like "Wolverine." (Id. ¶¶ 97-99.)

These allegations create a cogent and compelling inference that Lukianov and Lambert were aware that the company's sales and marketing practices were improper, but they chose to represent that the company was compliant with healthcare laws and regulations anyway.

However, the analysis is different for O'Boyle, as Plaintiff does **[\*35]** not allege that he participated in or had direct knowledge of the scheme. For O'Boyle, Plaintiff relies on the "core operations" inference, under which scienter may be imputed to key officers based on their role in the company. See _Reese v. Malone, 747 F.3d 557, 575-76 (9th Cir. 2014)_ (discussing the uses of the inference). As the company's Chief Financial Officer through November 2009, Plaintiff claims, O'Boyle must have known about the improprieties because the company's sales, marketing, and administrative expenses consumed more than 60% of revenues every year since 2008, which was far more than the average of 34% spent by the company's competitors. (Id. ¶¶ 39-41, 312, 314-15.)

The "absurdity" application of the core-operations inference Plaintiff relies on for O'Boyle's scienter applies only in an "exceedingly rare category of cases." _South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 n.3 (9th Cir. 2008)_. Commonly, the inference is merely used to buttress the strength of other allegations. See _Reese, 747 F.3d at 575_. However, "in rare circumstances," the inference alone "may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." _Id. at 576_. In such cases, the falsity must be **[\*36]** "patently obvious." _Zucco Partners, 552 F.3d at 1001_.

Three cases are helpful to illustrate this use of the inference. The seminal case in this circuit is _Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir. 2008)_. In Berson, investors sued Applied Signal for failing to disclose stop-work orders from its largest customers. See _id. at 984_. The plaintiffs did not allege that the company's top managers actually knew about the orders. See _id. at 987_. Instead, they inferred that the managers "must have known about the orders because of their devastating effect on the corporation's revenue." Id. Because the officers were "directly responsible" for the company's day-to-day operations, the Ninth Circuit held, it was "hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." _Id. at 988_. "These facts were prominent

enough that it would be 'absurd' to suggest that top management was unaware of them." *Id. at 989*.

Similarly, in *Reese v. Malone, 747 F.3d 557 (9th Cir. 2014)*, shareholders alleged that officers in charge of BP's Alaskan pipelines made false statements about the company's maintenance of the pipelines and its leak-detection practices after an initial oil spill, which harmed investors when a second oil spill occurred. See *id. at 563-64*. In the wake of the first spill, defendant Johnson, **[\*37]** who was a chemical engineer, Senior Vice President and the leader of operations in the area, and the "external and internal gatekeeper of information on the Prudhoe Bay pipelines," *id. at 576*, told the press that the corrosion that caused the first spill was unique to that pipeline, *id. at 573*. The Ninth Circuit found it "absurd" to suggest that she was unaware of the true condition of the second pipeline, which was in the same area, given her position of knowledge within the company and evidence that the company had treated the pipelines similarly for at least a decade. *Id. at 576*. The information imputed to her was "fundamental to operations of her business over the tenure of her career." *Id*.

Last, in *Mulligan v. Impax Laboratories, Inc., 36 F. Supp. 3d 942 (N.D. Cal. 2014)*, the case Plaintiff relies on, investors alleged that the FDA repeatedly warned senior managers of a pharmaceutical-manufacturing company that manufacturing conditions were seriously deficient, but the conditions were not addressed, while the Chief Executive Officer and Chief Financial Officer repeatedly made statements trumpeting the company's remediation efforts. See *id. at 955-56*. Although there were no allegations that they knew the falsity of their statements, the court found it "'absurd' to think that the CEO and CFO of **[\*38]** a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption," particularly when the company had received repeated warnings about the conditions from the FDA, which were directed at top management. *Id. at 970*.

In each of these cases, the facts that were imputed were within the direct jurisdiction of the officer whose scienter was at issue, and there were distinct "red flags"—stop-work orders on contracts that comprised the vast majority of the company's revenue, failure of a nearly identical pipeline, and repeated warnings directed to top management about a subject central to the company's business—that made the facts so prominent that they would have been patently obvious to a person in the officer's position.

In this case, the allegations regarding O'Boyle's scienter present a close call, but ultimately fall short of the proposition that it would have been "absurd" to think that he did not know the truth about the company's alleged misconduct. The complaint indicates only that he was Chief Financial **[\*39]** Officer during a time when NuVasive spent proportionately about twice as much on sales, marketing, and administration as its competitors spent on average, and that he signed off on the company's financial reports during that time. Undoubtedly, he must have known that the company spent more than its competitors did. However, the mere fact that the company spent more does not plainly indicate that the excess was being spent on something illegal, as opposed to legitimate marketing expenses. Further, there is no sign that the company's regulatory compliance or the substance of its sales and marketing programs were within his jurisdiction, and there do not appear to be any "red flags" like the ones in the cases discussed

here that would have made the alleged illegalities so prominent that he must have known about them. Some additional nexus between O'Boyle and the alleged misconduct is necessary.

Thus, while the allegations regarding Lukianov and Lambert create a cogent and compelling inference that they knew the company's sales and marketing activities were illegal and that they nevertheless represented to investors that the company was operating legally, the claims against O'Boyle must **[*40]** be dismissed. Because additional allegations may cure this defect, the claims against O'Boyle are dismissed with leave to amend.

### c. Loss Causation

"Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos, 762 F.3d at 887*. "Ultimately, a securities fraud plaintiff must prove that the defendant's misrepresentation was a substantial cause of his or her financial loss." *Id.* (internal quotation marks omitted). "At the pleading stage, however, the plaintiff need only allege that the decline in the stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.* "In other words, the plaintiff must plausibly allege that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." *Id.* (internal quotation marks omitted).

Regarding loss causation, Plaintiff alleges that he and putative class members bought NuVasive securities at an inflated price during the class period and were harmed when the previously concealed risks materialized on July 30, 2013, when the company announced the **[*41]** subpoena, Lukianov admitted that the subpoena was specific to NuVasive, and analysts reported the next day that the investigation was probably related to healthcare fraud and was likely to result in the company paying a settlement in the tens of millions of dollars.[1] (FAC ¶¶ 23, 305-07.) Following these events, Nuvasive securities declined $3.28 per share, or over 12%, to close at $22.84 per share on July 31, 2013. (Id. ¶ 309.)

Defendants contend that these allegations cannot establish loss causation because "any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred." *Loos, 762 F.3d at 890* ("The announcement of an investigation does not 'reveal' fraudulent practices to the market."). Defendants urge that Lukianov's statements to investors and the analyst report, which were not alleged in the previous complaint, do not add anything new to the assessment.

The court agrees with Defendants that the events on July **[*42]** 30 and 31 cannot, without more, be the basis of a viable loss-causation theory under *Loos*. Although Lukianov's statements to investors and the analyst report provide some additional information about the nature of the investigation and the likely outcome, they do not reveal any new facts about the company's conduct or whether any fraud actually occurred. Hence, the present complaint must be dismissed.

---

[1] Defendants protest that there was only one analyst, not several analysts. How this is legally relevant is unclear. Regardless, at this stage the court must take Plaintiff's allegations as true.

At this point, however, there have been several new developments: the company's announcement that Lukianov resigned for failure to comply with certain of the company's expense-reimbursement and personnel policies; the company's announcement that it agreed to pay the Department of Justice $13.8 million to settle the investigation; the Department of Justice's announcement of the settlement and the underlying allegations regarding false claims and kickbacks; and the filing and purported settlement of a *qui tam* action in Maryland, which also involved allegations of false claims and kickbacks.[2]

In their supplemental filings, Defendants contend that these later events cannot be the basis of a viable loss-causation theory because they could not have caused the harm Plaintiff claims to have suffered on July 30 and 31, 2013, and, regardless, no risks were concealed because Defendants repeatedly disclosed that the company was subject to healthcare fraud and abuse laws.

These arguments miss the mark. Certainly, the later events cannot have caused the price drops that occurred months earlier. That does not mean, however, that the entire series of events and corresponding price drops, if properly alleged, cannot be the basis of a viable loss-causation theory that includes the earlier events. As Plaintiff points out, *Loos* did not hold that the announcement of an investigation could never be part of a viable loss-causation theory. See *762 F.3d at 890 n.3* ("We do not mean to suggest that the announcement of an investigation can never form the basis [*44] of a viable loss causation theory."). Indeed, at various points in their filings prior to the recent events, Defendants themselves suggested that the company's settling or paying fines could provide the "something more" that would result in a viable theory of loss-causation.[3]

Nor is the court persuaded that Defendants' disclosures absolve them of liability, since Plaintiff claims that Defendants failed to disclose the true level of risk, not that they failed to disclose that there was a risk. Those are two very different things. As other courts have put it: "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near [*45] certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)* (internal quotation marks omitted).

One remaining point requires some discussion. Defendants observe, correctly, that the Ninth Circuit has not adopted the materialization-of-the-risk approach to loss causation. See *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013)* ("The Ninth Circuit has not adopted the materialization of the risk approach . . . .").

---

[2] Plaintiff requested judicial notice of the complaint from the *qui tam* action, but not the settlement. And, although he asked the court to take notice of the various press releases and he asserted that [*43] the announcement of Lukianov's resignation caused shares to decline 7%, he did not provide any evidence of that or ask the court to take notice of the effect any of these events had share prices. Hence, those facts are not properly before the court at this time.

[3] See Doc. No. 49-1 at 6 ("Plaintiff would have the Court believe that, as of the announcement, NuVasive had paid tens of millions of dollars in fines or settlements with the government, which is not true at all."); Doc. No. 51 at 3 (distinguishing Plaintiff's cases on the grounds that, "[i]n each of them, the partial disclosures at issue culminated in the disclosure of an actual fraud, a settlement, or similar order—exactly the types of disclosures lacking here").

Nevertheless, there does not appear to be any impediment to using the approach here. In Nuveen, the Ninth Circuit discussed the materialization approach with apparent approval, stating that "[d]isclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." Id. at 1120. It continued:

> Along similar lines, we have recognized that loss causation can be established by showing that the Defendants' misrepresentation was directly related to the actual economic loss the plaintiff suffered. Put another way, a plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.

Id. (brackets, citations, and internal quotation marks omitted).

Indeed, the **[*46]** Ninth Circuit in Nuveen recognized that district courts in this circuit have applied the materialization-of-the-risk approach, see id. at 1122 n.5, and Plaintiff provided some recent samples, see, e.g., Special Situations Fund III QP, L.P. v. Brar, 2015 U.S. Dist. LEXIS 38825, 2015 WL 1393539, at *9 (N.D. Cal. Mar. 26, 2015). Moreover, as Plaintiff points out, several courts have concluded that there is no meaningful difference between the various approaches to loss causation. See, e.g., Schleicher v. Wendt, 618 F.3d 679, 683-84 (7th Cir. 2010) ("Although 'materialization of the risk' runs like a mantra through the parties' briefs, we do not think that it has any significance. The phrase appears in a few decisions . . . but it is not a legal doctrine or anything special as a matter of fact." (citation omitted)); In re MannKind Sec. Actions, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) ("[T]his is a distinction without a difference. . . . [T]he FDA's rejection both revealed the falsity of defendants' prior statements and was a materialization of the previously undisclosed risks.").

Thus, absent something more substantial from Defendants, Plaintiff's theory—that Defendants engaged in illegal practices and did not disclose the true risk of regulatory scrutiny to investors, who bought their shares at an artificially inflated price and were harmed when the foreseeable result of that risk materialized, beginning with the investigation and culminating with Lukianov's **[*47]** resignation and the settlement—appears to be enough to support a claim.

Accordingly, although Plaintiff's *Section 10(b)* and Rule 10b-5 claim must be dismissed, Plaintiff may file an amended complaint that includes the new developments and any corresponding damages.

### 2. Section 20(a) Claim

Last, Defendants contend that Plaintiff's Section 20(a) claim must be dismissed because he failed to establish an underlying claim for securities fraud. Because Plaintiff's underlying securities-fraud claim must be dismissed and may be amended, his Section 20(a) claim must be dismissed and may be amended as well.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, (Doc. No. 49), is GRANTED. However, Plaintiff may file an amended complaint within 14 days after entry of this order.

IT IS SO ORDERED.

DATED: August 28, 2015

/s/ Jeffrey T. Miller

Hon. Jeffrey T. Miller

United States District Judge

---

**End of Document**