**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PURANJAY DAS, Individually and on Behalf
of All Others Similarly Situated,

                                    **Plaintiffs,**

        **-against-**

RIO TINTO PLC, TOM ALBANESE, ALAN
DAVIES, AND SAM WALSH,

                                  **Defendants.**

**16-cv-09572 (ALC)**
**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

On behalf of a putative class consisting of purchasers of American Depositary Receipts

("ADRs") between March 16, 2012 and November 17, 2016, Lead Plaintiff Puranjay Das

("Plaintiff") brings this action against Defendants Rio Tinto plc ("Rio Tinto" or "the Company")

as well as Tom Albanese, Alan Davies, and Sam Walsh ("Individual Defendants"), asserting

claims of securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"). Defendants have moved to dismiss this action for failure to state a claim

under Fed R. Civ. P. 12(b)(6). Walsh and Davies also move to dismiss the action for lack of

personal jurisdiction under Rule 12(b)(2). For the reasons set forth below, Defendants' motions

to dismiss are GRANTED.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Plaintiff's Amended Complaint (ECF No. 40) ("Am.

Compl") and are presumed to be true for purposes of this motion to dismiss. The Court also

takes judicial notice of Rio Tinto's public filings, many of which Plaintiff quotes from at length.

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Rio Tinto finds, mines, and processes mineral resources such as iron ore. Am. Compl ¶

2. Albanese served as Rio Tinto's Chief Executive Officer ("CEO") from May 2007 until

1

January 2013 and on the Board of Directors ("Board") from 2006 until January 2013. *Id.* ¶ 21. Walsh served as CEO from January 2013 until his retirement in July 2016, and as a Board member from June 2009 through July 2016. *Id.* ¶ 24. Davies served as the Company's chief executive of the Energy & Minerals Group from July 2016 through November 2016, when he was terminated. *Id.* ¶ 23. Each Individual Defendant also served as Executive Committee members during the Class Period. *Id.* ¶ 22-24.

Between 1997 and 2008, the Government of Guinea ("GoG") granted Rio Tinto exploration rights and a concession to sections (known as blocks 1 through 4) of Simandou, a mountain in Guinea's interior that is home to one of the largest iron-ore deposits in the world. *Id.* ¶¶ 3-4. In late 2008, the GoG revoked Rio Tinto's rights to blocks 1 and 2, ultimately awarding them to one of Rio Tinto's competitors. *Id.* ¶ 5. The GoG maintained that it rescinded Rio Tinto's mining rights because the Company breached the Guinean Mining Code by failing to vigorously develop the mine. *Id.* The Company, however, believed that this was a pretext and that its rivals had bribed GoG officials to secure their share of Simandou. *Id.*

Lest Rio Tinto lose its remaining rights to blocks 3 and 4, the Company poured significant resources into their development, and high-level executives of the Company made frequent visits to the mine. *Id.* ¶¶ 5-6. In 2010, upon his election to power in Guinea, then-President Alpha Conde declared that all mining contracts would be reexamined. *Id.* ¶¶ 30, 67. As a result, Rio Tinto's competitor was stripped of its rights to blocks 1 and 2. *Id.* ¶ 68.

### A. Payment to Combret

Fearful that their rights to blocks 3 and 4 would likewise be stripped, Rio Tinto entered into an arrangement with one of President Conde's close friends, Francois Polge de Combret. *Id.* ¶ 70. Combret had studied with President Conde in Paris. *Id.* ¶ 29. In 2010, Combret

2

established an independent advisory firm called FC Finance. *Id.* Plaintiff alleges that, since President Conde's victory, Combret "has played a key, nefarious role in the renegotiations of Simandou mining rights." *Id.* ¶ 70.

During the course of this relationship, Individual Defendants agreed to pay Combret $10.5 million ("Combret payment") for his help protecting the mining rights for blocks 3 and 4, in which they were ultimately successful. *Id.* ¶¶ 70, 76. Plaintiff alleges this payment constituted a bribe in violation of the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA"). *Id.* ¶ 7, 70.

On May 10, 2011, Walsh, Albanese, and Davies sent multiple emails discussing the Combret payment. *Id.* ¶¶ 71-74. In these messages, Davies described the "very unique and unreplicable services and closeness to the President" that Combret provided, along with his "extreme confidence that [Combret would] continue to assist [Rio Tinto] to improve [their] relationship with the GoG and the President." *Id.* ¶ 72. Walsh agreed that there was "[n]o question that [Combret] delivered sizeable value, but also no question that there is still sizeable risk going forward." *Id.* ¶ 71. Albanese cautioned Walsh to "think about [the] optics to the GoG." *Id.* ¶ 74.

On April 22, 2011, Rio Tinto disclosed the signing of a "Settlement Agreement" with the GoG, whereby their mining rights to blocks 3 and 4 were secured by a payment to the Guinean Public Treasury of $700 million. *Id.* ¶ 77.

These actions came on the heels of revelations in April 2010 that Rio Tinto executives had, in 2009, bribed Chinese officials in connection with iron-ore operations in China. *Id.* ¶ 44. At that time, Walsh stated that "[r]eceiving bribes is a clear violation of Chinese law and Rio Tinto's code of conduct, *The Way We Work* . . . [we] will spare no effort in doing everything we

can to prevent any similar activity." *Id.* ¶ 45. Walsh further stated that Rio Tinto had "already implemented a number of improvements to our procedures" and ordered "a further far-reaching independent review of our processes and controls." *Id.*

## B. Allegedly Misleading Statements

During the class period, Defendants made numerous public statements to Rio Tinto's investors via SEC filings, earnings calls, the Company's code of conduct, media releases, and its website. *Id.* ¶¶ 8-10, 93-186. These statements fall into five main categories: (1) Rio Tinto's commitment to law abidance and anti-corruption, *id.* ¶¶ 82-84; 94-100; 110-115; 122-23; 126-31; 134-37; 142-45; 156-162; 169-70; 173-76; 185-86; (2) the Company's work with the GoG, *id.* ¶¶ 108-09; 116-121; 124-25; 138-41; 152-55; 171-72; (3) the Company's contingent liabilities, *id.* ¶¶ 101-03; 146-47; 163-64; 177-78; 183-84; (4) the adequacy of the Company's of internal controls, *id.* ¶¶ 104-05; 148-49; 165-66; 179-80; and (5) SOX certifications, *id.* ¶¶ 106, 132, 150, 167, 181. Plaintiff contends that these statements were materially misleading because, in short, Defendants failed to disclose that they paid Combret a $10.5 million bribe which violated their code of conduct, subjected the Company to regulatory and legal action, and made clear the ineffectiveness of their internal controls. *Id.* ¶ 93.

## C. Revelation of Payment

The alleged bribery scheme came to light in 2015, when Rio Tinto's counsel found the May 2011 emails about the Combret payment during discovery in an unrelated case. *Id.* Counsel then reported the emails to Rio Tinto's head of Legal & Regulatory Affairs, Debra Valentine. *Id.* ¶ 80. At some point thereafter, another law firm was retained to conduct an internal investigation. *Id.* ¶ 81.

Rio Tinto first disclosed the payment in a media release on November 9, 2016. *Id.* ¶ 187. The Company stated that it launched an internal investigation into the matter led by external counsel and had notified relevant authorities in the United Kingdom and the United States. *Id.* On November 16, 2016, Rio Tinto issued a statement disclosing that it had reviewed the investigation's findings to date and concluded that executives "failed to maintain the standards expected of them under [Rio Tinto's] code of conduct." *Id.* ¶ 190. News articles published on November 14, 2016, ¶ 189, November 16, 2016, ¶ 191, and November 18, 2016, ¶¶ 192-94, discussed the alleged bribe and attendant controversy. Rio Tinto disclosed the outfall from the Combret payment as a contingent liability in its 2016 Form 20-F. *Id.* ¶ 200.

Following the disclosure, "heads rolled." *Id.* ¶¶ 12-13. Valentine, Davies, and Hugo Bague, group Executive of Organizational Resources, were terminated in connection with the payment. *Id.* ¶ 13. Additionally, Rio Tinto deferred bonuses and incentive plan awards designated to be paid to Davies and Walsh, valued at $20 million, and even reclaimed money already paid to Davies. *Id.* ¶¶ 197-99. Plaintiff alleges that this treatment indicates the seriousness of the alleged misconduct. *Id.* ¶ 13.

As a result of public statements about the bribe, Rio Tinto's ADR price dropped from $39.65 on November 14, 2016 to $36.55 on November 18, 2016. *Id.* ¶ 195. This caused Plaintiff and other putative class members "significant" losses and damages. *Id.* ¶ 196.

## II.     Procedural Background

Plaintiff filed the complaint commencing this action on December 12, 2016. ECF No. 1. Plaintiff filed an amended complaint on May 30, 2017. This is the operative complaint in this suit.

On September 11, 2017, Defendants moved to dismiss this action for failure to state a claim and lack of personal jurisdiction. ECF No. 62 ("Rio Tinto Mem"); 65 ("Albanese Mem"); 67 ("Davies Mem"); 69 ("Walsh Mem"). Plaintiff filed its opposition motion on October 11, 2017. ECF No. 70 ("Pl Opp"). Defendants filed reply memoranda on November 8, 2017. ECF No. 76 ("Rio Tinto Reply"); 78 ("Albanese Reply"); 80 ("Davies Reply"); 81 ("Walsh Reply").

Accordingly, the Court considers the motion fully submitted.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

When considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it

rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). The court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

Where, as here, a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)).

**DISCUSSION**

**I.     Personal Jurisdiction**

As an initial matter, the Court addresses whether it has personal jurisdiction over Walsh and Davies.

**A. Legal Standard**

On a motion to dismiss for lack of personal jurisdiction, "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted). Where such a motion is raised prior to discovery, the plaintiff need only make a "*prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks and citations omitted). Accordingly, "the plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 251 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

"In securities cases like this one involving securities listed on domestic exchanges, Section 27 of the Securities Exchange Act . . . establishes the exclusive basis for personal jurisdiction." *Id.* at 252. The Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). Accordingly, the Court must test Defendants' personal jurisdiction challenge "against due process standards." *Id.*

Those due process standards require "that if a defendant is 'not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017) (quoting *Int'l*

*Shoe Co. v. Washington*, 320 U.S. 310, 316 (1945)).[1] The analysis consists of two prongs: (1) the "minimum contacts" prong and (2) the "reasonableness" prong. *Id.* (citation omitted).

## B. Analysis

### i. Minimum Contacts

In assessing minimum contacts, courts focus on "the relationship among the defendant, the forum, and the litigation." *Straub*, 921 F. Supp. 2d at 253 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). Courts in this District have held that "[b]ecause the Exchange Act authorizes worldwide service of process, the relevant contacts . . . are those with the United States as a whole." *In re Banco Bradesco*, 277 F. Supp. 3d at 642 (collecting cases).

In order to "establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, the plaintiff must show that its 'claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'" *Id.* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). While "a defendant may 'not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . [j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum.'" *Straub*, 921 F. Supp. 2d at 253-54 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Additionally, "a defendant's physical absence from a forum is insufficient to defeat personal jurisdiction." *Id.* at 254 (citing *Burger King*, 471 U.S. at 475).

---

[1] Plaintiff does not allege that this Court can exercise general jurisdiction over Defendants and accordingly the Court only addresses specific personal jurisdiction.

The Supreme Court has emphasized that "'it is the defendant's actions, not his expectations, that empower a [forum's] courts to subject him to judgment.'" *Id.* (quoting *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 88 (2011)). Furthermore, while "effects in the United States attributable to conduct abroad may be sufficient" to provide for personal jurisdiction, "foreseeability *alone* has never been a sufficient benchmark" under the Due Process Clause. *Id.* (citations and internal quotation marks omitted). Thus, courts look to whether the "foreign actor's activity in relation to the United States" is "sufficiently extensive and regular to make [the] possibility [of litigation in the United States] a foreseeable risk of the business." *Id.* (citation omitted).

In accordance with these principles, "courts have exercised personal jurisdiction over individuals who orchestrated bribery schemes aimed at foreign governments *and* as part of that scheme signed off on misleading management representations to company auditors and signed false SEC filings." *In re Banco Bradesco*, 277 F. Supp. 3d at 643-44 (citation omitted); *accord Straub*, 921 F. Supp. 2d at 255 (an "attempt to obstruct [forum state's] laws", such as through securities fraud, can trigger personal jurisdiction).

### *Walsh*

Walsh argues that his connection to the U.S. is too tenuous. Walsh resided in Australia, worked for a company headquartered in the United Kingdom, and the payment at issue was made with Guinea. Walsh Mem at 9. He contends that his role as CEO, signatures on SOX certifications, and statements on earnings calls are insufficient to demonstrate minimum contacts, particularly where Plaintiff has not sufficiently alleged any unlawful bribe. Plaintiff points the Court to numerous cases holding that minimum contacts are satisfied where an individual exercised control over or signed fraudulent SEC statements. Pl Opp at 69-70.

Here, the Court determines that Plaintiff has met its burden of alleging a *prima facie* case of personal jurisdiction as to Walsh.[2] Walsh served as CEO of a company that is listed on the New York Stock Exchange ("NYSE"). Am. Compl ¶ 2. In this capacity, he signed the Company's Form 20-Fs for the years 2012 through 2015. *See id.* ¶¶ 132, 150, 167, 181. Regardless of the merits of Plaintiff's claims, the complaint alleges that those filings contained materially misleading information. The dissemination of these filings allegedly harmed U.S. purchasers of Rio Tinto's securities. *Id.* ¶ 1. Even if the alleged scheme was not "principally directed" at the United States, this alleged conduct "was designed to violate United States securities regulations and was thus necessarily directed toward the United States." *Straub*, 921 F. Supp. 2d at 255. Indeed, through making regular SEC filings, Walsh "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities." *Id.* (citation omitted).

Under similar circumstances—and even where courts ultimately held that Plaintiff failed to state a claim—courts have found minimum contacts. *See In re Banco Bradesco*, 277 F. Supp. 3d at 643-44 (minimum contacts over officer allegedly involved in "bribery schemes aimed at the Brazilian government" who signed press releases and SEC filings); *Straub*, 921 F. Supp. 2d at 256 (collecting cases). Importantly, unlike in cases relied on by Walsh, Plaintiff's allegations here are not conclusory. Plaintiff alleges that Walsh signed specific SEC filings that contained allegedly misleading information. *Cf. In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (no minimum contacts where complaint "does not allege, concretely, that [Defendant] played *any* role in making, proposing, editing, or approving [company's] public filings in the United States").

---

[2] Albanese does not challenge personal jurisdiction over him. In any event, for the same reasons elucidated as to Walsh the Court would hold that jurisdiction over Albanese is proper.

*Davies*

Davies likewise challenges his connection to the U.S. since he lived in the United Kingdom, worked for a company headquartered in the United Kingdom, and the allegedly unlawful payment was made with Guinea. Davies Mem at 17. Unlike Walsh, Plaintiff does not allege that Davies actually signed any SEC filings. The only statement attributed to Davies is a statement in a 2014 Form 6-K that the signing of the Investment Framework with the GoG is "the culmination of years of collaborative and tremendous work." Am. Compl ¶ 154. The rest of Plaintiff's allegations against Davies amount to his role in the development of the Simandou project, his position in the Company's Energy and Mineral products group and Executive Committee, and his oversight of the drafting of *The way we work*. Pl Opp at 47.

Such allegations "are merely conclusory statements applicable to all individual defendants as a result of their positions within the Company. A person's status as a board member is not alone sufficient to establish jurisdiction." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008). Indeed, "[a]bsent any alleged role . . . in preparing false financial statements the exercise of jurisdiction here exceeds the limits of due process[.]" *U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 548 (S.D.N.Y. 2013).

Accordingly, Plaintiff has sufficiently alleged minimum contacts as to Walsh, but not as to Davies.

### ii. Reasonableness

The reasonableness analysis asks "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels*, 305 F.3d at 129 (citation and internal quotation marks omitted). If the plaintiff sufficiently alleges minimum contacts, then "a

defendant may defeat jurisdiction only by presenting 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 643-43 (quoting *Burger King*, 471 U.S. at 477). Indeed, courts have determined that this inquiry "is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *Straub*, 921 F. Supp. 2d at 259 (citations omitted).

Here, Walsh has not proffered compelling reasons as to why jurisdiction would be unreasonable. While litigating in the U.S. "might not be convenient," Walsh has "not made a particular showing that the burden on [him] would be 'severe' or 'gravely difficult.'" *Id.* Moreover, "because this case was brought under federal law, the judicial system has a strong federal interest in resolving this issue here." *Id.*

Accordingly, the Court finds that the exercise of personal jurisdiction over Walsh is not unreasonable. The complaint against Davies is dismissed for lack of personal jurisdiction.[3]

## II.      Section 10(b) Claim

To prevail on a § 10(b) claim, a plaintiff must prove "1) a material misrepresentation or omission by the defendant; 2) scienter; 3) a connection between the misrepresentation or omission and the purchase or sale of a security; 4) reliance upon the misrepresentation or omission; 5) economic loss; and 6) loss causation." *Matrixx Initiatives, Inc. v. Siricusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Defendants contend that Plaintiff has inadequately pled material misstatements or omissions, scienter, and loss causation.

### A.  Existence of Underlying Illegal Conduct

---

[3] For the reasons adduced below, if the Court determined that personal jurisdiction over Davies was appropriate it would still dismiss the claims against him pursuant to Rule 12(b)(6).

First, the Court addresses whether Plaintiff has pled the existence of any underlying illegal conduct. This is because where, as here, securities fraud claims are based on failure to disclose uncharged illegal conduct, "the complaint must state a plausible claim that the underlying conduct occurred." *Menaldi v. Och-Ziff Capital Mgmt Group LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (collecting cases); *see also In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally flawed."). The issue at this stage, of course, is not whether Plaintiff has proved that Defendants actually violated the law, but rather whether Plaintiff has stated a claim that they did so. *See In re Adv. Battery Tech, Inc. Sec. Litig.*, No. 11-cv-2279, 2012 WL 3758085, at *9 (S.D.N.Y. Aug. 29, 20120).[4]

Here, Plaintiff alleges that the Combret payment violated the FCPA.[5] Defendants contend that, absent allegations that the payment was made to a "foreign official," it cannot violate the statute.

The anti-bribery provisions of the FCPA forbid any issuer which has a class of securities registered pursuant to the Exchange Act, or their officers, directors, employees, or agents, from making "an offer or payment of anything of value to any person [] while knowing that the money would be offered or given directly or indirectly to any foreign official [] for the purposes of influencing any act or decision of such foreign official in his official capacity." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt*

---

[4] The parties dispute whether Plaintiff must plead the existence of the underlying violation with the specificity required under Rule 9(b) and the PSLRA. Because Plaintiff has failed to meet either standard, the Court need not reach this issue. See *Menaldi*, 164 F. Supp. 3d at 578 n.5.

[5] Plaintiff's complaint mentions "other laws" as well. However, Plaintiff only specifically alleges, and the parties only briefed, a potential violation of the FCPA. Accordingly, this Court only analyzes the alleged FCPA violation.

*International B.V. v. Schreiber*, 327 F.3d 173, 179 (2d Cir. 2003). The FCPA defines "foreign official" as:

> [A]ny officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international organization.

15 U.S.C. § 78dd-1(f)(1)(A). A person's state of mind is "knowing" under the FCPA if "i) such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or ii) such person has a firm belief that such circumstance is substantially certain to occur." 15 U.S.C. §§ 78dd-1(f)(2)(A)(i)-(ii); *see Straub*, 921 F. Supp. 2d at 263 ("Congress intended to make an 'intent' or mens rea requirement for the underlying bribery.").

### i. Whether Combret is a Foreign Official

Plaintiff contends that Defendants indirectly bribed Guinean government officials by paying $10.5 million to Combret for the purposes of effectuating the $700-million settlement with the GoG that allowed the Company to maintain its hold on the Simandou concessions and strengthen its relationship with the GoG. Defendants respond that Plaintiff fails to allege that any of the Company's payment to Combret was ultimately offered to any foreign official. Moreover, allegations that Combret and President Conde had a close relationship are insufficient to show that Combret actually offered President Conde anything of value.

The Court agrees with Defendants that such allegations are insufficient. The allegations here are similar to those in *Menaldi*. There, as here, the complaint alleged that Defendant used a "fixer" to broker deals with government officials, resulting in payments to said officials. *Menaldi*, 164 F. Supp. 3d at 579. And there, as here, the complaint fell short of alleging that any

payment to foreign officials actually occurred. *Id.* ("[T]he Complaint cites [the fixer's] 'close relationship with Joseph Kabila,' President of the Congo, but nowhere alleges that [the 'fixer'] offered Kabila anything of value in exchange for access to Congolese oil and mines.").

Plaintiff argues in the alternative that Combret is himself a foreign official "acting as an 'instrumentality' of or 'on behalf of' the GoG," and thus the payment was a direct bribe. Pl Opp at 33. First, the definition of "instrumentality" in the FCPA is unclear and not defined by statute. However, the text of the FCPA compels a reading of "instrumentality" as something other than a person, since the definition of a foreign official includes an "officer or employee *of* a . . . instrumentality* [of a foreign government]." 15 U.S.C. § 78dd-1(f)(1)(A) (emphasis added). While not reaching this precise issue, courts assessing the meaning of "instrumentality" appear to have interpreted it as an entity, not a person. *See, e.g., United States v. Duperval*, 777 F.3d 1324, 1333 (11th Cir. 2015) (defining instrumentality as "an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own"); *United States v. Carson*, No. SACR 09-00077-JVS, 2011 WL 5101701, at *4-5 (C.D. Cal. May 18, 2011) ("[W]hether employees of state-owned companies could be "*foreign officials*" within[] the meaning of the FCPA turns on whether state-owned *companies* can be considered "*instrumentalities*" under any circumstances.") (emphasis added). In addition, the DOJ and the SEC have indicated that such a reading should be followed. *See* U.S. Dep't of Justice & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* 20 (Nov. 14, 2012), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf ("The term 'instrumentality'. . . can include state-owned or state-controlled entities."). Since Combret is an individual, not an entity, he does not qualify as an instrumentality.

Second, the FCPA requires that the individual act "*in an official capacity* for or on behalf of any such government." 15 U.S.C. § 78dd-1(f)(1)(A) (emphasis added). Plaintiff does not allege that Combret worked for the GoG in any official capacity. By Plaintiff's own admissions Combret acted "as an *informal* advisor" to President Conde and worked at an "*independent* advisory firm." Am. Compl ¶ 70 (emphasis added). With no official position in the GoG, it strains logic to consider Combret a "foreign official."

### ii. Whether Defendants had Knowledge

Plaintiff also fails to allege facts supporting the "knowing" element of an FCPA violation. Plaintiff relies on email exchanges between Individual Defendants to allege that Defendants knew that they were making an unlawful payment. It is clear that Defendants knew that they were making a payment. However, the complaint alleges no facts sufficient to show that Defendants were aware that the payment would be directed to a *foreign official*, as required by the FCPA. *See* 15 U.S.C. § 78dd-1(a)(3).

Accordingly, Plaintiff does not allege an FCPA violation here. Since the payment was not unlawful, failure to disclose it cannot violate the Exchange Act, and Plaintiff's § 10-b claim must fail.

In any event, for the reasons discussed below Plaintiff fails to allege a material misstatement or scienter.

### B. Material Misstatements or Omissions

To satisfy this element, Plaintiff must allege (1) a misstatement or omission, (2) that the misstatement or omission was material, and (3) the maker of that statement. "A statement is considered materially misleading under § 10(b) when its representations, viewed as a whole, would have misled a reasonable investor." *Levy v. Maggiore*, 48 F. Supp. 3d 428, 444 (E.D.N.Y.

2014) (citations omitted). At the motion to dismiss stage, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000)).

In cases such as this, where there are multiple defendants, the complaint must allege that each particular defendant "'made' the material misstatements." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). As the Supreme Court explained, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. Thus, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07-cv-318, 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

Under the "group pleading doctrine," a plaintiff may "rely on a presumption that written statements that are 'group-published,' e.g., SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" *City of Pontiac General Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting *Camofi Master LDC v. Riptide Worldwide, LLC*, No. 10-cv-4020, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)). It is thus "an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *In re Vivendi Univ., S.A.*, 381 F. Supp. 2d 158, 191 (S.D.N.Y. 2003)). The doctrine is "extremely limited in scope." *Lockheed*, 875 F. Supp. 2d at 373 (citations omitted). It is "most commonly

applied to high-ranking officers in a corporation. *In re Cannavest Corp. Sec. Litig.*, 14 Civ. 2900 (PGG), 2018 WL 1633847, at *9 (S.D.N.Y. Mar. 31, 2018) (collecting cases). The doctrine applies only to written documents, not to oral statements. *Levy*, 48 F. Supp. 3d at 449 (citations omitted).

However, it is unclear whether the group pleading doctrine survives *Janus*. *See In re Banco Bradesco*, 277 F. Supp. 3d at 637-41 (describing split within district over whether group-pleading doctrine still applies and holding it no longer applies); *In re Cannavest*, 2018 WL 1633847, at *8 (same and holding doctrine still applies). For the purposes of this motion, the Court assumes *arguendo* that the group pleading doctrine still applies.[6]

Here, Plaintiff alleges that Defendants made dozens of misstatements that fall into five categories: (1) law abidance and anti-corruption; (2) dealings with the GoG on Simandou; (3) contingent liabilities; (4) internal controls; and (5) SOX certifications.

### i. Law Abidance and Anti-Corruption

Plaintiff claims that Defendants made materially false or misleading statements that, essentially, they followed the law and did not engage in corruption. Defendants made such statements in Rio Tinto's 2011-2015 Form 20-Fs, 2012-2016 Form 6-Ks, *The way we work*, media releases, earnings calls, and Rio Tinto's website. These statements are false, Plaintiff contends, because Defendants violated the FCPA. Defendants respond that, even if a FCPA violation had occurred, the relevant statements are non-actionable puffery.

"[I]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely on them." *City of Pontiac Policemen's and Firemen's Ret.*

---

[6] This Court need not address whether the group pleading doctrine survives *Janus* because, even if it applies, Plaintiff still fails to state a claim.

*Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Puffery is frequently comprised of "statements [that] are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *Id.* "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (citations omitted).

The Court first addresses Rio Tinto's aspirational statements, such as that it "is committed, in principle and practice, to transparency consistent with good governance[.]" Am. Compl ¶ 122; *see also* ¶¶ 96, 97, 126, 127, 134, 136, 142, 143, 158-160, 173, 174, 185. Such statements are "merely generalizations regarding [Defendants'] business practices" and are thus "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statements that company "'set the standard' for 'integrity' and that it would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline'" were inactionable puffery). Further, statements in *The way we work* are "explicitly aspirational" and thus "quintessentially the sort of puffery about corporate reputation, integrity, and compliance with ethical norms that define the category." *Lopez v. Ctpartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (internal quotation marks and citations omitted); *accord In re Braskem*, 246 F. Supp. 3d at 755-56 ("Because a code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all.").

Next, the Court addresses statements that Rio Tinto actually "do[es] not commit, or become involved in, bribery or corruption of any form . . .", Am. Compl. ¶ 99; *accord* ¶ 112, 128, 144, 161, 175, and that Rio Tinto's directors "have continued to apply" its Corporate

20

Governance standards. *Id.* ¶ 136; *accord* ¶¶ 156, 169, 185. These statements present a closer call as they do not contain the aspirational language characteristic of puffery. However, this is not determinative and the statements "must be viewed within the context of the totality of circumstances." *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12-cv-6811, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013).

Plaintiff contends that the 2010 revelations that Rio Tinto executives bribed Chinese officials create a context in which the statements were materially misleading. However, the alleged misstatements here were made years after the Chinese bribery scandal, and were not made in response to questions about that incident or any other purportedly unlawful activities. Rather, the statements derive from Defendants' internal ethics standards, which Rio Tinto had promoted well before the Chinese bribery incident or the Combret payment. *See* Supplemental Declaration of Nathaniel J. Kritzer ("Supp Kritzer Decl") & Ex. 7 (ECF No. 77). This contrasts with cases relied on by Plaintiff, where anti-corruption statements were made amidst contemporaneous questions regarding the company's ethics or investigations of the company's illicit activities. *See, e.g., In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) ("repeated references made specifically in response to damaging media reports about bribery and bid-rigging" at Defendant corporation to "emphasize its reputation for integrity or ethical conduct" actionable).

Even if the statements here were actionable, the Court would need to determine who "made" each statement. All of the aforementioned statements were made by Rio Tinto and thus are directly attributed to it. Albanese signed the 2011 Form 20-F, and would accordingly be liable for statements in that filing. *See* Am. Compl ¶ 106; *City of Roseville Empls.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("There is no dispute that . . .

each of the Individual Defendants who signed the Registration Statements 'made' the statements under *Janus*"). For the same reason, Walsh could be liable for the 2012-2015 Form 20-Fs. *See* Am. Compl ¶¶ 132, 150, 167, 181. Plaintiff does not allege that Davies signed any SEC filings. The fact that he "was present" when certain statements were made is not sufficient to attribute liability. *See* Pl Opp at 61.

Plaintiff nevertheless seeks to hold Albanese, Walsh, and Davies accountable for all of Rio Tinto's public statements based on their status as members of the Executive Committee, which "was responsible for the Company's public statements." Am. Compl ¶ 40. Defendants argue that the Company's SEC filings make clear that the Disclosure Committee, not the Executive Committee, was responsible for the Company's public filings. *See* Albanese Mem at 8-9; Rio Tinto, 2011 Annual Report (Form 20-F) (Mar. 16, 2012). Plaintiff does not allege that any Individual Defendant was a member of the Disclosure Committee.

In any event, since Individual Defendants were high-ranking officers, assuming *arguendo* that the group pleading doctrine applies, Rio Tinto's SEC filings and media releases could be attributed to them. *See Lockheed*, 875 F. Supp. 2d at 373. However, the doctrine is "limited" in scope. *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014). Accordingly, Albanese could not be held liable for any public statements issued after he stepped down as CEO in January 2013. *See In re Braksem*, 246 F. Supp. 3d at 762 (Defendant "cannot be held to have violated § 10(b) based on the Form 20-Fs" filed after Defendant left position as CEO). Further, statements on Rio Tinto's website could not trigger liability since "it is far from obvious that senior corporate officers would be involved in drafting text for a corporate website." *DeAngelis*, 17 F. Supp. 3d at 281 (citation and internal quotation marks omitted). The complaint does not provide any other factual allegations tying Defendants to the website.

22

## ii. Dealings with the GoG on Simandou

Plaintiff next alleges that, through earnings calls and SEC filings discussing Rio Tinto's work with the GoG, Defendants materially omitted the fact that their success was made possible by a bribe. *See* Am. Compl ¶¶ 108-09; 116-121; 124-25; 138-41; 152-55; 171-72. Defendants contest that they had any obligation to disclose the payment.

Courts have made clear that "[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *UBS*, 752 F.3d at 184 (citations and internal quotation marks omitted). Indeed, "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012). Instead, a company's statements become actionable if the company attributes its success to a particular cause without also disclosing the unlawful activity that contributed to that success. *See In re VEON Ltd. Sec. Litig.*, No. 15-cv-08672, 2017 WL 4162342, at *6-7 (S.D.N.Y. Sept. 19, 2017); *accord In re Braskem*, 246 F. Supp. 3d at, at 752 (collecting cases). Under such circumstances, the company is "obligated to disclose information concerning the source of its success," including illegal sources. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (citation and internal quotation marks omitted).

Here, the statements do not attribute Rio Tinto's successes in securing the mining concessions or working with the GoG to any particular cause. Thus, Defendants did not "have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market." *In re Braskem*, 246 F. Supp. 3d at 752; *see In re ITT Educ. Servs., Inc. Sec. and Shareholder Deriv. Litig.*, 859 F. Supp. 2d 572, (S.D.N.Y. 2012) (statements regarding Defendant's growth "not misleading

because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring"). This context separates Defendants here from those in *In re Veon*, where the Company asserted that corporations enjoyed equal protection under the law in Uzbekistan despite knowing "that any promise of equal protection contained in Uzbek law was illusory given the necessity of bribes." *In re Veon*, 2017 WL 4162342, at *7.

Assuming the statements were actionable, all of the aforementioned statements would be properly attributed to Rio Tinto. The statements were either made by the entity in SEC filings or, if made via phone calls, are attributable to the Company because they were made by employees acting within the scope of their employment. *See I.B. Trading, Inc. v. Tripoint Global Equities, LLC*, 280 F. Supp. 3d 524, 535 n.3 (S.D.N.Y. 2017) (citing *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 551-53 (S.D.N.Y. 2007)). Walsh would be liable for statements in the Form 20-Fs that he signed. *See* Am. Compl ¶¶ 124, 140. Albanese could be liable for statements he made on a 2012 earnings call, *id.* ¶ 108, and Walsh for those he made on earnings calls in 2013, 2014, and 2015, *id.* ¶¶ 120, 138, 171. Under the group pleading doctrine, Individual Defendants would also be responsible for SEC filings issued while they worked at Rio Tinto. *See id.* ¶¶ 116, 118 (all Defendants); 124, 140, 152 (Davies and Walsh). Since the group pleading doctrine does not apply to oral statements, however, statements on earnings calls could not be attributed to any non-speaking Defendants.

### iii. Contingent Liabilities

For the first time in its opposition to Defendants' motion to dismiss, Plaintiff alleges that Defendants improperly failed to disclose contingent liabilities in connection with the Combret payment under International Accounting Standard ("IAS") 37 and Item 303 of SEC Regulation S-K ("Item 303"). Since Plaintiff did not raise these arguments in its complaint, the Court need

not address these claims. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (collecting cases). Nevertheless, the Court notes that Plaintiff generally fails to state a claim on these grounds.

### 1. IAS 37

IAS 37 imposes a duty to disclose a contingent liability "unless the possibility of an outflow of resources embodying economic benefits is remote." *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 290 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) (quoting IAS 37). This disclosure duty is not absolute. Indeed, "[t]he notion that IAS 37 obligates companies to disclose any potentially illegal conduct the instant it is committed because future liability is always possible, and that failure to do so may form the basis for a material omission under Rule 10b-5, is unrealistic and contrary to precedent." *Id.* (collecting cases). "At most, the disclosure obligation would arise when an investigation into the conduct began" and, even then, the duty to disclose is not triggered "where the possibility of liability remains 'remote.'" *Id.* at 290-91.

Here, Plaintiff alleges that Rio Tinto's failure to disclose the potential fallout from the Combret payment as a contingent liability until its 2016 Form 20-F violates IAS 37. Plaintiff contends that this liability was foreseeable because the DOJ's prosecutorial factors strongly suggest that Rio Tinto would face penalties as a result of the payment. Defendants counter that (1) since the payment was not unlawful, there was no duty to disclose, and (2) any such duty would only arise upon the initiation of an investigation.

The Court agrees that Plaintiff does not plead Individual Defendants' awareness that the payment was unlawful and thus that it would expose the company to economic risk. As such, there was nothing to disclose.

In any event, the relevant statements disclosed only *pending* "legal proceedings, claims, complaints and investigations," not liabilities expected to result from *future* claims. *See, e.g.*, Am. Compl ¶ 177. As a result, such statements would not be misleading unless the company was under investigation or facing legal claims at the time the statements were made. Likewise, the Court agrees with Defendants that, as a matter of law, the disclosure obligation does not arise until an investigation is initiated. *See Gusinsky*, 944 F. Supp. 2d at 290.

The question, then, is when the investigation began. According to the complaint, "[i]n 2015, the May 2011 Emails came to light to Rio Tinto officers, other than Defendants Albanese, Davies, and Walsh," by Rio Tinto's attorneys in a separate case. Am. Compl ¶ 79. It further states that, "[i]n 2015," those attorneys "reported to Valentine." *Id.* ¶ 80. The complaint does not specify when in 2015 the emails were discovered, when that year Valentine learned about the emails, and whether anyone else at Rio Tinto was alerted at that time. The complaint next provides that "[t]hereafter, Kirkland & Ellis was retained to conduct an internal investigation[.]" *Id.* ¶¶ 81. Again, the complaint does not specify when that investigation began. The complaint next alleges that, in its November 9, 2016 media release announcing the payment, Rio Tinto claimed it became aware of the payment on August 29, 2016 and "launched an investigation into the matter." *Id.* ¶ 187. Thus, Plaintiff alleges that Rio Tinto knew about the payment in 2015 but did not disclose it until November 2016, while Rio Tinto contends that it only learned about, and thus investigated, self-reported, and subsequently disclosed, the payment in 2016. *See id.* ¶¶ 187, 200.

Accordingly, the earliest that the investigation could have begun is 2015. Thus, statements about contingent liabilities made before 2015, or statements that only address outstanding legal claims (as opposed to investigations), are certainly not actionable. *See id.* ¶¶

101-02, 146-47; 163-64. The Court agrees with Defendants that Plaintiff has not specifically pled that the investigation began in 2015. The most plausible conclusion from the complaint appears to be that the investigation began sometime after August 29, 2016. Since no statement alleged here was issued after that date, Plaintiff does not state a claim.

Assuming *arguendo* that the investigation began in 2015, two statements about contingent liabilities could be actionable. *See id.* ¶¶ 177 (2015 Form 20-F: "The Group is subject to certain . . . investigations . . . The Group believes that no material loss to the Group is expected to result from these . . . investigations."); 183 (August 3, 2016 Form 6-K: "No events were identified after the balance sheet date which could be expected to have a material impact on the consolidated preliminary financial information included in this report"). Even then, the Court is reminded that disclosure is only required if Defendants "had any reason to believe that losses related to the bribery scheme were more than a remote possibility." *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, No. 17-cv-4576, 2018 WL 3768037, at *36 (S.D.N.Y. Aug. 8, 2018).

If the Court concluded that the statements were materially misleading, both statements would be actionable against the Company. Walsh signed the 2015 20-F, and accordingly would be liable for that statement. *See id.* ¶ 181. Under the group pleading doctrine, Walsh would also be liable for the 2016 Form 6-K, and Davies would be liable for both filings. Since Albanese was no longer CEO, he could not be liable here.

Nevertheless, the Court notes that Plaintiff's claim would still fail because Plaintiff does not plead scienter.

### 2. Item 303

Plaintiff next alleges that Defendants had a duty to disclose the Combret payment under Item 303. Item 303 "requires registrants to '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quoting 17 C.F.R. § 229.303). The SEC's interpretive release of Item 303 provides that "the Regulation imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Id.* (citation and internal quotation marks omitted).

The Circuit has clarified that "Item 303 requires the registrant only to disclose those trends, events, or uncertainties that it *actually knows* of when it files the relevant report with the SEC. It is not enough that it should have known[.]" *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (emphasis added). Thus, "[a]t the motion to dismiss stage, Item 303's disclosure mandate requires that a plaintiff plead, with specificity, facts establishing that the defendant had actual knowledge of the purported trend, demand, commitment, event, or uncertainty." *In re SAIC, Inc. Sec. Litig.*, No. 12-cv-1353, 2014 WL 407050, at *4 (S.D.N.Y. Jan. 30, 2014) (internal quotation marks and citation omitted).

The Circuit has held that "Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). However, failure "to make a required disclosure under Item 303" is "not by itself sufficient" to state a 10(b) claim. *Id.* at 102. The omission must be "material." *Id.* In this context, materiality is determined by "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the

totality of the company activity." *Id.* at 102-03 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis omitted).

Here, Plaintiff argues that Individual Defendants were aware of a material contingent liability in connection with the Combret payment in 2011 and Rio Tinto was aware in 2015, yet Defendants did not warn investors until 2016. Defendants contend that disclosure was not required because Defendants had no reason to believe that an unlawful act occurred or would be identified by a regulator, or that any regulatory penalty was reasonably likely to impact Rio Tinto's finances or operations.

Until the investigation began, "[i]t was entirely speculative that disclosure of the executives' bad behavior would ever come to light, let alone that this revelation would be revealed in a forum and manner that would badly damage [Rio Tinto's] earnings or revenue." *Lopez*, 173 F. Supp. 3d at 35-36 (no obligation to disclose hostile work environment under Item 303 because "plaintiff has not adequately alleged that the defendants knew a public revelation was forthcoming"); *accord In re Bank of America AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (disclosure under Item 303 not required because "imminence and amount of [] suit were insufficiently certain" and no allegations that suit was "reasonably likely to generate any loss, let alone a material loss"). Thus, as with respect to IAS 37, the duty arose only when the investigation began—at the earliest, in 2015. Defendants, aside from Albanese, would be liable for the same two contingent liability statements from 2015 and 2016 discussed above.

### iv. Internal Controls

Plaintiff alleges that statements about internal controls in Defendants' 2011-2015 Form 20-Fs are materially misleading. Those filings state that Rio Tinto "maintains disclosure controls

and procedures," has "evaluated the effectiveness of the design and operation" of those controls and, "as of the end of the period covered by this report" those disclosure controls and procedures "were effective at a reasonable assurance level." Am. Compl. ¶ 104; *accord* ¶¶ 130, 148, 165, 179. The 2011 Form 20-F also states that "Rio Tinto makes immediate disclosure to the listing authorities of any information that a reasonable person would expect to have a material effect on its share price in accordance with their rules." *Id.* ¶ 104.

Plaintiff contends that the aforementioned statements are materially misleading because Defendants stated that Rio Tinto's internal controls were sound despite knowing that its senior executives approved an unlawful payment. However as Defendants argue, an unlawful payment is not necessarily the result of faulty internal controls. Plaintiff offers no facts as to what internal controls were insufficient or not followed, how any internal controls may have been insufficient or not followed, or what actions could or should have been taken to avoid the alleged violation. Such "conclusory assertion[s] without any factual support" or specificity are insufficient to state a claim. *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010); *cf. In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (Plaintiffs stated claim by alleging structural inadequacies in internal controls and pleading particular allegations regarding those inadequacies). Since Plaintiff does not specifically plead any deficiency in Rio Tinto's internal controls, such statements are not materially misleading.

If the statements were actionable, Rio Tinto would be liable for all of the aforementioned statements, Albanese would be liable for the 2011 Form 20-F that he signed and Walsh would be liable for the 2012-2015 Form 20-Fs that he signed. Additionally, under the group pleading doctrine Walsh and Davies would be liable for the 2011 filing and Davies would be liable for the 2012-2015 filings.

### v. SOX Certifications

Finally, Plaintiff alleges that Defendants' SOX certifications on the 2011-2015 Form 20-Fs were materially misleading. The statements represent that the certifying officer had reviewed the Forms and determined that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Am. Compl. ¶ 106; *accord* ¶¶ 132, 150, 167, 181.

These SOX certifications "contained an important qualification that the certifying officer's statements are true 'based on [his] knowledge." *Menaldi*, 277 F. Supp. 3d at 517. Plaintiff contends that Defendants "did not honestly hold" these opinions. Pl Opp at 70. However, Plaintiff does not state a claim that Defendants had actual knowledge that the payment was unlawful (or that the payment violated the FCPA at all). This "undermines the allegations that they knew that the SOX certifications were false." *Id.* Accordingly, the SOX certifications here are not actionable.

The Court notes that, if the statements were actionable, they would be attributable to the Defendants in the manner discussed above with respect to internal controls.

### C. Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)).

The plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Here, Plaintiff does not allege liability under the motive and opportunity prong. *See* Pl Opp at 65. Thus, the Court only addresses the second prong.

Recklessness in the securities fraud context is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation and internal quotation marks omitted). As compared to the "motive and opportunity" prong, with the recklessness prong "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks and citation omitted).

The requisite strong inference of recklessness can be established where a complaint sufficiently alleges that Defendants:

> (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Novak v. Kassaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

With respect to option 3, "[t]o determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In*

*re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (internal citations and quotation marks omitted); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false."). The complaint "must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

When examining these factors, a court must be mindful that the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Ultimately, the requisite standard for scienter is satisfied when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Where, as here, the scienter of a corporation is at issue, the plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex*, 531 F.3d at 195-96). Often, "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Teamsters*, 531 F.3d at 195. Nevertheless, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.*

Here, Plaintiff argues that facts giving rise to a strong inference of Defendants' conscious misbehavior or recklessness have been sufficiently alleged via (1) violations of anti-bribery laws; (2) knowledge and concealment of the payment from the public; (3) terminations and discipline of Rio Tinto executives; (4) the Company's admission of wrongdoing and self-reporting; (5) SOX certifications; and (6) the core operations doctrine.

### i. Violation of Anti-Bribery Laws

Plaintiff contends that Individual Defendants' approval of the Combret payment evinces their conscious misbehavior or recklessness. Merely paying Combret is insufficient, however. Plaintiff must allege that Defendants knew, or were reckless in not knowing, that the payment was unlawful. Plaintiff does not plead facts suggesting that Defendants knew, or should have known, that Combret was a foreign official. Indeed, Plaintiff does not plead facts suggesting that Combret even *was* a foreign official. The complaint simply does not state a claim that Defendants had any indication that the payment was unlawful. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408 (S.D.N.Y. 2016) ("statement in itself, absent any supporting content showing [Defendant] had some indication that the contracts were improper, does not provide for a cogent inference that [Defendant] knew about the illegal marketing scheme and thus knew the statements he was making were misleading"); *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1214 (S.D.N.Y. 1996) ("Absent some allegation that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter.").

Plaintiff contends that emails between Individual Defendants about the payment show scienter. But the emails do not suggest knowledge of any wrongdoing. The emails discuss services provided by Combret such as "vouch[ing] for [Rio Tinto's] integrity" which was

impactful due to his "closeness to the President." Am. Compl. ¶ 72. Combret also "helped [Davies] on a number of communication issues with the President and the Minister of Mines." *Id.* The emails also state that Combret "behaved with the utmost integrity." *Id.* The emails appear to discuss legitimate consulting practices. This does not give rise to a cogent inference that Individual Defendants knew, or should have known, that their conduct was unlawful.

Since Plaintiff does not state a claim that Individual Defendants acted with scienter by paying Combret, the Court cannot impute their scienter to Rio Tinto on this ground. Moreover, Plaintiff does not plead that anyone else at Rio Tinto knew about the payment at that time. Accordingly, the complaint does not support an inference of corporate scienter here.

### ii. Knowledge and Concealment of the Payment

Plaintiff next argues that Defendants acted with scienter because they knew about and subsequently concealed the payment from the public. Plaintiff states that Individual Defendants knew about the payment since 2011, and Rio Tinto became aware of it at least in 2015, yet Defendants delayed disclosing the payment until 2016.

This does not suffice to show scienter. Since Plaintiff does not allege that Individual Defendants knew, or were reckless in not knowing, that the payment was unlawful, he cannot state a claim that Defendants acted recklessly by failing to disclose it. Moreover, there is no general duty to disclose internal emails about payments to a consultant. *See Kalnit*, 264 F.3d at 143 (scienter not satisfied when "duty to disclose . . . was not so clear").

Further, Plaintiff does not adduce any facts alleging that Defendants purposefully delayed the investigation or covered up the emails. From the complaint, it is unclear how long Rio Tinto knew about the payment before disclosing it. Even if the timing "calls [Defendants'] motivations into question," that is insufficient to meet Plaintiff's "correspondingly greater"

burden to allege scienter via recklessness. *See Kalnit*, 264 F.3d at 142.[7] Plaintiff offers no specific allegations of Defendants' scienter with respect to disclosure of the emails.

### iii. Termination and Discipline of Executive Committee Members

Plaintiff asserts that the abrupt terminations of Davies, Valentine, and Bague support an inference of scienter. *See* Am. Compl ¶¶ 36, 40.

Resignations, while insufficient alone, can give rise to an inference of scienter. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases). Nevertheless, such an inference is not always appropriate as "there are any number of reasons that an executive might resign, most of which are not related to fraud." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (collecting cases).

Here, the terminations do not give rise to a cogent inference of scienter. First, scienter as to the Individual Defendants would be inappropriate. Plaintiff does not allege that Albanese or Walsh were involved in terminating the aforementioned individuals. Furthermore, Davies was terminated. The fact that Rio Tinto fired him says nothing of his state of mind.

Second, the complaint does not allege corporate scienter on this ground either. To be sure, the terminations were linked to the alleged fraud. However, Rio Tinto stated that it fired these executives because they "failed to maintain the standards expected of them under [Rio Tinto's] global code of conduct." Am. Compl ¶ 190. This does not necessarily support the inference that Rio Tinto knew that the executives violated the law, which of course is narrower than a company's ethics code. In any event, that Rio Tinto took disciplinary action in 2016 does not lead to a cogent inference that the Company was aware of, or consciously disregarded, any

---

[7] The Court notes that Albanese stepped down in 2013 and thus could not be liable for any concealment following his resignation.

fraud at the time it was committed. The more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action.

Even if the terminations could give rise to an inference of scienter, the Court is reminded that terminations alone are insufficient to satisfy this element. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d at 633 n.84.

### iv. Admission of Wrongdoing

Plaintiff argues that the fact that key executives admitted to wrongdoing and self-reported supports an inference of scienter. *See* Am. Compl ¶¶ 187-194. Essentially, Plaintiff contends that Defendants would not have self-reported and dealt with the anticipated fallout if they were not aware of unlawful actions. Moreover, Plaintiff suggests that Rio Tinto self-reported to seek leniency from the SEC, fearing harsh consequences.

As Defendants note, the Company announced that "something *might* have gone wrong," not that any wrongdoing necessarily occurred. *Id.* ¶ 201 (emphasis added). Further, Rio Tinto admitted violations of ethical obligations, not legal ones. *See, e.g., id.* ¶ 190 ("[T]he board concluded that the executives failed to maintain the standards expected of them under our global code of conduct, *The way we work*."). Finally, self-reporting—even to seek leniency—does not compel an inference "that [Rio Tinto] was trying to hide anything from its investors." *Slayton v. Am. Exp. Co.*, 604 F. 3d 758, 777 (2d Cir. 2010). Rather, it "suggest[s] that [Rio Tinto] . . . was endeavoring in good faith" to disclose the payment. *Id.*; *accord City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665, 2014 WL 4832321, at *29 (S.D.N.Y. Sept. 29, 2014) ("announcing that an internal FCPA investigation had been undertaken, and that the SEC and DOJ had been advised of that investigation," puts the public on notice rather than gives rise to a strong inference of scienter).

Even if this factor could raise some inference of scienter as to Rio Tinto, it does not as to Individual Defendants, who made no public disclosures of wrongdoing.

### v. SOX Certifications

Plaintiff next asserts that Defendants' SOX certifications show scienter. As discussed, Albanese signed the 2011 Form 20-F and Walsh signed the 2012-2015 Form 20-Fs. Davies did not sign any SOX certifications, and thus this factor could not support scienter as to him. Rio Tinto's scienter could be inferred from that of the certifying officers.

Courts have determined that "signing the SOX certifications might be indicative of scienter." *Menaldi*, 277 F. Supp. 3d at 517. However, Plaintiff "cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases). Where, as here, the complaint "does not adequately allege that [Defendants] had actual knowledge" that the payment was unlawful, "it undermines the allegations that they knew that the SOX certifications were false." *Menaldi*, 277 F. Supp. 3d at 517. Accordingly, the SOX certifications do not support an inference of scienter as to any Defendant.

### vi. Core Operations Doctrine

Finally, Plaintiff relies on the core operations doctrine to support scienter. The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (citations omitted). Core operations "include matters critical to the long term viability of the

company and events affecting a significant source of income." *Id.* (citations and internal quotation marks omitted). The doctrine "typically applies only where the operation in question constitute[s] nearly all of a company's business." *Lipow v. Net1 UEPS Tech., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

This theory "at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter." *Id.* (collecting cases). Furthermore, "several courts in this Circuit have expressed doubts as to the doctrine's continuing import after the enactment of the PSLRA." *Reilly v. United States Phys. Therapy Inc.*, No. 17-cv-2347, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (collecting cases). In the absence of Circuit guidance, this Court has considered these allegations "to constitute supplementary but not independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

Plaintiff argues that the Company's emphasis on integrity raises it to the level of a core operation. Even if integrity could be a core operation, Defendants' knowledge of the Company's general commitment to integrity would not put it on notice of any unlawful bribe. *See in re SAIC*, 948 F. Supp. 2d at 384 ("Plaintiffs' general claim that the Board . . . should have known about this information falls far short of circumstances that suggest direct access to the relevant data.").

Next, Plaintiff contends that the Simandou project constitutes a core operation. Plaintiff notes that Rio Tinto pumped over a billion dollars into the mine; emphasized its importance in press releases; sent Individual Defendants and other high-level officers routinely to visit the mine and GoG officials; and frequently updated investors about its progress. *See* Am. Compl. ¶¶ 6, 56, 66, 69, 78, 82.

Without knowing the comparative amount of resources that Rio Tinto exerted on other projects, it is difficult for this Court to determine whether the Simandou project is a core operation. Assuming that it is, Plaintiff still only alleges that Defendants knew about a *payment* related to the project, not that they knew about an *unlawful* payment. In any event, because Plaintiff has not successfully offered an independently sufficient means to plead scienter, his core operations argument must fail. *See In re Wachovia,* 753 F. Supp. 2d at 353.

Accordingly, Plaintiff has not alleged scienter for any Defendant.

### D. Loss Causation

"In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This loss causation requirement "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted). A plaintiff may allege loss causation by pleading either "(a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that [] the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Barclays*, 750 F.3d at 232-33 (citations and internal quotation marks omitted).

Here, Plaintiff's "failure to adequately plead either scienter or a misstatement or omission is dispositive. Thus, the Court need not reach the issue of loss causation." *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 367 (S.D.N.Y. 2015) (collecting cases). Indeed, whether or not Plaintiff pleaded a causal relationship between Rio Tinto's disclosures and its stock value, "since loss causation is premised on the assumption that a misstatement or omission concealed

something from the market, Plaintiff[] cannot demonstrate loss causation where [he] [has] failed to establish any such misrepresentation." *Id.* at 368 (internal citation omitted).

### III.    Section 20(a) Claim

To establish a prima facie case of control person liability under § 20(a), a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108 (citing *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996)).

"It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.,* 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014) (collecting cases). Thus, "[i]n light of Plaintiff['s] failure to adequately plead a primary violation against [Defendants], [his] Section 20(a) claims against [Defendants] cannot stand." *Id.*

### CONCLUSION

For all of the foregoing reasons, the Court GRANTS Defendants' motions to dismiss the Amended Complaint. The Clerk of Court is kindly requested to terminate the motions at ECF Nos. 61, 64, 66, and 68 and close this case.

**SO ORDERED.**

**Dated**:    August 31, 2018
New York, New York

_____
**ANDREW L. CARTER, JR.**

**United States District Judge**